**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

A.A., A.B., A.D., A.G., A.P., A.S., A.V., Al.C.,
Am.P., An.A., An.D., Ar.A., Ari.R., Arn.R.,
B.D., B.M., B.T., C.C., C.S., C.V., D.D.R.,
D.L., E.A., E.C., E.D.C., E.D.L., E.G., E.L.,
E.M., Ed.T., En.C., Er.T., F.B., F.S., F.T., G.A.,
G.D.L., G.G., G.O., G.S., G.T., H.V., I.E., J.A.,
J.B., J.C., J.D.C., J.F., J.J.G., J.L., J.N.B., J.O.,
J.P., J.S., J.T., Ji.T., Jo.B., L.G., L.L., L.N.,
L.P., L.V., M.A., M.D.L., M.G., M.R., M.S.,
N.C., P.C., R.A., R.B., R.B.E., R.C., R.D., R.E.,
R.F., R.I., R.L., R.N., R.P., R.S., R.T., R.V.,
Ra.D., Ra.G., Ra.L., Ra.V., Re.C., Re.D., Rh.P.,
Ri.C., Ri.O., Ro.D., Ro.L., Ro.P., Rod.O.,
Rog.B., Rol.P., Rom.B., Ron.O., S.N., T.L.,
V.A., V.B., V.M., and W.B.,

        Plaintiffs,

    v.

OMNICOM GROUP, INC., PORTLAND PR,
INC., OGILVY GROUP, LLC, OGILVY
PUBLIC RELATIONS WORLDWIDE LLC,
and MEMAC OGILVY & MATHER LLC,

        Defendants.

Case No. 1:25-cv-3389

**COMPLAINT**

JURY TRIAL DEMANDED

---

## I.   NATURE OF THE ACTION

1.    When the 2022 FIFA World Cup was awarded to Qatar in 2010, it kicked off the

most ambitious infrastructure-development project in Qatar's history. To host dozens of games

and millions of spectators, the Qatari regime built a new airport, expanded rail infrastructure, and

constructed dozens of new hotels. And the Qatari regime built several state-of-the-art stadiums

that were designed to keep players, spectators, and media comfortable during scorching, humid

days in a place where the temperatures can reach 120 degrees Fahrenheit. Hailed (by some) as a resounding success (for some), the 2022 FIFA World Cup generated billions of dollars in revenue for Qatar's brutal authoritarian dictatorship.

2.      The Qatari regime's World Cup "triumph" was built on a foundation of human trafficking and forced labor. Qatar realized its dream of hosting the 2022 FIFA World Cup only through untold thousands of migrant workers being subjected to nightmarish conditions. Workers toiled long hours in the desert heat, often without adequate rest, hydration, and nourishment. Many were routinely forced to work overtime without pay. Many were forced to live in inhumane, cramped, dirty, and pest-infested barracks. Pay was withheld. Passports were confiscated by the workers' employers, leaving them unable to visit home or find a humane job. Workers were treated as disposable. Thousands of migrant workers suffered severe physical injuries and mental trauma. At least hundreds more died. That is why many have referred to human trafficking, forced labor, and related labor abuses during the preparations for the Qatar World Cup as "modern slavery."

3.      In terms of the scale of victims and contemporaneous media condemnation, the 2022 FIFA World Cup involved one of the worst labor-trafficking schemes in recent history. But this is just the latest episode in Qatar's reprehensible history sponsoring and benefitting from trafficked and forced labor. Long before the Qatari regime broke ground on new stadiums, it was widely condemned by governments, non-governmental organizations ("NGOs"), journalists, and victims as one of the worst trafficking and forced labor locales on Earth. Observers across the ideological spectrum routinely and emphatically criticized Qatari conditions under which migrant laborers toiled. The Qatari regime's (and Qatari employers') reliance on trafficked and forced labor was plainly visible to anyone who bothered to look.

4.      To ensure the steady supply of trafficked and forced labor necessary to build stadiums and infrastructure for the World Cup, Qatar engaged public relations and lobbying firms to hide, minimize, obfuscate, and even lie about reports regarding the horrific conditions in which migrant laborers worked and lived.  This coordinated public relations and government relations campaign was a commercial venture designed to hide the labor abuse through "sportswashing" Qatar's image, taking advantage of Qatar's role in the World Cup to mask its horrific human rights record.  The public relations venture helped Qatar pay lip service to the international community's loud, repeated, and cacophonous alarm that labor abuse was endemic to its World Cup preparations, and the lobbying venture slowed the pressure to reform.  This case is about certain public relations and lobbying firms that entered into the venture designed to help Qatar keep the steady flow of exploited labor available.

5.      Omnicom Group, Inc. ("Omnicom") and its subsidiary Portland PR, Inc. ("Portland") and Ogilvy Group, LLC ("Ogilvy") and its subsidiaries Ogilvy Public Relations Worldwide LLC ("OPRW") and Memac Ogilvy & Mather LLC ("Memac Ogilvy") were participants in the "World Cup Labor Venture" (also referred to herein as "Venture").  The Venture had two commercial components: a public relations element and a lobbying element.  One goal of the Venture was to help Qatar deliver the World Cup stadiums on time and within budget.  To achieve that goal, the Venture needed to ensure that Qatar had continued access to trafficked and forced labor.  Defendants' roles in the World Cup Labor Venture were essential to achieving that goal, and they did that by, among other things, stopping and/or limiting reporting regarding labor abuses, refuting with lies to minimize the world's understanding of the problem, lobbying governments and media to ignore the obviously prevalent labor abuses, and generally sportswashing Qatar so that Qatar could host the World Cup despite exploiting labor to do so.

6.       Qatar paid Defendants handsomely for their roles in the Venture.  The contracts Defendants entered into paid them to monitor reporting regarding trafficked and forced labor, actively respond to such reporting, generate whitewashing content to offset it and distract from the abuses, lobby government entities to ignore labor exploitation, and advise Qatar regarding how best to reputation manage its messaging about human rights abuses.  Defendants' work for Qatar allowed Qatar to continue to use trafficked and forced labor in preparation to host the World Cup. By doing these things, each Defendant helped Qatar launder its reputation.  Defendants' actions not only contributed to labor abuses, but they also slowed promulgation of progressive labor reforms and allowed Qatar to drag its feet on implementing what little reforms were adopted. Knowing that trafficked and forced labor was rampant, each Defendant chose to knowingly participate in and profit from the Venture.

7.       The Venture's participants included (but is not limited to, *see infra* ¶27) Defendants' clients in the Qatari regime and at Qatar Foundation, *Fédération Internationale de Football Association*, d/b/a FIFA ("FIFA"), Defendants' other subsidiaries, including the Omnicom subsidiary Mercury Public Affairs LLC ("Mercury"), and the direct employers of the exploited migrant workers.  To be sure, the laborers' direct employers perpetrated most of the labor abuses.  Those employers took passports, trapping workers in Qatar, and then forced workers to work inhumane hours in Qatar's scorching heat while enduring squalid living and dangerous working conditions.  But Defendants—by distracting from, minimizing, refuting, and lying about reports of the labor abuses as they occurred—created the environment allowing those direct employers to cause those harms.  That was by design of the Venture, and that is exactly what Qatar paid Defendants to do.  Defendants were thus an inextricable part of the broader World Cup Labor Venture, working on behalf of the client they shared with migrant laborers' direct employers in

Qatar, enabling labor abuses to continue, so that their mutual client could deliver the stadiums and infrastructure needed at a cheap cost and by the time the games kicked off.

8.     Plaintiffs were among the thousands of migrant workers whose labor was exploited during preparations for the 2022 FIFA World Cup.  Plaintiffs were lied to about the work they would do, the pay they would receive, the inhumane living conditions they would have to suffer, and the dangerous jobsites they would have to navigate, and they were trapped in Qatar.

9.     While the migrant laborers' employers and recruiters lied to them, Defendants lied to the international community about what was happening, to ensure exploitation could (and did) continue.  Defendants' conduct violated the Trafficking Victims Protection Reauthorization Act (the "TVPRA").  The World Cup Labor Venture trafficked Plaintiffs and forced Plaintiffs to work in violation of 18 U.S.C. §§ 1589 and 1590.  Defendants, integrally involved in public relations messaging and lobbying related to labor issues for the Qatar World Cup, knowingly benefitted from participation in that Venture, which they knew or should have known relied on trafficked and forced labor.  Plaintiffs now seek to hold Defendants accountable.

## II.     JURISDICTION AND VENUE

10.     Plaintiffs bring their claims in this District because Defendants participated in and knowingly benefitted from the World Cup Labor Venture here.  As such, they are liable for their domestic conduct that violated the TVPRA and New York law.  Further, to the extent Defendants' other acts were outside the United States, the 2013 amendments to the TVPRA explicitly provide for extraterritorial jurisdiction.  *See* 18 U.S.C. § 1596.  18 U.S.C. § 1596(a) makes clear that Defendants are liable to the extent conduct was outside of the United States because they were, at all relevant times, nationals of the United States or present in the United States.

11.     Plaintiffs' TVPRA claims accrued after December 23, 2008, the effective date of 18 U.S.C. § 1596.

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship.   All Plaintiffs are foreign nationals as well as citizens and residents of the Philippines, and each of their claims for damages exceeds $75,000.  Defendants are United States corporations, based in New York, and their subsidiaries that were or are in New York or that reached into New York in furtherance of the Venture.

13.     Defendants are either nationals of the United States or are present in the United States, irrespective of nationality, providing this Court with extraterritorial and federal-question jurisdiction under 18 U.S.C. § 1596(a) and 28 U.S.C. § 1331.

14.     No foreign government has prosecuted or is prosecuting Defendants for the conduct alleged herein.

15.     Because they are headquartered in New York, this Court has general personal jurisdiction over Omnicom, Ogilvy, and OPRW.

16.     Defendant Portland, an indirect wholly owned subsidiary of Omnicom, is incorporated in Delaware and maintains its corporate headquarters in Washington, D.C.  Until 2018, Portland's headquarters was in New York, and it did its work related to the Venture out of New York offices.  Portland is subject to specific personal jurisdiction in this Court because, among other things, it signed multiple contracts, at least one with Qatar directly, to provide public relations and lobbying services related to the World Cup, and Portland, pursuant to that contract and otherwise, did work in furtherance of the World Cup Labor Venture in New York, reached into New York to further its work on the Venture, and on information and belief made decisions

and took actions in this District in furtherance of the Venture that caused or contributed to the Plaintiffs' harms.

17.    Defendant Memac Ogilvy is an indirect wholly owned subsidiary of Ogilvy, which on information and belief is incorporated and headquartered in Dubai, United Arab Emirates. Memac Ogilvy is subject to specific personal jurisdiction in this Court because, among other things, it signed a contract with Qatar Foundation to provide public relations services related to the World Cup, and Memac Ogilvy, pursuant to that contract and otherwise, did work in furtherance of the World Cup Labor Venture in New York, reached into New York to further its work on the Venture, and on information and belief made decisions and took actions in this District in furtherance of the Venture that caused or contributed to the Plaintiffs' harms.

18.    Under 28 U.S.C. §§ 1391(b)(3) and (c)(2), venue over the Defendants is proper in this District.  Based on subsection (b)(3), venue is proper because this District is one where Defendants are subject to personal jurisdiction.  Further, based on subsection (c)(2), Defendants are deemed to reside in this District because Defendants are subject to personal jurisdiction here.

### III.    THE PARTIES

19.    Portland is a public relations firm, and for the ten years leading up to the World Cup, Portland contracted with Qatar on a publicly reported "broad remit," ranging from "government affairs through to nation branding," including by providing Qatar public relations and media management services.

20.    Mercury is a lobbying firm hired by Qatar to, in relevant part, advocate to the United States regarding Qatar, labor, and the World Cup.

21.     Omnicom is the corporate parent to Portland and Mercury.  Omnicom is a global leader in marketing and communications, trading on the New York Stock Exchange under the ticker OMC, with annual revenue over $13 billion per year.

22.     Omnicom filed publicly that its

business model was built and continues to evolve around our clients.  While our networks and agencies operate under different names and frame their ideas in different disciplines, we organize our services around our clients.  Our fundamental business principle is that our clients' specific marketing requirements are the central focus of how we structure our service offerings and allocate our resources.  This client-centric business model ***requires that multiple agencies within Omnicom*** collaborate in ***formal and informal*** virtual client networks utilizing our key client matrix organization structure.  This collaboration allows us to ***cut across our internal organizational structures*** to execute our clients' marketing requirements in a consistent and comprehensive manner. (Emphasis added.)

23.     Memac Ogilvy is a public relations firm that for years has worked for Qatar Foundation, including on the World Cup Labor Venture.

24.     OPRW is a New York-based public relations firm that provides its services worldwide.  In 2018, PR Week estimated OPRW's global revenue to be $375 million.  OPRW operates as Ogilvy Government Relations ("OGR") out of Washington, D.C. offices.  OPRW and OGR worked on the World Cup Labor Venture.

25.     Ogilvy is a New York-headquartered global advertising powerhouse, and is the corporate parent to both Memac Ogilvy and OPRW.  Ogilvy's revenue is publicly estimated to be $5.9 billion.

26.     In 2017, Ogilvy totally dismantled any distinction between its different workflows and product offerings, and put everything into one entity called "Ogilvy."  Ogilvy did this to be more "client-centred"—to be able to bring all resources to bear across the globe to service their clients.  The integrated Ogilvy brand, "One Ogilvy," brought together all the parts of the company into one entity.

27.    The participants in the World Cup Labor Venture included each Defendant, and others that include but are not limited to:

a.  Mercury and other Omnicom subsidiaries;

b.  Other Ogilvy subsidiaries;

c.  Supreme Committee for Delivery and Legacy of the FIFA World Cup Qatar 2022 (the "Supreme Committee");

d.  FIFA;

e.  Qatar Foundation;

f.  Jacobs Engineering and CH2M and their subsidiaries;

g.  VINCI;

h.  Tokyo Freight;

i.  J.A.K. Construction Builders;

j.  Al Jaber Engineering;

k.  Imar Trading and Contracting Company;

l.  Midmac Company;

m.  Electro Mechanical Enterprises Qatar;

n.  Fino International;

o.  Habtoor Leighton Group; and

p.  Rabban Readymix.

28.    Plaintiffs are workers who were trafficked to Qatar and whose coerced labor was exploited to prepare for the 2022 FIFA World Cup in Qatar. *See infra* V.G.

## IV.    SOURCING

29.    The factual allegations in this Complaint are based on an extensive investigation drawing on a broad array of public and non-public information, including evidence obtained from witnesses with direct and indirect knowledge, public reports and contract data, Defendants'

(inclusive of their employees' and agents') admissions, statements and data relating to the other participants in the World Cup Labor Venture, U.S. government reports published to Congress under statutory directive, U.N. investigative reports, public investigations, reports, and documentaries published by NGOs, photos and videos, Qatari market data and regulations, public statements by U.S., U.N., and Qatari government officials, media reports, scholarly analyses, think tank publications, and Plaintiffs' own recollections.

## V.    FACTS

### A.    Qatar's Universally Known *Kafala* System Exploited and Abused Migrant Laborers.

30.    At all relevant times, Qatar's economy relied on millions of migrant workers, comprising most of its labor force.

31.    Pursuant to the Qatari regime's (and Qatari employers') notorious system called "*kafala*" (sponsorship), migrant workers' visas were tied to their employers, which left workers dependent on their employers for their legal residency and status in the country.

32.    In Qatar, the *kafala* system made migrant workers vulnerable by granting Qatari employers broad and exploitative powers over migrant workers, allowing them to evade accountability for trafficking and forced labor abuses, and leaving workers beholden to debt and in constant fear of retaliation.  The *kafala* system also made workers depend on their employers not just for their jobs but also for housing and food.

33.    The Qatari regime's (and Qatari employers') *kafala* system was described in 2022 by the widely-followed soccer publication *Tifo Football*—in relation to the World Cup construction projects—as a form of "economic apartheid."  James Montague, author of numerous books and articles about soccer in the Middle East, explained in 2022,

[t]here has perhaps ***never been a more controversial World Cup host.  Qatar has been rightfully criticised*** for its human rights record, how it won the World Cup bid and especially its treatment of migrant workers.  In 100 years from now, humans will look back at kafala [] in . . . Qatar . . . ***as one of the great economic crimes of the twenty-first century***.  (Emphasis added.)

34.    Zahra Babar, Associate Director for Research of Georgetown University's Center for International and Regional Studies, noted the ***direct causal relationship*** between the World Cup and horrific trafficking and labor abuses inflicted on migrant workers:

> ***From the initial stages***, human rights and migrants' rights practitioners ***drew a direct causal link*** between the awarding of the World Cup hosting rights to Qatar and the expansion of difficult, ***if not unendurable, working and living conditions for migrant workers***.  (Emphasis added.)

35.    In 2012, Qatari Labor Undersecretary Hussein al-Mulla pledged that the government would replace the *kafala* sponsorship system with a system requiring contracts between the employer and the worker.  Those "reforms" still have not been fully implemented.

36.    It was not until August 2020 that the Qatari regime introduced a law that ended the requirement for migrant workers to obtain their employer's permission to change jobs.  Until late 2020, to change jobs before the end of their contract, each migrant worker would have had to obtain a "No Objection Certificate" from their employer.

37.    Earlier in 2020, the Qatari regime ended its requirement that migrant workers obtain an "Exit Permit" to leave Qatar.  Before 2020, such a permit was required to depart Qatar.

38.    Prior to August 2020, the minimum wage in Qatar was only QR750, or approximately $210, per month.  2020 "reforms" required new minimum wage and food and housing allowances, designed to combat Qatari employers' widely known practice of forcing migrant workers in Qatar to live and work in inhumane conditions.  The new minimum wage plus food and housing allowance requires payment of QR1,800, or approximately $500, per month.

39.     The Qatari regime's 2020 "reforms" purportedly sought to effectively dismantle the Qatari regime's (and Qatari employers') *kafala* sponsorship system, which provided the basis for exploitation of forced labor throughout Qatar.  But even after these Qatari regime "reforms," there remained restrictions on leaving Qatar.  For example, many workers could not return home until the end of their two-year contract unless they were willing to both lose their jobs and pay for their way home.  In some instances, departing prior to two years of service required repaying the "finder's fee" that had been paid to their domestic employment agencies or required that Plaintiffs pay the full cost to travel home, in contravention of what was promised during their recruitment.

40.     Prior to these "reforms," which still have not been fully implemented, migrant workers' physical movement and freedom were controlled by their employers.

41.     James Montague (the widely published soccer scholar) reported in 2022 that "how these new laws were implemented meant that **little changed on the ground** for many workers" (emphasis added) as change related to employers' absolute rights over migrant labor has been slow to be implemented.

42.     Additionally, and distinct from the *kafala* system, Qatari employers and labor supply companies frequently delayed, withheld, or arbitrarily deducted migrant workers' wages and/or overtime, or otherwise violated their contracts with migrant workers with impunity; they also frequently forced migrant workers to risk their safety, forced migrant workers to work through the night, sometimes as long as 36 hours straight, and forced migrant workers to live (when housing was provided) in inhumanely crowded, unsafe, and unsanitary conditions.

43.     Additionally, and distinct from the Qatari regime's (and Qatari employers') *kafala* system, Qatari employers and labor supply companies had a commonly known practice of confiscating workers' passports and using possession of the passports to restrict workers' physical

movement.  By confiscating workers' passports, the companies prevented workers from returning to their home countries until their contracts expired and restricted workers' ability to change employers in Qatar.

44.     Qatari employers frequently forced migrant workers to work despite this treatment, and therefore exploited forced labor, by (a) taking migrant workers' passports from them; (b) imposing substantial debts—typically, by requiring the migrant worker to pay for the worker's own "recruitment fee," which they must pay off over time as they work; (c) denying migrant workers permission to return home unless they pay sums they cannot afford; (d) changing the terms of their employment once they were in Qatar and could not object; (e) violating the terms of the contracts in place by, among other things, imposing a "no work no pay" policy which punished illness, and/or (f) threatening legal prosecutions.

**B.      Purposes of the World Cup Labor Venture Were to Sportswash Qatar, Lessen the Pressure to Reform *Kafala*, and Obfuscate Abuses—and thereby to Facilitate Continued Use of Trafficked and Forced Labor.**

45.     After the World Cup was awarded to Qatar, the international community began pressuring Qatar to implement labor reforms.

46.     For example, in 2014, United States Senator Bob Casey pointed to Qatar's treatment of migrant workers and demanded that FIFA take the World Cup away from Qatar.  That same year, seventeen members of the United States House of Representatives co-sponsored a resolution shaming Qatar for its labor practices, citing the abuse of Filipino workers.

47.     In July of 2015, the United States Senate held hearings on FIFA corruption and heard testimony from Amnesty International on Qatar's labor abuses.  Senator Jerry Moran, who chaired the hearings, said "[t]he hearing will examine the integrity and impending leadership changes at FIFA, the role of the United States in international soccer, and concerns about the labor

conditions of workers in Qatar, the host of the 2022 World Cup. …[FIFA's] culture of corruption is turning a blind eye to significant human rights violations and the tragic loss of lives."

48.    The United States was not alone; the European Union sent a delegation to pressure Qatari authorities to reform its labor laws.

49.    NGOs also exerted pressure.  In 2016, Amnesty International launched a campaign to pressure FIFA and Qatar into improving the lives of World Cup workers.  Called the "Qatar World Cup of Shame," Amnesty publicly reported its findings that workers for the World Cup in Qatar were being subjected to trafficked and forced labor.  Amnesty International specifically reported that "[m]igrants . . . working on the refurbishment of the showcase Khalifa Stadium . . . and sporting facilities . . . [were] being exploited" through recruitment fees, appalling living conditions, lies about pay, delayed pay, detainment at working and living facilities, denial of ability to change jobs, confiscated passports and denial of ability to leave the country, and threats.

50.    In May of 2016, after collecting thousands of signatures on an online petition, Amnesty International warned that it was concerned that any reported protection for workers could be "just a FIFA PR stunt," and suggested that "soon it will be too late to prevent a World Cup built on exploitation."

51.    As this chorus of opposition grew, it was clear to Qatar that it had a problem:  While it wished to host the World Cup to "sportswash" its reputation, its ubiquitous and widely known use of trafficked and forced labor threatened to cost Qatar hosting privileges, and the spotlight was making it harder to deliver the massive infrastructural and facility preparations for the World Cup, because it could not do so on time and within budget without continuing to use trafficked and forced labor.

52.    To solve this problem, Qatar pulled off a public relations and lobbying coup.  Qatar spent millions of dollars to hire experienced lobbyists, public relations firms, and marketers willing, despite knowing of the harms, to try to make the entire world look away from ongoing labor abuses so that Qatar could deliver the event.

53.    The public relations and lobbying campaign defended Qatar's human rights record, minimized the wrongs and abuses, and outwardly promised to adopt labor reforms—knowing fully well that any such reforms would be limited in scope, implemented halfheartedly, and never fully enforced.  This approach allowed Qatar to reap the reputational gains and "sportswashing" effect from hosting the World Cup and quiet the growing chorus calling for a boycott, while also letting Qatar avoid and delay fixing labor-abuse problems.  That is why Defendants' role in the Venture was essential.

