**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.A., A.B., A.D., A.G., A.P., A.S., A.V., Al.C., Am.P., An.A., An.D., Ar.A., Ari.R., Arn.R., B.D., B.M., B.T., C.C., C.S., C.V., D.D.R., D.L., E.A., E.C., E.D.C., E.D.L., E.G., E.L., E.M., Ed.T., En.C., Er.T., F.B., F.S., F.T., G.A., G.D.L., G.G., G.O., G.S., G.T., H.V., I.E., J.A., J.B., J.C., J.D.C., J.F., J.J.G., J.L., J.N.B., J.O., J.P., J.S., J.T., Ji.T., Jo.B., L.G., L.L., L.N., L.P., L.V., M.A., M.D.L., M.G., M.R., M.S., N.C., P.C., R.A., R.B., R.B.E., R.C., R.D., R.E., R.F., R.I., R.L., R.N., R.P., R.S., R.T., R.V., Ra.D., Ra.G., Ra.L., Ra.V., Re.C., Re.D., Rh.P., Ri.C., Ri.O., Ro.D., Ro.L., Ro.P., Rod.O., Rog.B., Rol.P., Rom.B., Ron.O., S.N., T.L., V.A., V.B., V.M., and W.B., | Case No.: 1:25-cv-03389 |
| | |
| Plaintiffs, | |
| v. | ORAL ARGUMENT REQUESTED |
| OMNICOM GROUP INC., PORTLAND PR INC., OGILVY GROUP, LLC, OGILVY PUBLIC RELATIONS WORLDWIDE LLC, and MEMAC OGILVY & MATHER LLC, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

**DAVIS+GILBERT LLP**
James R. Levine
Gregg A. Gilman
William S. Kukin
1675 Broadway
New York, New York 10019
(212) 468-4800
jlevine@dglaw.com
ggilman@dglaw.com
wkukin@dglaw.com

*Attorneys for Defendants Omnicom
Group Inc. and Portland PR Inc.*

Steven P. Lehotsky*
Mary Elizabeth Miller*
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, D.C. 20001
steve@lkcfirm.com

Mark M. Rothrock*
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615

* Admitted *Pro hac vice*

*Attorneys for Defendants Ogilvy Group,
LLC, Ogilvy Public Relations Worldwide
LLC, and Memac Ogilvy & Mather LLC*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 4

      A.    The Alleged World Cup Trafficking Venture ..................................................... 4

      B.    Portland Contracts with the Qatari Embassy and GCO .................................... 5

      C.    Mercury Contracts with the Qatari Embassy and GCO ................................... 6

      D.    Memac Contracts with QF ................................................................................. 7

LEGAL STANDARD ................................................................................................................ 8

ARGUMENT ............................................................................................................................. 9

    I.     PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE
          TVPRA OR THE PARALLEL NEW YORK STATUTE ........................................... 9

      A.    Plaintiffs Do Not Plead Defendants' "Participation" in a "Venture" that
           Violated the TVPRA ......................................................................................... 9

          1.    The Complaint Does Not Adequately Plead a TVPRA "Venture" ........ 10

          2.    Portland Did Not Participate in the Alleged Venture ............................. 13

          3.    Omnicom Did Not Participate in the Alleged Venture ......................... 15

          4.    Ogilvy Did Not Participate in the Alleged Venture ............................... 16

          5.    Plaintiffs Cannot Pierce the Corporate Veil to Assert Claims Against
             Omnicom or Ogilvy Group .................................................................. 19

      B.    Plaintiffs Do Not Plead Defendants' Actual or Constructive Knowledge of
           Any TVPRA Violation as to Plaintiffs ............................................................ 22

      C.    Plaintiffs Do Not Plead that Defendants Knowingly Benefitted from
           Participation in the Alleged Venture ................................................................ 27

      D.    Plaintiffs Do Not Adequately Plead a Primary Violation of the TVPRA ........ 29

      E.    Plaintiffs' New York Law Claim Fails ............................................................ 34

    II.    IF PLAINTIFFS PLAUSIBLY PLEAD A TVPRA CLAIM, THEN THAT
          CLAIM VIOLATES ARTICLE III ......................................................................... 34

III.   PLAINTIFFS SEEK AN IMPERMISSIBLE EXTRATERRITORIAL
       APPLICATION OF THE TVPRA AND NEW YORK LAW ................................... 39

IV.   PLAINTIFFS' CLAIMS MUST BE DISMISSED UNDER THE ACT OF
       STATE DOCTRINE ..................................................................................................... 44

V.    PLAINTIFFS' THEORY OF LIABILITY REQUIRES AN APPLICATION OF
       THE TVPRA THAT VIOLATES DEFENDANTS' FIRST AMENDMENT
       RIGHTS ........................................................................................................................ 46

VI.   THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANT
       MEMAC ........................................................................................................................ 50

VII.  PLAINTIFFS CANNOT ASSERT A CLAIM UNDER SECTION 1593 ................ 54

CONCLUSION .......................................................................................................................... 54

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                    **Page(s)**

*Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89 (2d Cir. 2019) ......................................................... 30

*Allen v. Wright,* 468 U.S. 737 (1984) ........................................................................ 35, 37, 39, 40

*Anora v. Oasis Pro. Mgmt. Grp., Ltd.*, 2023 WL 2307180 (S.D.N.Y. Mar. 1, 2023) ................. 33

*Arch Specialty Ins. Co. v. Payne*, 2025 WL 1416607 (2d Cir. 2025) .......................................... 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 9

*Brown v. Dolce Gabbana USA Inc.*, 2025, 2025 WL 1919549 (S.D.N.Y. July 11, 2025) ........... 20

*Calzone v. Summers*, 942 F.3d 415 (8th Cir. 2019) ..................................................................... 50

*Caplan v. Dollinger*, 2025 WL 1808530 (S.D.N.Y. June 30, 2025) ...................................... 22, 53

*Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*, 491 B.R. 335 (S.D.N.Y. Apr. 8,
     2013) ........................................................................................................................................... 21

*Carter v. HealthPort Techs.*, LLC, 822 F.3d 47 (2d Cir. 2016) ................................................... 35

*CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371 (S.D.N.Y. 2019) ............................................... 51

*Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178 (2d Cir. 2019) .......... 35, 37

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) .................................................. 33

*Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, 2023 WL 5688392 (Del. Ch.
     Ct. Sep. 4, 2023) ............................................................................................................ 20, 21, 22

*Connick v. Myers*, 461 U.S. 138 (1983) ....................................................................................... 49

*Cooke v. Frank Brunckhorst Co., LLC*, 2025 WL 1742509 (E.D.N.Y. June 24, 2025) .............. 30

*Corradino v. Liquidnet Holdings Inc.*, 2021 WL 2853362 (S.D.N.Y. July 8, 2021) ................... 29

*Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183 (2d Cir. 2020) ................................................. 9

*Danuri Tex Co. v. Yoco*, 2020 WL 4735190 (S.D.N.Y. Aug. 14, 2020) ...................................... 20

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010) .................................................... 5

*Doe (G.N.C.) v. Uniquest Hosp., LLC*, 2024 WL 4149251 (S.D.N.Y. Sept. 11, 2024) .............. 23

*Doe (P.B.) v. Wyndham Hotels & Resorts, Inc.*, 2023 WL 8890229 (D.N.J. Dec. 26, 2023) ...... 23

*Doe I v. Apple Inc.*, 2021 WL 5774224 (D.D.C. Nov. 2, 2021) ...................................... 41, 42, 43

*Doe v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024) ...................................... 10, 11, 12, 13

*Doe v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021) .................................... passim

*Drimal v. Tai*, 786 F.3d 219 (2d Cir. 2015) ................................................................. 31

*DWPN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145 (2d Cir. 2014) ................. 39

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ........................... 50

*Farrakhan v. Anti-Defamation League*, 2025 WL 24066 (2d Cir. Jan. 3 2025) ........................ 37

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167 (2d Cir. 2006)................................. 47

*Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004)....................................................... 29

*G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023) .................................... passim

*Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp.3d 156 (S.D.N.Y. 2019)........................ 28, 29

*Glob. Gaming Philippines., LLC v. Razon*, , 2022 WL 836716 (S.D.N.Y. Mar. 21, 2022) ......... 20

*Holland v. JPMorgan Chase Bank, N.A.*, 2019 WL 4054834 (S.D.N.Y. Aug. 28, 2019)............ 35

*Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012 (10th Cir. 1990) .................... 53

*Idrobo v. Microsoft*, 2025 WL 662697 (S.D.N.Y. Feb. 28, 2025).................................... 36, 37, 39

*In re Elysium Health-Chromadex Litig.*, 2018 WL 4907590 (S.D.N.Y. Sep. 27, 2018)............. 50

*Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698 (2d Cir. 1990) ........ 22

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) ........................................... 47

*Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 575 U.S. 650 (2015)......................... 42

*Kittay v. Kornstein*, 230 F.3d 531 (2d Cir. 2000) ........................................................ 31

*Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991) ................................................... 49

*Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562 (S.D.N.Y. 2022)................................................................................................ 53

*Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489 (D.C. Cir. 1967) .................................... 50

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) .................... 52

*Liu Meng-Lin v. Siemens AG*, 763 F.3d 175 (2d Cir. 2014) ...................................... 42

iv

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................................................ 35, 37, 38

*Mia v. Kimberly-Clark Corp.*, 2025 WL 752564 (D.D.C. Mar. 10, 2025) .................................... 41

*Miller v. Ziegler*, 109 F.4th 1045 (8th Cir. 2024) ..................................................................... 49

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010 ........................................................ 42

*Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329 (S.D.N.Y. 2025) ........... 10, 26

*Murray v. Miner*, 74 F.3d 402 (2d Cir. 1996) ............................................................................. 20

*Nestlé USA, Inc. v. Doe*, 593 U.S. 628 (2021) ....................................................................... 40, 41

*Ngono v. Owono*, 2024 WL 911797 (2d Cir. Mar. 4, 2024) ................................................... 30, 31

*Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196 (S.D.N.Y. 1991) ..................................... 40

*Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159 (9th Cir. 2022) .................................... 23, 25, 26

*Ricchio v. McLean* 853 F.3d 553 (1st Cir. 2017) ....................................................................... 13

*RJR Nabisco v. European Cmty.*, 579 U.S. 325 (2016) ......................................................... 40, 42

*Rodriguez v. KGA Inc.*, 155 A.D.3d 452 (1st Dep't 2017) ..................................................... 43, 44

*Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706 (D.C. Cir. 2022) ............................................. 43

*Ross v. Jenkins*, 325 F. Supp. 3d 1141 (D. Kan. 2018) ............................................................... 34

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ...................................................................... 36

*S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020) .......................... 25, 27, 34

*Schwartz v. Sensei, LLC.*, 2020 WL 5817010 (S.D.N.Y. Sept. 30, 2020) ................................... 21

*Shantou Real Lingerie Mfg. Co., Ltd. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433 (S.D.N.Y. 2018) ....................................................................................................................... 54

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ..................................................... 35, 36

*Smith v. AECOM Tishman*, 2023 WL 2734430 (S.D.N.Y. Mar. 30, 2023) ................................... 44

*Snyder v. Phelps*, 562 U.S. 443 (2011) ............................................................................. 47, 49, 50

*Spiegel v. Schulmann*, 604 F.3d 72 (2d Cir. 2010) .................................................................... 51

*Spokeo, Inc. v. Robins,* 578 U.S. 330 (2016) ............................................................................. 35

*Straw v. Dentons US LLP*, 2020 WL 3182775 (S.D.N.Y. June 11, 2020) .................................... 47

*Sysco Food Serv. of Metro New York, LLC v. Jekyll & Hyde, Inc.*, 2009 WL 4042758 (S.D.N.Y. Nov. 17, 2009) ................................................................................. 20

*Thackurdeen v. Duke Univ.*, 130 F. Supp. 3d 792, 798 (S.D.N.Y. 2015) .............................. 51, 52

*Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221 (2d Cir. 2009) .......................... 53

*United States v. All Assets Held in Acct. Number XXXXXXXX*, 83 F. Supp. 3d 360 (D.D.C. 2015) ....................................................................................................... 45

*United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) ........................................... 24

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) .............................................. 32

*United States v. Griffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004) .................................... 45

*Vacation Travel Int'l, Inc. v. Sunchase Beachfront Condo. Owners Ass'n, Inc.*, 2007 WL 757580 (D. Colo. Mar. 8. 2007 ................................................................. 53

*W.S. Kirkpatrick & Co. v. Env't'l Tectonics Corp., Int'l*, 493 U.S. 400 (1990) .................... 45, 47

*Wallace ex rel. Cencom Cable Incom Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175 (Del. Ch. Ct. 1999) ..................................................................................... 21

*Wm. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc.*, 933 F.2d 131 (2d Cir. 1991) ............. 54

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) ...... 45, 46

*Zanotti v. Invention Submission Corp.*, 2020 WL 2857304  (S.D.N.Y. June 2, 2020)................ 40

*Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 177 (S.D.N.Y. 2021) ..................... 52

**Constitutional Provisions**

U.S. Const., amend. I ................................................................................ 50

**Statutes**

18 U.S.C. § 1589..................................................................................... 9, 30

18 U.S.C. § 1589(a) ............................................................................... 31, 41

18 U.S.C. § 1589(a)(1)............................................................................... 31

18 U.S.C. § 1589(a)(2)............................................................................... 32

18 U.S.C. § 1589(a)(3)............................................................................... 32

18 U.S.C. § 1589(a)(4)............................................................................... 32

18 U.S.C. § 1589(c)(1) ....................................................................................... 31, 32

18 U.S.C. § 1589(c)(2) ........................................................................................... 31

18 U.S.C. § 1590 ................................................................................................. 9, 29

18 U.S.C. § 1593(a) ................................................................................................. 54

18 U.S.C. § 1593(b)(1) ............................................................................................ 55

18 U.S.C. § 1593(c) ................................................................................................. 55

18 U.S.C. § 1595(a) ........................................................................................... passim

18 U.S.C. § 1596 ..................................................................................................... 42

18 U.S.C. § 1596(a) ................................................................................................. 41

18 U.S.C. § 1596(b) ................................................................................................. 42

N.Y. Penal Law § 135.35 ........................................................................................ 44

N.Y. Soc. Servs. Law § 483-bb(c) .......................................................................... 34

N.Y. Soc. Servs. Law § 483-bb(c)(i) ...................................................................... 44

N.Y. Soc. Servs. Law § 483-bb ............................................................................... 44

## Other Authorities

McKinney's Cons. Laws of N.Y., Book 1, Statutes § 149 ........................................ 43

The White House, *Fact Sheet: President Donald J. Trump Secures Historic $1.2 Trillion Economic Commitment in Qatar* (May 14, 2025) .................................................. 47

## INTRODUCTION

Plaintiffs are more than 100 foreign citizens who allegedly worked on construction projects in Qatar and have no connection to the United States other than the existence of this lawsuit. They contend that lobbying and public-relations work Defendants performed for Qatari governmental entities and the private Qatar Foundation before the 2022 FIFA World Cup violated the Trafficking Victims Protection Reauthorization Act (TVPRA) and its New York state law equivalent by "sportswashing" labor abuses of migrant-construction laborers in Qatar and thus shielding Qatar from international criticism of its labor laws and conditions.