### C.    Qatar Foundation Sought to Sportswash Qatar and Ensure that Trafficked and Forced Labor Continued to Be Available for the Venture.

54.    Qatar Foundation was controlled by the Qatari regime.  It was chaired by Sheikha Moza bint Nasser Al-Missned, the Qatari emir's influential mother, and the CEO was Sheikha Hind bint Hamad Al-Thani, the emir's sister.  According to the U.S. State Department's 2022 Country Report, Qatar Foundation housed "[s]everal quasi-governmental organizations" that "rarely criticized" the government.  As such, Qatar Foundation was widely recognized as a regime mouthpiece whose role was to do the bidding of the regime.[1]  According to public reporting by *The Daily Beast* in 2017, Qatar Foundation was "seen in the emirate as a state-within-the-state," and its "budget is considerable although opaque and remains unpublished."  Further, Hussain Abdul-Hussain and David Adesnik, of the Foundation for Defense of Democracies, reported in

---

[1] Defendants obfuscated the relationship between Qatar Foundation and the Qatari regime to the United States in their Foreign Agent Registration Act ("FARA") disclosures, stating that it was a "private" or "independent" organization.

2022 that "Qatar Foundation and the government in Doha cultivate bigotry throughout" Qatar by, *inter alia*, promoting and broadcasting the views of "violent extremists."

55.    Defendants knew that due to their participation in the Venture, they were closely intertwined with Qatar Foundation (indeed, Qatar Foundation was a client), which openly and notoriously helped play a public leadership role in the Venture.  In turn, Qatar Foundation touted its role "at the heart" of the Venture on its website:

> Throughout the 12-year buildup to the FIFA World Cup Qatar 2022™, and the four spectacular weeks of the tournament itself, Qatar Foundation (QF) was at the heart of a nationwide effort to deliver amazing.
>
> As a key supporter of the first FIFA World Cup™ in the Middle East, QF channeled its expertise, its values, its platforms, and its people into the preparations for the tournament, the welcome it would offer to people throughout the world…and the legacy it will create.

56.    Defendants were also aware of the World Cup Labor Venture's inextricable link to Qatar Foundation due to public reporting.  For example, an article published by *The Daily Beast* in 2017, and entitled ***Qatar's Foundation for Hypocrisy***, reported that "[o]ne of the most ambitious stadiums Qatar is building for the controversial 2022 World Cup competition is in the [Qatar Foundation]'s Education City."

57. Due to Defendants' interaction with and work with Qatar Foundation, Defendants knew Qatar Foundation served as the Qatari regime's notorious "reputation washing" front that was purpose-built to enable the regime's priorities, including its support for endemic trafficking of migrant workers, like Plaintiffs, by Qatari employers under Qatar's *kafala* system, which provided the economic foundation for the Qatari regime's dictatorship. For example, in 2013, the *Economist*'s flagship due diligence publication, the *Economist Intelligence Unit*, reported (headline: ***The Middle East's Migrant Workers: Forget About Rights***) as follows:

> ***Attempts to improve the lot of migrants working in the Middle East are unlikely to make much difference***[.]
>
> ***"Our workers are treated worst in the Gulf," says Walden Bello, a Filipino parliamentarian, referring to those of his countrymen who seek their fortune abroad.*** … Many pay up to $3,000 to recruitment agencies, only to find themselves working long hours for a pittance and with no time off in jobs that often differ vastly from the ones they signed up for back home. Mistreatment, including the sexual sort, is relatively common. ***The International Labour Organisation (ILO), a UN body, reckons that 600,000 workers in the region can be classed as victims of trafficking.***
>
> ***This is the sort of bad press Qatar wants to avoid in the run-up to the 2022 football World Cup, as it imports more workers to build stadiums for the tournament using a labour force already 94% foreign. The Qatar Foundation, an organisation founded by the emir, has drawn up rules for foreign workers.*** …
>
> Sarah Leah Whitson of Human Rights Watch, a New York-based lobby, says the Qatar Foundation code is a model that could spark regional change. ***But she worries that the regulations--which have not been enshrined in Qatari law--will not be put into practice. …*** A Domestic Workers Convention adopted by the ILO in 2011 has found little support in the region. ***Cruelty towards foreign workers … remains widespread.***
>
> ***The migrant workers' lot is unlikely to improve until the reform of the kafala system, whereby workers are beholden to the employers who sponsored their visas.*** The system blocks domestic competition for overseas workers in the Gulf countries. …
>
> ***Rulers of the Gulf states, where workforces are made up of low-paid foreigners, are loth to change the system, since it ensures cheap labour.*** Eyeing unrest

elsewhere in the region, they are wary of upsetting locals. ***The migrants' suffering is not about to end.*** (Emphases added.)

58.    From 2013 until at least 2020, Qatar confirmed Ms. Whitson's, and Human Rights Watch's, skepticism in the above quote:  The Qatari regime made no meaningful changes to Qatar's *kafala* system and, consequently, Qatar Foundation's role was merely to reputation wash for the World Cup Labor Venture.

59.    In 2014, the *Guardian* published a lengthy investigative report headlined ***Modern-Day Slavery – Qatar World Cup: Migrants Wait a Year to Be Paid for Building Offices***, which detailed that

> Qatar Foundation, a state body, published a report examining trafficking, debt bondage and forced labour among migrant workers.  It identified practices that contravene International Labour Organisation conventions on forced labour and UN anti-trafficking protocols, "widespread" non-payment of wages and bribery and extortion among recruitment agents and employers. . . .
>
> "We know there is much more to do," said Abdullah al-Khulaifi, Qatar's minister of labour and social affairs in a statement detailing progress on labour law reforms. "But we are making definite progress and are determined to build momentum."

60.    Abdullah al-Khulaifi's statement, above, was a lie, the cover for which was provided by Qatar Foundation.  Qatari regime officials made similar statements every year between 2013 and 2020, typically in contexts in which Qatar Foundation was also referenced, like here.  And, of course, that was the point all along:  A front (which provides "cover") only works if it claims to oppose the thing that it is engaging in, *i.e.*, it lies.  Otherwise, it would not provide "cover" to the regime's sponsorship of trafficking and forced labor under Qatar's *kafala* system in the first instance.  Similarly, the fact that Qatar Foundation regularly published reports confirming

that widespread trafficking was a feature, not a bug, of Qatar Foundation's role as a front.[2]  Given Defendants' sophistication and their role in public relations on behalf of Qatar Foundation, Defendants understood that the practices described in articles like those published by the *Guardian* could not be reconciled with Qatar Foundation's declarations unless one concluded that the latter was, in fact, a front rather than an organization dedicated to combatting trafficking.  These lies were all facilitated by Defendants.

61.     The same 2014 *Guardian* report also contained a link to a 14-minute short film documentary by the *Guardian*'s journalists,[3] which supported the conclusion that thousands of migrant laborers who worked on the World Cup Labor Venture likely died as a result of their work on the Venture.  On information and belief, the Venture's participants, including with the help of Defendants, pervasively underreported and misrepresented the numbers of deaths, substantial injuries, and physical, including sexual, assaults that were committed against migrant laborers trafficked by and for the Venture and its participants.

62.     The *Guardian* documentary video report provided substantial video and photographic evidence of the pervasive trafficking and labor abuses perpetrated against migrant laborers who worked on the World Cup Labor Venture, like Plaintiffs.  Summing up the inhumane and unlawful working and living conditions under which migrant laborers, like Plaintiffs, were trafficked by the Venture and its participants, the *Guardian* concluded that Qatar had treated, and

---

[2] Given that its purpose was to simply persuade gullible audiences that the Qatari regime was trying to improve conditions for laborers (when it was not), Qatar Foundation had no choice but to regularly issue reports observing the obvious—that trafficking was endemic in Qatar—so that Qatar Foundation could then say that it was credible and people could trust it when it claimed to be fighting trafficking.  In this way, Qatar Foundation was like a corrupt political leader who claimed to be cracking down on bribery when, in reality, he was simply leveling corruption charges against his competitors in the bribery marketplace so his own economic needs would be satisfied.
[3] *See* Qatar World Cup Video, *available at* https://tinyurl.com/y9hcmc8k.

continued to treat, migrant laborers working on the Venture as "***just another disposable commodity***." (Emphasis added.) This corroborates reporting from an Amnesty International investigation that concluded "World Cup workers [were] 'treated like cattle.'"

63.    In 2014, Human Rights Watch publicly called out Qatar Foundation for serving, in effect, as a fig leaf for the Qatari regime's (and Qatari employers', including the Foundation and its subsidiaries') ongoing refusal to do anything meaningful that would prevent laborers, like Plaintiffs, from being trafficked in connection with the World Cup Labor Venture:

> The Qatar Supreme Committee, the body charged with delivering the Gulf state's 2022 World Cup, this morning released its Workers' Welfare Standards. In this detailed 50-page document, the committee outlines how it intends to ensure the basic rights of foreign migrant workers involved in select projects related to the construction of stadiums and associated infrastructure. ***(Another quasi-governmental body, the Qatar Foundation, released a similar set of standards in April 2013.)***

> These … efforts … do not go nearly far enough in a country with such a dismal record on workers' rights. …

> ***[I]t would be credulous to regard this as a long-term solution to very serious problems in Qatar and the rest of the Gulf. The new standards don't ensure a worker's rights to change employers, leave the country, or bargain collectively for better pay and conditions.*** And the standards will impact only a small fraction of migrant workers in Qatar, excluding even some of those serving the World Cup, such as the construction workers building the hotels where fans will stay, or the taxi drivers who will shuttle tourists around the capital, Doha. ***The standards don't alter the fact that, more than three years after Qatar won the bid to host the 2022 World Cup, Qatar's legal and regulatory framework still facilitates the trafficking and forced labor of migrant workers.***

> ***Qatar's labor system needs a major overhaul, not a minor makeover. Reform should be led by the relevant government authorities, not the World Cup delivery committee***, and it should address all migrant workers in the country, not just those who will build futuristic stadiums.

### D.    Defendants Participated in the World Cup Labor Venture.

64.    Omnicom, Portland, Mercury, Ogilvy, OPRW, and Memac Ogilvy employees provided public relations and lobbying services to Qatar, the Qatar Embassy, Qatar Foundation, and the Supreme Committee, and those services were meant to hide, obfuscate, lie about, and minimize that the preparations for the World Cup in Qatar were using trafficked and forced labor. By participating in a commercial venture with their contractual counterparties, Defendants took part or shared in an enterprise or undertaking that involved danger, uncertainty, or risk, and potential gain. Defendants were paid for their work, so there was potential profit, and their work was a common undertaking or enterprise both with their clients and with the employers who, for example, took the passports away. Indeed, Defendants worked together with their clients, by providing public relations and lobbing support, to help ensure that the World Cup Stadiums were built on time and under budget. Defendants' clients were able to prepare for the World Cup at a lower cost due to exploitation of labor, and thus were willing and did pay Defendants to help them achieve that goal. Defendants had a shared enterprise with the perpetrators who took Plaintiffs' passports because Defendants and the perpetrators both were playing their part to ensure that trafficked and forced labor continued to be available to their mutual clients who depended on it. Defendants had continuous commercial and business relationships with Qatar, the Supreme Committee, and Qatar Foundation, among others. Those commercial ventures were intended to cover up the abuses, minimize reporting about the same, and slow reform, thus making the abuses more likely to continue unabated, and thus facilitating trafficked and forced labor. And Defendants had continuous business relationships with their clients, tailoring their services to ensure wrongful ends, and had the desire to promote the Venture's success. By entering into those continuous business relationships and doing the work that allowed the Venture to continue to exploit labor, Defendants actively participated in the World Cup Labor Venture.

65.    To be clear, Defendants' participation in the Venture is not protected speech—it is paid-for commercial advocacy, strategizing, and public relations management that creates liability because it is work meant to further the Venture's goal of continuing to use trafficked and forced labor.  Because Defendants' work, and the output in the form of public relations campaigns were at best misleading and at worst untruthful, it does not deserve protection from liability.  Further, Plaintiffs here do not seek regulation that curtails speech (or lobbying), but would impose liability for the harms of those commercial activities, many of which were done in Qatar and on behalf of foreign entities.  Since there is no protection for false statements regarding trafficked and forced labor, and no protection to protect corrupt ends, illegal outcomes, and imminent lawless action, such as the labor exploitation that was ongoing throughout Defendants' participation, Defendants' acts described herein are likewise not protected.

### 1.  Portland's Role

66.    Information readily available in the public domain makes clear that as part of Portland's contract to provide public relations services to Qatar, Portland worked on the World Cup Labor Venture and played a key role; it was "the cornerstone" of Qatar's campaign to refute accusations of labor abuses of the migrant workers for the World Cup, working directly for the 2022 World Cup organizing committee and the Qatar Foundation.  Reporting after the World Cup ended linked Portland's hiring with the labor abuse issue, stating that Qatar "appointed Portland in the run-up to the 2022 football World Cup at a time when the country was facing heightened international scrutiny due its chequered human rights record."

67.    Soon after Portland signed the contract to provide public relations services related to the World Cup, it filed FARA statements with the U.S. government to disclose itself as an agent of Qatar, working from New York, New York.  In at least one FARA statement, Portland disclosed it had New York employees working for Qatar on "[United States]-based government

communications and media relations services," so it is reasonable to infer that work was related to the contract Portland had signed to provide public relations services regarding the World Cup. For example, Charles McLean, Portland's New York managing partner, disclosed that he rendered services to Qatar on behalf of Portland out of Portland's New York offices, and publicly touted that during his time heading Portland's New York office he "led Portland's on-site communications teams in . . . Qatar." These types of activities were reflected on FARA documents up through 2021, just before the World Cup, when Portland disclosed it was providing "media relations" assistance.

68.    Portland had other employees based in or working from Portland's New York offices who were on information and belief working on World Cup public relations work for Qatar, including but not limited to Sebastian Schwark. Sebastian Schwark was a Portland partner who worked from Portland's New York offices, on behalf of Qatar Foundation, with relation to crisis management and reputation management, on information and belief related to the World Cup Labor Venture. Another employee, Eric Schultz, worked from Portland's New York offices on behalf of Qatar Foundation to "advance[e] client agendas through direct outreach to key decision-makers at national and local media outlets," and on information and belief, did so in furtherance of the World Cup Labor Venture. Portland employees based in New York also filed a FARA document detailing their work on "Qatar – Engagement plan (NY)," which included "developing media and stakeholder engagement plans for top US influencers," on information and belief in furtherance of the World Cup Labor Venture. Portland employees based in New York filed another FARA document detailing their work for Qatar which included lobbying U.S. lawmakers and executive branch departments, on information and belief in furtherance of the World Cup Labor Venture. And Portland's Noah Black and David McKay worked from both Washington, D.C. and

New York, on behalf of Qatar, to manage a team of public relations professionals whose goal was, in part, to minimize or manage coverage of labor abuses related to the World Cup in Qatar. Indeed, FARA disclosures indicate Noah Black provided services to Qatar from Portland's New York and Washington, D.C. offices, and he later admitted publicly, *infra* ¶79, he was working on the Venture.

69.     Portland had still other employees, including but not limited to Savanah Dickinson, Lucy Fyler, Sarah Wallace, Julian Graham, and Gabriela Luciano who were based in Washington, D.C., and who worked on the World Cup public relations project on behalf of Qatar. Employees such as Scott Smith worked from Washington, D.C. to "provide[ ] tactical assistance," "advice on policy and media issues," and "crisis communications" regarding, on information and belief, World Cup labor issues, and "[w]orked directly with key media, pitched stories and served as a regular liaison with journalists, bloggers, online influencers, and political and government contacts" to minimize coverage of labor abuses. Employees such as Kayla Elias worked from Washington, D.C. to provide Qatar with "U.S.-based government communications and media relations services," and "work[ed] with U.S. officials and thought leaders" directly to manage coverage and policy related to, on information and belief, the use of trafficked and forced labor.

70.     Portland employees loudly and publicly announced the many ways they participated in the World Cup Labor Venture. For example, Portland employees touted their roles in: creating a "quarterly newsletter for the Embassy of the State of Qatar, which is delivered to over a thousand government and media stakeholders, and promotes . . . positive media coverage of the country"; "highlighting public diplomacy efforts in the United States"; working with their clients to "strengthen their public image"; "manag[ing] daily media monitoring"; managing

government social media platforms; and "ensure[ing] foreign policy goals [were] met" by, among other things, "writ[ing] . . . talking points for government officials."

71.    Portland employees publicly confirmed Portland's participation in the Venture. One stated she worked on, among other things, "crisis communication strategy development ahead of the FIFA World Cup Qatar 2022," "a 24/7 media monitoring product," and "draft[ing] responses to members of the media."  Another said he worked for Portland on "media communications and stakeholder engagement" "on behalf of the Supreme Committee for Delivery and Legacy of the FIFA World Cup Qatar 2022."

72.    Portland's contemporaneous FARA filings also confirmed its role monitoring and tracking media, providing a "rapid response team" to handle sensitive issues or crises, and continuous communication with Qatar related to sensitive government relations, lobbying, and media engagement.

73.    Public reporting regarding Portland's role in participating in the World Cup Labor Venture also included a report at the end of Portland's engagement with Qatar stating that Portland had actively worked to attack critics of Qatar.

74.    A specific example of how Portland participated in the World Cup Labor Venture was when it arranged for journalists to tour migrant workers' housing facilities, to demonstrate that workers lived comfortably.  Media coverage of the tour indicated that Portland worked with Qatar's Prime Minister's office to "court[] international journalists"; during the trip Portland showed journalists "spacious and comfortable villas for construction workers, with swimming pools, gyms and welfare officers"—which was meant to distract from the actual, squalid living conditions of the vast majority of the workers, including Plaintiffs in this case.  Portland's propaganda effort ultimately backfired: When journalists attempted to learn about the workers'

actual living conditions (*i.e.*, beyond the façade that Qatar and Portland presented), journalists from the BBC were handcuffed and jailed.

75.    For much of this work, Portland worked directly for the office that managed the World Cup enterprise on behalf of Qatar, the Government Communications Office ("GCO"), which Portland helped to create, staff, and manage.  The GCO is part of the Prime Minister's office, answering directly to him, and the Prime Minister from 2013 to 2020 was Abdullah bin Nasser bin Khalifa Al Thani, who was also the Chairman of the Executive Committee of the Supreme Committee.  Portland therefore had a direct relationship with perpetrators who were actively lying about the labor abuses as they were occurring, and facilitated dissemination of those lies.  For example, Portland wrote press releases denying the Qataris' efforts to cover up continuing labor abuses (which led to the above-discussed arrest of BBC journalists and others).

76.    Another specific example of how Portland participated in the Venture came in 2015, when Portland disclosed it worked for Qatar, and identified the foreign principal with which it worked as Saif Ahmed Al Thani.  Portland helped Al Thani and Qatar try to refute a *Washington Post* article that discussed labor abuses against migrant workers at the World Cup construction sites.  Specifically, in response to the report that as many as 1,200 migrant workers had died while working on projects related to the 2022 World Cup, Al Thani famously and falsely asserted "[t]his is completely untrue . . . not a single worker's life has been lost.  Not one."  On information and belief, Portland participated in the World Cup Labor Venture by working with Al Thani on that response, which Portland knew was false.

77.    For other parts of its work, Portland worked directly with the Qatar Foundation, which also was a direct perpetrator of trafficked and forced labor as owner and operator of the Al Rayyan Education City stadium.

78.     Finally, Portland participated in the Venture by supplying "reputation laundering" services to Qatar, meant to ensure Qatar, generally, and the direct employers of Plaintiffs and other migrant workers, more specifically, could continue to exploit labor.  "Reputation laundering," in this context, meant that Qatar utilized established, well-known, and expensive Western service providers, here, Defendants, to legitimize Qatar's reputation.  With regard to Portland, *The Guardian* once reported that Portland had a history of working for autocrats, such as the Kremlin, and its willingness to do so "whatever their records," and recommended that Portland and other public relations companies should "take an ethical stance rather than the first shilling that is on offer," and "ask themselves if this is a regime they should be representing."  Reputation laundering is a well-known strategy to ensure that bad acts can continue, while the reputational impact of it is removed through obfuscation, coverups, and distraction.  Here, much the same, Portland engaged in reputation laundering to ensure that Qatar (and the migrant laborers' employers) could continue to exploit migrant labor, and thus participated in the Venture.

79.     On November 15, 2022, just as the World Cup was set to kick off, Noah Black

publicly confirmed Portland's many years of "active" participation in the Venture:



here we go...

Noah Black
Co-Founder at Threshold

November 15, 2022

The FIFA World Cup Qatar 2022 kicks-off Sunday, following twelve years of active preparation in the State of Qatar.

It has been Portland's privilege to work with Qatar for much of the journey. To be part of this incredible delivery team is an absolute honor. Getting to work with professionals who regularly exceed expectations and bend the time space continuum to deliver inspires me every day.

Those of us running this latest segment of the journey stand on the shoulders of many colleagues before us. To all of them, wherever they worked in the world, our deepest appreciation, thanks, and respect.

When Andre Agassi retired from tennis, he spoke to the fans at the US Open and said, "I've found generosity. You have given me your shoulders to stand on, to reach for my dreams, dreams I could never have reached without you."

That is how I feel about the team that I've been fortunate enough to be part of for seven-plus years. Thank you to my incredible colleagues and clients, past and present.

Aaron Muench Ahmed N A Almassri Alexandra Agha Alexandre Le Coz Andrew Brown Bicky K. Bouthaina El-Kheshn Connor Sadler Dalia Alqudah Delina Tewelde Derin Koçer Doreen Abi Saleh Erin Godbold Eufracia Taylor Dave Curtis Eve Dunlop Ferkan Memedi Gabrielle Said Haneen Shaer Dalia Alqudah James Bell Jamie Enright Lucy Fyler Mariam Eltaweel Meghan Powers Nourhan Elnahla Rachael Colton Raghd Hamid Tom Coyne Anna Novgorodova Abdallah Nazzal Eloisa Abelito Gabrielle Said Julia Bouillet de Ornellas Sarah Thoumieux Sarah Touma Sarah Wallace Sashika Vidushan Savanah Dickinson Serena Jackson Serkan Çakır Yasmeen Kalla Deema Worthington

Romain Raoux Lewis Green George Kyrke-Smith Nadine Ottenbros Joe Riley Mark Flanagan Gabriela Luciano Maja Opolcer Iman Alice Yashruti Rose Williams Justin Kerr-Stevens Max Kellett Anneka Munsch-Razi Elizabeth Davis Dan Morland Olivia Harvey Igor Catran Julian Graham Lucinda Chamberlain Sara Lobo Kareem Malas Romain Raoux Deisy Verdinez Kayla Elias Ned Ukrop Guy Blofeld Tolly Rose Karim B. El Ouazzani Nadyah Hilmi Kevin Tierney Natalia Zuluaga Lopez Gabriela Luciano Charles McLean Tim Allan Martin Sheehan Steve Morris Jordan

80.     One of the people Noah Black referenced in this LinkedIn post said that in his work for Portland, he "helped [Portland] deliver FIFA World Cup 2022 Qatar's message to the world, within a 100+ strong team across 4 offices worldwide," and that he worked on "media strategy," as well as "message development" and "communications strategy."