Plaintiffs' Complaint asks this Court to endorse an extraordinary and unprecedented legal theory: that the TVPRA imposes liability upon public-relations and lobbying firms with no connection at all to alleged labor abuses except for the firms' constitutionally protected advocacy. The Complaint brings claims on behalf of foreign plaintiffs, working in a foreign country, under foreign labor laws, for foreign employers—all with no connection to the United States. To state this theory is necessarily to reject it under multiple, well-established statutory, international, and constitutional doctrines. Plaintiffs' claims against defendants Omnicom Group Inc., Portland PR Inc., Ogilvy Group, LLC, Ogilvy Public Relations Worldwide LLC, and Memac Ogilvy & Mather LLC (collectively, Defendants) should be dismissed for numerous reasons.

*First*, Plaintiffs fail at every turn to state a claim under the TVPRA or New York law. To do so, they must plausibly plead Defendants participated in a "venture" that violated the statute, meaning they took part in an enterprise involving danger, uncertainty, or risk, as well as potential gain. Plaintiffs do not—because they cannot—allege that any Defendant directly participated in any trafficking or forced labor violations, or that any Defendant had any direct (or even indirect) relationship with the alleged primary perpetrators of labor abuses in Qatar.

Plaintiffs otherwise do not plead Defendants' actual or constructive knowledge of any

TVPRA violation *with respect to* Plaintiffs, as the TVPRA requires. The Complaint nowhere alleges that Defendants were aware of Plaintiffs at all. Plaintiffs allege only that Defendants had some *general* awareness of labor abuses in Qatar, which is insufficient as a matter of law. Plaintiffs also cannot establish that Defendants knowingly benefited from participation in the purported venture, let alone that they benefited *because* of that participation. On top of all these deficiencies, Plaintiffs fail to adequately plead that they suffered injuries covered by the TVPRA.

*Second*, any determination that Plaintiffs plausibly state a TVPRA claim would violate the constitutional limits of Article III, which requires—at minimum—a causal connection between the alleged unlawful conduct and the alleged injury for a plaintiff to have standing to sue. The Complaint rests on a series of indirect and highly attenuated links between Defendants' public relations work and Plaintiffs' purported injuries, without even attempting to plead any plausible causal relationship between the two.

*Third*, Plaintiffs' claims are premised upon an impermissible extraterritorial application of the TVPRA and New York law. Federal laws are presumed to apply only domestically. The civil remedy provision of the TVPRA contains no language rebutting that presumption. Although a separate provision of the TVPRA permits extraterritorial jurisdiction for specifically delineated criminal offenses under the Act, Congress chose to *exclude* the civil remedy provision applicable here. It is likewise well settled that no New York statute operates outside the territorial limits of the State unless expressly stated; the relevant statutes contain no such express statement.

*Fourth*, Plaintiffs' claims are barred by the act of state doctrine. Plaintiffs' claims necessarily require this Court to evaluate the validity of Qatar's labor laws and its enforcement of them in the lead up to the World Cup. But the act of state doctrine, firmly rooted in both the separation of powers and a recognition of foreign sovereignty, prohibits the Judicial Branch from

sitting in judgment of the practices of a foreign sovereign country to preserve the Executive Branch's ability to effectively conduct the Nation's foreign relations. The claims at issue in this case are especially pernicious because they ask the judiciary to hold Defendants liable for lobbying and public relations activity directed at the Legislative and Executive Branches—the very political branches responsible for foreign affairs.

*Fifth*, Plaintiffs' claims are also barred by the First Amendment because they impose liability for Defendants' exercise of their First Amendment rights. Plaintiffs' claims target Defendants' public relations and lobbying activity on core political issues: There can be no doubt from the Complaint itself that the topic of the labor conditions in the host country of the World Cup—the largest sporting event in the World—is a matter of global public concern. This Court should not apply the TVPRA to impose liability that would violate Defendants' First Amendment rights.

*Sixth*, Plaintiffs' claims against Defendant Memac Ogilvy & Mather LLC ("Memac") should be dismissed because the Court lacks personal jurisdiction over that Defendant. Memac is not domiciled in New York, and Plaintiffs fail to plead that any of the elements of their TVPRA or state law claims "arise from" Memac's alleged contacts with New York as state law requires. All Plaintiffs can claim is that Memac "collaborat[ed]" with Ogilvy Group and Ogilvy Public Relations Worldwide LLC (OPRW), both based in New York, in conducting public relations work on behalf of a Qatari client. But none of that conduct gives rise to a TVPRA claim. And Plaintiffs cannot plausibly allege that the Court's jurisdiction over Ogilvy Group—the corporate parent—can be imputed to Memac, a wholly owned subsidiary.

For all these reasons, Plaintiffs' Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

A.  **The Alleged World Cup Trafficking Venture**

Plaintiffs' Complaint purports to vindicate alleged labor abuses in Qatar in the lead up to the 2022 World Cup in that country. Compl. ¶ 2. Plaintiffs explain that to "host dozens of games and millions of spectators, the Qatari regime" "built several state-of-the-art stadiums." *Id.* ¶ 1. Completing those infrastructure projects, Plaintiffs allege, was possible only "through untold thousands of migrant workers being subjected to nightmarish conditions," under which "the laborers' direct employers" in Qatar "took passports, trapp[ed] workers in Qatar, and then forced workers to work inhumane hours in Qatar's scorching heat while enduring squalid living and dangerous working conditions." *Id.* ¶¶ 3, 7.

Plaintiffs' claims, however, do not target the actions of their direct employers in Qatar (the "Employers") or the (unspecified) foreign individuals in other countries who allegedly trafficked Plaintiffs to Qatar (the "Traffickers"). Instead, Plaintiffs allege that Defendants—a group of public-relations and lobbying firms—were "essential" to a so-called "World Cup Labor Venture" whose goal was to "help Qatar deliver the World Cup stadiums on time and within budget" by "ensur[ing] that Qatar had continued access to trafficked and forced labor." *Id.* ¶ 5. Plaintiffs allege Defendants stopped or limited reporting on labor abuses, "refuting with lies to minimize the world's understanding of the problem," lobbied governments and media, and "generally sportswash[ed] Qatar so that Qatar could host the World Cup despite exploiting labor to do so." *Id.* Plaintiffs assert that other venture participants included numerous entities not named as Defendants, including their direct Employers as well as Qatar Foundation, FIFA, and various other entities whose roles in the alleged venture are left unexplained. *Id.* ¶ 27.

Plaintiffs' allegations against Defendants are based on publicly filed contracts between Defendants and various Qatari entities: the State of Qatar, the Qatari Embassy, the Qatari

Government Communications Office (GCO), and the Qatar Foundation for Education, Science, and Community Development (QF). *See id.* ¶ 29. The Complaint does not allege any of these entities had a business relationship with any of Plaintiffs' Employers or the Traffickers. In fact, Plaintiffs do not even allege that the State of Qatar, the Qatari Embassy or the GCO participated in the venture. *Id.* ¶ 27.

B. **Portland Contracts with the Qatari Embassy and GCO**

Beginning in 2014, Portland entered into a series of services contracts for media and government relations work related to Qatar.[1] Initially, Portland entered into a services contract with its UK affiliate, Portland PR Limited, that ultimately benefited the Qatari government. Kukin Decl. ¶ 2, Ex. 1. Portland PR Limited is not named as a Defendant.[2] Portland US provided "[c]onsultancy support" for Portland UK's client, including a "weekly brief on relevant US political developments" and "developing media and stakeholder engagement plans for top US influencers." *Id.* 5-13.

Beginning in 2015, Portland US contracted directly with the Embassy of the State of Qatar in Washington, D.C. Kukin Decl. ¶ 3, Ex. 2. Portland's contract with the Qatari Embassy was renewed several times through the end of 2016. Kukin Decl. ¶¶ 3-5, Exs. 2-4. Portland's services included "communications on behalf of the Embassy of the State of Qatar with officials in executive branch departments and agencies, with members and staff of the U.S. Congress, and

---

[1] On a motion to dismiss, the Court may consider "documents incorporated by reference in the complaint" as well as documents that are "integral" to the complaint because the complaint "relies heavily upon [their] terms and effect." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The Complaint repeatedly references Defendants' publicly filed Foreign Agents Registration Act ("FARA") statements, *e.g.*, Compl. ¶¶ 67, 68, 72, 84, 100, 101, and sources many of its allegations from such filings. *Id.* ¶ 29. The relevant FARA filings are attached to the accompanying Declarations of William S. Kukin and Mary Elizabeth Miller.

[2] Defendant Portland PR Inc. is sometimes referred to herein as "Portland US," and Portland PR Limited is referred to as "Portland UK."

with other individuals and organizations involved in governmental and public policy matters." Ex. 2 at 4, Ex. 3 at 2, Ex. 4 at 2.

For a brief period in 2017, Portland contracted with Portland UK to provide services benefitting the Government of Qatar, the Qatari Embassy, and QF. Kukin Decl. ¶¶ 6-7, Exs. 5-6. With respect to QF, Portland US provided limited "[m]edia support," "[s]trategic counsel" and "[c]risis support" for a period of three months, from June 21, 2017, through September 21, 2017. Ex.6 at 5.

In 2018, Portland contracted directly with Qatar's GCO, the successor agency to the Qatari Embassy. Kukin Decl. ¶ 8, Ex. 7.  Portland provided the GCO with "communications counsel to support Qatar-US relations," which included "[m]essaging and communications materials for key audiences/stakeholders," "[b]riefing papers, Q&A, talking points, and speeches," and "[a]ssist[ance] with media relations activities." Ex. 7 at 12. The GCO renewed Portland's contract several times through June 2023. Kukin Decl. ¶¶ 9-14, Exs. 8-13.

C. **Mercury Contracts with the Qatari Embassy and GCO**

Mercury Public Affairs LLC ("Mercury") is an indirect subsidiary of Omnicom and is not named as a Defendant. Beginning in 2015, Mercury contracted with the Qatari Embassy as follows:

> Mercury Public Affairs, LLC will provide strategic consulting and management services specific to issues facing the Client in the areas of government relations and issues management as follows:
>
> Representation of the Government of Qatar to the United States Senate and House of Representatives and Non-Governmental entities (such as think tanks and businesses).

Kukin Decl. ¶ 15, Ex. 14 at 10.

Mercury's 2015 contract was renewed across several extensions through June 30, 2017. Kukin Decl. ¶¶ 15-20, Exs. 14-19. As reflected in a letter agreement between Mercury and GCO

in September 2017, the Qatari Embassy had assigned its agreement with Mercury to the GCO and extended the agreement through June 30, 2018.  Kukin Decl. ¶ 21, Ex. 20 at 1.  The agreement was then extended again through June 30, 2019. Kukin Decl. ¶ 22, Ex. 21.

In November 2019, Mercury again contracted with the Qatari Embassy. Kukin Decl. ¶ 23, Ex. 22. Mercury's work included:

> A. Research advice and assistance to Embassy regarding the work of nongovernmental policy institutions and academic institutions active in studying Middle East issues.
>
> B. Weekly reporting on (1) above, with abridged commentary and upcoming events.
>
> C. As requested, preparation of background information for events and meetings.

Ex. 22 at 10. Mercury's contract was renewed in January 2022 and extended through 2023. Kukin Decl. ¶¶ 24-25, Exs. 23-24.

### D. Memac Contracts with QF

In 2018, Memac contracted with QF to provide public relations support. Compl. ¶ 109; Miller Decl., Ex. A at 3. QF is a "private, non-profit organization that serves the people of Qatar by supporting and operating programs in three core mission areas: education, science and research, and community development." Miller Decl., Ex. A at 7. QF receives a percentage of its annual operating budget from the State of Qatar. *Id.* at 2. The contract provided that Memac would "draft and execute a detailed PR strategy and implementation plan for QF that is focused on…media relations, QF placement in external conferences and events, and strategic brand alliances." *Id.* at 8; *see also id.* at 9 (Memac will "draft and maintain up-to-date versions of QF corporate press collateral, including but not limited to: Boiler plates, Official Q&A; Press kits; Approved facts and figures (about QF and QF Centers): Backgrounders; QF Story; Corporate Presentation, etc."). It otherwise provided that Memac would "establish[] a monitoring system for any negative news and

issues affecting QF And advising QF External Comms on any necessary reactive and proactive mitigation measures and communications processes." *Id.* at 9; *see also id.* at 10 (provisions directing Memac to produce media monitoring and analysis reports). And it directed Memac to "conduct research to assess QF's social media audiences and devise ways to increase awareness and understanding of QF" by developing a "social media strategy and implementation plan" as well as content for social media platforms. *Id.* at 14.

    As part of Memac's public relations efforts on behalf of QF, it "engaged The Ogilvy Group in NY to provide support for U.S.-based media relations on behalf of the [F]oundation." *Id.* at 3. That support included "engag[ing] U.S. media to engage interest in stories promoting Qatar Foundation's mission and leadership; facilitat[ing] interviews for Qatar Foundation executives if interest is secured; provid[ing] internal preparation support; provid[ing] media with supporting background materials, including Qatar Foundation press releases; [and] engag[ing] interested reporters and editors to help shape resulting coverage." *Id.* at 4. In 2019, Ogilvy Public Relations Worldwide also provided "strategic communications counsel and planning, proactive media relations, media monitoring and reporting, media familiarization trip (FAM) planning and coordination, [and] partnership and event sponsorship vetting on Qatar Foundation's focus areas: education, community development, and innovation." Miller Decl., Ex. B at 11.