81.     And Portland still advertises its participation in the Venture; as late as 2023, Victoria Dean, then a deputy CEO of Portland, confirmed Portland had participated in the Venture when she told an interviewer she was proud of her team's work "handling international media for the 2022 FIFA World Cup."

## 2.  Mercury's Role

82.     In 2013, Michael Soliman became a partner at Mercury.  He was also chairman of Senator Robert Menendez's political campaign.

83.     In 2014, Mercury opened an office in New Jersey.  As a part of that acquisition, Omnicom employees provided support in the form of due diligence and financial analysis, and Omnicom would have therefore known that Mercury's business in part was related to lobbying on behalf of Qatar and also Mr. Soliman's relationship with Senator Menendez.

84.     Also in 2014, Vin Weber of Mercury signed FARA documents related to Mercury's work lobbying on behalf of Qatar.

85.     In 2015, Vin Weber of Mercury conducted lobbying activities related to the World Cup Labor Venture, and specifically lobbied Senators Klobuchar and Moran on World Cup issues.

86.     Also in 2015, Mercury's Mr. Soliman brokered access to Senator Menendez and the Senate Foreign Relations Committee, and specifically lobbied U.S. government officials in an attempt to sportswash Qatar and minimize U.S. government response to reports that Qatar was exploiting migrant labor.  He did this, for example, by providing the Portland-assisted Qatar Embassy response to the *Washington Post* article, *supra* ¶76, to suppress and refute the reporting of harms related to the World Cup Labor Venture.

87.     Also in 2015, other Mercury lobbyists conducted multiple additional lobbying outreach calls and meetings related to Qatar and the World Cup and, on information and belief, tried to minimize U.S. action to stop Qatar from using trafficked and forced labor in the World Cup Labor Venture.

88.     In 2018, Mercury helped Qatar put on a "road show" of economic opportunities for domestic United States firms to engage with Qatar.  This road show prominently featured the Supreme Committee, was done in part in response to the mounting international pressure to reform labor regulations and was part of the sportswashing campaign that Mercury worked on for Qatar, related to the World Cup.  As part of that road show, Mercury hosted an event in New York from

a New York office leased by Omnicom. Through all these acts, Mercury participated in the Venture by trying to influence U.S. legislators not to pressure Qatar to reform its oppressive labor laws and conditions.

### 3. Omnicom's Role

89.     Omnicom participated in the World Cup Labor Venture in many ways.

90.     First, it provided its employees in its CLS Strategies division to work with the global media network Al Jazeera on promoting content that sportswashed the Qatari regime while suppressing stories regarding the ongoing labor abuses.

91.     Second, it provided resources and employees from its DDC Advocacy group, on information and belief, to support Portland and Mercury in their public relations and lobbying work with campaign development materials.

92.     Third, it provided materials and work from employees in its media group to develop public relations and media materials for Qatar, including but not limited to on behalf of beIN Sports, the Qatari sports channel used to broadcast all the World Cup games as well as sportswashing and Qatar-positive materials.

93.     Fourth, it provided content by employees in its OMD Worldwide group to be used for beIN Sports, and allowed that same group to organize large corporate sponsorships for the World Cup 2022.

94.     Fifth, it provided content from its Experiential Group, which considers itself a "borderless agency," and in this instance created events at the World Cup such as a neighborhood activation and a fan zone, all of which contributed to distracting from ongoing labor abuses and otherwise sportswash Qatar's hosting of the events.

95.     Sixth, it allowed its employees, including for example Guillaume Trihan, to provide tax and accounting work in support of Omnicom's subsidiaries (*e.g.*, Portland and Mercury) for

their work related to the World Cup and the Venture.

96.    Seventh, it directly worked with Mercury, from New York offices Mercury needed for certain of its lobbying activities related to the World Cup and the Venture.  And on information and belief, Omnicom provided labor from its employees to work directly with Mercury employees as they actively lobbied U.S. government officials to lessen the international condemnation regarding Qatar's labor practices, in support of the World Cup Labor Venture.

97.    Eighth, on information and belief, Omnicom worked with Portland, from their shared offices in New York, on all of the above-described work Portland did while it was co-headquartered with its corporate parent in New York.

98.    Ninth, on information and belief, Omnicom worked with Mercury and Portland employees who ran a "war room" at the Qatari Embassy, where Qatar and its lobbying and public relations teams from Defendants worked to respond to media and government condemnation of the use of trafficked and forced labor in Qatar's preparations for the World Cup.

99.    Tenth, on information and belief, Omnicom provided data analysis, social media, and earned media support to Portland and Mercury as part of their public relations and lobbying campaigns on behalf of Qatar, related to the World Cup and the Venture, including but not limited to in the form of Omnicom's "omniearnedID" program, "Omni Custom Audiences" toolkit, and through Omnicom employees in Omnicom's Annalect data and analytics division.

100.    Eleventh, Omnicom provided legal and compliance support services to both Portland and Mercury as part of the group's work on behalf of Qatar related to the World Cup and the Venture.  For example, on information and belief, Omnicom provided general counsel support, via Elizabeth DiRusso and Louis Januzzi, to Portland and Mercury, related to the World Cup Labor Venture.  Also, Craig Gangi was a lawyer for Omnicom who was also listed on some corporate

filings as an officer of Portland and Mercury.  Additionally, Omnicom employees worked directly on Mercury's FARA submissions related to its lobbying work in support of the Venture.  And Eric Meyerowitz, an Omnicom employee, provided legal support regarding contracts and transactions to Omnicom subsidiaries including, on information and belief, to Portland and Mercury and their work on the Venture.

101.    Finally, due to Omnicom's general business practices of disregarding corporate form and formalities, and servicing clients across agencies, subsidiaries, and even geographies, *supra* ¶22, it is reasonable to infer that Omnicom contributed to Portland's and Mercury's work. This allegation is well founded based on specific examples.  First, Omnicom holds out Mercury employees as employees of Omnicom Group, generally, on LinkedIn.  For example, key lobbyists Mercury employed, including Vin Weber, Mike McSherry, Michael Soliman, and Lisa Kaufmann are listed as Omnicom Group employees.  And Omnicom does the same thing with Portland employees including, for example, Rhys Jones, the head of Portland's Doha Office, and Alexandra Farley, the current CEO and longtime CFO of Portland who signed numerous Qatar-related contracts on behalf of Portland.  All these employees are held out as Omnicom employees.  Second, Omnicom employees have made clear that Omnicom plays a direct role in the operations of its subsidiaries, directly managing and supporting their work.  For example, Omnicom employee Guillaume Trihan publicly disclosed that he provided tax and accounting work in support of Omnicom's subsidiaries (*e.g.*, Portland and Mercury) related to the World Cup.  In another example, John Doolittle, an Omnicom employee, signed a sworn affidavit saying that his "responsibilities include overseeing . . . Mercury."  And in yet another example, Omnicom has a New York-based "Public Relations Group" through which Omnicom directly coordinates its agencies' work, including Portland and Mercury, so that they foster cross-agency collaboration

and integrate service offerings. And when Mercury or Portland had work that needed to happen in New York, Omnicom supported its subsidiaries working on the World Cup Labor Venture by providing resources and facilities, as needed. Third, there is evidence in the public domain that Omnicom employees in its legal and compliance departments worked on Mercury's FARA applications, in support of Mercury's disclosures of its lobbying related to the World Cup. Fourth, Omnicom also, via Omnicom Capital, facilitated the finances and cash positions for all its subsidiaries and, on information and belief, did so for Portland and Mercury. Omnicom's management of its subsidiaries' cash positions necessitated direct involvement with them, and it, on information and belief, directly facilitated Portland's and Mercury's work on the World Cup Labor Venture.

102.    Due to Omnicom's business practice of organizing its services around its clients, Omnicom, Mercury, and Portland collaborated to provide public relations and lobbying services to Qatar, via Omnicom's subsidiaries' direct contractual relationships with Qatar, the Qatar Embassy, and the Supreme Committee. Because multiple agencies, such as Portland and Mercury (and others), routinely "collaborate[d] in formal and informal virtual client networks . . . cut[ting] across [Omnicom's] internal organizational structures," Omnicom, Portland, and Mercury all worked together on the World Cup Labor Venture.

103.    Omnicom also disclosed that in 2018 it "completed the process of forming practice areas within [its] global network structure to bring together agencies operating in common disciplines." It is therefore reasonable to infer that Omnicom and Portland (as well as Omnicom's other subsidiaries) used cross-functional teams that ensured that data, analysis, documentation, and the like were all shared seamlessly across and between them and their affiliates. Consequently,

when one Defendant learned a material fact relating to the World Cup Labor Venture, it ordinarily would have and did share such information with the other Defendants.

104.    For example, Portland employees disclosed there was no delineation between offices or teams within their structure, including with respect to their work on the World Cup Labor Venture.  One employee disclosed that he worked from London "across multiple industries and teams" and "across five international regions on behalf of the Supreme Committee … across media communications and stakeholder engagement."  It is reasonable to infer therefrom that Portland worked directly for and with the Supreme Committee, and that work occurred among and through Omnicom and its subsidiaries throughout the Omnicom family of companies.

105.    Omnicom has also publicly disclosed that it co-mingled assets and back-office support functions for all its subsidiaries, including Portland and Mercury, such as legal, compliance, and data analysis, operated itself and its subsidiaries out of the same address in New York, and co-mingled officers and directors of the companies.  For example, Mercury's corporate filings indicate that Dale Adams, Thomas Harrison, and Deborah Zangara, all Omnicom employees, were at times officers of Mercury.  And Louis Januzzi, an attorney for Omnicom, signed contracts on behalf of Mercury.

106.    These facts, *supra* ¶¶101-05, demonstrate it is reasonable to infer that Portland, Mercury, and corporate parent Omnicom had interrelated operations, that were centrally controlled, with common management, and with common ownership or control, such that Omnicom should be held liable for the acts of its subsidiaries.

107.    These facts, *supra* ¶¶101-05, also demonstrate Omnicom exercised a significant degree of control over Portland's and Mercury's employee and employment strategy, business

strategy, and decision-making with regard to their work on the World Cup Labor Venture, such that each subsidiary was doing the work of Omnicom as its agent.

108.    These facts, *supra* ¶¶101-05, also demonstrate Omnicom exercised extensive control over the acts of each of its subsidiaries, including Portland and Mercury, and on information and belief owns all or the majority of the capital stock of each subsidiary, shares common directors or officers with its subsidiaries, finances its subsidiaries, pays the salaries or expenses or losses of its subsidiaries, and employees of Omnicom, Portland, and Mercury make no distinction between the entities.  For all these reasons, Portland and Mercury are merely instrumentalities of Omnicom.

### 4.  Memac Ogilvy's Role

109.    Information readily available in the public domain makes clear that as part of Memac Ogilvy's contract to provide public relations services to Qatar Foundation, Memac Ogilvy worked on the World Cup Labor Venture and played a key role.  Indeed, Memac Ogilvy was the "communications partner" of the Qatar Foundation, and won awards for "managing the brand and reputation of one of the country's foremost institutions during the FIFA World Cup Qatar 2022."

110.    On February 12, 2023, the Memac Ogilvy official Instagram account posted a video that commemorated "the unforgettable 2022 FIFA World Cup Qatar," and told viewers to "[e]xperience behind the scenes [] the work we did."  This post was itself participation in the Venture, sportswashing Qatar, while also commemorating and admitting Memac Ogilvy's participation in the Venture.

111.    The work that Memac Ogilvy did was pursuant to a contract it signed to provide broad public relations and reputation management services to Qatar Foundation.  Ogilvy disclosed in a FARA registration that the "scope of services" for the contract with Qatar Foundation required

Memac Ogilvy to, in relevant part:

a)    Be responsible for all of the operations of the Qatar Foundation's press/media relations office, including its interactions with global/international (i.e., US) media, and handling and responding to all press inquiries.

b)    Draft press releases, feature articles, and speeches for leading spokespersons.

c)    Globally distribute press releases.

d)    Comprehensively monitor media draft responses, including by "keep[ing] a record of all negative articles" and "monitor[ing] the news daily (including holidays and weekends) and alert[ing] Client of any extremely positive or negative articles that might require action."

e)    Manage all social media.

112.    Memac Ogilvy thus participated by having, among other things, an "embedded" public relations team at the Qatar Foundation.

113.    One of Memac Ogilvy's other "anchor clients" was the Qatar Tourism Authority ("QTA"), for which it provided public relations support beginning no later than 2016.  QTA was deeply involved in the World Cup, and it is one of the entities that contracted with FIFA ambassadors (most notably, David Beckham) before and after the World Cup.  Memac Ogilvy resumes suggest that employees tasked with QTA projects worked on World Cup content in furtherance of the Venture.

114.    Memac Ogilvy's participation in the Venture was commemorated and recognized publicly with major awards, including:

a)    "Best Crisis Communication / Issues Management Strategy - Navigating the Uncertainty of the First Arab World Cup"

b)    "Best Corporate Reputation - Defending the First Arab World Cup"

c)    "Best Campaign in Qatar Best Sport & Recreational Campaign - Managing the Global Narrative For The Most Discussed Event On The Planet, the FIFA World Cup"

115.    Memac Ogilvy admitted in its awards submission that its work was in response to "relentless international scrutiny leading up to the first Arab FIFA World Cup," where they "execut[ed] a program that contributed significantly to the 180-degree perception turnaround."

116.    After winning the awards, Megan Yarmouth, who holds herself out on LinkedIn as

an Ogilvy employee (rather than a Memac Ogilvy employee), took responsibility for Memac Ogilvy's participation in the Venture. She said, at the time, that she was "proud and humbled to lead the Memac Ogilvy Qatar PR team," because "our Doha office, in collaboration with Qatar Foundation, clinched four golds and a bronze, specifically for our outstanding PR efforts related to the FIFA World Cup 2022. This achievement wouldn't have been possible without the dedication of numerous current and former Qatar Foundation and Memac Ogilvy team members who worked tirelessly to bring this success to fruition." This post was itself participation in the Venture, sportswashing Qatar, while also commemorating and admitting Memac Ogilvy's participation throughout the Venture.

117.    Other Memac Ogilvy employees publicly reported their (and thus Memac Ogilvy's) participation in the Venture, including:

a)    Riham Elhoushi, who was the Group Account Director at Memac Ogilvy, who made a presentation entitled "About the Campaign: Navigating the Uncertainty of the First Arab World Cup," and publicly held herself out as having worked on the Venture;

b)    Holoud Elderwy, who led "local content and campaigns during the year of the FIFA World Cup Qatar 2022";

c)    Stefano Perazzo, who disclosed that he worked directly on public relations and social media tasks for Qatar Foundation;

d)    Paige Kollock, who touted her employer Memac Ogilvy's "PR work on the FIFA World Cup 2022";

e)    Samantha McGarry, who disclosed that she was embedded with the Qatar Foundation and worked on the World Cup "media and stakeholder engagement efforts," and helped win an award for "outstanding PR efforts related to the FIFA World Cup Qatar 2022, in collaboration with Qatar Foundation"; and

f)    Tanisha Nityanand, who worked on "[p]roject management of international, regional & local campaigns on social" for "FIFA World Cup Qatar 2022."

118.    As detailed *infra* V.D.5 and V.D.6, another way that Memac Ogilvy participated in the Venture was by working with and through its affiliates at OPRW and Ogilvy to perform public relations and lobbying activities within the United States, including in New York.

**5.  Ogilvy Public Relations Worldwide's Role**

119.    OPRW participated in the Venture by providing public relations support to Memac

Ogilvy's work in Qatar, doing unique outreach to media members in the United States, including in New York, working directly with and in coordination with Memac Ogilvy on the broader public relations remit, and providing lobbying support in Washington, D.C., to try to suppress pressure on Qatar to implement labor reforms.

120.    For example, contemporaneous reporting stated that Memac Ogilvy reached into New York to collaborate directly with "Ogilvy's New York office," and specifically with Jennifer Risi, an OPRW employee who was "worldwide managing director-media influence" and "head[ed] Ogilvy's New York team."

121.    These public reports suggest OPRW managed the public relations work of Ogilvy subsidiaries in foreign countries, including Memac Ogilvy. Further, the New York office provided wide-ranging public relations work directly for Qatar Foundation and, on information and belief, therefore worked on the Venture from New York. For example, a creative director at Memac Ogilvy publicly disclosed that when he pitched work for campaigns for clients including Education Above All, which is a subset of the Qatar Foundation, and the Qatar Tourism Authority, he did that work in collaboration with the New York offices of Ogilvy. This confirmed one way that Memac Ogilvy reached into New York to fulfill its contract with Qatar Foundation, and also shows one way that OPRW was doing work, itself, from New York.

122.    OPRW also on information and belief participated in the Venture by providing social media support for its international client Qatar Foundation from New York, via their "Social@Ogilvy" team, which was "a worldwide practice connecting all of the agency's social media experts to deliver solutions across all areas of business." Social@Ogilvy was a "network of social media strategists delivering global and local solutions," headquartered in New York. On information and belief, OPRW participated in the Venture by providing services from New York

via the Social@Ogilvy platform to Qatar Foundation, pursuant to the requirements of the contract Memac Ogilvy entered into.

123.    OPRW employees who worked directly with Memac Ogilvy to help with Qatar Foundation's "communications effort," and thereby participated in the Venture on behalf of OPRW include but are not limited to:

a)    Jennifer Risi, who has publicly disclosed that she is an "expert in nation branding," said that her clients include "Heads of State the world over," admitted she "led all communications for Ogilvy's PR capability globally," and registered as a foreign agent for Qatar Foundation;

b)    Andrea Romero, a New York-based "Vice President, PR & Influence," who worked directly with Risi's team in New York, and was responsible for "leading the external media strategy . . . advising a diverse portfolio of global and regional clients including governments [and] country brands," who has said she helps countries "shape, protect and elevate their brand, increase awareness, and improve reputation," and works with "crisis management clients;" who also registered as a foreign agent and said her job was "[p]roactive media outreach on behalf of the Qatar Foundation;"

c)    Kathleen Treganowen, a New York-based employee who publicly touted her work on "crisis management" and "securing high profile national and global media coverage," who also registered as a foreign agent for Qatar Foundation, and worked for Risi;

d)    Tara Mullins, a New York-based "media relations expert" for "nation-states," with the title of "vice president of Ogilvy's Media Influence offerings," who also registered as a foreign agent for the Qatar Foundation in 2018;

e)    Corey Chambliss, a New York-based employee who signed a FARA registration as a foreign agent for Qatar Foundation, and worked for Risi;

f)    Melissa Harrison, a U.S.-based employee who also registered as an agent of Qatar Foundation, who worked directly with Risi's team in New York, on information and belief, related to the Venture, and in early 2019 traveled to Qatar to work directly on the Venture with Memac Ogilvy; and

g)    Mary Rouse, a U.S.-based employee who also registered as an agent of Qatar Foundation, on behalf of OG, and worked directly with Risi's team in New York, on information and belief, on projects related to the Venture.

124.    Ogilvy's FARA filings confirm the work that OPRW did.  The filings just from 2019 indicate Ogilvy was paid hundreds of thousands of dollars in 2019 for public relations work its employees, including the above-discussed Rouse and Romero, did for Qatar Foundation. Further, specific work disclosed in the filing listed "media outreach" to media outlets located in New York, confirming Ogilvy's work related to the Venture was in and directed toward New York.

125.    Additionally, OGR, headquartered in Washington, D.C., is a d/b/a of OPRW.  OGR filed a FARA registration which attached a 2018 contract with the Embassy of Qatar, via the law firm Nelson, Mullins, Riley & Scarborough ("Nelson Mullins"), stating that "[r]egistrant [Ogilvy] will advise Foreign Principal on outreach and engagement with key policy makers."  OPRW was paid $10,000 per month on this contract.  Further, Nelson Mullins's 2018 FARA filings show that the work for Qatar was related to whitewashing Qatar's labor abuses and touting labor reforms. Indeed, Nelson's Mullin's 2021 FARA disclosures show that they were developing materials meant to directly refute and counter the reporting by *The Guardian* related to labor abuses.  OGR's January 2019 FARA filing disclosed that the State of Qatar paid OPRW hundreds of thousands of dollars for its work.  OPRW thus participated in the Venture and knowingly benefitted thereby.

126.    In 2021, OGR changed its FARA registration to be directly with the Embassy of Qatar, rather than via Nelson Mullins, and attached a 2021 contract pursuant to which OGR would be paid $20,000 per month.   On information and belief, the work that OPRW did under that contract was similar to what it was doing before:  sportswashing Qatar and trying to minimize reporting and reaction to labor abuses, so as to delay and avoid Qatar labor reforms.  OGR's FARA disclosures show, for instance, that OGR lobbied United States legislators regarding Qatari labor reforms, on information and belief, in furtherance of the Venture, in 2018, and in 2021 did further lobbying related to the World Cup and workers' rights and labor issues in Qatar.  On information and belief a letter that an OGR principal disclosed he sent to U.S. legislators in 2021 was the Nelson's Mullin 2021 letter meant to directly refute and counter the reporting by *The Guardian* related to labor abuses.  OPRW thereby participated in the Venture.

### 6.  Ogilvy's Role

127.    Ogilvy is the corporate parent to both Memac Ogilvy and OPRW.

128.    Ogilvy helped Memac Ogilvy deliver on the contract Memac Ogilvy signed with

Qatar Foundation.  That is why Ogilvy registered itself under FARA and disclosed the contract between its subsidiary and Qatar Foundation in 2018.  Indeed, in those filings Ogilvy disclosed that it was doing work for the Qatar Foundation related to the Memac Ogilvy contract:  It was "engag[ing] U.S. media" and "engag[ing] interested reporters and editors to help shape resulting coverage."  It thereby participated in the Venture.

129.    Ogilvy also helped OPRW in its domestic public relations support of Memac Ogivly's contract and assisted OPRW in its lobbying efforts (done under the name OGR), pursuant to OGR's separate contracts with Nelson Mullins and Qatar.  Indeed, contemporaneous reporting noted the relationship between and among the New York public relations work being done by OPRW and the government relations work being done by OPRW (d/b/a OGR) in D.C.  The reasonable inference therefrom is that the public relations work and the lobbying work were each part of the overall Ogilvy relationship with Qatar and Qatar Foundation, and all these U.S.-based activities were operating in sync and done by Ogilvy and its subsidiaries.  Ogilvy thereby participated in the Venture.

130.    Ogilvy also had global marketing technology (which Ogilvy calls "MarTech") implemented through the "MarTech Center of Excellence," with a core staff of 30 in New York led by Ogilvy employee Gunther Schumacher out of the New York offices.  On information and belief, Ogilvy provided MarTech services to support Memac Ogilvy's work on the Qatar Foundation contract, OPRW's domestic work in support of Memac Ogilvy's work, and OPRW's domestic lobbying work on the separate lobbying contracts entered into by OGR, all in furtherance of the Venture.