## LEGAL STANDARD

    Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining a complaint's adequacy, a court must disregard conclusory allegations and legal conclusions, which are not entitled to the assumption of truth, and determine whether the remaining "well-pleaded factual allegations" suggest the plaintiff has a plausible—as opposed to merely conceivable—claim for relief. *Id.* at 679. The Court is "not required to credit conclusory

allegations or legal conclusions couched as factual . . . allegations." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020).

## ARGUMENT

## I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE TVPRA OR THE PARALLEL NEW YORK STATUTE

The TVPRA criminalizes human trafficking crimes, including forced labor and involuntary servitude. *See, e.g.*, 18 U.S.C. § 1589, 1590. The Act also provides a civil remedy for an injured private plaintiff to bring a civil action against a defendant who "knowingly benefits" "financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged" in a primary, criminal violation of the TVPRA. 18 U.S.C. § 1595(a). "[T]o state a beneficiary claim under Section 1595(a), a plaintiff must plausibly allege that the defendant (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff." *Doe v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021). Plaintiffs fail to plausibly allege each element, and their state law claim fails for the same reason.

### A.    Plaintiffs Do Not Plead Defendants' "Participation" in a "Venture" that Violated the TVPRA

Plaintiffs nowhere allege that any Defendant directly participated in any trafficking or forced labor violations, nor that Defendants had any direct relationship with the alleged primary perpetrators of labor abuses. Instead, Plaintiffs concoct a far-reaching and ill-defined "World Cup Labor Venture" to "ensure that Qatar had continued access to trafficked and forced labor." Compl. ¶ 5. Despite failing to plead *any* connection between Defendants and the alleged primary perpetrators of labor abuses, the Complaint nevertheless alleges that Defendants "participated" in

9

the venture alongside Plaintiffs' direct Employers. *Id.* ¶ 27.

The TVPRA does not define the words "participation" or "venture," and the Second Circuit has not yet interpreted their meaning. Courts "look[] to the plain meaning of these terms, as identified by dictionary definitions." *Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329, 337 (S.D.N.Y. 2025). (citing *Doe v. Apple Inc.*, 96 F.4th 403, 414 (D.C. Cir. 2024) (hereinafter, "*Apple I*")); *see also, e.g.*, *Red Roof Inns*, 21 F.4th at 724-25. "'Venture' means 'an undertaking that is dangerous, daring, or of uncertain outcome' or a 'business enterprise involving some risk in expectation of gain.'" *Mueller*, 777 F. Supp. 3d at 337 (quoting *Apple I*, 96 F.4th at 414 (citing American Heritage Dictionary of the English Language (4th ed. 2000))); *see Red Roof Inns*, 21 F.4th at 724–25 ("ordinary meaning of 'venture' is an undertaking or enterprise involving risk and potential profit") (citing *Venture*, Oxford English Dictionary 520 (2d ed. 1989) ("[a]n enterprise of a business nature in which there is considerable risk of loss as well as a chance of gain; a commercial speculation"))). "Participation" means "taking part or sharing in something." *Mueller*, 777 F. Supp. 3d at 337. Thus, the ordinary meaning of "participation in a venture" is "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain." *Id.*

Plaintiffs fail to plead both a TVPRA venture and participation as to each Defendant.

### 1.    The Complaint Does Not Adequately Plead a TVPRA "Venture"

To survive dismissal, Plaintiffs must adequately allege a common enterprise or undertaking *between Defendants and a primary violator* of the TVPRA. *See Red Roof Inns*, 21 F.4th at 726 (recognizing that whether hotel franchisors participated in a sex trafficking venture turns on whether "the franchisors took part in the common undertaking of sex trafficking with hotel employees, management, owners, and sex traffickers"); *accord, e.g.*, *Apple I*, 96 F.4th at 415 (concluding participation in a venture requires adequately pleading a "shared enterprise between

the Companies and the suppliers who facilitate forced labor"); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 559 (7th Cir. 2023) (noting a plaintiff may sufficiently allege participation in a venture "by showing a 'continuous business relationship' between the plaintiff and the trafficker").

The Complaint alleges no relationship whatsoever between Defendants and Plaintiffs' direct Employers—the alleged primary perpetrators of the underlying TVPRA violations—let alone a common enterprise or undertaking involving shared risk and profits. The Complaint proffers a purported "World Cup Labor Venture," with "two commercial components: a public relations element and a lobbying element." Compl. ¶ 5. According to Plaintiffs, Qatari governmental entities and QF hired "lobbyists, public relations firms, and marketers" in response to the "international community" "pressuring Qatar to implement labor reforms." *Id.* ¶¶ 45-53. Plaintiffs contend that the "public relations and lobbying campaign defended Qatar's human rights record, minimized the wrongs and abuses, and outwardly promised to adopt labor reforms," all to "quiet the growing chorus calling for a boycott" of the World Cup and to permit Qatar to "avoid and delay fixing labor-abuse problems." *Id.* ¶ 53. Plaintiffs allege in conclusory fashion that Defendants participated in the venture alongside the Employers, *see id.* ¶ 27, but the Complaint includes no well-pleaded facts from which to infer a common enterprise. That is unsurprising: The public relations and lobbying services that Defendants performed—which Plaintiffs claim are the sole "commercial components" of the venture—were the result of contractual arrangements that did not involve any Employers or Traffickers. Defendants contracted with various agencies (and related entities) of the Qatari government—not with any Employer or Trafficker. The Complaint therefore alleges no relationship at all between Defendants and any primary perpetrator of alleged labor abuses.

Nor does the Complaint allege even an *indirect* business relationship. Many of the entities

with which Defendants actually contracted—the Qatari Embassy, the GCO, and the Qatari government—are not even *themselves* alleged to be participants in the venture. *See id.* And although Plaintiffs allege that QF and the Supreme Committee participated in the Venture, the Complaint nowhere pleads any direct business relationship between those entities and the alleged primary TVPRA offenders. Neither Defendants nor Defendants' clients are alleged to have had *any* relationship with the Employers or the Traffickers.

Tellingly, the Complaint describes the "direct employers" who "perpetrated most of the labor abuses" as taking part in a "*broader* World Cup Labor Venture." *Id.* ¶ 7 (emphasis added). The reference to a "broader" venture belies Plaintiffs' conclusory attempt to lump together Defendants and the Employers in a common enterprise. As alleged in the Complaint, the Employers (and the Traffickers) were engaged in activities far removed from the lobbying and public-relations efforts in which Defendants engaged.

The absence of any connection is fatal to the Complaint's attempt to plead a TVPRA venture. Without it, Plaintiffs' allegations cannot plausibly create an inference of a *common* enterprise that "involves danger, uncertainty, or risk, and potential gain." *Apple I*, 96 F.4th at 415. In *Apple I*, the D.C. Circuit found technology companies had not participated in a venture with suppliers who allegedly facilitated forced labor in the mining and sale of cobalt. There, as here, the defendants did not "share in the suppliers' profits and risks", nor did the complaint allege a "direct and continuous relationship" between the tech companies and the suppliers. *Id.* at 415-16. Likewise, in *Red Roof Inns*, the Eleventh Circuit held that hotel franchisors did not "participate[] in a common undertaking involving risk or profit that violated the TVPRA—*i.e.*, the alleged sex trafficking ventures," even though the allegations "suggest[ed] that the franchisors financially benefitted from renting hotel rooms to the Does' sex traffickers." 21 F.4th at 726-27. Absent

12

allegations plausibly suggesting that the franchisors shared in the sex traffickers' risk or profit, the TVPRA claims failed. *See id.*

This case stands in stark contrast to other cases where courts have found the allegations of a TVPRA venture sufficient. In *Salesforce*, the Seventh Circuit held that the plaintiff plausibly alleged participation in a venture where the defendant had a "continuous business relationship" with a website "that was almost exclusively a sex-trafficking business and that had engaged in multiple acts in violation of [the TVPRA's criminal prohibitions], nay, whose business model was built upon systematic and widespread violation of [those provisions]." 76 F.4th at 560–61; *see also, e.g.*, *Ricchio v. McLean* 853 F.3d 553, 555-56 (1st Cir. 2017) (plaintiff adequately pleaded a TVPRA venture premised on the defendant motel operator's direct transactions with a sex trafficker).

Here, the Complaint alleges neither shared profits and risks, nor any business relationship—let alone a direct and continuous one—between Defendants and the Employers or Traffickers.

### 2. Portland Did Not Participate in the Alleged Venture

It is undisputed that Portland did not have a relationship with any Trafficker or Employer. Instead, the Complaint hinges Portland's "participation" in the venture on "Portland's contract to provide public relations services to Qatar." *E.g.*, Compl. ¶¶ 66, 71. But Portland contracted almost exclusively with two Qatari counterparties—the Qatari Embassy and the GCO—*who are not alleged to be participants in the venture*. *See id.* ¶ 27. The Complaint does not allege that the Qatari Embassy or the GCO violated the TVPRA, nor does it allege *any relationship whatsoever* between the Qatari Embassy or the GCO on the one hand, and the Traffickers or Employers on the other hand. Plaintiffs allege no facts from which to infer an undertaking involving risk or profit between Portland (or Portland's clients) and the alleged primary TVPRA offenders. The Complaint is

13

therefore missing the crucial link between Portland and the "traffickers or others" "who violated the statute." *Red Roof Inns*, 21 F.4th at 727.

A close analysis of the Complaint reveals a dearth of allegations as to Portland's direct contractual counterparties. Across 322 Paragraphs spanning 145 pages, the Qatari Embassy is mentioned only *nine* times and the GCO is referenced fleetingly in just a *single paragraph*. Far from alleging that the Embassy or the GCO participated in the venture, the Complaint alleges essentially nothing about Portland's contractual counterparties.[3]

Even if the Complaint could somehow be read to allege that the Qatari Embassy or the GCO participated in the Venture—which it cannot—that would still be insufficient to impute TVPRA liability to Portland. The activities attributed to Portland in the Complaint plainly do not amount to participation in a TVPRA venture. The Complaint characterizes Portland as the "'cornerstone' of Qatar's campaign to refute accusations of labor abuses," but then goes on to describe routine public relations services such as providing "government communications and media relations services," "developing media and stakeholder engagement plans," providing "advice on policy and media issues," and creating a "quarterly newsletter for the Embassy." Compl. ¶¶ 66-70. These allegations do not create a plausible inference that Portland's services related to the construction of World Cup stadiums—the supposed goal of the Venture, *see id.* ¶ 5—let alone to the TVPRA violations alleged in the Complaint.[4] They certainly cannot establish

---

[3] The Complaint repeatedly states that Portland also worked "directly with the Qatar Foundation." *E.g.*, Compl. ¶ 77. As set forth *supra*, these allegations are flatly contradicted by the referenced FARA filings. Portland US contracted to provide services to Portland UK on behalf of Portland UK's client, QF, for a mere three months in 2017.  Kukin Decl. ¶ 7, Ex. 6. Moreover, the Complaint does not allege that QF had a business relationship with any Employer or Trafficker.

[4] The Complaint repeatedly alleges on information and belief that Portland's routine media and public relations services related to the World Cup. *E.g.*, Compl. ¶¶ 67-68. But the contracts between Portland and its Qatari counterparts, incorporated by reference in the Complaint, nowhere reference the World Cup.

the requisite "tak[ing] part in a common undertaking involving risk or profit" that is necessary to establish participation in a TVPRA venture. *Red Roof Inns*, 21 F.4th at 727.

The only "specific example[s]" Plaintiffs cite of Portland's supposed participation in the venture are: (1) that Portland arranged for journalists to visit migrant workers' housing facilities, in what Plaintiffs allege was a "propaganda effort," and (2) Portland worked with a Qatari official on a response to a *Washington Post* article about migrant workers, which, on Plaintiffs' "information and belief," "Portland knew was false." *Id.* ¶¶ 74, 76. Even accepting these allegations as true for purposes of this motion, they still do not show that Portland "took part in the common undertaking of [labor] *trafficking*." *Red Roof Inns*, 21 F.4th at 727 (emphasis added). At best, Plaintiffs have alleged that Portland "would have seen signs of [labor] trafficking," but as numerous courts have held, "observing something is not the same as participating in it." *Id.*[5]

### 3.  Omnicom Did Not Participate in the Alleged Venture

Omnicom is not alleged to have executed *any* contract to provide services to the Qatari government, nor is Omnicom alleged to have filed any FARA disclosures related to Qatar.  The entirety of Plaintiffs' allegations against Omnicom relate to Omnicom purportedly supporting the work of its subsidiaries, Portland and Mercury. Compl. ¶¶ 89-108. Indeed, all of Plaintiffs' allegations as to Mercury are a transparent attempt to impose indirect liability on Omnicom, as Plaintiffs do not even name Mercury as a Defendant. The Complaint therefore pleads no facts from which to infer Omnicom's participation, and Plaintiffs' attempt to impose indirect liability on Omnicom fails. *Infra* § I(A)(5).

---

[5] The Complaint likewise does not plead Mercury's participation in the alleged venture. Mercury contracted solely with the Qatari Embassy and GCO, neither of which is alleged to be a venture participant or to have any business relationship with a primary perpetrator of labor abuses.

4. Ogilvy Did Not Participate in the Alleged Venture

It is undisputed that none of the Ogilvy Defendants contracted with any Trafficker or Employer. Instead, the Complaint stakes its theory on a contract entered into by Memac—a foreign affiliate located in Qatar with no meaningful contacts with the United States—with QF to provide public relations services. Compl. ¶ 109. But as with the other Defendants, the allegations describing that relationship simply describe run-of-the-mill public-relations efforts on behalf of QF: being "responsible for all of the operations of the Qatar Foundation's press/media relations office" including "interactions" with media; "draft[ing] press releases"; "distribut[ing] press releases"; and "monitor[ing] media draft responses" and daily news. *Id.* ¶ 111. The contract elsewhere confirms Memac was tasked with "draft[ing] and execut[ing] a detailed PR strategy and implementation plan." Miller Decl., Ex. A at 8. Nowhere in the contract does Memac agree to "obfuscate … labor abuse against migrant workers" or "slow the adoption and implementation of labor reforms." Compl. ¶ 305.