131.    Ogilvy also, by dismantling distinctions between entities via its "One Ogilvy" re-launch, *supra* ¶26, by utilizing cross-discipline and cross-entity teams to perform client

expectations, by allowing its employees to be dual hatted—*i.e.*, serving within Ogilvy while also fulfilling functions at the subsidiary level—by placing its own employees in geographies to oversee its subsidiaries' (including Memac Ogilvy's) work, and by placing at least one member on Memac Ogilvy's board, participated in the Venture by working with and managing Memac Ogilvy on its Venture-related work.

132.    Examples of Ogilvy employees who worked on the Venture, confirming that Ogilvy as an entity itself participated, include:

a)    Jim Woods, the Ogilvy New York executive who signed the FARA registrations on behalf of Ogilvy, disclosed that he was in charge of negotiating all "client commercial agreements" for the worldwide business; his signature on the FARA registrations was itself work done by Ogilvy in furtherance of the Venture;

b)    Paul O'Donnell, Ogilvy's regional director who publicly stated he was "responsible for running Ogilvy's operations across" the region in which Memac Ogilvy operated and was therefore "theoretically" the "boss" of the CEO of Memac Ogilvy;

c)    Andrew Clark, who worked as Ogilvy's "Head of Social" in 2017, who disclosed that he "[m]anaged all aspects of social media strategic engagement plans for high profile Qatari and international clients from the education, petrochemical, financial, luxury, and sports sectors," and who therefore worked, on information and belief, on the World Cup Labor Venture;

d)    Lucie Abrie, who has been "Head of Social" at Ogilvy from 2019 to the present, and who disclosed publicly that she had done work for the Supreme Committee and Qatar Foundation;

e)    Megan Yarmouth, who holds herself out on LinkedIn as an Ogilvy employee rather than a Memac Ogilvy employee, and who took responsibility for Memac Ogilvy's participation in the Venture;

f)    JoAnn Kharma, who worked as a "PR and Influence" account executive and stated on LinkedIn that one of her key clients was the Supreme Committee; and

g)    Corey Chambliss, who signed a FARA registration as a foreign agent for Qatar Foundation, with the primary registrant listed on the registration as Ogilvy (and, notably, not OGR or OPRW), indicating Ogilvy was both Chambliss's employer and the entity that was providing FARA-related services.

133.    Yet another example is Jeffrey Chertack.  He was another Ogilvy employee who worked with the Memac Ogilvy team in Qatar and specifically, on information and belief, on the World Cup Labor Venture.  For example, one publicly available biography states he has experience "crafting and managing the reputations" for entities, including the Supreme Committee.  He

actively supported Qatar's sportswashing endeavors, as early as 2014, when he posted on Twitter Qatari propaganda regarding its plans to ensure that labor would not be exploited, and publicly tried to refute the international criticism and pressure put on Qatar related to the World Cup (and thus participated in the Venture):



134.    And when Ogilvy employee MacLean ("Mac") Brodie took over Chertack's role, he worked, on information and belief, as an employee of Ogilvy overseeing and managing the work done by Memac Ogilvy including its work on the World Cup Labor Venture.  For example, he was named as the "General Manager" of Memac Ogilvy on the contract submitted with Ogilvy's FARA registration related to Ogilvy's Venture work, despite not being a Memac Ogilvy employee. His work on the World Cup Labor Venture was done on behalf of Ogilvy, which confirms its participation in the venture.

135.    Additionally, Ogilvy starting in 2017 adopted a "One Ogilvy" business strategy that abandoned distinctions between and among its divisions and subsidiaries.  That is why Ogilvy employee Jeffrey Chertack was sent to Qatar by the U.S.-based entity to oversee and "mentor" Memac Ogilvy's public relations teams, and "managed the PR and social media operation for Memac Ogilvy Qatar" from 2013 to 2016.  Chertack was also the general head of social media at Ogilvy, which was "a global cross-discipline team of social experts from across all of the [Ogilvy] businesses."  When he was "appointed" by Ogilvy to run operations at Memac Ogilvy, this demonstrated how the corporate parent exerted control and management over the activities of its foreign subsidiary; indeed, an executive from Ogilvy said at the time that Chertak's "appointment to Qatar reflects the importance we place on increasing the trading relationship with Memac Ogilvy by placing people who can connect resources to serve clients in any geography."

136.    Another example is Patou Nuytemans, who at the time of the Ogilvy re-branding and integration in 2017-2018 was dual hatted in the organizations—serving both as CEO of Memac Ogilvy and as Ogilvy's chief digital officer for EMEA.  Described as an "Ogilvy veteran" who had "been with the network for 22 years, operating in five different markets in five very different roles," she was placed by Ogilvy as chief executive for Memac Ogilvy.  Notably, her LinkedIn profile lists her *only* as an executive for Ogilvy, and does not list her separate Memac Ogilvy role.  At that time, Nuytemans, speaking as CEO of Memac Ogilvy, confirmed that Ogilvy as a whole was transforming so that "all disciplines [are] consolidated into a single integrated enterprise," a "transformation that began in the US" and "rolled out globally."

137.    Additionally, Ogilvy placed at least one employee, including but not limited to Ralph Clementson, on Memac Ogilvy's board of directors, further exerting control over the subsidiary.

138.    Additionally, Saada Hammad, who was employed directly by Memac Ogilvy, but whom Ogilvy generally held her out, at least as of 2015, as a regional director for Ogilvy's worldwide operations.  Indeed, she held herself out in 2016 as having an "Ogilvy.com" email address, not a Memac Ogilvy address.

139.    Finally, Ogilvy routinely held itself out in FARA statements as being the registrant for the work done by OPRW and Memac Ogilvy.

140.    Due to Ogilvy's general business practices of disregarding corporate form and formalities, and servicing clients across agencies, subsidiaries, and even geographies, it is reasonable to infer that Ogilvy contributed to and collaborated with OPRW and Memac Ogilvy's work.  This allegation is well founded based on specific examples.  First, as stated, when Ogilvy re-launched itself in 2017, it stated publicly that it was integrating all its divisions into "One Ogilvy" under direct control of Ogilvy in New York.  Second, Ogilvy holds out OPRW and Memac Ogilvy employees as employees of Ogilvy, generally, on LinkedIn.  Third, Ogilvy employees have made clear that Ogilvy plays a direct role in the operations of its subsidiaries, directly managing and supporting their work.  Indeed, Ogilvy executives routinely disclosed that they managed and oversaw the operations, contracts, and activities of Ogilvy's subsidiaries, including but not limited to OPRW and Memac Ogilvy.  For example, Jim Woods, the New York executive who signed the FARA statement on behalf of Ogilvy, disclosed that he was in charge of negotiating all "client commercial agreements" for the worldwide business.  And Paul O'Donnell, an Ogilvy executive said publicly he was "theoretically" the "boss" of the CEO of Memac Ogilvy.

141.    Due to Ogilvy's business practice of organizing its services around its clients, Ogilvy, OPRW, and Memac Ogilvy collaborated to provide public relations and lobbying services

to Qatar. Thus, Ogilvy, OPRW, and Memac Ogilvy all worked together on the World Cup Labor Venture.

142.    These facts, *supra* ¶¶131-41, demonstrate it is reasonable to infer that OPRW and Memac Ogilvy and their affiliates and corporate parent Ogilvy had interrelated operations that were centrally controlled, with common management, and with common ownership or control, such that Ogilvy should be held liable for the acts of its subsidiaries.

143.    These facts, *supra* ¶¶131-41, also demonstrate Ogilvy exercised a significant degree of control over OPRW and Memac Ogilvy's employee and employment strategy, business strategy, and decision-making with regard to their work on the World Cup Labor Venture, such that each subsidiary was doing the work of Ogilvy as its agent.

144.    These facts, *supra* ¶¶131-41, also demonstrate Ogilvy exercised extensive control over the acts of each of its subsidiaries, including OPRW and Memac Ogilvy, and on information and belief owns all or the majority of the capital stock of each subsidiary, shares common directors or officers with its subsidiaries, finances its subsidiaries, pays the salaries or expenses or losses of its subsidiaries, and employees of Ogilvy, OPRW, and Memac Ogilvy make no distinction between the entities. For all these reasons, OPRW and Memac Ogilvy are merely instrumentalities of Ogilvy.

**E.    Defendants Knew or Should Have Known the World Cup Labor Venture Engaged in Human Trafficking and Forced Labor.**

145.    Each of Omnicom, Portland, Ogilvy, OPRW, and Memac Ogilvy—because they were hired generally to manage Qatar's and Qatar Foundation's global reputation in the wake of negative international media coverage and governmental pressure, and specifically to counter reporting and pressure on Qatar related to trafficked and forced labor—by the very definition of the jobs they were hired to do, were directly aware of the reporting and protests regarding

trafficked and forced labor being used in preparations for the World Cup.  Those were the exact public relations crises that Defendants were hired to smooth over, so they knew about them.  Each Defendant thus had actual knowledge, or at the very least constructive knowledge, that labor abuses were endemic to the Venture and that their clients were involved with human trafficking and forced labor.

146.    For example, Defendants were hired to counter an evolving public narrative, and there were parts of that narrative that Defendants could not have ignored (indeed, they would have had to know of them to do their jobs).  Pressure to boycott Qatar was put on World Cup sponsors in ways that public relations and lobbying firms would have directly viewed, as activists re-designed brand logos to reflect the businesses' complicity with Qatar's widely known abuse of migrant laborers.  This activist campaign was publicly reported, with "anti-logos" for "multi-national companies including Adidas, Budweiser, Coca Cola and Sony" meant to "shame the corporations sponsoring the 2022 FIFA World Cup in Qatar."  One example of these logo re-designs "show[ed] migrant slaves holding up the VISA sign":



147.    Each negative press item would have alerted Defendants that the Venture and their clients were involved with human trafficking and forced labor.  Portland was hired to monitor and analyze the negative publicity related to trafficked and forced labor—indeed, FARA filings indicate they were directly involved with rapid review and response to media crises, so they would have learned of the fact of trafficked and forced labor as part of that work.  Similarly, Memac Ogilvy's contractual remit (as evidenced by Ogilvy's FARA filings) was to monitor negative press about things like, for instance, the use of trafficked and forced labor at Qatar Foundation's Education City World Cup Stadium, and to help Qatar Foundation respond.  Omnicom and Ogilvy would also have provided the backbone data analytics tools and personnel to assist their subsidiaries in this work.  *The Guardian* publicly reported that the Secretary General of the Supreme Committee "phone[d] his PR people in fury each time there's a negative headline about what's happening in Qatar" related to migrant workers.  On information and belief, "PR people" he called (and therefore directly informed of the issue) regarding negative reporting related to labor abuses were Defendants' employees.  As such, Defendants knew.

148.    Sebastian Schwark, one of the New York Portland partners who disclosed in FARA filings in 2017 that he was working for Portland on behalf of the Qatar Foundation, recently admitted that "[a]t least 15,000 have died during construction work for the 2022 World Cup in Qatar," and noted that "[i]n the future, companies will have to decide whether they want to do business with aggressive autocracies . . . ."  Mr. Schwark's belated acknowledgement supports the reasonable inference that Defendants knew about these abuses when they were contractually providing professional services to Venture participants.

149.    Portland, Memac Ogilvy, and OPRW were also hired to give their clients advice on how to widely disseminate "good" news to mitigate the impact of adverse reporting (including by

producing their own content and using "bought" media coverage). Defendants would, based on that work, have known that trafficked and forced labor was endemic to the World Cup Labor Venture.

150.    At all relevant times it was widely known in the United States, Europe, and Qatar— all locations where Defendants conducted business—that the Qatar labor market relies and relied upon trafficked and forced labor, and that the preparations for the World Cup used trafficked and forced labor in a way that was not materially different from how it was otherwise customary in Qatar. Defendants also knew or should have known that the World Cup Labor Venture employed migrant laborers pursuant to the then-prevalent Qatari *kafala* system.

151.    Defendants knew or should have known that the World Cup Labor Venture would and did exploit trafficked and forced labor. Specifically, Defendants knew or should have known that workers would be lied to about the terms and conditions of their employment and living conditions; that workers' passports would be retained; that workers would be forced to work inhumane and unsafe hours, sometimes without compensation; and that workers would be forced to live in unsafe and unsanitary conditions.

152.    Defendants knew these widely understood facts, as well as the other local-Qatar-knowledge-based allegations in this Complaint, in part through their Qatar-focused and/or Qatar-deployed employees' and local agents' local knowledge. These agents (Defendants' employees on the ground in Qatar, who were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the World Cup Labor Venture engaged in systematic human trafficking and that any commercial actor who participated in it would necessarily benefit from trafficked and forced labor, including the abuses Plaintiffs allege.

153.    Defendants knew or should have known about the extreme trafficking and forced labor risks related to their participation in the World Cup Labor Venture because public reports alerted Defendants to such risks before they began participating in the Venture (while they were deciding whether to participate) and then afterwards throughout the period in which they participated in the Venture.  Reports supporting an inference of Defendants' knowledge are legion, and included, but were not limited to, widely publicized reports authored by the United States, respected NGOs, mainstream media outlets, and documentarians.

### 1. Government and NGO Reports

154.    **U.S. Government reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge.  Such reports included, but were not limited to the June 20, 2014, State Department *Trafficking in Persons Report 2014*, which classified Qatar as a "Tier 2 Watch List" country because it did "not fully comply with the . . . minimum standards" of the TVPRA.  This report alerted Defendants that "Qatar [was] a destination country for men and women subjected to forced labor. . . .  Approximately 1.2 million men and women . . . voluntarily migrate[d] to Qatar to work . . . primarily in the construction, oil and gas, service, and transportation industries . . . but many subsequently face[d] forced labor."  Thereafter, Qatar remained a "Tier 2 Watch List" country in 2015 and 2016.

155.    **NGO reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge.  Indeed, Defendants' job was to monitor and respond to reports such as:

a.      Human Rights Watch.  In 2012, Human Rights Watch sent letters directly to the Supreme Committee regarding slave labor in Qatar's construction industry.  Then, in June 2012, Human Rights Watch published a landmark report entitled ***Building a Better World Cup: Protecting Migrant Workers in Qatar Ahead of FIFA 2022*** ("2012 HRW Report") documenting pervasive employer exploitation and abuse of workers in Qatar's construction

industry. Defendants knew or should have known of the abuses detailed in the 2012 HRW Report and were on notice of the exploitative forced labor conditions detailed herein by 2012 when it was published. The 2012 HRW Report alerted Defendants that "the deeply problematic working conditions of migrant workers throughout the country mean that realizing Qatar's World Cup vision may depend on their abuse and exploitation unless adequate measures are taken to address the human rights problems widespread in the construction industry in Qatar." The 2012 HRW Report also documented exorbitant fees required to obtain jobs, which led to debt servitude, unsafe and unhealthy working conditions, overcrowded, unsanitary, and inhumane living conditions, passport confiscations, and delayed, reduced, or denied pay. The 2012 HRW Report concluded that many of these construction workers are "very likely to be in conditions of forced labor, as defined by international law."

b.    <u>Amnesty International</u>. In 2013, Amnesty International released a report entitled ***The Dark Side of Migration: Spotlight on Qatar's Construction Sector Ahead of the World Cup***, which concluded that migrant workers are subject to forced labor or modern slavery and exploited throughout the construction industry. Then in 2016, Amnesty International published "Qatar World Cup of Shame," and reported its findings that workers for the World Cup in Qatar were being subjected to trafficked and forced labor.

c.    <u>Verité</u>. In 2017, Verité, "a global NGO with a mission to ensure that people around the world work under safe, fair, and legal conditions," published a 355-page report, ***Strengthening Protections Against Trafficking in Persons in Federal and Corporate Supply Chains: Research on Risk in 43 Commodities Worldwide***. In the section entitled "Labor Abuse in Construction Facilities for the World Cup," the report stated that "[a]n investigation into the working conditions in Qatar during preparations for the 2022 FIFA World Cup has found evidence of severe abuse of migrant laborers and indicators of human trafficking." The report detailed evidence of withheld pay and passports to restrict workers from leaving, unsafe worksites, inhumane living conditions, and debt servitude with usurious interest rates.

156.    The 2016 Amnesty International report provides a specific example of Defendants' knowledge of the labor abuses endemic to the World Cup Labor Venture. Defendants would have seen that report, to be sure, but more specifically at that time, Portland (and later, OPRW's) client the Qatari Embassy and Defendants' client the Supreme Committee both issued English-language press releases in response. It is reasonable to infer that Portland's personnel worked on those responses (and thereby participated in the Venture), as they included misleading denials of Amnesty International's reporting. In any event, each Defendant was undoubtedly aware of Amnesty International's claims, which all turned out to be true.

### 2.  Media Reports

157.    **Written Media Reports** alerted Defendants that they were participating in a trafficking venture.  Indeed, because Defendants' role in the World Cup Labor Venture was to monitor[4] and respond to media reporting related to trafficked and forced labor, they knew or should have known in real time about each of the preceding reports, as well as the following examples:

a.    *The Guardian*.  Reports by the *Guardian* regularly alerted Defendants that preparations for the World Cup relied upon trafficked and forced labor.  In December 2012, the *Guardian* published the first of many articles regarding the exploitation of migrant laborers working in Qatar on World Cup preparations.  Later in 2013, the *Guardian* published an article entitled ***No Respite for Qatar's Migrant Workers, International Trade Union Finds***, which reported that a delegation from the International Trade Union Confederation found there had been no improvement in living and working conditions for migrant workers working on the World Cup, detailed employers' practice of withholding salaries and passports to prevent workers from leaving the country, and quoted a trade union official to say "***International companies should be on notice*** about the reputational risk of doing business in Qatar without respect for workers' rights." (Emphasis added.)  Also in 2013, the *Guardian* published another article (entitled ***Qatar's World Cup "Slaves"***), which found "[e]vidence of forced labour on a huge World Cup infrastructure project" and detailed labor abuses, confiscated passports, inhumane living conditions, and debt servitude, and warned that the migrant laborers coming to Qatar to help build the World Cup facilities were uniquely vulnerable to exploitation.  In 2014, the *Guardian* published another lengthy investigative report, headlined ***Modern-Day Slavery - Qatar World Cup: Migrants Wait a Year to Be Paid for Building Offices***.  The *Guardian*'s series of reports was entitled ***Modern-Day Slavery in Focus: Qatar***.

b.    *The Economist*.  In 2013, the *Economist* published a report about migrant laborers readying Qatar for the World Cup, which detailed exorbitant recruitment fees, unfair labor practices, and the problems with exploitation related to Qatar's *kafala* system.  The *Economist* concluded that many workers could be classified as "victims of trafficking."

c.    *USA Today*.  In 2015, *USA Today* published an article—entitled ***FIFA Must Pull Cup Out of Qatar***—reporting that, "[a]s for migrant workers, the kafala sponsorship system is ***just a fancy term for slavery***." (Emphasis added.)

---

[4] On information and belief, one or more of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Labor Venture used Google's "Notification" feature—in which a person can identify any word or phrase and automatically receive a Google-generated email containing a link to any article that pings on such word or phrase after the person signs up—to receive automatically generated emails from Google (a "Google Alert") relating to words like "Qatar," "World Cup," and/or "human trafficking."

d.  <u>Vox</u>.  In 2015, Defendants would have read the *Vox* article entitled **The World Cup's Biggest Issue: Modern Slavery and Dead Workers**, which said in relevant part "FIFA officials **must have known** that giving hosting rights to Qatar would have **directly and undeniably meant funneling money to one of the most horrific construction sectors in the world**."  (Emphasis added).  The article discussed how, even though "[w]orking conditions are . . . horrendous," construction workers could not change jobs because their employers hold their passports.  Indeed, the construction workers working on the World Cup were reported to be "**prevented from leaving the company or the country**" and "**forced to work in impossibly hot weather and conditions that virtually guarantee some will die**."  (Emphasis added).

e.  <u>Wall Street Journal</u>.  In 2015, the *Wall Street Journal* published an article entitled **Qatar Called to Publish World Cup Worker Death Figures**, which discussed the "renewed allegations of labor abuse" as the "latest controversy to mar Qatar's plans to host" the World Cup.  Citing a representative from the International Trade Union Confederation, the article noted "up to 500 construction workers a year could die due to limited access to health services and poor working and living conditions that might prompt heat-related illnesses, stress-induced heart attacks and work-related falls and injuries."  And the article noted that "rights officials" have "called on the Qatari government to address the allegations of abuse" endured by "migrant workers."

f.  <u>Fox News</u>.  In 2016, *Fox News* published an article entitled **Critics Call Foul as Qatar's 2022 World Cup City Built With "Slavery."**  Addressing the construction of World Cup infrastructure in Qatar, including Lusail Stadium, *Fox News* reported that Qatar's "migrant workforce faces deadly conditions, miserable accommodations and low wages."  Quoting a representative from the International Trade Union Confederation, the article stated that "'[c]onditions in camps are simply inhuman.'"  "'FIFA,'" according to that same person, "'is **content for the World Cup to be built on modern slavery**.'"  (Emphasis added.)

g.  <u>Huffington Post</u>.  In 2016, *Huffington Post* reported—in an article entitled **Report Tells FIFA To Protect Human Rights Or Move World Cup From Qatar**—that "Amnesty International recently interviewed more than 200 migrant workers to document human rights abuses at these construction sites. The global human rights group criticized FIFA for not pressuring Qatar to implement promised reforms, leaving intact a labor system that other groups have likened to **'modern slavery.'**"  (Emphasis added.)

h.  <u>CNN International</u>.  In 2016, CNN reported that "Qatar actually commissioned a report by an international law firm **about two years ago**, which said very clearly that the kafala system, or the sponsorship system can facilitate and drive **modern-day slavery**."  (Emphasis added.)

i.  <u>Deutsche Welle</u>.  In 2018, Deutsche Welle reported about the deaths of "hundreds of foreign workers, including at FIFA 2022 World Cup venues," and zeroed in on worker treatment at the Al Rayyan Stadium, in Education City, the compound owned, controlled and operated by Qatar Foundation.  The report included video evidence showing workers forced to work through mid-day heat as high as 120 degrees Fahrenheit, despite there being

a general law against work at that time, and quoted workers as saying their passports had been confiscated and that "life in the [housing] camp is unbearable."