Plaintiffs point to industry awards Memac won for its public relations efforts related to the World Cup and describe certain employees' work on campaigns related to the event. Compl. ¶¶ 114-17; *see e.g.*, *id.* ¶ 117 (individual who made a presentation on "the Uncertainty of the First Arab World Cup;" individual who "led 'local content and campaigns during the year of the FIFA World Cup Qatar 2022"; individual who "worked on the World Cup 'media and stakeholder engagement efforts'"; and individual who "worked on '[p]roject management of international, regional & local campaigns on social'" for "'FIFA World Cup Qatar 2022'"). But those allegations do nothing more than tie Memac to World Cup-related work generally. They do not support a plausible inference that Memac's services related to any of the TVPRA violations alleged in the Complaint. And they cannot establish the requisite "tak[ing] part in a *common* undertaking involving risk or profit" that is necessary to establish participation in a TVPRA venture. *Red Roof*

16

*Inns*, 21 F.4th at 727 (emphasis added). Indeed, under Plaintiffs' theory, any person that said anything favorable about Qatar or the World Cup could be accused of "sportswashing" and subject to liability under the TVPRA. Even if limited to entities that contracted with QF, Plaintiffs' theory would mean that everyone who said anything positive about Qatar would be part of a TVPRA venture. That cannot be right.

Plaintiffs' allegations against OPRW and Ogilvy Group are even further removed. The Complaint contends OPRW participated in the venture because it engaged in "outreach to media members in the United States" and "provid[ed] lobbying support in Washington, D.C. to try to suppress pressure on Qatar to implement labor reforms." Compl. ¶ 119. But as with Memac, the Complaint contains no allegations beyond general descriptions of routine public relations and lobbying work. Paragraph 122 of the Complaint notes that Ogilvy has a social media platform, "Social@Ogilvy," and then—without *any* additional allegations about what that public facing social-media platform said or did to advance the interests of Qatar—declares "[o]n information and belief, OPRW participated in the Venture by providing services from New York via the Social@Ogilvy platform to Qatar Foundation." In other words, because Ogilvy has a social media platform, it must have provided those services to QF, and those services must have been in furtherance of the venture. That is the definition of conclusory. And in Paragraph 123, the Complaint lists purported employees that "participated in the Venture on behalf of OPRW," but Plaintiffs' own descriptions of those employees' work demonstrate only biographical public-relations work. *See, e.g.*, *id.* ¶ 123 (individual who is an "expert in nation branding"; individual who "advis[es] a diverse portfolio of global and regional clients including governments [and] country brands" and engaged in "media outreach on behalf of the Qatar Foundation"; individuals who registered as foreign agents for QF or signed a FARA registration). Plaintiffs contend that

two individuals "on information and belief" did work "related to the Venture," but offer no well-pleaded allegations as to what that work was. *Id.*

The Complaint contends that Ogilvy's 2019 FARA filings "confirm the work that OPRW did," but again, Plaintiffs only refer to general "public relations work" for "Qatar Foundation." *Id.* ¶ 124. And Ogilvy's September 2019 FARA filing describes work unrelated to the World Cup. *See* Miller Decl., Ex. B at 11 (describing pitches for "the Qatar Foundation's new progressive preschool"; "Qatar Foundation's International Biobanking Conference"; and "media on autism research and therapies from Qatar Foundation").[6] None of this relates to, or gives rise to any plausible inference about, Ogilvy's alleged participation in the venture.

With respect to Ogilvy Group, Plaintiffs generically allege it "helped Memac deliver" on Memac's contract with QF. Compl. ¶ 128. As with all the other Defendants, Ogilvy Group's FARA disclosures reflect only routine public relations work: "engage U.S. media to gauge interest in stories promoting Qatar Foundation's mission and leadership;" "provide media with supporting background materials, including Qatar Foundation press releases;" and "engage interested reports and editors to help shape resulting coverage." Miller Decl, Ex. A at 4.

Plaintiffs' attempts to plead additional detail falter. They contend that Ogilvy made its

---

[6] In two paragraphs, Plaintiffs allege that Ogilvy Government Relations (OGR) is a d/b/a of OPRW that contracted with the Embassy of Qatar in 2018 to "advise…on outreach and engagement with key policy makers." Compl. ¶¶ 125-26. At the outset, these allegations cannot support Plaintiffs' claims because the Embassy of Qatar is not an alleged venture participant. Regardless, none of Plaintiffs' allegations with respect to OGR plausibly plead participation. The content of another party's FARA filings on behalf of the State of Qatar do not establish *OGR's* participation. Plaintiffs assert that the work OGR agreed to perform under a 2021 contract with the Embassy was "sportswashing," but the contract describes the work as "[a]dvice and assistance to Embassy in Congressional liaison and government affairs." Miller Decl., Ex. C at 13. Other 2021 FARA filings note that OGR personnel engaged in routine communications with congressional staff, such as "follow[ing] up about scheduling dinner or coffee" and "sen[ding] an email inviting all assigned Members to the 2021 Doha Forum." Miller Decl., Ex. D at 16. Grasping at straws, Plaintiffs note the disclosure refers to "sen[ding] a Labor letter on workers' rights" to various offices. *Id.* at 21. Those vague and limited entries do not plausibly establish, as Plaintiffs claim, that "OPRW thereby participated in the Venture." Compl. ¶ 126.

"global marketing technology" available to its affiliates and therefore QF "in furtherance of the Venture." Compl. ¶ 130. But again, Plaintiffs offer no explanation for how the provision of a generally available marketing technology amounts to participation in the venture. And as with Memac and OPRW, Plaintiffs' descriptions of the work performed by specific individuals show nothing more than general public relations efforts related to the World Cup event. *See e.g.*, *id.* ¶ 132 (individuals who were "Head of Social" at Ogilvy, signed FARA registrations, or did "work for the Supreme Committee and Qatar Foundation").

     5.  <u>Plaintiffs Cannot Pierce the Corporate Veil to Assert Claims Against Omnicom or Ogilvy Group</u>

Plaintiffs also may not pierce the corporate veil to bring claims against the corporate parent Defendants. Plaintiffs attempt to impose liability on Omnicom and Ogilvy Group by piercing the corporate veil between Omnicom and its subsidiaries, Portland and Mercury, and between Ogilvy Group and its subsidiaries, OPRW and Memac. Plaintiffs explicitly request that Omnicom and Ogilvy Group "be held liable for the acts of [their] subsidiaries" as the subsidiaries are "merely instrumentalities" of their corporate parents. *Id.* ¶¶ 106, 108, 142, 144. Under New York and Delaware law,[7] the corporate veil is pierced only under "extraordinary circumstances" that are not alleged to be present here. *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996); *see Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, 2023 WL 5688392, at *4 (Del. Ch. Ct. Sep. 4, 2023) ("exceptional circumstances").

---

[7] When determining whether piercing the corporate veil is appropriate, courts in the Second Circuit apply the law of the relevant corporation's state of incorporation. *See, e.g.*, *Glob. Gaming Philippines., LLC v. Razon*, 2022 WL 836716, at *5 (S.D.N.Y. Mar. 21, 2022). Here, New York law applies as Omnicom is incorporated in New York. And though Plaintiffs allege that Ogilvy Group is a New York entity, Delaware law applies to Ogilvy Group as it was formed in Delaware. *See id.*

To pierce the corporate veil, Plaintiffs must prove: (1) the corporate parents "exercise complete domination in respect to the transaction attacked," and (2) "such domination [was] used to commit fraud or wrong against the plaintiff, which proximately caused the plaintiff's injury." *Sysco Food Serv. of Metro New York, LLC v. Jekyll & Hyde, Inc.*, 2009 WL 4042758, at *2 (S.D.N.Y. Nov. 17, 2009); *see Boomerang Tube*, 2023 WL 5688392, at *5 (plaintiff must show (1) "the subsidiary and the parent operate as a single economic entity such that it would be inequitable for the Court to uphold a legal distinction between them" and (2) the "corporate structure cause[s] fraud or similar injustice" (cleaned up)). At the motion to dismiss stage, Plaintiffs must do more than rely on "[p]urely conclusory allegations." *Sysco*, 2009 WL 4042758, at *3.

Plaintiffs cannot satisfy the second element. Under New York and Delaware law, the purported fraud or wrong cannot be identical to the underlying cause of action. *Danuri Tex Co. v. Yoco*, 2020 WL 4735190, at *4 (S.D.N.Y. Aug. 14, 2020); *Brown v. Dolce Gabbana USA Inc.*, 2025, 2025 WL 1919549, at *7 (S.D.N.Y. July 11, 2025) ("Logically, the fraud or wrong…must be independent from the wrongs…in the underlying causes of action" or "the mere existence of valid causes of action would usurp the entire second prong of the analysis."); *see Boomerang Tube*, 2023 WL 5688392, at *6 ("The fraud or injustice must…come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim."). Delaware law further requires that the subsidiary be a "sham" that "exists for no other purpose than as a vehicle for fraud." *Wallace ex rel. Cencom Cable Incom Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. Ct. 1999).

The Complaint nowhere alleges that Omnicom or Ogilvy Group perpetuated any independent fraud or wrong toward Plaintiffs. Nor could it, as the Complaint nowhere alleges that

any Defendant even knew of Plaintiffs.[8] It also does not allege that Ogilvy Group's subsidiaries existed solely as vehicles for fraud. For this reason alone, Plaintiffs cannot pierce the corporate veil, and all claims against these corporate parents should be dismissed. *See Arch Specialty Ins. Co. v. Payne*, 2025 WL 1416607, at *2 (2d Cir. 2025) (affirming dismissal of claims against certain defendants because allegations of complete domination without fraud were insufficient to pierce the corporate veil).

Plaintiffs also cannot satisfy the first element because they do not allege levels of control beyond that of a typical parent corporation. *See Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*, 491 B.R. 335, 349-350 (S.D.N.Y. Apr. 8, 2013) (finding plaintiff failed to meet the first element as the allegations did not reveal a relationship beyond that of a typical parent corporation); *see Boomerang Tube*, 2023 WL 5688392, at *6 (similar). The Complaint only makes conclusory allegations about Omnicom's and Ogilvy Group's "general business practices of disregarding corporate form and formalities" and how Omnicom's and Ogilvy Group's subsidiaries "were centrally controlled," with no plausible allegations supporting those conclusions. *See* Compl. ¶¶ 101, 106, 140, 142.

With respect to Omnicom, Plaintiffs make only conclusory allegations that it provided employees and resources to support Portland and Mercury, such as assisting with tax, accounting, legal and compliance work; generally contributing to their work; sharing information; and sharing back-office support functions. *Id.* ¶¶ 90-106. With respect to Ogilvy Group, they allege it shared

---

[8] If Plaintiffs did attempt to allege fraud, then they would need to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. *Schwartz v. Sensei, LLC.*, 2020 WL 5817010, at *9 (S.D.N.Y. Sept. 30, 2020) ("[A]llegations concerning domination are governed by Rule 8(a)'s basic pleading standard, but allegations concerning the fraud or wrongful element are subject to Rule 9(b)'s heightened pleading requirements to the extent they allege fraud.").

a "One Ogilvy" brand with OPRW and Memac; provided employees and resources to support its subsidiaries; and generally contributed to their work. *Id.* ¶¶ 127-44.

These allegations are nothing more than "[g]eneralized and conclusory allegations regarding common ownership, employees, management, control, and decisionmaking," which "are plainly insufficient to state a claim of alter ego status." *Caplan v. Dollinger*, 2025 WL 1808530, at *8 (S.D.N.Y. June 30, 2025). None come close to showing the subsidiaries were mere instrumentalities of their corporate parents, that they failed to manage their own affairs or observe corporate formalities, or that they were sham entities. To the contrary, Plaintiffs allege nothing beyond a typical parent-subsidiary relationship. *See Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 704 (2d Cir. 1990) (affirming dismissal of claims against parent corporation proper where subsidiary handled its own everyday affairs and observed corporate formalities); *Caplan*, 2025 WL 1808530, at *8 (dismissing where plaintiffs solely allege overlap in officers, personnel, and office locations); *Boomerang Tube*, 2023 WL 5688392, at *6 (dismissing where it was "unreasonable to infer" from plaintiff's allegations that the defendant subsidiaries "are sham entities").[9]

### B. Plaintiffs Do Not Plead Defendants' Actual or Constructive Knowledge of Any TVPRA Violation as to Plaintiffs

Section 1595(a) requires that the defendant "knew or should have known" that the alleged TVPRA venture "has engaged in an act in violation of this chapter," meaning "the defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated

---

[9] The Complaint implies Plaintiffs alternatively seek to impose vicarious liability on Omnicom and Ogilvy Group pursuant to an agency theory. *See* Compl. ¶¶ 107, 143 (alleging that "each subsidiary was doing the work of [the corporate parent] as its agent"). To the extent Plaintiffs allege vicarious liability under federal or New York common-law principles of agency, they fail to plead sufficient facts to meet the requisite elements. *See, e.g.*, *Doe (G.N.C.) v. Uniquest Hosp., LLC*, 2024 WL 4149251, at *5-6 (S.D.N.Y. Sept. 11, 2024).

22

and from which it knowingly benefited—violated the TVPRA *as to the plaintiff*." *Red Roof Inns*, 21 F.4th at 725 (emphasis added).

Plaintiffs' claims fail at the outset because the Complaint nowhere pleads Defendants' knowledge of a specific TVPRA violation as to any Plaintiff, let alone that Defendants were aware of Plaintiffs at all. *See Uniquest*, 2024 WL 4149251, at *4 (dismissing TVPRA claims as to defendants against whom plaintiff failed to plead "constructive or actual knowledge that the undertaking or enterprise violated the TVPRA *as to the plaintiff*"); *Doe (P.B.) v. Wyndham Hotels & Resorts, Inc.*, 2023 WL 8890229, at *5 (D.N.J. Dec. 26, 2023) (dismissing TVPRA beneficiary claim where the plaintiff "has not plausibly pled that Franchisors had either actual or constructive knowledge of Plaintiff's particular trafficking, an explicit requirement under the TVPRA"); *accord Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022) (affirming summary judgment dismissing a TVPRA beneficiary claim where the plaintiffs' evidence failed to "support an inference that [the defendant] knew or should have known of the *specifically alleged* TVPRA violations" in the complaint (emphasis added)).