158.    **Television Reports and Documentaries** also alerted Defendants—through stark videos and photos—that they were participating in a trafficking venture and support an inference of Defendants' knowledge.   These videos addressed the squalid conditions in which migrant workers in Qatar lived, highlighting labor abuses related to the World Cup Labor Venture.   A non-exhaustive list of such reports, which Defendants would have seen via their active monitoring (and response) projects, follows:

| Broadcaster / Program | Title of Segment | Year |
|---|---|---|
| International Trade Union Confederation | ***Hidden Faces of the Gulf Miracle***<br><br>https://tinyurl.com/mrxuw5mp (last accessed April 22, 2025) | 2011 |
| The *Guardian* / *Guardian* Online | ***Qatar World Cup 2022: Migrant Workers Forced to Work for No Pay***<br><br>https://tinyurl.com/6jddprue (last accessed April 22, 2025) | 2013 |
| HBO / Last Week Tonight (with John Oliver) | ***FIFA and the World Cup***<br><br>https://tinyurl.com/389shwcc (last accessed April 22, 2025) | 2014 |
| ESPN / E:60 | ***Qatar's World Cup***<br><br>https://tinyurl.com/3sy66dtt (last accessed April 22, 2025) | 2014 |
| The *Guardian* / *Guardian* Online | ***Qatar World Cup: Migrants Wait a Year to be Paid for Building Offices***<br><br>https://tinyurl.com/3kd8c3e5 (last accessed April 22, 2025) | 2014 |
| BBC / BBC News | ***"Forced Labour" at Qatar World Cup Site***<br><br>https://tinyurl.com/bdertvsn (last accessed April 22, 2025) | 2016 |
| Amnesty International | ***Investigating Conditions in Qatar Migrant Camps***<br><br>https://tinyurl.com/43cz8ebk (last accessed April 22, 2025) | 2016 |

159.    Such video coverage spanned the political spectrum.  For example, MSNBC's *All In With Chris Hayes* broadcast a piece entitled **FIFA Corruption Scandal** in 2015, https://tinyurl.com/46xd6vpy (last accessed April 22, 2025), which stated in relevant part that "[t]he situation is extraordinarily grim in Qatar where ***migrant workers are building World Cup stadiums in slave-labor conditions, with hundreds, perhaps thousands, dying in the process***." Similarly, in a segment titled **FIFA Sponsors Voice Concerns in Wake of Corruption Scandal**, which aired in 2015, https://tinyurl.com/3sxn4tz2 (last accessed April 22, 2025), *Fox News* observed: "[l]ook at the Qatar World Cup.  Hundreds of immigrant workers have died building World Cup stadiums there."

160.    News outlets, investigative journalists, and non-governmental organizations also published (and republished) imagery that revealing the squalid and inhumane conditions of migrant construction workers' lives in Qatar.  Defendants would have seen each of the following examples:

a.   Sleeping quarters for migrant workers (*Guardian*, July 2014):[5]



b.   Restrooms for migrant workers (*Guardian*, Qatar World Cup Video, July 2014):



---

[5] This video can be seen on the *Guardian*'s website where it hosts its news item entitled "Qatar World Cup worker: 'I want to go home but I don't have any money,'" (July 28, 2014) ("Qatar World Cup Video"), *available at* https://tinyurl.com/43ww2njy (last accessed April 22, 2025).

c.  Group kitchen for migrant workers (*Guardian*, Qatar World Cup Video, July 2014):



d.  Group bathing area for migrant workers (*Guardian*, Qatar World Cup Video, July 2014):



e.  Toilet-stall bathing area for migrant workers (*Guardian*, Qatar World Cup Video, July 2014):



f.  Toilet-stall bathing area for migrant workers (*Guardian*, Qatar World Cup Video, July 2014):



g.  Housing for migrant workers (Amnesty Int'l, March 2016):



h.  Successful attempt to shut down interview, by World Cup Labor Venture participant, when interviewee was asked about the Venture's use of migrant labor to build the stadiums (*Guardian*, Qatar World Cup Video, July 2014):



### 3. Defendants' Due Diligence

161.    Defendants also knew or should have known that they were participating in a trafficking venture because, on information and belief, Defendants conducted due diligence that alerted Defendants to the risks. On information and belief, such diligence included, but was not limited to: (1) review of the reports described above; (2) preparation and review of due diligence materials (*e.g.*, summaries and emails) prepared by Defendants and/or Defendants' consultants or agents; and (3) discussions with persons who were knowledgeable about prevailing labor practices in Qatar.

162.    For example, Omnicom stated in its Code of Business Conduct that it "[a]ssess[es] and monitor[s]" the labor practices of its "business partners," such as Qatar. That is because:

> We expect our business partners to share our commitment to individual rights. Before you work with any business partner, they should be assessed so that you are reasonably certain that their actions are in line with the law and that they treat all workers with dignity and with respect for their basic human rights.

And this directive applied to Portland and Mercury, too. "Everyone who works on Omnicom's behalf must follow the Code. That includes employees, both full and part-time, at every level, in every location around the world. It also includes everyone else who represents Omnicom, from contractors to our Board of Directors. Even our business partners are expected to uphold our high standards." On information and belief, Ogilvy and its subsidiaries had similar internal corporate policies and requirements.

163.    At a minimum, Defendants' industry-standard due diligence and internal corporate policies support an inference of Defendants' knowledge of the trafficking and forced labor abuses committed by the World Cup Labor Venture in which they participated. Defendants' due diligence would have revealed to them, at the latest in 2014 and 2015 when governments began calling for reform that the Venture relied upon trafficked and forced labor. Given the nature and extent of the

public reports described throughout this Complaint it would not have been possible for Defendants to "clear" the trafficking and forced labor risks in the normal course of the due diligence they conducted.

### 4. Qatar Foundation's Notorious Role, Reputation, and History

164. As discussed, *supra* V.D.1, V.D.4, V.D.6, Portland, Ogilvy, and Memac Ogilvy all disclosed in FARA documents that Qatar Foundation was their client. As discussed *supra* V.C., the Qatar Foundation was controlled by the Qatari regime, Qatar Foundation was a direct perpetrator of harms against Plaintiffs and others who worked at Education City, and Qatar Foundation was the Qatari regime's notorious "reputation washing" front which worked to support trafficked and forced labor. Defendants thus knew or should have known that they were participating in a trafficking venture because Qatar Foundation's notorious role, reputation, and history also alerted Defendants that their participation in the World Cup Labor Venture benefited from the trafficking and forced labor of persons like Plaintiffs, and ensured that Defendants should have detected, and did detect, abuses and forced labor relating to the Venture.

165. For example, the 2014 *Guardian* report and the film included with it demonstrated labor abuses, and Qatar Foundation's response, in which Defendants played a role, pervasively underreported that exploitation. Defendants would have known of the truth, due to their work to suppress it.

166. In 2018, Deutsche Welle reported regarding "blatant evidence" of labor abuses at the Qatar 2022 World Cup stadium that Qatar Foundation owned, operated, and was responsible for. Defendants, because they worked with Qatar Foundation on this very topic, would have known.

167. Defendants also knew, or should have known, of a litany of contemporaneous reports that alleged that Qatar Foundation, and its associated charities, had directly funded

HAMAS, Hezbollah, al-Qaeda, and other notorious trafficking ventures (and terrorist groups), which were known for engaging in significant and systematic human trafficking, including when Defendants worked closely with Qatar Foundation, which alerted Defendants that Qatar Foundation was not a legitimate charity, but instead a front that enabled human trafficking.

168.   For example, the *Australian Review* publicly reported in 2012 that "Qatar Foundation" had "attracted [] negative headlines due to allegations that the non-profit organisation had provided funding to terrorists."  Similarly, in 2015, Shurat HaDin Israeli Law Center, an Israeli NGO dedicated to fighting extremism in the Middle East, launched a media campaign, including a detailed press release, that publicly "called on FC Barcelona to suspend ties with the Qatar Foundation on the grounds that it [was] 'immoral to receive funding from a country that supports terrorist groups,'" during which Nitsana Darshan-Leitner, the NGO's president, warned anyone adjacent to Qatar Foundation, like Defendants, that "[w]e know that Qatar [through Qatar Foundation] has … funded … groups like Islamic State, Al-Qaeda and Hamas."  And in 2017, Israeli attorney Louis Garb publicly observed that "Qatar" was "a vicious, terror-supporting dictatorship" such that "Qatar, through Hamas and Hezbollah, support[ed] terror worldwide" and "also use[d] slave labor to build the stadiums needed to indulge the megalomania of its rulers who, through bribery, won the opportunity to host the next World Cup."

169.   Defendants knew that HAMAS was a notorious trafficker, which further contextualized their awareness of the role of Qatar Foundation.  In 2007, for example, *Deutsche Presse Agentur* (*i.e.*, the German Press Agency), publicly reported that Dutch researchers had concluded that "the militant Palestinian Hamas movement" financed itself, in substantial part, through the "[l]arge sums of money" HAMAS received "from the money [that] originate[d] from … human trafficking."  Similarly, in 2014—while Qatar Foundation was ramping up its support

for HAMAS—numerous sources in Israeli media confirmed HAMAS's bedrock reliance on trafficking, like when *Israel National News* reported that, "Palestinian Authority … Chairman Mahmoud Abbas's Fatah … exposed that Hamas is running a human trafficking network."[6]

170.    Defendants' knowledge that Qatar Foundation was directly involved in aiding notorious trafficking ventures (and terrorist groups) like HAMAS, Hezbollah, al-Qaeda, and ISIS confirms that Defendants knew, or should have known, that Qatar Foundation supported human trafficking in Qatar.  These groups that Qatar Foundation supported were notoriously engaged in human trafficking and forced labor, including, but not limited to, by engaging in hostage-taking and ransoms, forced labor and services, and sex trafficking.

171.    Due to all these red flags about Qatar Foundation, Defendants knew that Qatar Foundation was, and is, best understood as a reputation washing front designed to enable trafficking, including in relation to the World Cup Labor Venture, rather than serving as a legitimate charitable foundation.  Indeed, Qatar Foundation, one of Portland's and Memac Ogilvy's direct clients, was building a stadium at Education city in Qatar that depended on and used trafficked and forced labor.  Defendants knew of Qatar Foundation's true nature for at least two reasons.  *First*, Defendants' own relationship directly with Qatar Foundation, as a service provider, gave them direct knowledge of its objectives and tactics.  Indeed, the contexts in which Defendants operated could only have given rise to the ineluctable conclusion that Qatar

---

[6] More generally, Defendants' knowledge that Qatar Foundation was in the business of directly supporting groups that committed systematic violence like trafficking humans, beheading hostages, and detonating car bombs, also alerted Defendants that Qatar Foundation was not a legitimate charity.  When Defendants collaborated with Qatar Foundation, they were not partnering with a legitimate charitable institution—they were partnering with a notorious front that the Qatari regime used to funnel money to its violent, human trafficker allies like HAMAS, Hezbollah, al-Qaeda, and ISIS, among the many notorious hostage-taking trafficking ventures/terrorist groups with which the regime was aligned.

Foundation's anti-trafficking words were lip service designed to provide cover for continued trafficking given the Qatari regime's absolute power and control over the country and Qatar Foundation. *Second*, media reports, including but not limited to the *Economist*'s reporting, alerted Defendants to this reality.

172.    For all these reasons, Defendants' work with Qatar Foundation made them know, or they should have known, that the World Cup Labor Venture engaged in human trafficking and forced labor.

### 5.  Defendants' Roles in the World Cup Labor Venture

173.    Defendants' specific roles in the World Cup Labor Venture, detailed *supra* V.D, also alerted Defendants to the fact that trafficked and forced labor was endemic to the Venture.

174.    For example, Portland, Omnicom, Ogilvy, OPRW, and Memac Ogilvy each provided services meant to hide, obfuscate, and minimize reporting about the use of trafficked and forced labor, and Mercury and OPRW lobbied to try to stop pressure to reform, so they all knew of the trafficked and forced labor they were focused on trying to refute reporting of and reaction to.

175.    Portland employees' worked to "manage daily media monitoring," including producing "a 24/7 media monitoring product," and their management of government social media platforms ensured that Portland and Omnicom learned of the trafficked and forced labor endemic to the Venture.  Similarly, Ogilvy, OPRW, and Memac Ogilvy employees' review of negative media and management of social media for Qatar Foundation would have alerted them to the problems of trafficked and forced labor in the Venture.  Examples of what they would have seen in the normal course of their work are legion, *see supra* V.E.1, V.E.2.

176.    Portland's work to draft "talking points for government officials," "responses to members of the media," and "crisis communication strategy" for the World Cup made certain that

Omnicom and Portland would learn of the trafficked and forced labor alleged to be exploited throughout World Cup preparations. Memac Ogilvy, which did its work in collaboration with Ogilvy and OPRW, had a similar contractual obligation to help respond to negative media and develop crisis response materials, and would have known of the trafficked and forced labor inside the World Cup Labor Venture due to that work.

177. Portland's efforts to paint a rosy picture of migrant laborer conditions, including by organizing a propaganda tour for international journalists, *supra* ¶74, demonstrates that Portland and Omnicom knew about the allegations of trafficked and forced labor. They knew the truth about the housing conditions and labor exploitation and participated in the World Cup Labor Venture by attempting to convince international journalists that there was a different, manufactured reality.

178. And Portland's work generally to minimize coverage of labor abuses would have alerted Portland and Omnicom to the exploitation of trafficked and forced labor in World Cup preparations. One example of this was Portland's work with Al Thani to directly refute claims of exploitation of migrant workers, Portland and Omnicom would have learned of the trafficked and forced labor, and abuses of migrant labor in the World Cup Labor Venture, in that instance among many others.

179. Similarly, Ogilvy's—and its subsidiaries Memac Ogilvy's and OPRW's—public relations work to minimize and refute the reporting related to labor abuses in the World Cup Labor Venture would have alerted them to the exploitation that was ongoing. In one example, in February 2014, Jeff Chertack posted to Twitter the Qatari government response to the criticism that their labor standards were exploitative of migrant labor. The article that he linked as part of that post discussed substandard living conditions at migrant laborers housing, and noted that they violated

the standards adopted by the Supreme Committee and published by the Qatar Foundation, regarding number of people in a bedroom.

180.    Finally, Omnicom's, Mercury's, Ogilvy's, and OPRW's work within the United States on governmental lobbying campaigns, designed to stop, minimize, or lessen, U.S. pressure on Qatar to reform labor standards, would have alerted each Defendant to the labor abuses.  For example, Portland was in the "war room" with Mercury regarding domestic lobbying efforts to counter international pressure to reform.  And OPRW lobbyists at its OGR shop in Washington D.C. actively disseminated materials meant to minimize the truth about labor abuses.  By virtue of doing this work, each Defendant would have known that the World Cup Labor Venture used trafficked and forced labor.

### 6.  Defendants' Venture-Related Course of Dealings

181.    Defendants' course of dealings—including those of their partners, *e.g.*, the Supreme Committee, Qatar Foundation, and FIFA—also alerted Defendants that they were participating in a trafficking and forced labor venture and provides further direct evidence that Defendants knew of these abuses in the World Cup Labor Venture in which they participated. Plaintiffs are aware of at least three instances when such course of dealings confirms that Defendants knew or should have known that Plaintiffs were being trafficked by the World Cup Labor Venture in which Defendants participated.

182.    *First*, in 2013, FIFA acknowledged that "fair working conditions [for migrant workers] with a lasting effect must be introduced quickly in Qatar."  However, the Qatari regime would not begin implementing those "reforms" until 2020; even after, ongoing labor practices continued to violate the TVPRA.  Defendants would have seen FIFA's pronouncement and would have had direct knowledge regarding implementation of reforms, and lack thereof.

183.    *Second*, in 2015, VINCI, a construction company working on the Al Rayyan Stadium and Precinct project for the World Cup, and thus a part of the World Cup Labor Venture Defendants participated in (indeed, this was the stadium at Education City that was owned and operated by Portland's and Ogilvy's client Qatar Foundation), admitted to confiscating passports after a related public accusation. Labor abuses continued, and in 2018 Deutsche Welle reported (including with video evidence) obvious and widespread labor abuses at the same stadium. Defendants would have known of these reports and managed their client's expectations regarding how to respond, and likely worked to minimize and/or limit the impact of these reports when they occurred.

184.    *Third*, in 2015 when Portland was organizing the propaganda tour of migrant workers' housing facilities, Portland would have been acutely aware of the conditions in which the migrant workers lived. Portland also managed Qatar's interactions with the BBC journalists who were on that tour, both before and after it went off the rails. That is, they were also in charge of managing the fallout of the tour, and in charge of interacting with the BBC in the years that followed. Portland would have understood the labor abuses, because it actively worked to try to stop the BBC from reporting on them.

**F.    Defendants Knowingly Benefitted from Participating in the World Cup Labor Venture.**

185.    Defendants entered into contracts and were paid to provide public relations and lobbying services in aid of the World Cup Labor Venture. The total value paid to Defendants is not known at this time, but it was substantial because over one hundred employees worked on these projects. On information and belief, each of Omnicom and Ogilvy realized at least $20 million dollars in profit from their participation in the Venture. For example, Ogilvy and its subsidiaries handled United States public relations for Qatar Foundation and other Qatari clients

since at least 2017, its government relations arm was registered as an agent for the Qatari government and Qatar Foundation in 2018, and it was paid more than $1 million that year. Public reporting after the World Cup was over stated that the "Qatari government was late paying [Portland] millions of pounds of fees," but that "all fees owed to Portland have since been paid." Discovery will reveal the total amounts Defendants were paid, which is undoubtedly substantial.

186.    Defendants violated the TVPRA by knowingly benefiting from the World Cup Labor Venture in the United States. Portland's New York entity had contracts to do work related to the World Cup Labor Venture in New York and was paid millions of dollars per year. Omnicom is headquartered in New York and from there both supported and profited from Portland's and Mercury's work to provide public relations and lobbying services in aid of the World Cup Labor Venture. Ogilvy signed FARA statements saying it was assisting with media outreach in the United States, disclosed that that outreach was to New York media, and therefore supported and profited from the work done in furtherance of the Venture. OPRW employees worked on the Venture from New York and Washington, D.C. and had contracts with Qatar and were paid in the United States for that work.

187.    Finally, each of Defendants' and Defendants' employees' public announcements regarding the World Cup Labor Venture confirm not only that they participated in the Venture (and each social media post is, in and of itself, participation in the Venture, at times from within this District), but also that Defendants knowingly received benefits in the United States in the form of the publicity and notoriety of being involved in such a high-profile international project.

**G.    Each Plaintiff Was a Victim of Trafficking by the Venture.**

188.    Each Plaintiff was a victim of trafficking by the Venture. Below, Plaintiffs set forth each Plaintiff's allegations as to both that individual Plaintiff's injuries, as well as the pattern and practice demonstrated by all the Plaintiffs—and the allegations of all the Plaintiffs further

corroborate the allegations of each individual Plaintiff.  Accordingly, all Plaintiffs' allegations below are relevant to each Plaintiff's individual allegations.

189.    **Plaintiff A.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Khalifa Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Midmac Company.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress.  He understood he could not leave until his contract was complete.  He was forced to work through exhaustion and sleep deprivation, routinely over 16 hours per day, and was forced to routinely provide overtime work.  He was not paid what he was promised and had earned.  He was not compensated for all overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  The food that he was provided was not clean.

190.    **Plaintiff A.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2013-2016, and specifically on the construction of the Khalifa Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Rabban Readymix.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract, which caused him to be frightened and depressed.  He was forced to work through exhaustion and sleep deprivation and was regularly forced to work as many as 72 hours straight.  He was hospitalized multiple times due to fatigue and dehydration.  He was lied to about

his pay.  He also, at times, received less pay than he was promised and had earned.  At times, he was forced to sleep in a truck, because the Venture participants did not provide him a bed.  He was not allowed to go home at the end of one of his contracts but instead was forced to stay in Qatar and continue working.

191.    **Plaintiff A.D.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Lusail Stadium and the Al Rayyan Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Imar Trading and Contracting Company.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel scared and like a prisoner.  He routinely was forced to work overtime, and through exhaustion, with a typical workday lasting 14-16 hours.  He was not paid what he was promised, and his overtime was not fully compensated.  He was forced to live in crowded and inhumane living conditions, packed into a small room with five other people.  He was forced to move from housing facility to housing facility.  He was provided food, but it was not nutritious and smelled unsanitary.

192.    **Plaintiff A.G.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014–2016, and specifically on the construction of the Lusail and Khalifa Stadiums.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Midmac Company.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from

leaving the country or his job until the end of his contract. This caused him distress. He understood he could not leave until his contract was complete. He was forced to work through exhaustion and sleep deprivation and was forced to routinely provide overtime work. He was not paid what he was promised and had earned. He also was not compensated for all overtime work he provided. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. The food that he was provided was not clean and caused him medical complications.

193. **Plaintiff A.P.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2016-2019, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. When his passport was taken, he felt fear and was too scared to leave the compound where he stayed. But he felt he had no choice but to comply. He was lied to about his pay and was paid less than promised. He was forced to work through exhaustion, with workdays beginning at 4:00 AM due to travel time to the construction site. He was routinely forced to provide overtime work but was not fully compensated for it. He was forced to live in crowded and inhumane living conditions, in dirty rooms infested with bedbugs that housed twice as many as they were designed to. The food provided in the mess hall was unsanitary, poorly cooked, unappetizing, and monotonous.

194. **Plaintiff A.S.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2015-2018, and specifically on the construction of the Al Thumama Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture

which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was told that his passport had been confiscated to ensure that he finished his contract, causing him emotional distress. He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and at times was forced to work 24 hours straight. When he told his supervisors he did not wish to work as much overtime as was demanded, due to his exhaustion and worsening hypertension, he was threatened with the unexpected financial penalty of having to pay his own air fare and other fees to go home, and he was told to go back to work. Because he could not pay that cost, he felt he had no choice but to go back to work. He was not provided the compensation he was promised. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. He was provided food, but it was unsanitary.

195.    **Plaintiff A.V.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel confused and scared. He was lied to about his pay and he was not paid for all his overtime work. He routinely worked long hours, with days starting at 4:00 AM to catch a 5:00 AM shuttle to begin work at 7:00 AM. He was forced to work through exhaustion, often working until 9:00 PM. When required to work late, he

had no transportation back to his accommodation and was forced to either walk for hours or hitchhike. He lived in crowded and inhumane conditions, with eight to ten workers crammed into tiny rooms designed for only 4-6 people. He was frequently forced to move accommodations with no notice, sometimes being woken in the middle of the night to relocate. The food provided in the mess hall was unsanitary, poorly prepared, lacking in nutrition, and often had a bad smell.

196. **Plaintiff Al.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Thumama Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar, precluding him from leaving the country or his job until the end of his contract. He was forced to work in extreme heat through exhaustion, with workdays beginning at 4:00 AM to travel to the construction site. He was not paid what he was promised, and he was forced to work overtime but was not compensated for all overtime hours worked. He was forced to live in crowded and inhumane living conditions, packed into a room with seven other workers. The food provided in the mess hall was inadequate and unsanitary, including chicken that was not properly cleaned or cooked. He was denied sick leave and automatically marked absent if he could not work. After two years, he was not allowed to leave and was threatened that the company would not pay for his airfare home unless he kept working. He decided to leave anyway, but the company kept his passport and he had to remain in Qatar for over two months without pay and without a food allowance. Finally, his family sent him funds to pay for his air fare home and the company finally gave his passport back to him so he could leave.