Some courts in other circuits have erroneously held that "[k]nowledge of the specific victim…is not required" under the TVPRA. *E.g.*, *Salesforce*, 76 F.4th at 558. Those holdings cannot be squared with the TVPRA's text. The underlying TVPRA offense of forced labor makes it a crime to "knowingly provide[] or obtain[] the labor or services of *a person*" by means of force or serious harm. 18 U.S.C. § 1589(a) (emphasis added). As the dissenting judge in *Salesforce* noted, the "use of the term[] 'a person'" is "victim-specific, meaning an individual is not guilty of the crime unless the government can prove that his actions were tied to a specific victim." *Salesforce*, 76 F.4th at 568-69 (Kirsch, J., dissenting). Thus, the TVPRA requires knowledge of the specific victim to be held liable as a primary offender. *See id.*; *United States v. Calimlim*, 538

F.3d 706, 711 (7th Cir. 2008) (discussing the "express *scienter* requirement" of § 1589). A TVPRA beneficiary claim requires constructive knowledge of an underlying TVPRA violation. *See* 18 U.S.C. § 1595(a). Therefore, because the underlying TVPRA offense "requires knowledge of a specific victim, damages suits" under § 1595(a) "are available only when a plaintiff plausibly alleges that the defendant should have known that the venture engaged in her particular" TVPRA offense. *Salesforce*, 76 F.4th at 569 (Kirsch, J., dissenting).

A contrary holding would create perverse results: it would be easier for a plaintiff to establish a putative defendant's constructive knowledge in support of a secondary claim under § 1595 than it would be to establish the requisite scienter for a primary offense under § 1589. As one court noted with respect to a claim that a hotel franchisor knowingly participated in a TVPRA sex-trafficking venture, "under plaintiff's theory, the liability of franchisors—which are further removed from the sex trafficking than the actual hotels are—would be much easier proven than the liability of the hotels themselves. This would make no sense." *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020). Here, if the Employers must have knowledge of a specific TVPRA violation to be held liable as a primary offender, then "there is no interpretive logic by which" Defendants "can be held liable under that same statute for having only an abstract awareness" of labor abuses in general. *Id.* Further, a contrary holding would "extend civil liability to nearly every company and individual who did regular and personalized business" with Qatar "after it faced public allegations of [labor] trafficking." *Salesforce*, 76 F.4th at 568 (Kirsch, J., dissenting).

Even if the Court were to hold that knowledge of the specific TVPRA offenses as to Plaintiffs is not required, the Complaint fails to adequately plead Defendants' knowledge. General knowledge of TVPRA offenses is insufficient to state a claim under Section 1595. *See, e.g.*, *Ratha*,

35 F.4th at 1177 (TVPRA beneficiary claim fails where plaintiffs can show only that the defendant "should have known of labor abuses . . . *generally*"); *Choice Hotels*, 473 F. Supp. 3d at 154 ("[K]nowledge or willful blindness of a general sex trafficking problem…does not satisfy the *mens rea* requirements of the TVPRA."). Even *Salesforce* acknowledged as much. *See* 76 F.4th at 557 ("[T]o allow allegations that a civil defendant was aware of sporadic [trafficking] generally to show constructive knowledge of a particular sex trafficking venture 'unjustifiably bridges the scienter gap between "should have known" and "might have been able to guess."'").

The Complaint alleges only generalized knowledge of unspecified labor abuses through:

- A generalized "activist campaign" regarding migrant labor in Qatar;

- "[N]egative publicity related to trafficked and forced labor";

- The advice Defendants allegedly gave to their clients on how to "mitigate the impact of adverse reporting";

- Supposed "wide[] know[ledge]" that the "Qatar labor market relies and relied upon trafficked and forced labor";

- Unspecified observations from Defendants' employees "on the ground in Qatar"; and

- "[P]ublic reports" addressing "trafficking and forced labor risks."

Compl. ¶¶ 145-53. The Complaint goes on to cite various "[g]overnment and NGO [r]eports" and "[m]edia [r]eports" describing general allegations of labor abuses in Qatar. *Id.* ¶¶ 154-60. Even assuming Defendants were aware of these various reports, Plaintiffs' allegations "suggest[], at most, that [Defendants] should have known of labor abuses in [Qatar] *generally*." *Ratha*, 35 F.4th at 1177. But "[s]weeping generalities" about supposed labor abuses in Qatar "are too attenuated to support an inference that [Defendants] knew or should have known of the specifically alleged

TVPRA violations" in the Complaint. *Id.*

The remaining allegations concerning Defendants' knowledge are equally deficient. The Complaint hypothesizes "on information and belief" that Defendants conducted "due diligence" on their clients that "would have revealed to them…that the Venture relied upon trafficked and forced labor." Compl. ¶¶ 161-63. These vague "information and belief" allegations are insufficient to support a plausible inference that any Defendant "kn[e]w its client [was] engaged in trafficking." *Mueller*, 777 F. Supp. 3d at 339. Further, the Complaint does not allege that the Qatari Embassy or the GCO participated in the venture, so any due diligence on such clients cannot support an inference of knowledge.

Plaintiffs also seek an inference of Portland's, Ogilvy's, and Memac's knowledge by virtue of their specific work for QF. Compl. ¶¶ 164-72. The only allegation that Defendants knew QF was purportedly linked to alleged labor abuses specifically related to the World Cup is through a 2018 Deutsche Welle report, which Plaintiffs refer to in conclusory fashion. *Id.* ¶ 166. And the only work Portland did benefitting QF was in 2017—before the referenced report was published. Portland's alleged work for QF cannot sustain the inference that Plaintiffs ascribe to it. The remaining allegations relate to QF's supposed funding of terrorist groups. *Id.* ¶¶ 167-70. The venture is not alleged to have involved any of these terrorist groups, so these allegations cannot support an inference of any Defendant's knowledge of underlying TVPRA violations.

The Complaint also alleges that knowledge can be inferred by the specific contractual services Defendants provided to their clients. Compl. ¶¶ 173-80. As noted above, however, Defendants provided routine public-relations and lobbying services.

*S.J. v. Choice Hotels International, Inc.* is instructive. There, the court considered TVPRA beneficiary claims against hotel franchisors alleged to have participated in a sex trafficking

venture. 473 F. Supp. 3d at 150. The plaintiff alleged that the franchisors had constructive knowledge based on (1) their general knowledge that "sex trafficking often occurred on their branded properties," (2) the franchisor's development of "employee training to identify sex trafficking in hotels," and (3) "numerous news articles containing incidents of reported or confirmed sex trafficking" at defendants' franchise locations. *Id.* at 151. The court held that these allegations amounted to mere "knowledge or willful blindness of a general sex trafficking problem," but they failed to support an inference that the franchisor defendants "had the requisite knowledge of a specific sex trafficking venture." *Id.* at 154.

Likewise, the specific actions ascribed to Defendants fail to support the inference that Defendants had the requisite knowledge of a labor trafficking venture.

## C. Plaintiffs Do Not Plead that Defendants Knowingly Benefitted from Participation in the Alleged Venture

Plaintiffs also fail to adequately plead Defendants "knowingly benefit[ted] . . . from participation in a [TVPRA] venture." 18 U.S.C. § 1595(a). To satisfy this element, the statutory text requires Plaintiffs to plead both (1) knowledge of the benefit and (2) a causal relationship between the benefit and the venture that violated the TVPRA. *See, e.g.*, *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp.3d 156, 169 (S.D.N.Y. 2019). In other words, Plaintiffs must plausibly allege Defendants' constructive knowledge that they received a benefit "*because of* [their] facilitation" of the underlying TVPRA offenses. *Id.*

The Complaint alleges only that Defendants benefitted by receiving money, "publicity and notoriety" for their contractual services. Compl. ¶¶ 185-87. The Complaint fails to plead Defendants' constructive knowledge of any causal relationship between their receipt of benefits and any TVPRA violation. *See supra*, § I(A)–(B). Nor do Plaintiffs allege the requisite causal relationship between Defendants' receipt of benefits and any conduct furthering the venture. As

explained above, some Defendants were paid by contractual counterparties who are not even themselves alleged to have participated in the venture. And for those Defendants that contracted with alleged participants, those contractual counterparties had no relationship whatsoever with the Employers or Traffickers that allegedly committed the underlying violations. Thus, Plaintiffs fail to allege that Defendants benefitted "*from* participation in a [TVPRA] venture" at all, 18 U.S.C. § 1595(a) (emphasis added), let alone that Defendants received benefits *because of* their participation in any conduct furthering a TVPRA violation.

Some courts in other circuits have erroneously held that the TVPRA requires only that the defendant is aware that it is benefitting, but not that the benefit is specifically linked to a TVPRA violation. *See, e.g.*, *Salesforce*, 76 F.4th at 565 ("[W]here the defendant is simply aware that it is benefiting, that is enough."). Again, those decisions cannot be squared with the statutory text. It is difficult to imagine a scenario where a defendant benefits "financially or by receiving anything of value" without being aware of such benefit. 18 U.S.C. § 1595(a). To require only that the defendant be "aware that it is benefitting" effectively excises the word "knowingly" from the statute, and requires only that the plaintiff demonstrate a benefit. The Court should interpret the statute to give meaning to the entire text, which requires that the defendant "*knowingly* benefit[]." 18 U.S.C. § 1595(a) (emphasis added); *see Filler v. Hanvit Bank*, 378 F.3d 213, 220 (2d Cir. 2004) (an interpretation that "would render" certain words "redundant" is "a result that is to be avoided in statutory construction").

Plaintiffs fail to allege more than mere receipt of a benefit. This Court should join others in this District that have dismissed claims for this reason. *See Corradino v. Liquidnet Holdings Inc.*, 2021 WL 2853362, at *4 (S.D.N.Y. July 8, 2021) (dismissing TVPRA claim for failure to allege causal relationship between the defendant's receipt of any benefit and a TVPRA violation);

*Geiss*, 383 F. Supp. 3d at 170 (same).

D. **Plaintiffs Do Not Adequately Plead a Primary Violation of the TVPRA**

Plaintiffs' TVPRA beneficiary civil claims are premised on two primary violations: trafficking (Section 1590) and forced labor (Section 1589). The Complaint's allegations as to both fail to establish the requisite primary violation.

Plaintiffs' trafficking allegations are wholly insufficient. Section 1590 imposes criminal sanctions for "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services." The Complaint asserts in conclusory fashion that Plaintiffs "were trafficked to Qatar," Compl. ¶ 28, and that "[e]ach Plaintiff was a victim of trafficking by the Venture," *id.* ¶ 188, but it nowhere pleads any facts supporting that legal conclusion. The paragraphs of the Complaint detailing each Plaintiff's specific allegations do not mention trafficking at all. *See id.* ¶¶ 189-294. The Complaint contains no plausible information regarding the circumstances of any Plaintiff's alleged trafficking; it nowhere alleges how or where any Plaintiff was trafficked, when the trafficking occurred, or which individuals or entities allegedly perpetrated the trafficking.

Plaintiffs appear to stake their § 1590 claims on their § 1589 claims. Section 1589 criminalizes knowingly providing or obtaining labor or services by means or threats of force, serious harm, and abuse. And while there is case law stating that "if a defendant violates section 1589, he also violates section 1590," the Second Circuit is clear that that applies only where that defendant itself also "recruited the person to perform forced labor." *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir. 2019). Thus, to state a claim for violation of § 1590, the Complaint must allege, at minimum, a "separate act of recruitment." *Ngono v. Owono*, 2024 WL 911797, at *2 (2d Cir. Mar. 4, 2024). Plaintiffs' Complaint does not. The Court should dismiss all claims premised on an underlying trafficking violation. *See id.* (affirming dismissal of § 1590 claim where plaintiff

failed to allege a "separate act of recruitment").

Plaintiffs' forced labor claims under § 1589 are independently deficient. As an initial matter, the Complaint enumerates each Plaintiff's allegations almost exclusively in the passive voice and includes impermissibly vague assertions, often repeated verbatim from paragraph to paragraph. *See* Compl. ¶¶ 189-294. For example, many Plaintiffs repeat verbatim the vague allegation that they were "forced to work through exhaustion." Indeed, this allegation is repeated 61 times. *See id.* But no Plaintiff alleges *how* he was forced, *who* forced him, or—most importantly—*what* actions were taken that amount to "force." These allegations are "simply too vague to provide Defendant[s] with the requisite notice of the alleged claim and supporting grounds upon which Plaintiff[s'] allegations rest given [their] threadbare nature." *Cooke v. Frank Brunckhorst Co., LLC*, 2025 WL 1742509, at *6 (E.D.N.Y. June 24, 2025) (citing *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) ("[A] plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.'")).

Even if the Complaint could overcome those deficiencies, Plaintiffs nevertheless fail to state a claim for forced labor under the TVPRA. Section 1589 criminalizes obtaining a person's labor by means of (1) force or threats of force, (2) "serious harm or threats of serious harm," (3) "abuse or threatened abuse of law or legal process," or (4) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).[10] Plaintiffs do not adequately plead that their labor was obtained by any of these means.

---

[10] The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). The

Take, for example, the allegations of the lead Plaintiff, A.A.:

**Force or threats of force (§ 1589(a)(1))**. A.A. alleges that he was "forced" to work long hours, but the Complaint includes no supporting factual allegations concerning what actions were taken against A.A. (or by whom) that constituted "force." Compl. ¶ 189. The statement that A.A. was "forced" to work is therefore "a legal conclusion couched as a factual allegation," which courts "are not bound to accept as true" on a motion to dismiss. *Drimal v. Tai*, 786 F.3d 219, 223 (2d Cir. 2015). A.A. also does not allege that anyone threatened him with force. He has therefore failed to state a claim under § 1589(a)(1). *See Ngono*, 2024 WL 911797, at *2 (affirming dismissal of forced labor claim where the plaintiff "did not allege specific threats from [the defendant] that would satisfy § 1589").