197.    **Plaintiff Am.P.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2014-2018, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel nervous as he lacked identification in a foreign country, and he was once detained by police because he did not have his documents, and his visa had expired without being properly renewed by the company.  He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign an "indefinite" contract upon arrival in Qatar.  He was not paid what he was promised.  He was forced to work extremely long days, beginning at 4:30 AM and often not returning to his accommodation until 8:00 or 9:00 PM, including mandatory overtime.  He was forced to live in crowded and inhumane living conditions, first with six workers packed into a dirty room infested with bedbugs.  When he attempted to resign, the company repeatedly refused.  When they finally allowed him to go home, he had to pay for his own airfare.

198.    **Plaintiff An.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the road infrastructure leading to the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him

to be afraid.  He was forced to work through exhaustion, sometimes for as many as 24 hours straight when there were deadlines to meet, and he was not compensated for all overtime work. His salary was routinely delayed by more than a month.  He was forced to live in crowded conditions, with four workers to a room, with beds infested with bedbugs.  The food provided was unsanitary, undercooked, and sometimes did not reach the work site due to distance.  He suffered from a workplace injury from lifting heavy piles that caused severe back pain and nerve damage, and he was given only pain medication and no other treatment despite the injury being so severe that it caused him to use a cane.  After his two-year contract ended, he was not allowed to leave immediately but was forced to wait over a month before being permitted to return home.

199.    **Plaintiff An.D.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was deceived about both the work he would do and the amount he would be paid. He was forced to work through exhaustion, with workdays beginning at 3:00 AM to prepare for a 4:00 AM departure to reach the worksite by 6:00 AM.  He was routinely forced to work overtime but was not fully compensated for it.  He was forced to live in crowded and inhumane living conditions, with 8-10 workers packed into rooms with frequently-broken air conditioning and beds infested with bedbugs.  The food provided in the mess hall was unsanitary and inadequate, with raw meat and repetitive, unpalatable meals that caused him to become physically weak and lose substantial weight.  He suffered a serious workplace injury when his

finger was nearly severed, but the company refused to cover his medical costs or honor his insurance claim despite hospital and police documentation.

200.    **Plaintiff Ar.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2015-2018, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel stressed and powerless to object.  He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar, which he did out of fear of being sent home with no money to pay for his expenses.  He was not fully compensated for overtime work, despite being required to work those hours.  He was forced to live in crowded and inhumane living conditions, with eight workers sharing a small room with four double-deck beds, no storage space for belongings, and infestations of bedbugs that prevented him from sleeping.  The food provided was of poor quality, repetitive, and sometimes improperly cooked.  When he attempted to resign, he was forced to pay 5,000 Philippine Pesos and then made to wait an additional three months before being allowed to leave, during which time he received no work or pay.  He had to pay for his own airfare home.

201.    **Plaintiff Ari.R.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants,

including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This left him and his family scared and concerned.  He was lied to about his compensation and was paid much less than was promised.  He was forced to work through exhaustion and extreme heat, with workdays beginning at 3:00 AM to prepare for a 5:00 AM departure to reach the worksite by 6:00 AM.  He was routinely forced to provide overtime work, including on rest days and holidays, sometimes until midnight, but was not fully compensated for that work.  He was forced to live in crowded and inhumane living conditions, with seven workers packed into small rooms infested with bedbugs.  He was subjected to sudden transfers between accommodations with only an hour's notice to pack his belongings.  The food provided in the mess hall was unsanitary and inedible, with raw and foul-smelling meat.  He had a heat stroke due to the inhumane working conditions and long workloads but was required to pay for his own medical treatment.

202.    **Plaintiff Arn.R.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  As this was his first trip abroad, the seizure of his passport caused him to feel fear and anxiety, especially since he had no money to pay for his return flight if he refused to comply.  He was forced to work through exhaustion and sleep deprivation, routinely working overtime hours.  He was typically required to work overtime but was frequently not

compensated for all overtime hours worked. He was lied to about his pay. He was forced to live in crowded and inhumane living conditions, packed into a small room infested with bedbugs, and living with seven other workers. The food provided was unsanitary, bland, not nutritious, and at times inedible. Though his contract promised transportation to and from the work site, he was often forced to walk for hours back to his accommodation after long days of work, particularly after overtime shifts.

203.    **Plaintiff B.D.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear. He routinely was forced to work overtime. He was not paid what he was promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a room with seven to nine other people, insufficient air conditioning, and infestations of bedbugs. He was forced to move from housing facility to housing facility. He tried to resign when he developed psoriasis, but his employer still did not return his passport, and made him wait for months while charging him for costs to house him before he was allowed to fly home. He was provided food, but it was not nutritious and smelled unsanitary.

204.    **Plaintiff B.M.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017-2019, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture

which exploited his labor. His direct employer was Imar Trading and Contracting Company. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He understood he could not leave until his contract was complete, regardless of how he was treated, which caused him to feel anxious and scared, and caused him to restrict his movements in Qatar. He was forced to routinely provide overtime work. He was not paid what he was promised and had earned. He also was not compensated for all overtime work he provided. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. The food that he was provided was insufficient and not clean. He was forced to work through sickness, and denied access to a doctor, when he fell ill with chicken pox.

205.    **Plaintiff B.T.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2016-2019, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxious as he lacked identification in a foreign country. He was forced to work eleven-hour days including two hours of overtime daily and was not compensated for his frequent overtime beyond the initial two hours. He was also required to work on Fridays, which were supposed to be rest days. For more than a year, the company failed to renew his residency permit, leaving him with only a temporary ID that restricted his movement and caused him additional fear, having no

valid identification. He was forced to live in crowded and inhumane living conditions, with six to eight workers packed into rooms designed for two people, and beds infested with bedbugs. When he attempted to resign due to these conditions, the company refused his resignation, and then six months later terminated him without explanation and forced him to remain in Qatar for over a month without work or pay.

206. **Plaintiff C.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear and anxiety. He routinely was forced to work through exhaustion, and to provide overtime, sleeping only five hours per day. He was not paid what he was promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a room with seven to nine other people, infestations of bedbugs, and insufficient toilet facilities. He experienced additional trauma when he witnessed his co-worker die, he believes from heat exhaustion. He tried to resign due to the poor conditions of his work and accommodations, but he was not allowed to leave for months, during which he was charged costs to house him, after which his employer used his backpay to purchase his plane ticket home. He was provided food, but it was not nutritious and smelled unsanitary.

207. **Plaintiff C.S.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017-2019, and specifically on the construction of the Al Rayyan and

Lusail Stadiums.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Imar Trading and Contracting Company.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxious and afraid, and like he was a prisoner.  He was forced to work through exhaustion and sleep deprivation and routinely was forced to work overtime.  He was routinely forced to work 16-hour days, which after travel to and from work allowed for only three hours of sleep.  He was not paid what he was promised.  He was lied to about what he would be paid, and about whether he would have to repay his travel expenses to Qatar.  He was forced to live in crowded and inhumane living conditions, packed into a small room with seven other people, and he was often transferred from location to location to live without notice.  He was provided food, but it was not properly cooked.

208.    **Plaintiff C.V.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2013-2015, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Midmac Contracting Co.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work and was told they would keep it until the end of his contract.  He was not paid what he was promised, and was undercompensated for his overtime pay.  He was forced to work through exhaustion, routinely providing four hours of overtime per day and sometimes working 24-hour shifts.  He was forced to live in cramped and inhumane living conditions, packed into a small room with 5-6 other workers, with beddings

infested with bedbugs that made sleeping difficult or impossible. The food provided in the mess hall was inadequate, unappetizing, undercooked, not properly cleaned, and repetitive.

209. **Plaintiff D.D.R.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2019, and specifically on the construction of Khalifa Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. His employer specifically told him that he could not leave Qatar until the end of his contract. Because his passport was taken from him, he felt distressed because he would be unable to leave Qatar, even if there was an emergency, and he could not switch employers. He was forced to live in crowded and inhumane living conditions. He was forced to work through exhaustion, with a typical day starting with a bus ride to the stadium at 5:00 AM, and sometimes working until midnight—an 18-hour workday. Although he was forced to provide at least 2 hours of extra overtime work per day, he was denied compensation for that work. He either received delayed pay for overtime or received no overtime pay at all. His salary was sometimes significantly delayed, thus impacting his family in the Philippines and forcing him to borrow money to send to his family. He felt he was being treated like a slave.

210. **Plaintiff D.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2021, and specifically on the construction of Al Wakrah Stadium, the Thumama Stadium, and the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Rabban Readymix. Venture participants, including but not limited to, on information and belief,

his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. Because his passport had been confiscated, and he was told his employer would keep it to ensure he stayed for the full contract term, he was scared and felt fear and dread, and he restricted his movement in Qatar so as to not be found by authorities without his documentation. He was forced to work through exhaustion. He also was regularly forced to work overtime, sometimes as many as 36 hours straight, and he was not compensated for all overtime hours he worked. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. He was provided a food allowance that was insufficient for nourishment considering his heavy workload.

211. **Plaintiff E.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2018-2020, and specifically on the construction of the Lusail and Al Thumama Stadiums. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Imar Trading and Contracting Company. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was told that his passport had been taken to ensure that he finished his contract and did not transfer to another employer. This caused him fear and distress. He was forced to work through exhaustion, sleep deprivation, and medical conditions. He was forced to routinely provide overtime work such that he only slept approximately three hours per night. He was docked pay for having medical issues addressed. While providing labor for the Venture, he experienced a significant injury. He was not provided the compensation he was promised. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. He was provided food, but it was unsanitary.

212.    **Plaintiff E.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015, and specifically on the construction of Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Imar Trading & Contracting Company.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress.  He was lied to about his pay.  He also, at times, was denied pay or received less than he was promised and had earned.  When he was ill and took a day to rest, he was docked three days of pay.  When he asked if he could leave Qatar, he was threatened with the prospect of having to repay his recruitment fees.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided food, but it was often unsanitary.

213.    **Plaintiff E.D.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Al Thumama Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxious and worried.  He was routinely forced to work overtime, and was forced to work through exhaustion, sometimes as many as 24 hours straight.  He was not paid what he was promised.  He was forced to live in crowded and inhumane living conditions, packed into a small room with nine other people.  His bed was

infested with bedbugs, which caused him to be even more exhausted. The food he was provided was not nutritious and was at times unsanitary.

214.    **Plaintiff E.D.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Thumama Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Company. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear. He was not paid what he was promised, he routinely experienced delayed salary payments and was regularly denied compensation for overtime work. He was forced to live in crowded and inhumane living conditions, packed into a room with eight other people, with infestations of bedbugs. The food provided through mess halls was poor quality and repetitive.

215.    **Plaintiff E.G.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2015-2018, and specifically on the construction of the road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared, especially as a newcomer in a foreign country without proper identification. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign a five-year contract upon arrival in Qatar. He was not paid what he was

promised, experienced frequent salary delays, and was regularly denied full compensation for his overtime work despite working four hours of overtime daily.  He was forced to live in crowded and inhumane living conditions, with four workers packed into rooms designed for only two people, with beds infested with bedbugs and inadequate cooling systems that made sleeping difficult.  The food provided was unsanitary, repetitive, and sometimes insufficient, leading to worker strikes.  When he attempted to resign, he was not allowed to leave immediately and was forced to wait in Qatar for three months without pay before being permitted to return home.  The company also withheld his gratuity pay despite his three years of service.

216.    **Plaintiff E.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of roads leading to the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, stating it was "their policy," which caused him to feel scared and powerless.  He was forced to work through exhaustion and sleep deprivation, with shifts lasting up to 24 hours.  He was lied to about his compensation, was forced to sign a new contract when arriving in Qatar and was consistently denied full compensation for his overtime work.  He was forced to live in crowded and inhumane living conditions, packed into a small room with three other people, with beds infested with bedbugs, which caused him many sleepless nights.  The food provided in the mess hall was often raw, unsanitary, and improperly prepared, with chicken still having feathers and meat visibly bloody.  At the end of his contract, he was detained for more than a month without work or pay before finally being allowed to leave Qatar.

217.    **Plaintiff E.M.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.   His direct employer was Habtoor Leighton Group.   Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel scared as he believed it was unsafe to be in a foreign country without identification.  He was deceived about his contract, and after signing a two-year contract in the Philippines he was forced to sign a five-year contract upon arrival in Qatar.  His pay was frequently delayed and he was denied full overtime compensation despite sometimes being forced to work up to 24-hour shifts to meet deadlines.  He was forced to live in crowded and inhumane living conditions, with four workers crammed into small rooms that were uncomfortably tight.  The food provided in the mess hall was unsanitary, poorly prepared, lacking in nutrition, and monotonously repetitive.   When his employment was terminated by his employer he was forced to spend three months in the barracks with no work, no pay, and no food allowance while waiting to be allowed to return to the Philippines.

218.    **Plaintiff Ed.T.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of roads for the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from

leaving the country or his job until the end of his contract. This caused him to feel anxiety, particularly when going outside, due to fear of inspections without identification. After signing a two-year contract in the Philippines, he was forced to sign a five-year contract once in Qatar. His salary payments were frequently delayed up to a month, and he was often denied compensation for overtime work, including instances where he was forced to work 24-hour shifts. He was forced to live in crowded and inhumane conditions. The food provided in the mess hall was unsanitary and substandard. Due to the remote location of his worksite, food sometimes did not reach them at all, forcing workers to share meals. When he demanded to leave, he was forced to spend two months in the accommodation without work or pay while the company withheld his final salary, gratuity benefits, and passport, leaving him without means to purchase a plane ticket home.

219.    **Plaintiff En.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Rayyan Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear and like he was a prisoner. He routinely was forced to work overtime. He was not paid what he was promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a room designed for two with three other people, and with beds infested with bedbugs. He was provided a food allowance, but it was insufficient to pay for the amount of food he needed.

220.    **Plaintiff Er.T.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah

Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel fear, as it was his first time working abroad, but he felt he had no choice but to comply.  He was not paid what he was promised.  He routinely experienced salary delays lasting weeks or months, forcing him to borrow money from coworkers to buy food.  He was forced to work through exhaustion, working 12-hour shifts, as well as four hours of overtime each day for which he was not compensated.  He was forced to live in crowded and inhumane living conditions, with six to eight people packed into rooms designed for three to four people, with infestations of bedbugs that caused sleepless nights.  The food provided in the mess hall was terrible, lacked nutrition, repetitive, and often spoiled, though he had to eat it due to extreme hunger.

221.    **Plaintiff F.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Al Rayyan and Al Khalifa Stadiums.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Midmac Contracting Co.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel shocked, terrified, and afraid of being unable to return home even in an emergency.  He was deceived about his compensation and was not compensated for all his overtime.  He was forced to live in crowded and inhumane living conditions, with 6-8 people packed into rooms designed for only 3-4 people.

The rooms were dirty and filthy with broken bathroom facilities that had sewage problems. The food provided was almost inedible.

222. **Plaintiff F.S.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared, as he felt he had no choice. He experienced a significant reduction in his promised compensation, and salary delays lasting weeks or months. He was forced to work through exhaustion, sometimes working 24 hours straight, and was not permitted to refuse overtime when demanded. He was not compensated for all overtime hours worked. He was forced to work in dangerous conditions, being required to continue working even during "red flag" warnings indicating work should stop due to extreme heat. The food provided in the mess hall was poorly prepared and at times inedible.

223. **Plaintiff F.T.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared for his safety and life, as he knew nothing about Qatar's laws and felt he could not return home. He was deceived about his

compensation and was forced to routinely do overtime work for which he was not fully compensated. He was forced to live in crowded and inhumane living conditions, with 8-10 people packed into rooms designed for only 4 people, and with beds infested with bedbugs. He was repeatedly forced to move between different accommodations without notice. The food provided in the mess hall was terrible. He was forced to work in extreme heat and humidity and he often was required to walk for several hours back to his accommodation after long work shifts.

224.    **Plaintiff G.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2014-2018, and specifically on the construction of the Mandarin Oriental Hotel, which hosted athletes and other VIPs for the FIFA World Cup. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Fino International. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fearful, especially as it was his first time working abroad. He was forced to work through exhaustion, sometimes for up to 24 hours straight to meet deadlines, with as little as two hours of sleep between shifts. He was not fully compensated for his overtime work, and was even required to work on holidays without pay. The company enforced a punitive policy of deducting two days' pay for each day of absence, forcing him to work even when ill. He experienced frequent salary delays, sometimes lasting up to three months, which severely impacted both his ability to afford food in Qatar and his family's financial situation in the Philippines. He was forced to live in crowded and inhumane living conditions, with eight people sharing a small room designed for four, and beds infested with bedbugs. When his father died shortly before the

end of his contract, the company coerced him into signing a contract extension by refusing to allow

him to return home for the funeral unless he agreed to return to Qatar afterward.

225.    **Plaintiff G.D.L.** worked as a construction worker on the World Cup Labor Venture

during his time in Qatar in 2015-2018, and specifically on the construction of the Al Thumama

Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture

which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants,

including but not limited to, on information and belief, his direct employer, confiscated his

passport when he first arrived in Qatar and began work, precluding him from leaving the country

or his job until the end of his contract.  This caused him to feel fear, as he knew he could not return

home even if something happened to him or his family in the Philippines.  He was lied to about

his compensation.  He was not paid for all his overtime work.  He was forced to work through

exhaustion, with workdays beginning at 5:00 AM for travel to the worksite, and routinely forced

to work multiple hours of overtime per day.  He was forced to live in crowded and inhumane living

conditions, packed into a small room with seven other workers, and with beds infested with bed

bugs which caused even more fatigue.  The food provided was poor quality and monotonous.

226.    **Plaintiff G.G.** worked as a construction worker on the World Cup Labor Venture

during his time in Qatar in 2017-2018, and specifically on the construction of Khalifa Stadium and

the Lusail Stadium.  Defendants participated in and knowingly benefitted from the World Cup

Labor Venture which exploited his labor.  His direct employer was Rabban Readymix.  Venture

participants, including but not limited to, on information and belief, his direct employer,

confiscated his passport when he first arrived in Qatar and began work, precluding him from

leaving the country or his job until the end of his contract.  When he asked that he be able to keep

his passport, his request was denied, and he was told he could not get his passport back even in

case of an emergency. This distressed both him and his family. He was not given enough food allowance, so he was often hungry. He was forced to work overtime regularly but was not compensated for all overtime hours he worked. In one two-month period he was forced to work 230 hours of overtime but was only paid for 30 of those hours, causing him emotional distress and economic harm.

227. **Plaintiff G.O.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2019, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was lied to about his pay and was not compensated for his overtime work. He was forced to work through exhaustion, with workdays lasting at least 12 hours, and for which he would have to wake at 4:00 AM to travel to the worksite. When return transportation was not provided, he was forced to either hitchhike or walk several hours back to his accommodations. He suffered a workplace injury when he fell from scaffolding and dislocated his rib, but was forced to go to the hospital alone, pay all medical expenses himself, and return to work the next day. He was forced to work through episodes of high blood pressure caused by intense heat, being denied rest even when he reported feeling unwell. He was forced to live in crowded and inhumane living conditions, packed into rooms designed for four people with 6-8 workers, and with beds infested with bed bugs that made sleep difficult. The food provided in the mess hall was of poor quality, often spoiled or improperly prepared. He was forced to stay longer

than his initial two-year contract because his employer threatened not to pay his severance benefits and for his return flight to the Philippines if he did not stay longer.

228.    **Plaintiff G.S.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2016-2018, and specifically on the construction of the Al Thumama Stadium and the Lusail Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxiety and that he had no choice but to endure the conditions imposed upon him.  He routinely was forced to work overtime.  He was not paid what he was promised, and his overtime was not fully compensated.  He was forced to live in crowded and inhumane living conditions, packed into a room with seven other people and infestations of bedbugs.  He was forced to move from housing facility to housing facility.

229.    **Plaintiff G.T.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015, and specifically on the construction of the Al Thumama Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel helpless and frightened.  He was routinely forced to work overtime, and he was not fully compensated for his work.  He was forced to live in crowded and inhumane living conditions, packed into a small room with seven other people.  There were

infestations of bed bugs in the barracks.  He was provided a food allowance, but it was insufficient to appropriately feed him.

230.    **Plaintiff H.V.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was lied to about his compensation and was denied overtime compensation.  His food allowance was not provided consistently, forcing him to subsist at times on only eggs. He was forced to work through exhaustion, with workdays requiring him to wake at 3:00 AM to get on a crowded bus, and his day would not end typically until 7:00 PM.  He was forced to work overtime, sometimes until midnight.  He suffered a heat stroke from being forced to work in extreme heat conditions.  He was forced to live in crowded and inhumane living conditions, with eight workers packed into a small room that felt "like living as squatters," and he was six times moved between accommodations without notice.

231.    **Plaintiff I.E.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017, and specifically on the construction of the Al Thumama Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He routinely was forced to work overtime.  He was not paid what he was

promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, and to sleep in beds infested with bed bugs. He was forced to move from housing facility to housing facility. His employer told him that if he resigned, he would be forced to pay his own way back to the Philippines. His employer also withheld backpay and thereby forced him to sign another contract to stay in Qatar.

232. **Plaintiff J.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He felt he had no choice but to surrender his passport. The contract he signed in the Philippines was for two years, but upon arrival he was coerced into signing a five-year contract, feeling he had no choice, once again, as he was already in Qatar. He was forced to work through exhaustion, routinely working 18-hour days until midnight or 1:00 AM. He was not compensated for all overtime hours worked. He was forced to live in crowded and inhumane living conditions, with four workers packed into a small, uncomfortable room. The food provided in the mess hall was dirty, smelly, and disgustingly undercooked. The company withheld his gratuity pay to ensure his return to Qatar, but then he was terminated without cause and then forced to remain in Qatar for over three months without pay before being allowed to return home. Though permitted to stay in the barracks during this period, he had to pay for his own food and eventually paid for his own airfare to return to the Philippines.

233.    **Plaintiff J.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Thumama Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, and he understood and feared this precluded him from leaving the country or his job until the end of his contract.  This caused him to feel worried and scared.  He was routinely forced to work overtime, and he had to work through exhaustion, sometimes as many as 24 hours straight.  He was neither paid what he was promised nor fully compensated for the overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a small room with seven to nine other people in a room designed to accommodate four.  He was provided a food allowance, but it was insufficient to appropriately feed him.

234.    **Plaintiff J.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Midmac Contracting Co.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxious and nervous, as he realized he would be unable to return home even if he was treated badly.  He was forced to work through exhaustion, beginning his days at 3:00 AM to catch a 4:00 AM bus to the worksite.  When his initial two-year contract was complete, he was told he could not leave and was forced to extend

his stay for another year via the threat that if he left he would forfeit his benefits and back pay. Having no money to pay for his own return travel, he felt trapped and was forced to continue working. He was deceived about his pay, and he was denied much of his overtime pay. He was forced to live in crowded and inhumane living conditions, packed into a room designed for six people with nine other workers. The food provided was unsanitary and sometimes raw, with the cooking areas poorly maintained, forcing him at times to spend his limited salary on outside food.