**Serious harm or threats of serious harm (§ 1589(a)(2), (4))**. A.A. alleges "[h]e was not paid what he was promised and had earned." Compl. ¶ 189. Although financial harm is cognizable as "serious harm" under the TVPRA, the Complaint fails to include any factual detail surrounding this allegation, such as identifying who made the initial promise of payment or explaining what was promised. But even assuming the Complaint can overcome these deficiencies, the scope of § 1589 "is narrowed by the requirement of *scienter*." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011). To state a forced-labor claim under § 1589(a)(2), the perpetrator must have "intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work." *Id.* Likewise, a claim involving a "scheme or plan" under § 1589(a)(4) "requires that the plan be intended to cause the victim to believe that that harm will befall her." *Id.* The Complaint fails entirely to allege *any* facts supporting an

---

term "abuse or threatened abuse of law or legal process" means the use of a law "for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." *Id.* § 1589(c)(1).

inference of intent on behalf of the (unidentified) primary perpetrator who allegedly failed to pay A.A. what he was promised. Thus, A.A. fails to state a claim under § 1589(a)(2) or (4).

**Abuse or threatened abuse of law or legal process (§ 1589(a)(3))**. Plaintiff A.A. makes no allegations that anyone—let alone a venture participant—used a law or legal process for a "purpose for which the law was not designed, in order to exert pressure" on him to cause him "to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). The Complaint alleges generally that "the Venture obtained Plaintiffs'" labor by means of "abuse and/or threatened abuse of law" by:

> misrepresenting the terms and conditions of their employment in Qatar, confiscating Plaintiffs' passports, telling Plaintiffs they could not leave and must endure the conditions imposed upon them, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, threatening deportation, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

Compl. ¶ 298. Of these actions, A.A. alleges only that his passport was confiscated, which, as explained *infra*, is insufficient. Moreover, A.A. does not plead that the primary perpetrator "had the requisite scienter to violate Section 1589(a)(3)," which "'requires proof that the defendant "knowingly" abused the law or legal process as a means to coerce the victim to provide labor or services against her will.'" *Anora v. Oasis Pro. Mgmt. Grp., Ltd.*, 2023 WL 2307180, at *13 (S.D.N.Y. Mar. 1, 2023). A.A. therefore fails to state a claim under § 1589(a)(3).

Plaintiff A.A. is a representative example of the pleading deficiencies in the Complaint for every single other Plaintiff.

To be sure, nearly every Plaintiff alleges that his passport was confiscated, which could in theory support an underlying § 1589 violation. But the allegations of passport confiscation are insufficient to sustain a TVPRA *beneficiary* claim because they do not adequately plead that a

participant in the alleged venture confiscated Plaintiffs' passports. The following allegation is repeated verbatim (or nearly verbatim) 106 times in the Complaint: "Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract." Compl. ¶¶ 189-294. Asserting upon information and belief that the perpetrators were unspecified "venture participants" including the Employers does not create a plausible inference that the venture confiscated Plaintiffs' passports. "A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018). This is particularly true where, as here, there is no reason why Plaintiffs should not be able to identify who confiscated their own passports. *Cf. id.* at 384-85 (allegations upon information and belief "will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control *of the defendant* or where the belief is based on factual information that makes the inference of culpability plausible.'"). It is telling that each of the 106 Plaintiffs who allege that his passport was confiscated seems to have no personal knowledge about the circumstances of his passport being taken, and instead must resort to "information and belief" pleading.

Plaintiffs' failure to sufficiently plead that their passports were confiscated by participants in the alleged Venture is fatal. A TVPRA beneficiary claim requires pleading that "*that undertaking or enterprise*"—*i.e.*, the "common undertaking or enterprise" in which the defendant is alleged to have participated—"violated the TVPRA as to the plaintiff." *Red Roof Inns*, 21 F.4th at 726 (emphasis added). The Complaint fails to plead facts supporting the inference that the venture in which Defendants are alleged to have participated violated the TVPRA as to Plaintiffs.

E. **Plaintiffs' New York Law Claim Fails**

Plaintiffs' state law claim fails for the same reasons their TVPRA claims fail. New York Social Services Law § 483-bb(c) provides a civil action for victims of labor trafficking, as defined by N.Y. Penal Law § 135.35. That definition tracks the definition used by the federal statute. *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1165 (D. Kan. 2018) (comparing N.Y. Penal Law § 135.35 with 18 U.S.C. §§ 1589, 1590)). And, like the federal statute, New York permits civil remedies against the "perpetrator or whoever knowingly advances or profits from, or whoever should have known he or she was advancing or profiting from" labor trafficking in violation of § 135.35. *See* N.Y. Soc. Servs. Law § 483-bb(c); *see also Choice Hotels*, 473 F. Supp. 3d at 157 (noting that New York Social Services Law § 483-bb(c)) "went into effect … several years after the parallel TVPRA was enacted"). As explained *supra*, the Complaint fails to plead these elements.

## II.   IF PLAINTIFFS PLAUSIBLY PLEAD A TVPRA CLAIM, THEN THAT CLAIM VIOLATES ARTICLE III

Article III of the Constitution requires, at minimum, a "causal connection between the assertedly unlawful conduct and the alleged injury" for a plaintiff to have standing. *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). Although Congress has the ability to create private rights of action, it "is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Thus, if the Court determines that Plaintiffs have adequately stated a claim under the TVPRA, a fundamental problem remains: the Complaint fails to allege causation and thus falls below "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Put another way, even if the Court concludes that Congress intended that the claims asserted here are passable under the statute, they would still be outside the limits of the Constitution.

34

To meet the constitutional minimum, Plaintiffs' "injury has to be fairly … traceable to the challenged action of the defendant, and not … the result of the independent action of some third party not before the court." *Id.* "To satisfy the 'traceability' or 'causation' prong of the Article III standing test, allegations must provide more than 'unadorned speculation' to 'connect their injury to the challenged actions.'" *Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178, 190 (2d Cir. 2019) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976)). At the pleading stage, the plaintiff has the burden of "alleg[ing] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. HealthPort Techs.,* LLC, 822 F.3d 47, 56 (2d Cir. 2016). A plaintiff proceeding against multiple defendants "must establish standing as to each defendant and each claim." *Holland v. JPMorgan Chase Bank, N.A.*, 2019 WL 4054834, at *6 (S.D.N.Y. Aug. 28, 2019).

The requisite causal nexus to establish standing is "'most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue.'" *Idrobo v. Microsoft*, 2025 WL 662697, at *2 (S.D.N.Y. Feb. 28, 2025) (Furman, J.) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). "An indirect relationship"—such as the one alleged here— "'make[s] it substantially more difficult' to show traceability." *Id.* (quoting *Simon*, 426 U.S. at 44-45).

The Complaint pleads an indirect and highly attenuated connection between Defendants' conduct and Plaintiffs' injuries that does not come close to plausibly establishing the requisite causal nexus. Despite the stunning breadth of the allegations in the 322 paragraphs and 145 pages of the Complaint, Plaintiffs devote minimal space to *any* facts supporting causation. Plaintiffs allege (1) their injuries resulted indirectly from Defendants' public-relations and lobbying work in America refuting allegations of labor abuses in Qatar which (2) then caused independent third

35

parties in the "international community" to cease pushing for labor reforms in Qatar which (3) then "slowed promulgation of progressive labor reforms" by the State of Qatar. Compl. ¶¶ 4, 6. The relationship between these various links in the causal chain—and how they ultimately connect to Plaintiffs' injuries—is not pleaded in the Complaint. Plaintiffs concede that the Employers, who were of course in Qatar, "perpetrated most of the labor abuses." *Id.* ¶ 7. But the only alleged connection between the Employers' actions and Defendants' conduct is the conclusory statement that Defendants "created the environment allowing those direct employers to cause those harms" by "distracting from, minimizing, refuting, and lying about reports of the labor abuses as they occurred." *Id.*

These allegations suggest a "line of causation [that] is bound exclusively by hypothetical, conclusory, and implausible assertions." *Idrobo*, 2025 WL 662697, at *2. The connection between Defendants' conduct and Plaintiffs' injuries "depends on 'unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Id.* (quoting *Lujan*, 504 U.S. at 562). Each link in the alleged causal chain "involves numerous third parties," including at least one foreign sovereign (the State of Qatar), and other foreign entities, such as FIFA, "whose independent decisions may not collectively have a significant effect" on causing Plaintiffs' alleged injuries. *Allen*, 468 U.S. at 759. Plaintiffs' speculative theory of causation fails at each step.

The first link in Plaintiffs' alleged causal chain—that Defendants quieted international pressure—relies on rank speculation regarding the impact of Defendants' alleged conduct. The Complaint asserts that Defendants' public relations efforts were aimed at "refut[ing] accusations of labor abuses" in Qatar. *E.g.*, Compl. ¶ 66. But the Complaint nowhere explains how these public relations efforts influenced the conduct of the relevant third parties—namely, governments and

other actors in the "international community" who were pressuring Qatar to implement reforms. Plaintiffs do not cite even a *single* instance where Defendants allegedly caused a member of the "international community" to cease applying pressure to Qatar. The Complaint thus offers nothing but "unadorned speculation" about the impact of Defendants' alleged conduct on third parties who are not before the Court. *Citizens for Responsibility & Ethics in Wash.*, 953 F.3d at 190; *see Farrakhan v. Anti-Defamation League*, 2025 WL 24066, at *2 (2d Cir. Jan. 3 2025) (holding that the plaintiff failed to allege that his injuries were fairly traceable to defendant's conduct because "Plaintiffs' allegations that ADL's general advocacy caused the third parties' decisions are unsupported by particularized factual assertions and, instead, rely on mere 'speculative inferences'").

The next link in the alleged causal chain—that decreasing international pressure allegedly caused Qatar to slow progress on its labor reforms—likewise involves speculation regarding a key third party not before the Court: the State of Qatar. Qatar is a sovereign country, an independent actor, with countless motivations behind any of its policy choices. Qatar exercises "broad and legitimate discretion" in deciding whether to enact certain laws within its territory, which courts "cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562. It is entirely speculative whether a purported reduction in international pressure had any impact whatsoever on Qatari labor reforms, and Qatar may not have enacted reforms even if the international community continued to push for reforms unabated.

The final alleged causal links—which are barely even stated in the Complaint—are that a lack of labor reforms in Qatar "created an environment" that allowed generally for labor abuses to continue, which, in turn, caused the actual labor abuses alleged in the Complaint. Here again, the alleged causal chain is pure conjecture. The Complaint invites speculation about the "unfettered

choices made by independent actors not before the courts," *i.e.*, the Employers and the (unidentified) Traffickers. *Lujan*, 504 U.S. at 562. The Complaint offers nothing beyond hypothetical and conclusory assertions to suggest that the "environment" allegedly created— indirectly—by Defendants caused the Employers or the Traffickers to perpetrate labor abuses against Plaintiffs.

The vague and threadbare nature of the allegations concerning Plaintiffs' injuries only further reinforces the numerous speculative inferences required to establish causation. For example, as noted above, many Plaintiffs allege in the passive voice that they were "not paid what [they were] promised," *e.g.*, Compl. ¶ 189, but they nowhere allege *who* made the initial promise of payment. The initial promises may well have been made by individuals or entities who stood entirely outside of the Complaint's alleged chain of causation because they operated in the Philippines, and thus were not even subject to Qatari law.

Plaintiffs' alleged causal chain is also directly contradicted by other allegations in the Complaint. For example, Plaintiffs allege that the practice of confiscating workers' passports was "*distinct from* the Qatari regime's (and Qatari employers') *kafala* system." Compl. ¶ 43 (emphasis added). Although the Complaint is not a model of clarity on this point, the plausible inference from this allegation is that a change in Qatari labor law would have had no impact on the "commonly known practice of confiscating workers' passports." *Id.*[11] Certainly, nothing in the Complaint suggests that there would have been an "appreciable difference" in the Employers' alleged conduct had Defendants acted differently, *Allen*, 468 U.S at 759, and the Court should not accept Plaintiffs' unsupported and speculative allegations otherwise. *See DWPN Holdings (USA), Inc. v. United Air*

---

[11] To the extent Plaintiffs mean to allege that a change in Qatari law would have prevented further passport confiscations, that allegation separately fails under the act of state doctrine. *See infra* § IV.

*Lines, Inc.,* 747 F.3d 145, 152 (2d Cir. 2014) (on a motion to dismiss, the court need not accept conclusory "general allegations" that "are contradicted by more specific allegations in the Complaint").

In *Idrobo*, this Court considered the allegations of a plaintiff who alleged that he was injured indirectly as a result of news coverage by certain media defendants, "which, in turn, incited riots by third parties, leading to racketeering activity" that caused the theft of the plaintiff's cell phone, among other alleged injuries. *Idrobo*, 2025 WL 662697, at *2 (Furman, J.). Here, as in *Idrobo*, the asserted chain of causation is "bound exclusively by hypothetical, conclusory, and implausible assertions" and "depends on unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* at *2; *Zanotti v. Invention Submission Corp.*, 2020 WL 2857304, at *9 (S.D.N.Y. June 2, 2020) (dismissing complaint where the "causal chain is too weak to support standing at the pleading stage").[12]

Therefore, even if Plaintiffs manage to plead a TVPRA claim, that claim is barred by Article III because it fails to establish the irreducible minimum of causation between the Defendant's conduct and any Article III injury suffered by Plaintiffs.

## III. PLAINTIFFS SEEK AN IMPERMISSIBLE EXTRATERRITORIAL APPLICATION OF THE TVPRA AND NEW YORK LAW

Plaintiffs' TVPRA claims fail for the independent reasons that they impermissibly seek to apply § 1595's civil remedy provision extraterritorially, and they involve no domestic application

---

[12] Plaintiffs cannot support causation by reference to the inadequately pleaded TVPRA venture. "[B]road allegations of conspiracy" "cannot give rise to Article III standing" unless Plaintiffs can establish "a 'line of causation' between [Defendants'] action and their alleged harm that is more than 'attenuated.'" *Zanotti*, 2020 WL 2857304, at *8 (quoting *Allen*, 468 U.S. at 757); *cf. Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196, 1199-200 (S.D.N.Y. 1991) (plaintiff cannot avoid effect of standing doctrine by alleging that all defendants were in a conspiracy and therefore a business relationship with one means that all can be sued).

of that statute. Plaintiffs' state law claim likewise fails because New York law does not apply outside the State.