235.    **Plaintiff J.D.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017, and specifically on the construction of Khalifa Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. Because his passport was confiscated, and he knew that another worker had asked for his passport back to attend a funeral in the Philippines and was denied, he felt anxiety and emotional distress and that he was being treated like a prisoner. He was forced to live in crowded and inhumane living conditions. He was not given enough food and often went hungry. He was forced to work through exhaustion, regularly forced to do at least four hours of overtime per day. And he was lied to about his pay, denied pay he was promised and had earned, and at times received delayed payments, which caused him distress, trauma, and sleeplessness because his family in the Philippines depended on him to regularly send funds and was forced to take out loans.

236.    **Plaintiff J.F.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2016-2018, and specifically on infrastructure for the Al Rayyan, Al

Thumama, Lusail, and Al Janoub Stadiums. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. Though he had signed a two-year contract in the Philippines, upon arrival he was coerced into signing a five-year contract. He was not paid what he was promised, and was not paid for all his overtime work. He was forced to work through exhaustion, routinely working 5 hours of overtime daily, until 11:00 PM, and sometimes he was forced to work 24-hour shifts and sleep at the worksite. He was forced to live in crowded and inhumane living conditions, with four workers packed into a small room with beds infested with bedbugs. The food provided in the mess hall was dirty, smelly, and undercooked, with chicken sometimes served still bloody. He was suddenly terminated after two years but he was forced to wait two months in the barracks without pay before being allowed to return home.

237.    **Plaintiff J.J.G.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2016-2017, and specifically on the construction of the Khalifa Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Rabban Readymix. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him distress. He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and sometimes had to work as many as 24 hours straight. The forced overtime caused him depression and hypertension. He was not compensated for all the overtime work he provided. He was forced to live in crowded and

inhumane living conditions, packed tightly into a room with others. He was provided a food allowance that was insufficient to cover the cost of food he needed.

238.    **Plaintiff J.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2014-2016, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar. He was also deceived about his salary, which was reduced from the promised 1500QR/month to 1000QR/month with little explanation. He was not paid for all his overtime work, and he was forced at times to work up to 14 hours straight. He was denied sick leave and was subject to a "no work, no pay" policy that forced him to work even when ill. He was forced to live in crowded and inhumane living conditions, first in container vans in the desert with six workers per container, and later in cramped accommodations with four workers per room, both locations infested with bedbugs. The food provided in the mess hall was repetitive, poorly cooked, and sometimes unsafe to eat, with chicken that smelled bad and contained blood. When he tried to resign, he was forced to wait for two months before being allowed to return home, during which time he received no pay. He had to pay for his own airfare home.

239.    **Plaintiff J.N.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium and associated infrastructure. Defendants participated in and knowingly benefitted from

the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxiety, afraid to leave his accommodations and concerned the company could do whatever they wanted to him. He was forced to work through exhaustion, routinely working overtime, and at times was required to work 24 hours straight. He was not paid what he was promised and he was not compensated for all the overtime work he provided. He was forced to live in crowded and inhumane living conditions, packed into a small room with three other people. The drinking water provided was not potable, forcing him to purchase his own bottled water. He was forced to continue working in extreme heat even when Qatar's "red flag" rule mandating work stoppage during high temperatures was in effect.

240.    **Plaintiff J.O.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2015-2017, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel nervous and afraid, particularly about his ability to leave Qatar in case of an emergency in the Philippines. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign an "indefinite" contract upon arrival in Qatar. He was not paid what he was promised. While working as a welder, he suffered a severe workplace injury

when a glass shard penetrated his eye due to substandard safety equipment provided by the company. The injury required surgery and left him permanently blind in one eye. Despite this serious injury, the company refused to pay for his medicines and follow-up appointments, forced him to return to work after only one week, and enforced a "no work, no pay" policy during his recovery, docking his pay for the time when he was out for surgery and recovery. The injury has permanently disabled him from working as a welder, his technical profession, forcing him to take lower-paying jobs since his return to the Philippines. The food provided was unsanitary, repetitive, and often improperly cooked, and workers were required to purchase their own drinking water. After he was terminated without explanation in January 2017, he was denied access to the mess hall and had to rely on colleagues and church members for food while waiting a month for his repatriation to the Philippines.

241.    **Plaintiff J.P.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2019, and specifically on the construction of the Al Wakrah Stadium and related infrastructure. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. The seizure of his passport was a "traumatizing experience" that caused him to feel both fear and anxiety, because although he resisted giving it up, he was forced to. Upon arrival in Qatar he was forced to sign a new five-year contract despite having signed only a two-year contract in the Philippines, and he was told if he did not sign he would have to pay his own way back to the Philippines. He was forced to work through exhaustion, at times being required to work 48 hours straight to meet deadlines. He was

not paid for all his overtime work. He was forced to live in crowded and inhumane living conditions, packed into a room with seven other workers. He was forced at times to walk long distances to the worksite when no transport was provided. When he attempted to resign, the company forced him to remain in the accommodation without pay for more than two months before allowing him to leave.

242. **Plaintiff J.S.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2014-2018, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel confused and scared, as it was his only form of identification in a foreign country. He was forced to work through exhaustion, with mandatory overtime that was not fully compensated due to the company's policy of capping overtime pay at two hours regardless of actual hours worked. His salary of 1,500 riyals per month was frequently delayed, sometimes for more than a month, impacting his ability to send money to his family. He was forced to live in crowded and inhumane living conditions, with six people packed into rooms designed for two, and beds infested with bedbugs. The air conditioning was frequently non-functional due to broken power generators, causing extreme discomfort in Qatar's heat. The food provided was unsanitary, and repetitive. When he attempted to resign, he was not allowed to leave immediately and was forced to remain in Qatar for three months without work or pay. He ultimately had to pay for his own return ticket to the Philippines and was denied his end-of-contract benefits.

243.    **Plaintiff J.T.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2016-2020, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him concern as it left him without formal identification.  He was required to work excessive hours, waking at 3:00 AM to catch a 5:00 AM bus for a workday that officially began at 7:00 AM and typically included 4-5 hours of mandatory overtime for which he received no compensation, often not returning to his accommodation until midnight.  He was forced to live in crowded and inhumane living conditions, with four workers packed into a small room infested with bedbugs. The food provided was repetitive and unsanitary, and the drinking water was contaminated with insect larvae, which caused him to develop diarrhea and dehydration severe enough to require medical attention.  After completing his contract, he was forced to wait three months without pay before being allowed to return to the Philippines.

244.    **Plaintiff Ji.T.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2016-2018, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel afraid

and worried about his status in Qatar. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar, which he did despite his hesitation because he felt he had no choice. He was forced to work through exhaustion, with days beginning at 4:00 AM to catch a 5:00 AM bus, working from 6:00 AM to 6:00 PM plus three hours of overtime daily, not returning to his accommodation until around 9:00 PM, leaving him barely any time to sleep. He worked every day but was not paid for all his work. He was not paid for all his overtime work. He was not paid what he was promised and his salary was frequently delayed, preventing him from sending money home and forcing his family to borrow money from neighbors for daily needs. He was provided poor quality, repetitive food that was undercooked, tasteless, and often had a foul smell, while the drinking water provided caused stomach issues. When he became ill with a fever, he received no medicine and was subject to a "no work, no pay" policy, forcing him to buy his own medicine. He was forced to live in cramped, filthy accommodations with four people to a room, with beds infested with bedbugs. When his father died, his employer refused to allow him to return home for the funeral, and then when he tried to resign, he was not allowed to leave in time to attend the funeral.

245.    **Plaintiff Jo.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2016-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel shocked and nervous, but he complied out of fear of repercussions. He was deceived about his

contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar. He was also deceived about his compensation, as he never received the promised 300-riyal food allowance that was part of his original contract. He was forced to work through exhaustion, often working 13-hour shifts and sometimes until early morning on urgent projects while still being required to report for work the following morning. He was not paid for all his overtime work. He was forced to consume repetitive, poorly prepared food that was often undercooked, had a strong odor, and caused health concerns among workers. He was forced to live in a room invested with cockroaches and bedbugs. After receiving a termination notice, he was not allowed to leave for three months, during which time he received no pay, was denied access to the mess hall, and had to beg for food from coworkers. Unable to send money to his family in the Philippines, he remained trapped in this situation because the company withheld both his passport and final pay until his departure. He had to pay for his own airfare to return home.

246.    **Plaintiff L.G.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2013-2015, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was forced to work through exhaustion, beginning his days at 4:00 AM to transport other workers and sometimes being forced to work 24 hours straight to meet deadlines. He was not compensated for his overtime work. He was forced to drive buses with broken air conditioning in unbearable heat. He was forced to live in crowded and inhumane

living conditions, packed into a cramped room with seven other workers, which was infested with bedbugs and sometimes with broken air conditioning, so that he was unable to sleep. The food provided was poor quality, repetitive, and improperly prepared, with meat sometimes still containing blood.

247.    **Plaintiff L.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017, and specifically on the construction of the Khalifa Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Rabban Readymix. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him distress. He understood that he would have no choice but to endure inhumane treatment. He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and sometimes had to work as many as 24 hours straight. The forced overtime caused him depression and hypertension. He was not compensated for all the overtime work he provided. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.

248.    **Plaintiff L.N.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2016-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel

extremely anxiety.  He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar.  He was forced to work through exhaustion, with workdays beginning at 4:00 AM to catch a 5:00 AM bus to begin work at 6:00 AM until 4:00 PM, not returning to his accommodation until around 5:00 PM.  He was routinely required to work overtime, including through the night for urgent tasks, but was not fully compensated for all overtime hours worked.  He was forced to live in crowded and inhumane living conditions, and transferred from one living location to another, first in a cramped freight container van in the desert with four workers and bedbug infestations, and later in overcrowded rooms in Labor City.  The food provided was repetitive, undercooked, smelly, and poorly prepared, forcing him to purchase his own food.  After sustaining a work injury to his eye that required three days of hospital treatment, he was denied sick leave and had his pay docked under a "no work, no pay" policy despite contractual provisions for sick leave.  After attempting to resign, he was denied the ability to leave until receiving a termination notice, and even then was forced to wait two additional months without work or pay before being allowed to return home.

249.    **Plaintiff L.P.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017-2019, and specifically on the construction of the Al Thumama and Al Wakrah Stadiums.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Electro Mechanical Enterprises Qatar.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxious and afraid.  He was forced to work through exhaustion and routinely was forced to work overtime.  He was not paid what he was promised, and his overtime was not fully

compensated.  He was forced to live in crowded and inhumane living conditions, packed into a small room with nine other people, at times without working air conditioning, and with bed bugs. He was provided food, but it was not nutritious and smelled unsanitary.

250.  **Plaintiff L.V.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2016, and specifically on the construction of the Al Thumama Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel helpless and frightened.  He was forced to work through exhaustion and sleep deprivation and at times worked as many as 24 hours straight.  He was forced to live in crowded and inhumane living conditions, packed into a small room with between seven and nine other people.  There were infestations of bed bugs in the barracks.  He was provided a food allowance, but it was insufficient to appropriately feed him.  He was hospitalized after suffering an aneurysm, and his employer covered only initial hospital costs related to his treatment and then sent him home to the Philippines without sufficient funds to make the trip home.

251.  **Plaintiff M.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Al Khalifa Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Midmac Company.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country

or his job until the end of his contract. This caused him to feel anxious and afraid because he knew he could not leave until he finished his contract. He was forced to work through exhaustion, medical injury, in extreme heat conditions, and routinely was forced to work overtime. He was not paid what he was promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a small room with five other people, with air conditioning that did not always work, and with beds infested with bed bugs. He was provided food, but it was not nutritious and smelled unsanitary.

252.    **Plaintiff M.D.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Al Rayyan Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear and anxiety. He routinely was forced to work overtime, and through exhaustion. He was not paid what he was promised, and his overtime was not fully compensated. He experienced a workplace injury, with a blow to his head by a pipe, and he was not paid during the time he was recovering. He was forced to live in crowded and inhumane living conditions, packed into a small room with seven or eight other people, and with beds infested with bedbugs. He was forced to move from housing facility to housing facility. He was provided food, but it was not nutritious and smelled unsanitary.

253.    **Plaintiff M.G.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2015, and specifically on the construction of Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which

exploited his labor. His direct employer was Rabban Readymix. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. Because his passport was confiscated, he was distressed because he had no ability to leave and no freedom to protest the conditions of his work and life in Qatar. He was forced to work through exhaustion and sleep deprivation. He also was regularly forced to work overtime—sometimes as many as 36 hours straight—and was not paid for all overtime worked. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. He was provided a food allowance that was insufficient to properly feed himself. His pay was delayed, at times, which caused him distress because his family at home in the Philippines depended on him regularly sending funds, and although he was embarrassed to do so, he at times had to borrow money from his coworkers to send home.

254.    **Plaintiff M.R.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Rayyan Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel frightened. He was forced to work through exhaustion and sleep deprivation and routinely was forced to work overtime. Sometimes he was forced to work 19 hours per day. He was not paid what he was promised. He was forced to live in crowded and inhumane living conditions, packed into a small room with seven to nine other people. He was provided food, but it was poorly prepared and at times inedible.

255.    **Plaintiff M.S.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2016-2018, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel nervous and concerned about his status.  He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign an indefinite contract upon arrival in Qatar, and he received less pay than he was promised.  He was forced to work through exhaustion, with days beginning at 4:00 AM to catch a 5:00 AM bus, working from 6:00 AM to 4:00 PM plus two additional hours of overtime daily, not returning to his accommodation until 6:00-7:00 PM.  He was not paid for all the hours he worked and his salary was often delayed, forcing his family in the Philippines to borrow money to survive.  He was provided poor quality, repetitive, and undercooked food.  He suffered frequent diarrhea from the food and poor water quality, and when injured by a falling object, received inadequate medical care, being given only one day off before being required to return to work.  He was forced to live in crowded and inhumane conditions, with four workers sharing a small room in the desert and later in Labor City, with beds infested with bedbugs that disrupted his sleep.  After resigning, he was not allowed to leave for more than two months, during which time he received no pay and had to pay for his own return airfare to the Philippines.

256.    **Plaintiff N.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Al Wakrah

Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel terrified, and that it was not safe for him to leave his housing barracks.  He routinely was forced to provide overtime.  He was not paid what he was promised, and his overtime was not fully compensated.  He was forced to live in crowded and inhumane living conditions, packed into a room with five to seven other people, and with infestations of bedbugs.  He was forced to move from housing facility to housing facility.  He tried to resign due to the poor conditions of his work and accommodations, but his employer threatened to blacklist him from all work in Qatar.  His employer then made him wait for a month before going home, during which he was charged costs to house him, and then he had to pay for his own airfare to leave.  He was provided food, but it was not nutritious and smelled unsanitary.

257.  **Plaintiff P.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Khalifa Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Midmac Contracting Co.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport without explanation when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel fear and anxiety.  He was forced to work through exhaustion, having to wake up at 3:00 AM to leave the accommodation by 4:00 AM to go to the worksite. Though required to work overtime, he was not fully compensated for his overtime work.  He was forced to live in crowded and inhumane living

conditions, packed into a room with nine other workers, often with broken air conditioning making the room extremely hot. The food provided in the mess hall was unsanitary and sometimes raw, forcing him to eat poorly prepared food just to have enough energy for work.

258. **Plaintiff R.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Lusail and Khalifa Stadiums. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Midmac Company. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He understood he could not leave until his contract was complete, which caused him distress. He was forced to routinely provide overtime work. He was not paid what he was promised and had earned. He also was not compensated for all overtime work he provided. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. The food that he was provided was insufficient and not clean.

259. **Plaintiff R.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of the road leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He felt confused and anxious but had no choice but to comply since he was in a foreign country. He was deceived about the terms of

his employment, and after signing a 2-year contract in the Philippines, he was forced upon arrival to sign a new 5-year contract and was told to "forget about" his original contract. He was not fully compensated for all overtime worked. He was forced to work through exhaustion, at times working 24-hour shifts. He was forced to live in crowded and inhumane conditions, with four to five workers packed into a single room infested with bedbugs and cockroaches, and was moved between accommodations multiple times. The food provided in the mess hall was inadequate and unsafe. When he was terminated he was forced to remain in the barracks for more than three months without work or pay before being allowed to leave.

260. **Plaintiff R.B.E.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium and related infrastructure. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon his arrival in Qatar, precluding him from leaving the country or his job until the end of his contract. This caused him to feel very anxious because it was his first time abroad. He was lied to about his compensation and was not paid for all his overtime work. He was forced to sign a five-year contract, different than what he had agreed to before leaving the Philippines. He was forced to work through exhaustion, having to leave at 5:00 AM to begin work at 6:00 AM, and was frequently required to work overtime. When he tried to resign he initially was not allowed to, and the company stopped allowing him to work while forcing him to remain in the accommodation without pay or salary for over a month.

261. **Plaintiff R.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of Khalifa Stadium and

the Lusail Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Rabban Readymix.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was told that his passport had been taken to stop him from going back to the Philippines or changing employers for the entirety of his contract.  This caused him distress because he would not be able to go home even in the event of an emergency.  He was forced to work through exhaustion.  He also was regularly forced to work overtime—sometimes as many as 24 hours straight.  He was provided a food allowance insufficient to purchase three meals per day.

262.    **Plaintiff R.D.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2014-2019, and specifically on the construction of roads for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign an "indefinite" contract upon arrival in Qatar.  He was forced to work through exhaustion, with days beginning at 2:00-3:00 AM to catch a 4:30 AM bus, working from 6:00 AM to 5:00 PM plus two additional hours of overtime daily, returning to his accommodation around 8:00 PM.  He was not paid what he was promised, he was not fully compensated for his overtime work, and his regular pay was frequently delayed by up to two months.  He was forced to live in crowded and inhumane living

conditions, being moved between seven different accommodations during his employment, all characterized by overcrowding, with up to 10 workers per room, with filth and bedbug infestations. One accommodation was located in a remote desert area requiring a 90-minute walk to reach transportation. The food provided was unsanitary, undercooked, repetitive, and often inedible, with poor-quality ingredients. The drinking water was unpalatable and required him to purchase his own. When he resigned, he was forced to remain without work or pay for two months while his resignation was processed, and had to pay for his own flight home.

263. **Plaintiff R.E.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was forced to work through exhaustion, with required 12-hour workdays, and even in extreme heat conditions when other companies had stopped work. He was lied to about his compensation and was not paid for his overtime work. He was forced to live in crowded and inhumane living conditions, packed into a small room with six to seven other people in a space designed for only four. He was forced to walk for hours between the worksite and accommodation due to lack of transportation. The food provided was inadequate and often unsafe, including undercooked chicken with visible blood. When he attempted to resign, he was initially refused and told to go back to work. Then, he was told to stop working but he was forced to wait almost two months, during which he received no pay or food allowance, before being allowed to depart Qatar, and he was denied his backpay and other benefits when he left.

264.    **Plaintiff R.F.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of road infrastructure for the World Cup stadiums.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel scared and extremely nervous, as he knew he could not return to the Philippines without his passport. He was deceived about his compensation and was forced to sign a new contract upon arrival in Qatar, different from the two-year agreement he had signed before departure.  He was forced to work through exhaustion, routinely being made to work overtime, and was sometimes forced to work for 24 hours straight, but was not compensated for all overtime work.  He was forced to live in crowded and inhumane living conditions, packed into a room with three other workers.  The food provided in the mess hall was unsanitary, dirty, undercooked, and at times disgusting to eat.  When he was terminated by his employer, he was forced to wait in Qatar for three months without pay or means to support his family while trying to secure assistance to get home.

265.    **Plaintiff R.I.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2015-2017, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him

to feel fear as he would not be able to identify himself with the authorities.  He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign a five-year contract upon arrival in Qatar.  He was not paid what he was promised.  He was forced to work exhausting hours, waking at 4:00 AM for workdays that typically lasted until 7:00 PM, including 2-3 hours of mandatory overtime for which he received no compensation.  He was forced to work even when ill due to the company's "no work, no pay" policy.  He was forced to live in crowded and inhumane living conditions, with four workers packed into a dirty room with bedbugs and poor lighting.  The food provided was repetitive, unsanitary, and often improperly cooked, with undercooked bloody chicken frequently served.  When he decided to resign, he was not allowed to leave immediately and was forced to remain in Qatar for three months without work or pay before being allowed to return to the Philippines.  He received only one month's delayed salary and no benefits, and had to use his own money to purchase his return ticket.

266.    **Plaintiff R.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2015, and specifically on the construction of the Lusail Stadium, the Al Khalifa Stadium, and the Al Thumama Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Rabban Readymix.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress: He understood he could not leave until his contract was complete.  He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and at times was forced to work 36 hours straight.  The long hours and hot working conditions caused him hypertension.  He was not compensated for all the overtime work he provided.  He was forced

to live in crowded and inhumane living conditions, packed into a room tightly with others. He was provided a food allowance that was insufficient to cover the cost of food he needed.

267. **Plaintiff R.N.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of the road leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He felt he had no choice but to give up his passport. He was lied to about his compensation, and was denied overtime pay. He was forced to sign a new 5-year contract upon arrival in Qatar, different from the 2-year contract he had signed. He had to work through exhaustion, waking up at 3:00 AM to travel to the worksite, with work until at least 5:00 PM before traveling back to the accommodations. He had to endure work in extreme heat. He was not provided clean drinking water, so he had to purchase water. The food provided was inadequate and unsanitary, with chicken sometimes served still having feathers. When he attempted to resign, he was initially refused permission to leave. After being told he would be sent home, he was forced to remain in the accommodation for two months without work or salary before being allowed to leave.

268. **Plaintiff R.P.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2015-2020, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and

belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign an "indefinite" contract upon arrival in Qatar. He was forced to live in crowded and inhumane living conditions, first with eight workers packed into a room with double-deck beds infested with bedbugs and no storage for personal belongings, then later with four workers in a room designed for two people. The food provided was unsanitary, repetitive, and often spoiled, with workers sometimes being served chicken that was rotten and had blood in it. After receiving a notice of termination, he was forced to remain in Qatar for six months without work or pay before being allowed to return to the Philippines.

269.    **Plaintiff R.S.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2016-2018, and specifically on the construction of Al Thumama Stadium and the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was J.A.K. Construction Builders. When he first arrived in Qatar and began work, World Cup Labor Venture participants, including but not limited to, on information and belief, his direct employer, took his passport from him so that he could not leave the job or the country until the end of his contract. Because his passport was confiscated, he did not feel free to leave the barracks or to find new employment, causing him emotional distress. He was forced to live in crowded and inhumane living conditions, packed into a room so tightly with others that he could not sleep. He was not given sufficient allowance for food and often went hungry. He was forced to work through exhaustion, sometimes as much as 36 hours straight. And he was lied to about his pay and was

denied pay that was promised him.  He believes his depression while in Qatar was due to being overworked and underpaid.

270.    **Plaintiff R.T.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of the road leading to the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  After signing a 2-year contract in the Philippines, he was forced upon arrival to sign a new 5-year contract and did so because he felt he had no choice.  He was not fully compensated for overtime work despite being forced to work 24-hour shifts.  He was forced to live in crowded and inhumane conditions, with accommodation repeatedly moved to locations so distant from work sites that food deliveries often could not reach the workers, leaving them hungry.  The food provided in the mess hall was inadequate and unsafe. At the end of his work, the company claimed it was terminating him but he was forced to remain in his accommodation without work or pay for over two months before being allowed to depart Qatar.