### A. Plaintiffs' TVPRA Claims Fail Because § 1595 Does Not Apply Extraterritorially

Federal laws are presumed to apply only domestically. *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 632 (2021); *RJR Nabisco v. European Cmty.*, 579 U.S. 325, 335 (2016). Case law reflects a "two-step framework for analyzing extraterritoriality issues." *Nestlé*, 593 U.S. at 632. Courts ask "whether the statute gives a clear, affirmative indication" that rebuts the presumption against extraterritorial application. *Id.* "[W]here the statute, as here, does not apply extraterritorially, plaintiffs must establish that the conduct relevant to the statute's focus occurred in the United States." *Id.* at 633. Plaintiffs' claims fail at both steps and therefore must be dismissed. *See Doe I v. Apple Inc.*, 2021 WL 5774224, at *16 (D.D.C. Nov. 2, 2021); *see also Mia v. Kimberly-Clark Corp.*, 2025 WL 752564, at *6 (D.D.C. Mar. 10, 2025).

*First*, Section 1595 does not rebut the presumption against extraterritoriality. As relevant here, it provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). The statute says nothing about extraterritorial application. "Thus, standing alone, it does nothing to rebut the presumption that it applies only domestically." *Apple Inc.*, 2021 WL 5774224, at *14; *see Nestlé*, 593 U.S. 628 (holding the Alien Tort Statute does not apply extraterritorially because its text "does not expressly…'evince a clear indication of extraterritoriality.'").

To be sure, § 1596(a) states that "the courts of the United States have extraterritorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591" under certain circumstances. But "while § 1596 explicitly grants extraterritorial application to many criminal statutes, it does not mention their *civil* analogue, § 1595." *Apple Inc.*, 2021 WL 5774224, at *15. Congress could have included § 1595 in the list of sections cited in § 1596. But it did not.[13] And "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010); *see Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 181 (2d Cir. 2014) (same).

Section 1596's text and structure confirm it is focused solely on criminal applications, not civil ones. It consistently uses the word "offense," which is "most commonly used to refer to crimes." *Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 575 U.S. 650, 658 (2015); *see* 18 U.S.C. § 1596 ("Additional jurisdiction in certain trafficking *offenses*." (emphasis added)); *id.* (extending "extra-territorial jurisdiction over any *offense* (or any attempt or conspiracy to commit *an offense*)" only to the TVPRA's *criminal* provisions (emphases added)). The remainder of § 1596 refers to criminal prosecutions, not mentioning civil suits. *See* 18 U.S.C. § 1596(b) ("Limitations on *Prosecutions of Offenses Prosecuted* in Other Countries." (emphasis added)); *id.* (providing that "[n]o *prosecution* may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has *prosecuted* or *is prosecuting* such person for the conduct constituting such *offense*[.]" (emphases added)). It is thus clear that Congress's omission of § 1595 from this Section was "an intentional

---

[13] Notably, Congress declined to do so even though it amended the text of § 1595 itself in that same Act. *Apple Inc.*, 2021 WL 5774224, at *15 (comparing Pub. L. 110-457, title II, § 221(2), Dec. 23, 2008, with Pub. L. 110-457, title II, § 223(a), Dec. 23, 2008.)

decision not to extend extraterritorially the reach of the statute's civil component." *Apple Inc.*, 2021 WL 5774224, at *16.

*Second*, Plaintiffs cannot otherwise establish that the relevant conduct occurred in the United States, as they must, given that the statute does not apply extraterritorially. Where analyzing whether a case "involves a domestic application of the statute," courts look "to the statute's 'focus.'" *RJR Nabisco*, 579 U.S. at 337. "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of whether other conduct occurred in U.S. territory." *Id.*

Here, the TVPRA's "focus" is ultimately on the underlying criminal violations because § 1595 "provides a civil remedy to 'a victim of a violation' of the TVPRA—it does not create a new violation merely for benefitting from other violations." *Apple*, 2021 WL 5774224, at *16 (quoting 18 U.S.C. § 1595(a)). As in *Apple Inc.*, the alleged conduct in this case relevant to that focus, *i.e.*, the TVPRA criminal violations, all occurred abroad—in Qatar. *See* Compl. ¶¶ 189-294 (contending that all Plaintiffs allegedly endured forced labor or labor trafficking "in Qatar"). The alleged forced labor and labor trafficking conduct, which took place abroad, forms the "core" of Plaintiffs' claims. *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022) (explaining that conduct "constitutes the 'core of [a] claim' only when it 'is itself wrongful—as opposed to wrongful based only on other conduct"). Indeed, Defendants' alleged public-relations and lobbying efforts could not form the basis of a TVPRA civil remedy claim without their connection to the purported criminal conduct that allegedly occurred in Qatar.

### B. Plaintiffs Have Likewise Failed to Plead Claims Under State Law Because New York Law Does Not Apply Extraterritorially

Plaintiffs' state law claim independently fails because neither the civil remedy statute under which Plaintiffs' claim arises nor the relevant criminal provision upon which it premises liability

42

expressly states that it applies extraterritorially. As a general rule, "[t]he laws of one state can have

no force and effect in the territorial limits of another jurisdiction, in the absence of the consent of

the latter." McKinney's Cons. Laws of N.Y., Book 1, Statutes § 149. Accordingly, New York

courts apply a "settled rule of statutory interpretation, that unless expressly stated otherwise, no

legislation is presumed or intended to operate outside the territorial jurisdiction of the state

enacting it." *Rodriguez v. KGA Inc.*, 155 A.D.3d 452, 452 (1st Dep't 2017).

Plaintiffs bring a civil liability claim under New York Social Services Law

§ 483-bb, which provides in relevant part:

> An individual who is a victim of the conduct prohibited by section…135.35…of
> the penal law may bring a civil action against the perpetrator or whoever knowingly
> advances or profits from, or whoever should have known he or she was advancing
> or profiting from an act in violation of section…135.35…of the penal law.

N.Y. Soc. Servs. Law § 483-bb(c)(i). Thus, to establish a defendant's civil liability under § 483-

bb, a plaintiff must prove an underlying violation of New York Penal Law § 135.35. *Id.* Penal Law

§ 135.35, in turn, provides criminal penalties for "labor trafficking." N.Y. Penal Law § 135.35.

Plaintiffs specifically premise their section 483-bb civil liability claim on alleged violations of

section 135.35. *See* Compl. ¶ 318 ("Each Plaintiff . . . is a victim of the conduct prohibited by

section 135.35 of the penal law[.]").

Crucially, section 135.35 contains no express statement that it applies to "labor trafficking"

that occurred outside of New York. N.Y. Penal Law § 135.35; *see Smith v. AECOM Tishman*, 2023

WL 2734430, at *5 (S.D.N.Y. Mar. 30, 2023) (dismissing as frivolous plaintiff's labor trafficking

claims, explaining that "there is no evidence in the Penal Law provisions cited by [plaintiff] that

they were intended to apply outside of New York"). Nor does section 483-bb expressly state that

it provides a civil remedy for violations of section 135.35 which occurred extraterritorially. *See*

43

N.Y. Social Servs. Law § 483-bb. Plaintiffs therefore cannot allege a violation under New York law for underlying labor abuses that occurred outside of New York.

Plaintiffs' allegations leave no doubt their alleged injuries took place "in Qatar," not in New York. *See* Compl. ¶¶ 189-295. Having failed to allege any underlying injuries that occurred in New York, Plaintiffs state-law claim must be dismissed. *See Rodriguez*, 155 A.D.3d at 453 (holding that plaintiffs failed to state a cause of action under New York law because the statutes under which their claims arose "do not expressly apply on an extraterritorial basis"); *Smith*, 2023 WL 2734430, at *5.

## IV. PLAINTIFFS' CLAIMS MUST BE DISMISSED UNDER THE ACT OF STATE DOCTRINE

Plaintiffs have not named the State of Qatar as a Defendant or venture participant in this suit, and they surely could not because of foreign sovereign immunity. But their claims nevertheless require this Court to evaluate the validity of Qatar's domestic labor practices under U.S. law, Qatar's implementation and enforcement of its own labor laws, Qatar's decision regarding whether (and when) to enact certain labor reforms, and Qatar's conduct with respect to hosting the World Cup. The Complaint therefore should be dismissed under the act of state doctrine. That doctrine applies where a plaintiff's claims would require a United States court to "question the 'legality,'" *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002), of "'the official act[s] of a foreign sovereign performed within' its boundaries," *United States v. All Assets Held in Acct. Number XXXXXXXX*, 83 F. Supp. 3d 360, 371 (D.D.C. 2015). It is meant to "foreclose[] court adjudications involving the legality of acts of foreign states on their soil that might embarrass the Executive Branch in the conduct of our foreign relations." *United States v. Griffen*, 326 F. Supp. 2d 497, 502 (S.D.N.Y. 2004). Where the act of state doctrine applies, it admits of no exception: dismissal is required. *World Wide Minerals*, 296

44

F.3d at 1166 (affirming dismissal of plaintiffs' claims "as a consequence of the act of state doctrine"); *see W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 406, 409 (1990) (explaining that the act of state doctrine serves as "a rule of decision," which requires "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid").

Plaintiffs' claims depend upon their allegations that Qatar's migrant-labor laws—the *kafala* system—violate the TVRPA's and New York's criminal provisions. Compl. at 10 (asserting "*Qatar's* Universally Known *Kafala* System Exploited and Abused Migrant Laborers" (first emphasis added)). Specifically, they allege that under Qatar's labor laws, "migrant workers' visas were tied to their employers, which left workers dependent on their employers for their legal residency and status in the country." *Id.* ¶ 31. Plaintiffs repeatedly allege that the *kafala* system and its requirements are Qatari law. *See id.* ¶ 36 (describing Qatari "requirement" that "migrant workers…obtain their employers' permission to change jobs"); *id.* ¶ 37 (asserting Qatari "requirement that migrant workers obtain an 'Exit Permit' to leave Qatar"); *id.* ¶ 38 (explaining Qatari minimum wage and food and housing allowances); *id.* ¶ 39 (describing Qatari restrictions on workers' movements). And there is no real doubt that Plaintiffs' claims depend on the direct employers' conduct under those laws: "In Qatar, the *kafala* system made migrant workers vulnerable by granting Qatar employers broad and exploitative powers over migrant workers, allowing them to evade accountability for trafficking and forced labor abuses, and leaving workers beholden to debt and in constant fear of retaliation." *Id.* ¶ 32. Moreover, under Plaintiffs' theory of liability, Defendants are only implicated in the alleged venture because their lobbying and public relations efforts purportedly "slowed the pressure to reform" Qatar's *kafala* policy. *Id.* ¶ 4; *id.* ¶ 53 (similar).[14]

---

[14] The Complaint includes brief allegations of employer conduct that Plaintiffs claim is "distinct" from the *kafala* system Compl. ¶ 32.  To the extent those allegations suggest that Plaintiffs' injuries resulted from

To hold Defendants liable under Section 1595 and New York law thus requires this Court to determine that the direct employers' conduct under Qatar's *kafala* system is a criminal violation of Sections 1589 and 1590 of the TVPRA and Section 135.35 of N.Y. Penal Law. Plaintiffs therefore impermissibly ask this court to "question the 'legality'" of Qatari law under American law. *World Wide Minerals*, 296 F.3d at 1165. Such a decision would deem Qatar's *kafala* system invalid, violating the "rule of decision" imposed by the act of state doctrine. *W.S. Kirkpatrick*, 493 U.S. at 406, 409 (explaining that under the act of state doctrine, "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid").[15] Therefore, Plaintiffs Complaint must be dismissed with prejudice.

## V.    PLAINTIFFS' THEORY OF LIABILITY REQUIRES AN APPLICATION OF THE TVPRA THAT VIOLATES DEFENDANTS' FIRST AMENDMENT RIGHTS

Plaintiffs' claims ask this court to apply the TVPRA and New York law in a manner that violates Defendants' First Amendment rights—namely, by imposing civil liability for public-relations and lobbying connected in any way to Qatar or QF. Courts have repeatedly recognized that the First Amendment may serve as a defense to claims for civil liability. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011) ("The Free Speech Clause of the First Amendment…can serve as a

---

conduct that was unaffected by Qatari law, they break the chain of causation and defeat Plaintiffs' Article III standing. *See supra* § II. But to the extent those allegations are just another way of saying that Qatari law grants employers "broad and exploitative powers over migrant workers," *see id.* ¶ 42 (describing how Qatari employers violated workers' contracts "with impunity"), Plaintiffs necessarily invite the Court to impermissibly question the legality of Qatari law.

[15] The doctrine's underpinning policy considerations reinforce its application here. The current Administration is taking diplomatic steps to strengthen its relationship with Qatar. *See, e.g.*, The White House, *Fact Sheet: President Donald J. Trump Secures Historic $1.2 Trillion Economic Commitment in Qatar* (May 14, 2025), https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-president-donald-j-trump-secures-historic-1-2-trillion-economic-commitment-in-qatar/ (explaining through "new agreements and instruments," the administration is aiming "to drive growth of the U.S.-Qatar bilateral commercial relationship").

defense in state tort suits."); *James v. Meow Media, Inc.*, 300 F.3d 683, 695 (6th Cir. 2002) ("[C]ourts have made clear that attaching tort liability to protected speech can violate the First Amendment."); *Straw v. Dentons US LLP*, 2020 WL 3182775, at *6 (S.D.N.Y. June 11, 2020) ("Because Defendants' actions constitute speech on a matter of public concern, the First Amendment is a defense to any liability."). And even where a statute is "constitutional on its face," a defendant may assert as a defense that a statute, as applied, would violate the First Amendment. *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (explaining that an "as-applied challenge" arises where "application of a statute…deprive[s] the individual to whom it was applied of a protected right").