271.    **Plaintiff R.V.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Khalifa Stadium, among others.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Rabban Readymix.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from

leaving the country or his job until the end of his contract.  This caused him distress: He understood he could not leave until his contract was complete.  He was forced to work through exhaustion and sleep deprivation, was forced to routinely provide overtime work, and at times was forced to work 24 hours straight.  He was not compensated for all the overtime work he provided.  He was provided a food allowance that was insufficient to cover the cost of food he needed.

272.  **Plaintiff Ra.D.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel frightened.  He was forced to work through exhaustion and sleep deprivation and routinely was forced to work overtime.  He was not paid what he was promised.  He was forced to live in crowded and inhumane living conditions, packed into a small room with nine other people.  He was provided food, but it was not properly cooked.

273.  **Plaintiff Ra.G.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2019, and specifically on the construction of Khalifa Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  Because his passport was confiscated, he had anxiety, and felt trapped and helpless, because he knew he had to stay and work regardless of inhumane treatment.  He was

forced to live in crowded and inhumane living conditions, packed into a room so tightly with others that he could not sleep.  He was not given sufficient food, was at times forced to eat spoiled food due to no alternatives, and often went hungry.  He regularly left the barracks at 4 a.m. to travel to the construction site, was forced to render overtime and through exhaustion, and did not return from the site until after midnight.  Though temperatures were often extremely hot with high humidity, workers were not regularly supplied with drinking water, and he observed several workers collapse from overwork and heat exhaustion.  He was denied pay he was promised and had earned, and at times received delayed payments, which caused him distress because his family in the Philippines depended on him to regularly send funds and was forced to take out loans.

274.    **Plaintiff Ra.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He was paid less than he was promised and was not fully compensated for his overtime work.  He was forced to live in cramped and inhumane living conditions, packed into a small room with three other workers, with beds infested with bedbugs that led to sleepless nights.  The food provided was inadequate and monotonous.  The tap water provided was undrinkable and when he tried to drink it due to the intense heat, it made him sick.  After two years he had to remain in Qatar for five months with no pay while waiting for his final pay and return travel.

275. **Plaintiff Ra.V.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Wakrah Road project. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon his arrival in Qatar. He was forced to sign a new contract that reduced his base salary from what was promised and extended his term of service beyond the original two-year agreement, with no opportunity to review or understand the terms before being pressured to sign. He was forced to work through exhaustion with daily overtime but was consistently denied full compensation for his overtime hours. He was forced to live in crowded and inhumane living conditions, first packed into a small room with five other workers and later with three others, with persistent bedbug infestations in both accommodations. The food provided in the mess hall was often inedible, undercooked, and unhygienic. Food deliveries to the worksite were often late and spoiled, forcing him to survive on bread and coffee. When he attempted to resign he was initially refused, but then was told to stop reporting to work and was detained in the accommodation for more than a month without work or pay before being allowed to leave Qatar, and he had to pay for his own airfare home.

276. **Plaintiff Re.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the construction of road infrastructure for the World Cup stadiums. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from

leaving the country or his job until the end of his contract. This caused him confusion and distress. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign a five-year contract upon arrival in Qatar, but he felt he had no choice. He was forced to work through exhaustion, with workdays regularly stretching from 6:00 AM to 10:00 PM. He was forced to live in crowded and inhumane living conditions, packed into a small room with two other people, with beds infested with bedbugs which made sleep difficult. He injured his foot on the job and the foot became infected, requiring surgery, but because of the company's "no work, no pay" policy, he was not paid for the days he spent recovering from the procedure. When he attempted to resign, his employer refused to release his benefits or allow him to leave Qatar, and he was forced to stay for two months without work or money until he was finally allowed to return home.

277. **Plaintiff Re.D.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2013-2015, and specifically on the construction of the Al Khalifa and Lusail Stadiums. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Midmac Company. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxious and afraid, and he opted to stay in the barracks as much as possible thereafter. He was forced routinely to work overtime. He was not paid what he was promised. He was forced to live in crowded and inhumane living conditions, packed into a small room with others, and without sufficient access to toilets. He was provided food, but it was not properly cooked.

278.    **Plaintiff Rh.P.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017-2018, and specifically on the construction of Al Thumama Stadium and Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Rabban Readymix. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him distress, and he felt he had no freedom because he could not get access to his passport.  He was lied to about his pay. He also, at times, was denied pay or received less than he was promised and had earned, particularly for significant overtime work he was forced to supply.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  He was provided a food allowance, but it was insufficient to appropriately feed him.

279.    **Plaintiff Ri.C.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2013-2015, and specifically on the construction of the Lusail Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Midmac Contracting Co.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon his arrival, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel shocked and fearful about staying in Qatar without documentation.  He routinely was forced to work overtime, with standard shifts of 8 hours being extended by an additional 4 to 6 hours nearly every day.  He was sometimes forced to work 24-hour shifts. He was not paid what he was promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a very small room

with three other workers, with old bedding infested with bed bugs that made it difficult to sleep. The food provided in the mess hall was unsanitary and poorly prepared, with chicken sometimes served raw with traces of blood. The food often had an unpleasant odor and was not properly cleaned.

280.    **Plaintiff Ri.O.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear and anxiety. He routinely was forced to work overtime, and through exhaustion, routinely working 16 hours per day, and at times as long as 24 hours straight. He was not paid what he was promised, and his overtime was not fully compensated. He experienced a workplace injury, fainting from extreme heat and exhaustion, but his employer did not pay any of his medical expenses for the related hospital visit. He was forced to live in crowded and inhumane living conditions, packed into a small room with nine other people, and with beds infested with bedbugs.

281.    **Plaintiff Ro.D.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2020, and specifically on the construction of the Al Thumama Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until

the end of his contract.  This caused him to feel anxious and afraid.  He routinely was forced to work overtime.  He was not paid what he was promised, and his overtime was not fully compensated.  He was forced to live in crowded and inhumane living conditions, packed into a small room with eleven other people, with beds infested with bed bugs.  He was forced to move from housing facility to housing facility.  He was provided food, but it was not nutritious and smelled unsanitary.  His employer withheld backpay and threatened him that he would have to pay his own way back to the Philippines if he did not sign another contract.  When he nonetheless resigned, his employer did not allow him to leave for an additional month.

282.  **Plaintiff Ro.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Lusail and Khalifa Stadiums.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  He understood he could not leave until his contract was complete, which caused him to be scared and anxious.  He was forced to routinely provide overtime work.  He was not paid what he was promised and had earned.  He also was not compensated for all overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.  The food allowance that he was provided was insufficient to properly feed him.

283.  **Plaintiff Ro.P.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2016-2018, and specifically on the construction of the Lusail and Al Thumama Stadiums.  Defendants participated in and knowingly benefitted from the World Cup

Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He understood he could not leave until his contract was complete, which caused him to feel afraid. He was forced to routinely provide overtime work. He was not paid what he was promised and had earned. He also was not compensated for all overtime work he provided. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others.

284. **Plaintiff Rod.O.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Rayyan Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel trauma, because he learned that some of his coworkers were jailed by the police in Qatar for leaving their barracks without identification. He routinely was forced to work overtime, and through exhaustion, at times being forced to work 24 hours straight. He was not paid what he was promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a small room with nine other people, and with beds infested with bedbugs. He was provided food, but it was not nutritious and smelled unsanitary, and he once was hospitalized due to food poisoning.

285.    **Plaintiff Rog.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Al Jaber Engineering.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel anxious and "like a prisoner" since he could not leave even in case of emergency.  He was regularly forced to work overtime without compensation.  He experienced unexplained deductions to his pay.  He was forced to live in crowded and inhumane living conditions, packed into a cramped space with 8-10 other people, with beds infested with insects and bedbugs, and with only a few toilets shared by more than a hundred workers.  The food provided was disgusting.  When he attempted to resign, he was denied his right to leave, told he must complete his contract, and was denied his backpay and benefits. After that, he was forced to remain in Qatar for two additional months without work or pay, having to pay for his own food and expenses while waiting to be allowed to return home.

286.    **Plaintiff Rol.P.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2015-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel very nervous and scared about his inability to leave in case of emergency.  He was deceived about his

contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar, and he was not paid what he was promised. He was forced to work through exhaustion, routinely working 12-hour shifts, and was not paid in full for his overtime work. Because he was unable to send money to support his family in the Philippines, he suffered severe anxiety and depression. He was forced to live in crowded and inhumane living conditions, with four workers sharing small rooms, being relocated several times, with bedding infested with bedbugs and sheets that were only changed once in three and a half years. The food provided was repetitive, undercooked, had a strong odor, and sometimes caused allergic reactions; drinking water was contaminated with cockroaches due to dirty filters, forcing him to purchase his own. When he tried to resign, he was forced to wait for two months with no work and no pay. In the final two weeks before his departure, he was denied access to the mess hall and had to beg for food. He was then forced to pay for his return airfare home.

287. **Plaintiff Rom.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared and powerless as it was his first time working abroad. He asked for his passport back but was denied. He was lied to about his compensation, and he was not compensated for his overtime work. He was forced to work through exhaustion, working 12-hour shifts. He was forced to continue working even in extreme heat conditions when other companies' workers were allowed to stop.

He was forced to live in crowded and inhumane living conditions, packed into a small space with 6-8 other people, with beds infested with insects and bedbugs, and was subjected to sudden transfers without notice, sometimes in the middle of the night. The food provided was inadequate, dirty and unhealthy. When he attempted to resign, he was initially told he could not leave before his two-year contract ended and that he must go back to work. Days later he was told to stop work but was forced to remain in Qatar for two additional months without work or pay, having to pay for his own food and expenses while waiting to be allowed to return home, and then he was denied backpay and other benefits when he left.

288.    **Plaintiff Ron.O.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Thumama Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear. He routinely was forced to work overtime. He was not paid what he was promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a room with eleven other people, with insufficient air conditioning and infestations of bedbugs. He experienced a workplace injury, as he was cut by a piece of rebar metal, and he lost significant blood, but he was not allowed to stop working. He now has a significant scar from that injury. He was provided a food allowance, but it was insufficient to pay for the amount of food he needed.

289.    **Plaintiff S.N.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2016-2017, and specifically on the construction of the Lusail and Al

Thumama Stadiums. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He understood he could not leave until his contract was complete, which caused him distress. He was forced to routinely provide overtime work. He was not paid what he was promised and had earned. He also was not compensated for all overtime work he provided. He was forced to live in crowded and inhumane living conditions, packed into a room tightly with others. The food that he was provided was insufficient and not clean, so he went hungry. Even after he demanded to leave, because of the poor treatment and poor living and working conditions, his employer did not return his passport and allow him to leave for two months.

290.    **Plaintiff T.L.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2017-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him distress when he realized he would not be able to return home even in emergencies. Upon arrival he was forced to sign a new contract for less money than the contract he signed in the Philippines, and for a longer period. He was forced to work overtime that was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into rooms with three other workers,

with infestations of bedbugs, and at times without functioning air conditioning during extreme heat. He was frequently forced to move between different accommodations with little notice. The food provided was inadequate, and monotonous. He was forced to purchase his own drinking water as the provided tap water made workers sick. After his second year, when he tried to leave, the company delayed his departure for a month and forced him to pay for his own plane ticket back to the Philippines.

291.    **Plaintiff V.A.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2016-2018, and specifically on the construction of the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel frightened. He was routinely forced to work overtime. He was not paid what he was promised. He was forced to live in crowded and inhumane living conditions, packed into a small room with seven other people. The room was infested with bedbugs. He was promised a food allowance, but it was not provided, so he was forced to spend the limited money he was paid on food.

292.    **Plaintiff V.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2014-2016, and specifically on the construction of the Lusail Stadium and Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor. His direct employer was Midmac Contracting Company. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him

from leaving the country or his job until the end of his contract.  This caused him to become anxious about his inability to leave in case of emergency, and when he asked for his passport back, he was refused.  His workdays began at 2:00 AM to transport workers to the job site by 4:00 AM, followed by his "official" work shift from 6:00 AM to 5:00 PM, returning to his accommodation around 7:00 PM. He was not paid for the early morning hours transporting workers, despite this being a required part of his duties.  He was forced to work through exhaustion, once working for 48 hours straight.  He was not fully compensated for his overtime work and experienced salary delays of up to a month.  He was provided food that was "almost inedible," poorly prepared, often raw, repetitive, and sometimes containing blood.  He was denied sick leave, required to work even when ill, and witnessed retribution against workers who complained about conditions.

293.    **Plaintiff V.M.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar in 2015-2018, and specifically on the road infrastructure for the World Cup stadiums.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  When he arrived, he was forced to sign a new 5-year contract despite having originally agreed to a 2-year term in his home country.  This caused him distress, but he felt he had no choice but to sign.  He was forced to work through exhaustion, with workdays sometimes as long as 18 hours.  He was not paid what he was promised, and his salary was frequently delayed by a month or more and his overtime work was often not fully compensated.  He was forced to live in crowded and inhumane living conditions, packed into a small room with three other workers, with beds infested with bed bugs that caused him sleepless

nights.  The food provided in the mess hall was unsanitary, smelly, and sometimes inedible due to being undercooked. When he was terminated he was forced to remain in Qatar for four additional months without work or salary while waiting to be allowed to leave.  He was forced to pay for his own ticket back to the Philippines.

294.    **Plaintiff W.B.** worked as a construction worker on the World Cup Labor Venture during his time in Qatar from 2015-2019, and specifically on the construction of roads for the Al Wakrah Stadium.  Defendants participated in and knowingly benefitted from the World Cup Labor Venture which exploited his labor.  His direct employer was Habtoor Leighton Group.  Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  This caused him to feel scared and nervous, but he felt he had no choice but to comply.  He was deceived about his contract duration, as he had signed a two-year contract in the Philippines but was forced to sign a five-year contract upon arrival in Qatar.  He was forced to work through exhaustion, with workdays beginning at 4:00 AM to prepare for a 4:45 AM bus to reach the worksite by 6:00 AM.  He routinely worked until 6:00 PM, and when required to work overtime, until 10:00 PM, arriving back at his accommodation at 11:45 PM. He sometimes worked for 24 hours straight to complete urgent tasks. He was not compensated for much of his overtime work.  He was forced to live in crowded and inhumane living conditions, with four workers crammed into small, unclean rooms infested with bedbugs.  He was moved between accommodations three times, each with similarly poor conditions.  The food provided was unsanitary, poorly cooked, often smelly, and repetitive.  When his employment was terminated, he was forced to remain in Qatar for three months without work

or pay before finally being allowed to return to the Philippines and received only partial end-of-tenure benefits.

295.    To the extent any of Plaintiffs' claims would otherwise be untimely, the wrongful conduct of Defendants and other Venture participants prevented Plaintiffs from asserting those claims in a timely manner.  While they were in Qatar, the removal of their passports, as well as the Qatar regime's support for the trafficking and labor abuses suffered by migrant workers, made it impossible for Plaintiffs to vindicate their legal rights.

### COUNT 1
### TRAFFICKED AND FORCED LABOR
### TVPRA, 18 U.S.C. §§ 1589, 1590, and 1595

296.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

297.    The World Cup Labor Venture engaged in trafficked and forced labor.

298.    The Venture obtained Plaintiffs' and others' labor by means of abuse and/or threatened abuse of law or legal process by misrepresenting the terms and conditions of their employment in Qatar, confiscating Plaintiffs' passports, telling Plaintiffs they could not leave and must endure the conditions imposed upon them, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, threatening deportation, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

299.    The Venture obtained the labor of Plaintiffs and others by means of a scheme, plan, or pattern of acts intended to cause Plaintiffs to believe that if they did not work they would be subjected to serious harm, including but not limited to, by confiscating Plaintiffs' passports, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, threatening

deportation, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

300.    Plaintiffs were forced, by Plaintiffs' direct employers who were Venture participants with Defendants, to work in extreme and dangerous conditions, many hours more than they would have otherwise, and for lengths of time they otherwise would not have, to endure dangerous working conditions and extreme heat, and to live in inhumane, unsafe, and unhealthy conditions, due to the fact that they were not in possession of their passports and were made to believe they had no other choice.

301.    Defendants' Venture partners, including but not limited to Plaintiffs' direct employers, lied to Plaintiffs about the conditions Plaintiffs would live in and the terms of Plaintiffs' working conditions and compensation, and this fraud caused Plaintiffs to agree to go to Qatar and be lured into conditions of forced labor for the benefit of the World Cup Labor Venture.

302.    Each Plaintiff worked for the World Cup Labor Venture by providing labor for one or more of the projects included therein.

303.    Each Plaintiff was subjected to abusive practices by his employer(s) (who each were participants with Defendants in the World Cup Labor Venture), including by having his passport confiscated, not being able to leave Qatar and/or change employers in Qatar, being forced to work inhumane hours, being forced to live and work in unsafe and unsanitary conditions, and/or being underpaid or denied or delayed payments.

304.    Plaintiffs were therefore victims of trafficked and forced labor under 18 U.S.C. § 1589 and 18 U.S.C. § 1590, triggering Defendants' liability under 18 U.S.C. § 1595.

305.    Defendants participated in the World Cup Labor Venture.  Indeed, Defendants signed contracts to provide public relations and lobbying services to Qatar, the Qatari Embassy,

Qatar Foundation, and/or the Supreme Committee, and the intention of those contracts was to minimize, obfuscate, lie about, or stop reporting and international pressure related to labor abuse against migrant workers laboring to prepare for the World Cup in Qatar. Defendants' work as part of the World Cup Labor Venture was also intended to (and did) slow adoption and implementation of labor reforms. Defendants' participation in the World Cup Labor Venture made labor abuses, such as those experienced by Plaintiffs in this case, possible.

306.    Defendants knew or should have known, or recklessly disregarded that, the World Cup Labor Venture engaged in trafficked and forced labor in light of the prevalence of Qatar's *kafala* system; the norms of the construction industry in Qatar; public reporting, government reports, and non-profit reports; notices provided directly to Defendants; Defendants' internal processes and procedures; Qatar Foundation's role; Defendants' due diligence; Defendants' interactions with other Venture participants; and via Defendants' agents and employees in Qatar.

307.    Defendants knowingly benefitted in the United States from their participation in the World Cup Labor Venture. They received, at a minimum, $1 million each year they participated in the Venture, and likely much more. Defendants profited thereby.

308.    Defendants are therefore liable to Plaintiffs for damages and attorneys' fees under 18 U.S.C. § 1595(a).

**COUNT 2**
**RESTITUTION**
**TVPRA, 18 U.S.C. § 1593**

309.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

310.    Plaintiffs are victims of Defendants' offenses under the TVPRA.

311.    Plaintiffs are therefore entitled to the greater of the full amount of the gross income or value to Defendants of Plaintiffs' labor or the value of Plaintiffs' labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act.

## COUNT 3
## LABOR TRAFFICKING
### N.Y. Penal Law § 135.35; N.Y. Social Services Law § 483-bb

312.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

313.    Each Plaintiff is a victim of labor trafficking within the meaning of N.Y. PENAL § 135.35 because each was compelled to engage in labor by, including but not limited to, having their passport withheld and/or confiscated.

314.    Each Plaintiff is a victim of labor trafficking within the meaning of N.Y. PENAL § 135.35 because each was compelled to engage in labor under threat of fiscal harm and/or deportation.

315.    Each Defendant knew, or should have known, its clients and is Venture co-participants were engaging in violations of N.Y. PENAL § 135.35.

316.    Plaintiffs have each suffered and will continue to suffer substantial economic, physical and psychological injuries as the result of being trafficked.

317.    Defendants knew or should have known, or recklessly disregarded that, the World Cup Labor Venture engaged in trafficked and forced labor in light of the prevalence of Qatar's *kafala* system; the norms of the construction industry in Qatar; public reporting, government reports, and non-profit reports; notices provided directly to Defendants; Defendants' internal processes and procedures; Qatar Foundation's role; Defendants' due diligence; Defendants' interactions with other Venture participants; and via Defendants' agents and employees in Qatar.

318.    Each Plaintiff, as an individual who is a victim of the conduct prohibited by section 135.35 of the penal law, is entitled to bring a civil action against the perpetrator or whoever knowingly advanced or profited from, or whoever should have known they were advancing or profiting from, an act in violation of section 135.35.  Defendants knew or should have known they advanced an act in violation of section 135.35 through their participation in the Venture.  Indeed, Defendants' acts and omissions in support of the Venture facilitated and allowed labor trafficking to continue.  And Defendants also knew or should have known they were profiting from their clients' and their Venture co-participants' acts in violation of section 135.35.   Defendants knowingly profited from acts in violation of section 135.35 because they received, at a minimum, $1 million each year they participated in the Venture, and likely much more.

319.    Defendants knowingly benefitted from trafficked and forced labor, because they were paid money by their clients to help cover up and therefore to facilitate the abuses.  Because the goal of Defendants' work was to ensure that trafficked and forced labor continued to be available to Defendants' clients, they benefitted due to that trafficked and forced labor.

320.    Defendants are therefore liable to Plaintiffs for actual, compensatory, and punitive damages, as well as reasonable attorney's fees

## VI.    JURY TRIAL

321.    Plaintiffs demand trial by jury on all issues so triable.

## VII.    <u>PRAYER FOR RELIEF</u>

322.    WHEREFORE, Plaintiffs pray this Court will enter an Order:

(a)    Entering judgment in favor of Plaintiffs on all counts of the Complaint;

(b)    Awarding each of the Plaintiffs monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to restitution, fees and costs paid, debts incurred, and wages promised but not paid;

(c)    Awarding each of the Plaintiffs consequential damages;

(d)    Awarding each of the Plaintiffs damages for mental anguish and pain and suffering Plaintiffs experienced as a result of being forced to labor against their will, in inhumane conditions, and at risk of injury and death;

(e)    Awarding each of the Plaintiffs punitive and exemplary damages;

(f)    Awarding Plaintiffs any and all other damages allowed by law according to proof to be determined at trial;

(g)    Awarding Plaintiffs reasonable attorneys' fees and costs; and

(h)    Granting such other relief as the Court deems just and equitable.

Respectfully submitted this 24th day of April, 2025,


/s/ Eli J. Kay-Oliphant
Eli J. Kay-Oliphant (Bar No. EK8030)
 eli.kay-oliphant@sparacinopllc.com
Ryan R. Sparacino (pro hac vice forthcoming)
 ryan.sparacino@sparacinopllc.com
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel:  (202) 629-3530

Sean Grimsley (pro hac vice forthcoming)
 sgrimsley@olsongrimsley.com
Jason Murray (pro hac vice forthcoming)
 jmurray@olsongrimsley.com
Eric Olson (pro hac vice forthcoming)
 eolson@olsongrimsley.com
Olson Grimsley Kawanabe Hinchcliff & Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Tel: 303-535-9151

*Counsel for Plaintiffs*