Plaintiffs' Complaint exclusively targets activity protected by the First Amendment. Plaintiffs allege that Defendants are civilly liable under federal and state law based solely upon their "public relations and lobbying services to Qatar." Compl. ¶ 64. The Complaint makes clear that for each Defendant, speech forms the basis for Plaintiffs' claims: "Portland employees loudly and publicly announced," *id.* ¶ 70, Omnicom "promot[ed]" or "provided" certain "content," *id.* ¶¶ 90, 93, Memac "posted a video" on Instagram and "told viewers" to watch it, *id.* ¶ 110, OPRW engaged in "outreach to media members" and posted on social media, *id.* ¶¶ 119, 122, and an Ogilvy employee "posted on Twitter" regarding confirmation from FIFA that Qatar would host the 2022 World Cup, *id.* ¶ 133. The Complaint similarly makes clear that Plaintiffs' claims are also based on Defendants' lobbying efforts. *See, e.g.*, *id.* ¶ 72 (alleging Portland had "continuous communication with Qatar related to sensitive government relations, lobbying, and media engagement"); *id.* ¶ 98 (describing "war room" at Qatari Embassy "where Qatar and its lobbying and public relations teams from" Omnicom, Mercury, and Portland "worked to respond to media and government condemnation"); *id.* ¶ 125 (referring to a FARA registration Plaintiffs attribute to

47

OPRW that disclosed "outreach and engagement with key policy makers" on behalf of the Embassy of Qatar). The purpose of Defendants' speech and lobbying efforts, as Plaintiffs say, was to paint Qatar and associated entities in a positive light to "stop reporting and international pressure" on Qatar "related to labor abuse against migrant workers laboring to prepare for the World Cup in Qatar," and to "slow adopting and implementation of labor reforms." *Id.* ¶ 305 (TVPRA claim); *id.* ¶ 318 (New York law claim) ("Defendants' acts and omissions … facilitated and allowed labor trafficking to continue").

By seeking to hold Defendants liable for their lobbying and public-relations speech, Plaintiffs' claims under the TVPRA and New York's equivalent, as applied, violate the First Amendment. The First Amendment affords Defendants' public relations speech and lobbying "special protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983), because it relates to matters of "public concern," *Snyder*, 562 U.S. at 451-52; *cf. Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 528 (1991) ("[P]ublic relations activities" can implicate the First Amendment where they amount to "speech of a political nature in a public forum"); *Miller v. Ziegler*, 109 F.4th 1045, 1049 (8th Cir. 2024) (lobbying "qualifies as 'core political' speech'"). "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder*, 562 U.S. at 453. Taking the allegations in the Complaint as pleaded, Qatar's hosting of the World Cup, including concerns about migrant workers participation, was a matter of considerable public concern. According to Plaintiffs, "[o]bservers across the ideological spectrum routinely and emphatically criticized" Qatar's migrant labor policies. Compl. ¶ 3. Plaintiffs further allege that a "United States Senator" and "seventeen members of the United States House of Representatives" publicly criticized "Qatar

for its labor practices." Compl. ¶ 46. In addition, Plaintiffs allege that Congress held hearings in which it discussed the "conditions of workers in Qatar." *Id.* ¶ 47. That Qatar's alleged labor abuses were a topic of repeated discussion in Congress more than sufficiently demonstrates that Defendants' alleged speech was "relat[ed] to [a] matter of political, social, or other concern to the community." *Snyder*, 562 U.S. at 453.

Further, Plaintiffs cite a trove of news articles and public statements in which journalists and NGOs discussed migrant labor laws. *See, e.g.*, *id.* ¶ 57 (citing article about "Migrant Workers" published by the *Economist*); *id.* ¶ 59 (citing similar article published by the *Guardian*); *id.* ¶ 63 (citing public statement by Human Rights Watch); *id.* ¶ 146 (referencing an "activist campaign" to "boycott" Qatar's hosting of the World Cup based on alleged labor abuses); *id.* ¶ 155 (citing public reports by NGOs, including Human Rights Watch, Amnesty International, and Verité). Plaintiffs' expressly assert that Defendants participated in this robust debate by "counter[ing] [the] evolving public narrative" on this topic. *Id.* ¶ 146; *see id.* ¶ 155 (alleging that Defendants' "job was to monitor and respond" to reports and articles critical of Qatar's labor policies). This further confirms that Defendants' speech was on a topic of "public concern," as it was undisputedly "a subject of legitimate news interest." *Snyder*, 562 U.S. at 453.

In addition, Defendants' lobbying efforts implicate the First Amendment right "to petition the Government." U.S. Const., amend. I; *see Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1967) ("[E]very person or group engaged…in trying to persuade Congressional action is exercising the First Amendment right of petition."). Lobbying government officials to take or refrain from taking certain action is "First Amendment activity" similarly entitled to special protection. *Calzone v. Summers*, 942 F.3d 415, 422 (8th Cir. 2019) ("After all, interactive communication regarding political change is at the core of the First Amendment."); *see also E. R.*

*R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961) ("[S]olicitation of governmental action with respect to the passage and enforcement of laws" is protected by the First Amendment). Indeed, the *Noerr-Pennington* doctrine—which immunizes any attempt to influence government action from antitrust liability—is "routinely" extended to a "wide range of civil actions under both state and federal law," including to labor law claims. *In re Elysium Health-Chromadex Litig.*, 2018 WL 4907590, at *4 (S.D.N.Y. Sep. 27, 2018) (collecting cases). As noted, Plaintiffs' claims are based on precisely such lobbying activity, and they are thus barred by the First Amendment for this reason as well.

Plaintiffs' claims would ask this Court to impose liability to censor speech on one side of the issue on international politics and human rights and sports. Under Plaintiffs' view, no one can ever speak in defense of Qatar without being legally complicit in a TVPRA violation. That is fundamentally incompatible with the First Amendment.

## VI.   THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANT MEMAC

This Court does not have specific personal jurisdiction over Memac because Plaintiffs' allegations fail to show that their claims arise out of Memac's alleged connections to New York. "On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Thackurdeen v. Duke Univ.*, 130 F. Supp. 3d 792, 798 (S.D.N.Y. 2015). Although the Court must construe "the pleadings and any supporting materials in the light most favorable to the plaintiffs," the Court may not "draw 'argumentative inferences' in plaintiff's favor nor does it accept as true a legal conclusion couched as a factual allegation." *Id.*; *see CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 380 (S.D.N.Y. 2019) ("[C]onclusory allegations are not enough to establish personal jurisdiction.").

50

"A district court's personal jurisdiction is determined by the law of the state in which the court is located." *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010). Because Plaintiffs allege that Defendant Memac is "incorporated and headquartered in Dubai, United Arab Emirates," it is subject only "to specific personal jurisdiction in this Court[.]" Compl. ¶ 17.

New York courts may exercise specific jurisdiction over "non-domiciliaries" like Defendant Memac only where the plaintiff's "causes of action in the case 'arise from'" the "specific kinds of contact with New York" listed in N.Y. Civ. Prac. L. R. § 302. *Thackurdeen*, 130 F. Supp. 3d at 798, 801 (cleaned up) (explaining that, under specific jurisdiction, a court may only consider claims that "aris[e] out of or relat[e] to the [entity's] contacts with the forum"). To "arise from" the defendant's contacts with New York, "at least one element" of the plaintiff's claim must be related to those contacts. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013). And where a plaintiff fails to make that showing, the district court lacks personal jurisdiction, and the claims against that defendant must be dismissed. *See Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 177, 185 (S.D.N.Y. 2021).

Here, Plaintiffs have failed to plead facts showing that any of the elements of their TVPRA or state law claims arise from Memac's alleged contacts with New York. Plaintiffs chiefly assert that Memac "reached into New York" by "collaborat[ing]" with Ogilvy and OPRW "to fulfill its contract with Qatar Foundation." Compl. ¶ 121; *see id.* ¶ 120. But that contract merely required Memac to engage in run-of-the-mill public relations and lobbying services, such as "interactions" with media; "[d]raft[ing] press releases;" "distribut[ing] press releases;" and "monitor[ing] media draft responses" and daily news. *Id.* ¶ 111. Nowhere did Memac agree to "obfuscate … labor abuse against migrant workers" or "slow the adoption and implementation of labor reforms" in Qatar. *Id.* ¶ 305. And Plaintiffs' other allegations about Memac's contacts with Ogilvy and OPRW

51

employees in New York at most show that Memac provided QF with general work related to the World Cup, not work targeted to defend Qatar's migrant labor policies. None of those allegations are sufficient to demonstrate that Memac's conduct satisfies any element of either a TVPRA claim or the state law equivalent. *Supra* § I,

Plaintiffs also implausibly allege that this Court has personal jurisdiction over Memac because it should be treated as one entity with Ogilvy Group, which was managed from New York. *See, e.g.*, Compl. ¶¶ 131, 140-44. Even if that were the case, none of Ogilvy Group's (or, for that matter, OPRW's) alleged conduct satisfies any elements of Plaintiffs' claims. *See supra* § I. And though in "some circumstances a subsidiary corporations' contacts may be imputed to a parent for the purposes of jurisdiction, the reverse is not true." *Vacation Travel Int'l, Inc. v. Sunchase Beachfront Condo. Owners Ass'n, Inc.*, 2007 WL 757580, at *5 (D. Colo. Mar. 8. 2007) (citing *Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1020 (10th Cir. 1990)). Plaintiffs are foreclosed from imputing Ogilvy Group's contacts with New York to Memac.

Regardless, Plaintiffs' allegations cannot meet the requirements to disregard Memac's corporate status. Under New York law, "'alter egos are treated as one entity' for jurisdictional purposes." *Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009). But courts must consider a variety of factors when making this determination, including "(1) whether there was a failure to observe corporate formalities, (2) evidence of undercapitalization, (3) intermingling of personal and corporate funds, (4) shared office space and phone numbers, (5) any overlap in ownership and directors and (6) whether the corporation was used to perpetrate a wrongful act against the plaintiffs." *Caplan*, 2025 WL 1808530, at *4. Disregarding the corporate entity is rare and something that "courts are reluctant" to do. *Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 570 (S.D.N.Y. 2022).

Here, Plaintiffs assert that Ogilvy Group's branding relaunch and its purported sharing of employees and officers with Memac, among other things, renders Memac subject to personal jurisdiction in this Court. That is wrong. To begin, Plaintiffs do not allege that Ogilvy Group and Memac intermingled personal and corporate funds, or that Memac was undercapitalized. And Plaintiffs' few, specific allegations fall far short of the mark. Plaintiffs conclusorily allege that Ogilvy Group's rebranding as "One Ogilvy" "dismantl[ed] distinctions" between its entities, Compl. ¶ 131, and "brought together all parts of the company into one entity," *id.* ¶ 26. But these allegations do not justify the inferential leap, for instance, that Ogilvy Group's rebrand caused Memac to disregard corporate formalities, such as by failing to "elect[] directors" or "keep[] corporate records and the like," *Shantou Real Lingerie Mfg. Co., Ltd. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 439 (S.D.N.Y. 2018) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)), or that Memac suddenly lost its status as a "wholly owned subsidiary," Compl. ¶ 17.[16] Plaintiffs also allege that Ogilvy Group employees served as officers at Memac Ogilvy, and that Memac Ogilvy employees maintained Ogilvy.com email addresses and held themselves out on LinkedIn as Ogilvy employees. *See, e.g.*, *id.* ¶ 136 (asserting Memac's CEO also served as Ogilvy Group's Chief Digital Officer and listed herself on LinkedIn only as an Ogilvy employee); *id.* ¶ 138 (alleging that a Memac employee used an "Ogilvy.com email address, not a Memac Ogilvy address." (quotation omitted)).[17] But "shared officers" and the use of "the same email account" or social media accounts, standing alone, are "insufficient"

---

[16] Plaintiffs assert that Ogilvy Group "placed" one employee on Memac's board of directors. Compl. ¶ 137. But Plaintiffs make no allegations that Memac disregarded the ordinary election process when selecting this employee as a director. *See id.*

[17] Plaintiffs also assert that one Ogilvy employee "theoretically" managed Memac's CEO. Compl. ¶ 140. But that allegation does not give rise to a reasonable inference this was his *actual* role.

to justify disregarding the corporate entity. *See Caplan*, 2025 WL 1808530, at *5 (cleaned up) (citing cases). The Complaint fails to plead specific personal jurisdiction over Memac.

## VII.  PLAINTIFFS CANNOT ASSERT A CLAIM UNDER SECTION 1593

Count II—which seeks restitution under 18 U.S.C. § 1593—is necessarily derivative of Count I and should be dismissed for all the same reasons. Moreover, Section 1593 applies only in criminal proceedings. *See* 18 U.S.C. § 1593(a) (indicating that "the court shall order restitution for any *offense* under this chapter" (emphasis added)); *id.* § 1593(b)(1), (c) (providing that restitution shall be paid to "the victim," which is defined as "the individual harmed as a result of a *crime* under this chapter" (emphasis added). Restitution is unavailable for Plaintiffs' civil liability claim.

<u>**CONCLUSION**</u>

The Court should dismiss the Complaint with prejudice.

Dated: New York, New York
August 1, 2025

**DAVIS+GILBERT LLP**

By: _/s/ James R. Levine_
    James R. Levine
    Gregg A. Gilman
    William S. Kukin
    1675 Broadway
    New York, New York 10019
    (212) 468-4800
    jlevine@dglaw.com
    ggilman@dglaw.com
    wkukin@dglaw.com


    *Attorneys for Defendants Omnicom
    Group Inc. and Portland PR Inc.*

By: _/s/ Steven P. Lehotsky_
    Steven P. Lehotsky*
    Mary Elizabeth Miller*
    Lehotsky Keller Cohn LLP
    200 Massachusetts Ave., NW
    Washington, D.C. 20001
    steve@lkcfirm.com
    mary@lkcfirm.com

    Mark M. Rothrock*
    Lehotsky Keller Cohn LLP
    8513 Caldbeck Drive
    Raleigh, NC 27615
    mark@lkcfirm.com

    * Admitted *Pro hac vice*

    *Attorneys for Defendants Ogilvy
    Group, LLC, Ogilvy Public Relations
    Worldwide LLC, and Memac Ogilvy &
    Mather LLC*

## <u>CERTIFICATION OF WORD COUNT</u>

I, James R. Levine, an attorney duly admitted to practice law in this Court, hereby certify

that this Memorandum of Law complies with the word count limit set forth the Court's Order dated

July 22, 2025 (ECF No. 53), because it contains 17,414 words, excluding the parts exempted by

Section 4(C) of the Court's Individual Rules and Practices in Civil Cases and Local Civil Rule

7.1(c). In preparing this certification, I have relied on the word count of the word-processing

system used to prepare this Memorandum.

Dated: New York, New York
       August 1, 2025

               By:  */s/ James R. Levine*

                    **DAVIS+GILBERT LLP**
                    James R. Levine
                    Gregg A. Gilman
                    William S. Kukin
                    1675 Broadway
                    New York, New York 10019
                    (212) 468-4800
                    jlevine@dglaw.com
                    ggilman@dglaw.com
                    wkukin@dglaw.com

                    *Attorneys for Defendants Omnicom Group*
                    *Inc. and Portland PR, Inc.*