**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

A.A., A.B., A.D., A.G., A.P., A.S., A.V., Al.C.,
Am.P., An.A., An.D., Ar.A., Ari.R., Arn.R.,
B.D., B.M., B.T., C.C., C.S., C.V., D.D.R.,
D.L., E.A., E.C., E.D.C., E.D.L., E.G., E.L.,
E.M., Ed.T., En.C., Er.T., F.B., F.S., F.T., G.A.,
G.D.L., G.G., G.O., G.S., G.T., H.V., I.E., J.A.,
J.B., J.C., J.D.C., J.F., J.J.G., J.L., J.N.B., J.O.,
J.P., J.S., J.T., Ji.T., Jo.B., L.G., L.L., L.N.,
L.P., L.V., M.A., M.D.L., M.G., M.R., M.S.,
N.C., P.C., R.A., R.B., R.B.E., R.C., R.D., R.E.,
R.F., R.I., R.L., R.N., R.P., R.S., R.T., R.V.,
Ra.D., Ra.G., Ra.L., Ra.V., Re.C., Re.D., Rh.P.,
Ri.C., Ri.O., Ro.D., Ro.L., Ro.P., Rod.O.,
Rog.B., Rol.P., Rom.B., Ron.O., S.N., T.L.,
V.A., V.B., V.M., and W.B.,

       Plaintiffs,

   v.

OMNICOM GROUP, INC., PORTLAND PR,
INC., OGILVY GROUP, LLC, OGILVY
PUBLIC RELATIONS WORLDWIDE LLC,
and MEMAC OGILVY & MATHER LLC,

       Defendants.

Case No. 25-cv-3389-JMF

**Oral Argument Requested**

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

TABLE OF CONTENTS

Table of Authorities..................................................................................................ii

Introduction............................................................................................................ 1

Legal Standard ....................................................................................................... 4

Argument ................................................................................................................ 5

    I.       Plaintiffs Adequately Allege Civil Beneficiary Violations of the TVPRA. .................. 5

        A.  Defendants Participated in a "Venture." ....................................................... 5

        B.  Plaintiffs Plausibly Allege Defendants Knew or Should Have Known the Venture Used Trafficked and Forced Labor. .......................................................... 22

        C.  Plaintiffs Sufficiently Allege Defendants Knowingly Benefitted from Participating in the Venture........................................................................... 27

        D.  Plaintiffs Sufficiently Allege Underlying Violations of the TVPRA........................ 29

    II.     Plaintiffs Adequately State a Claim Under New York State Law. .............................. 32

    III.    Plaintiffs Have Article III Standing. .......................................................................... 32

    IV.    Extraterritorial Application of the TVPRA Is Proper, and Plaintiffs in Any Event Seek Domestic Application. ......................................................................... 36

        A.  The TVPRA Civil Cause of Action Applies Extraterritorially.................................... 37

        B.  Should the Court Find the TVPRA's Civil Remedy Does Not Apply Extraterritorially, Plaintiffs Seek Domestic Application.............................................. 41

    V.     Plaintiffs Do Not Seek Extraterritorial Application of New York Law. ..................... 42

    VI.    The Act of State Doctrine Does Not Prohibit Plaintiffs' Claims. .............................. 43

    VII.   The First Amendment Does Not Shield Defendants from Liability. ......................... 45

    VIII.  Memac Ogilvy Is Subject to Personal Jurisdiction in this Court................................ 47

        A.  Memac Ogilvy Is Subject to Jurisdiction Under the Laws of New York.................... 48

        B.  If Jurisdiction Is Not Appropriate Under New York Law, Memac Ogilvy Is Subject to Jurisdiction Under the Federal Long-Arm Statute..................................... 50

    IX.    Plaintiffs' §1593 Restitution Claim Should Not Be Dismissed. ................................ 52

Conclusion ................................................................................................................ 53

TABLE OF AUTHORITIES

## Cases

*A.D. v. Choice Hotels Int'l, Inc.*,
 2023 WL 2991041 (M.D. Fla. Apr. 18, 2023) ........................................................................ 28

*A.R. v. Wyndham Hotels & Resorts, Inc.*,
 2022 WL 17741054 (S.D. Ohio Dec. 16, 2022) .................................................................... 10

*Abafita v. Aldukhan*,
 2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019) ......................................................................... 40

*Adhikari v. KBR Inc.*,
 2017 WL 4237923 (S.D. Tex. Sept. 25, 2017) ...................................................................... 41

*Adhikari v. Kellogg Brown & Root, Inc.*,
 845 F.3d 184 (5th Cir. 2017) ........................................................................................... 37, 40

*Arista Recs., LLC v. Doe 3*,
 604 F.3d 110 (2d Cir. 2010) ............................................................................................. 4, 31

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ............................................................................................................... 4

*Ateres Bais Yaakov Academy of Rockland v. Town of Clarkstown*,
 88 F.4th 344 (2d Cir. 2023) .................................................................................................. 33

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
 2020 WL 4368214 (N.D. Cal. July 30, 2020) ....................................................................... 29

*Barnes v. Glen Theatre, Inc.*,
 501 U.S. 560 (1991) ............................................................................................................. 45

*Bartlett v. Société Générale De Banque Au Liban Sal*,
 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ....................................................................... 48

*Barton v. Waechter, L.L.C.*,
 2008 WL 11439344 (D. Kan. Jan. 3, 2008) .......................................................................... 35

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................................... 4

*Bennett v. Spear*,
 520 U.S. 154 (1997) ......................................................................................................... 33, 36

*Bigio v. Coca-Cola Co.*,
 675 F.3d 163 (2d Cir. 2012) ................................................................................................. 21

*Bistline v. Parker*,
 918 F.3d 849 (10th Cir. 2019) ..................................................................................... 6, 7, 19

*C.J. v. Santosa & Brother Inc.*,
 2025 WL 933800 (D. Colo. Mar. 27, 2025) .......................................................................... 25

*C.T. v. Red Roof Inns, Inc.*,
 2021 WL 2942483 (S.D. Ohio July 1, 2021) ........................................................................ 40

*C.T. v. Red Roof Inns, Inc.*,
2021 WL 602578 (S.D. Ohio Feb. 16, 2021) ........................................................ 40

*C.T. v. Red Roof Inns, Inc.*,
2023 WL 3510879 (M.D. Fla. Mar. 11, 2023) ...................................................... 10

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016) .................................................................................... 33

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) .................................................................................. 43

*Corradino v. Liquidnet Holdings Inc.*,
2021 WL 2853362 (S.D.N.Y. July 8, 2021) ......................................................... 28

*Dinsay v. RN Staff Inc.*,
2021 WL 2643639 (S.D. Ind. June 28, 2021) ....................................................... 53

*Doe #1 v. Red Roof Inns, Inc.*,
2020 WL 1872335 (N.D. Ga. Apr. 13, 2020) ....................................................... 25

*Doe #1 v. Red Roof Inns, Inc.*,
21 F.4th 714 (11th Cir. 2021) ................................................................. 6, 25, 33

*Doe (A.L.G.) v. Wyndham Hotel & Resorts, Inc.*,
2024 WL 5371983 (W.D. Tex. Nov. 21, 2024) .................................................... 25

*Doe (G.N.C.) v. Uniquest Hosp., LLC*,
2024 WL 4149251 (S.D.N.Y. Sept. 11, 2024) ..................................................... 25

*Doe (K.R.D.) v. Hilton Worldwide Holdings, Inc.*,
2025 WL 2539010 (N.D. Cal. Sep. 4, 2025) .......................................................... 9

*Doe (P.B.) v. Wyndham Hotels & Resorts, Inc.*,
2023 WL 8890229 (D.N.J. Dec. 26, 2023) ........................................................... 25

*Doe 1 v. Apple Inc.*,
96 F.4th 403 (D.C. Cir. 2024) ..................................................................... *passim*

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
671 F. Supp. 3d 387 (S.D.N.Y. 2023) ...................................................... 14, 26, 28

*Doe I v. Apple Inc.*,
2021 WL 5774224 (D.D.C. Nov. 2, 2021) ............................................................ 41

*Doe v. Scottsdale Inns LLC*,
2024 WL 3494375 (D. Ariz. July 22, 2024) ......................................................... 10

*Doe v. Wyndham Hotels & Resorts*,
2025 WL 85831 (E.D. Cal. Jan. 7, 2025) ............................................................. 25

*Doe v. Wyndham Hotels & Resorts, Inc.*,
2025 WL 824369 (S.D. Cal. Mar. 14, 2025) ........................................................ 28

*Doe, (H.E.W.) v. Radisson Hosp., Inc.*,
2025 WL 349556 (W.D. Tex. Jan. 21, 2025) .......................................................... 9

*F.C. v. Jacobs Sols., Inc.*,
  2025 WL 1766069 (D. Colo. June 26, 2025) ................................................ *passim*

*First Am. Corp. v. Price Waterhouse LLP*,
  988 F. Supp. 353 (S.D.N.Y. 1997) ...................................................................... 50

*Fuld v. Palestinian Liberation Org.*,
  606 U.S. 1 (2025) ....................................................................................... 51, 52

*G.G. v. Salesforce.com, Inc.*,
  76 F.4th 544 (7th Cir. 2023) ...................................................................... *passim*

*G.M. Choice Hotels Int'l, Inc.*,
  725 F. Supp. 3d 766 (S.D. Ohio 2024) ................................................................. 9

*Geiss v. Weinstein Co. Holdings LLC*,
  383 F. Supp. 3d 156 (S.D.N.Y. 2019) ................................................................ 27

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) ............................................................................... 45, 46

*Gilbert v. United States Olympic Comm.*,
  2019 WL 1058194 (D. Colo. Mar. 6, 2019),
   *report and recommendation adopted in part, rejected in part*,
  423 F. Supp. 3d 1112 (D. Colo. 2019) ................................................................ 31

*In re JVJ Pharmacy Inc.*,
  630 B.R. 388 (S.D.N.Y. 2021) ............................................................................ 21

*In re Shulman Transp. Enters., Inc.*,
  744 F.2d 293 (2d Cir. 1984) .............................................................................. 21

*Int'l Code Council, Inc. v. UpCodes Inc.*,
  43 F.4th 46 (2d Cir. 2022) ......................................................................... 14, 24

*K.O. v. G6 Hosp., LLC*,
  728 F. Supp. 3d 624 (E.D. Mich. 2024) .............................................................. 25

*Kashef v. BNP Paribas S.A.*,
  925 F.3d 53 (2d Cir. 2019) ......................................................................... 43, 44

*Khatskevich v. Shapiro*,
  2025 WL 833872 (S.D.N.Y. Mar. 17, 2025) ............................................... *passim*

*Kitler v. Church of Jesus Christ of Latter-Day Saints*,
  2025 WL 2209870 (N.D.N.Y. Aug. 4, 2025) .............................................. *passim*

*Lagasan v. Al-Ghasel*,
  92 F. Supp. 3d 445 (E.D. Va. 2015) ................................................................... 53

*Lagayan v. Odeh*,
  199 F. Supp. 3d 21 (D.D.C. 2016) ..................................................................... 29

*Lensky v. Turk Have Lovari, A.O.*,
  2023 WL 6173334 (2d Cir. Sept. 22, 2023) ........................................................ 51

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ................................................................ 48

*Lipenga v. Kambalame*,
   219 F. Supp. 3d 517 (D. Md. 2016) ........................................... 29, 30, 53

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................ 33

*Mia et al. v. Kimberly-Clark Corp.*,
   2025 WL 752564 (D.D.C. Mar. 10, 2025) ........................................... 41

*Mitchell v. Grand Hotel, Inc.*,
   2024 WL 3378035 (W.D. Wis. July 11, 2024) ..................................... 28

*Mueller v. Deutsche Bank Aktiengesellschaft*,
   777 F. Supp. 3d 329 (S.D.N.Y. 2025) .............................................. 6, 7

*Nestlé USA Inc. v. Doe*,
   593 U.S. 628 (2021) ............................................................................ 33

*Peterson v. Bank Markazi*,
   121 F.4th 983 (2d Cir. 2024) ............................................................... 49

*Porina v. Marward Shipping Co., Ltd.*,
   521 F.3d 122 (2d Cir. 2008) ............................................................... 50

*Ratha v. Phatthana Seafood Co.*,
   2016 WL 11020222 (C.D. Cal. Nov. 9, 2016) ................................ 39, 40

*Ratha v. Phatthana Seafood Co.*,
   35 F.4th 1159 (9th Cir. 2022) .......................................................... 27, 39

*RJR Nabisco, Inc. v. European Cmty.*,
   579 U.S. 325 (2016) ..................................................................... *passim*

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*,
   2005 WL 3658006 (D.N.J. June 7, 2005) ............................................ 50

*Rodriguez v. Pan Am. Health Org.*,
   29 F.4th 706 (D.C. Cir. 2022) ......................................................... 41, 42

*Roe v. Howard*,
   917 F.3d 229 (4th Cir. 2019) .................................................. 37, 38, 40, 52

*Ross v. Jenkins*,
   325 F. Supp. 3d 1141 (D. Kan. 2018) .................................................. 53

*S.J. v. Choice Hotels Int'l, Inc.*,
   473 F. Supp. 3d 147 (E.D.N.Y. 2020) ................................................. 26

*Salazar v. Nat'l Basketball Ass'n*,
   118 F.4th 533 (2d Cir. 2023) ............................................................... 35

*Sulaiman v. Laram*,
   2017 WL 11659746 (S.D.N.Y. Apr. 4, 2017) ...................................... 29

*T.B. v. Red Roof Inns, Inc.*,
    2025 WL 755165 (S.D. Ohio Mar. 10, 2025) ................................................... 9

*T.P. v. Wyndham Hotels & Resorts, Inc.*,
    2022 WL 17363234 (S.D. Ohio Dec. 1, 2022) ............................................... 10

*Timko v. NSPA Lounge LLC*,
    2025 WL 2162470 (W.D. Pa. July 30, 2025) ........................................... 25, 28

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ........................................................................................ 35

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ........................................................................................ 35

*U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*,
    402 F. Supp. 3d 162 (D. Md. 2019) ................................................................. 53

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*,
    752 F. Supp. 3d 118 (D.D.C. 2024) .......................................................... 40, 41

*U.S. v. Alvarez*,
    617 F.3d 1198 (9th Cir. 2010) ......................................................................... 45

*United States v. Hilliard*,
    2024 WL 3634201 (2d Cir. Aug. 2, 2024) ...................................................... 45

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ......................................................... 45, 46, 47

*United States v. Schulte*,
    436 F. Supp. 3d 747 (S.D.N.Y. 2020) ............................................................ 45

*Universal City Studios, Inc. v. Reimerdes*,
    82 F. Supp. 2d 211 (S.D.N.Y. 2000) ........................................................ 45, 46

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
    21 F.4th 1229 (10th Cir. 2021) ....................................................................... 33

*Vengalattore v. Cornell Univ.*,
    36 F.4th 87 (2d Cir. 2022) ................................................................................ 4

*Volokh v. James*,
    2025 WL 2177513 (2d Cir. Aug. 1, 2025) ................................................ 45, 46

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
    493 U.S. 400 (1990) .................................................................................. 43, 44

## Statutes

18 U.S.C. §1589(a) ............................................................................... 5, 9, 29

18 U.S.C. §1590(a) ..................................................................................... 30

18 U.S.C. §1593(a) ..................................................................................... 52

18 U.S.C. §1595(a) .................................................................................. *passim*

N.Y. C.P.L.R. §302(a) ............................................................................................ 48, 50

N.Y. PENAL LAW §135.35 (McKinney) ............................................................... 32, 43

N.Y. SOC. SERV. LAW §483-bb (McKinney) ...................................................... 32, 42

Trafficking Victims Protection Reauthorization Act of 2003,
    Pub. L. No. 108-193, 117 Stat. 2875 .............................................................. 39

Victims of Trafficking and Violence Protection Act of 2000,
    Pub. L. No. 106-386, 114 Stat. 1464, 1466 .............................................. 39, 52

**Rules**

FED. R. CIV. P. 4(k)(1) ........................................................................................... 47

FED. R. CIV. P. 4(k)(2) ............................................................................... 47, 50, 51

FED. R. CIV. P. 9(b) ................................................................................................ 22

**Other Authorities**

1 Am. L. of Torts §4:1 ........................................................................................... 35

Br. for Members of Congress Sen. Blumental, Rep. Smith, *et al.*, as Amici Curiae Supporting
    Respondents, *Nestlé USA, Inc. v. Doe*, 593 U.S. 628 (2021)
    (Nos. 19-416 & 19-453) ................................................................................... 40

Michael Weber, Cong. Rsch. Serv., IF10587,
    Human Trafficking and U.S. Foreign Policy: An Introduction (Nov. 16. 2023) ...................... 52

Restatement (Second) of Agency §219(1) (Mar. 2024 update) ................................................. 35

**INTRODUCTION**

The stadiums constructed for the 2022 FIFA World Cup in Qatar demanded cheap, exploitable labor. Desperate migrant workers were trafficked from a host of other countries, including the Philippines, lured by false promises, and forced to work and live in deplorable conditions in scorching desert heat. Defendants—massive U.S. public relations firms and their subsidiaries—were hired to mollify the public outcry against those practices, thereby ensuring the widespread exploitation of these vulnerable workers. Defendants were hired precisely because they could deploy legions of public-relations specialists and well-connected lobbyists to hide the exploitation. Defendants spun up a narrative of labor reform, happy workers, and safe, humane conditions that bore no resemblance to what Plaintiffs experienced—all to ensure the rampant, systemic exploitation of migrant workers in Qatar could continue, shielded from international scrutiny, so that the stadiums and infrastructure could be built cheaply and in time for the event.

The human toll of this exploitation was devastating. Plaintiffs each experienced unique, though in many ways similar, harm. Meanwhile, Defendants knew about the rampant abuse; they were *hired to cover it up*. Nobody pays "crisis communications" teams tens of millions of dollars unless there is a public relations crisis—and those teams know well what they are responding to. That's what happened here. Defendants were paid handsomely for their work, knowingly spreading misdirection and lies designed to ensure World Cup construction could continue to access exploitable migrant labor. Defendants thus violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1589 *et seq*., and New York anti-trafficking laws.

Plaintiffs are 106 Filipino construction workers trafficked to Qatar and forced to work unbearable hours in extreme heat. ¶¶1, 8, 28, 188-294.[1] Plaintiffs allege the construction projects

---

[1] Plaintiffs' Complaint (D.I. 1) is cited as ¶__.

to prepare for the World Cup in Qatar relied upon a commercial venture (the "World Cup Labor Venture," or "Venture"), ¶¶4-5, designed to ensure that migrant, exploited labor was available to perform the work. Plaintiffs' immediate employers in Qatar (the "Employers") participated in the Venture as construction subcontractors who provided labor for the Venture (including the work done by Plaintiffs). ¶¶7, 27. Plaintiffs, with their passports confiscated to ensure they could not leave Qatar, were forced to work long hours, sometimes for twenty-four hours straight or more, and in extreme heat; and many were forced to live in unimaginably cramped quarters infested with bedbugs. ¶¶188-294. They were not paid even the relatively meager sums they were promised. *Id.* Plainly, Plaintiffs were treated as "modern slaves." ¶¶2, 155, 157.

Defendants' clients participated by employing, directly or indirectly, Defendants and also Plaintiffs' Employers working on the construction projects and preparations for the World Cup. ¶¶5, 7, 27. Defendants participated in the Venture and were paid millions to, among other things, "monitor reporting ... [and] actively respond," "stop[] and/or limit[] reporting regarding labor abuses," run a "war room" to "respond to media and government condemnation of the use of trafficked and forced labor in Qatar's preparations for the World Cup," "refut[e] with lies" and generate "whitewashing content to offset it and distract" from the abuse, lobby government and media to ignore the problem, sportswash Qatar, and slow reform that would alleviate labor abuses, all to "help Qatar deliver the World Cup stadiums on time and within budget." ¶¶5-7, 98. Defendants and their subsidiaries signed contracts, ¶¶6, 16-17, 101, 105, 111, pursuant to which they were paid to manage the public relations elements of the Venture to ensure its other participants could continue to impose these terrible working and living conditions on Plaintiffs and thousands of others.

Plaintiffs allege in detail and with specificity all the different ways, "routine" or otherwise, that each Defendant participated in the Venture. First, Defendant Portland PR, Inc. ("Portland") admitted its participation, ¶¶79-81, 104, and signed contracts requiring its Venture work and filed Foreign Agent Registration Act ("FARA") disclosures, ¶67, confirming that the contemporaneous public news report—that Portland was the "cornerstone" of Qatar's campaign to refute accusations of labor abuses—was correct. ¶66; *see also* ¶19. Portland's indirect corporate parent Omnicom Group, Inc. ("Omnicom") participated alongside Portland by, among other things, supporting, *e.g.*, ¶¶88, 91, 95-104, 147, and controlling, *e.g.*, ¶¶101, 106-08, its subsidiaries' Venture work, hosting a domestic propaganda tour in New York in furtherance of the Venture, ¶88, and providing its own employee labor via its cross-organization "matrix organization structure," ¶¶22, 102.

Defendant Memac Ogilvy & Mather LLC ("Memac Ogilvy") signed a contract to be the communications partner for the Qatar Foundation, a Venture participant and owner and operator of one of the construction projects, ¶¶109, 111, repeatedly admitted its participation in the Venture with specific references to the World Cup, ¶¶110, 116-17, and applied for and won awards for that work, ¶¶109, 114-15. Ogilvy Public Relations Worldwide LLC ("OPRW"), Memac Ogilvy's New York affiliate, ¶¶24-25, participated by facilitating Memac Ogilvy's Venture work from the United States. Finally, Defendant Ogilvy Group, LLC ("Ogilvy") also publicly disclosed its work for Qatar Foundation, ¶128, and another Venture participant the Supreme Committee, ¶¶131-36, 138, and did so in coordination with, ¶¶127-30, 139, and by controlling, ¶¶133-35, 137, 140-41, its subsidiaries Memac Ogilvy and OPRW.

Defendants throw the sink at Plaintiffs' Complaint. But most of Defendants' arguments have been considered and rejected by other courts. Plaintiffs plausibly allege they were trafficked and forced to work, in violation of the TVPRA; that Omnicom, Portland, Ogilvy, Memac Ogilvy,

and OPRW participated in the Venture and knowingly benefitted therefrom; and that each Defendant "knew or should have known" that the Venture "engaged in an act in violation" of the TVPRA. 18 U.S.C. §1595(a).

To resist this straightforward application of the statute, Defendants repeatedly ignore or mischaracterize Plaintiffs' well-pled and meticulously supported allegations, improperly seek inferences in Defendants' favor, and ask the Court to prematurely resolve factual disputes. On top of that, Defendants urge the Court to adopt a narrow, contorted version of the TVPRA that includes a host of requirements not found anywhere in the statute or any binding precedent. But it is not proper at the pleading stage to ignore Plaintiffs' allegations, draw inferences in Defendants' favor, or resolve factual disputes—and where there exists overwhelming publicly available documentation supporting Plaintiffs' allegations, Plaintiffs should get the benefit of the doubt. With inferences properly drawn in their favor and the TVPRA faithfully applied, Plaintiffs plausibly allege their claims.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022) (citations omitted). The Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs may allege facts on information and belief where "facts are peculiarly within the possession and control of the defendant," or where "the belief is based on factual information that makes the inference of culpability plausible." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citation omitted).

<div align="center">ARGUMENT</div>

## I.    Plaintiffs Adequately Allege Civil Beneficiary Violations of the TVPRA.

Through the TVPRA, Congress broadly imposed criminal and civil liability on *both* those who exploit trafficked labor (*i.e.*, perpetrators) *and* those who knowingly benefit from that labor (*i.e.*, beneficiaries). *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 552 (7th Cir. 2023). Specifically, §1589(a) criminalizes the knowing use or threat of "force," "physical restraint," "serious harm," or "abuse ... of law or legal process" to "obtain[] the labor and services of a person." Section 1589(b), in turn, imposes criminal liability on anyone who:

> knowingly benefits, financially or by receiving anything of value from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means....

Congress also established a corresponding civil remedy empowering trafficking victims to sue both "the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the anti-trafficking laws])." §1595(a). To seek relief against a trafficking beneficiary, "a plaintiff must plead three elements: [1] that the defendant knowingly benefited or received anything of value [2] from participation in a venture, [3] which [the beneficiary] knew or should have known has engaged in an act in violation of ... [§]1589." *Khatskevich v. Shapiro*, 2025 WL 833872, at *9-10 (S.D.N.Y. Mar. 17, 2025) (citations omitted; cleaned up). Plaintiffs plausibly allege each element.

### A.    Defendants Participated in a "Venture."

Courts interpret §1595(a) "'participation' in accord with [an] 'ordinary understanding of culpable assistance to a wrongdoer,' which requires only 'a desire to promote the wrongful

<div align="center">5</div>

venture's success.'" *G.G.*, 76 F.4th at 559 (citation omitted). Adequately alleging "actions ... [taken] to partake in and further advance the scheme" is enough. *Id.* Plausible allegations that a defendant "'assist[ed], support[ed], or facilitat[ed]' *a venture* that violate[d]" the TVPRA suffice to defeat a motion to dismiss. *Id.* (citation omitted; emphasis supplied); *see also Khatskevich*, 2025 WL 833872, at *10. As Defendants recognize, the meaning of "participation" involves merely "taking part or sharing in something." MTD 10.

The TVPRA's civil remedy provision does not define "venture," although the term is defined "extremely broadly" in a related criminal provision as "any group of two or more individuals associated in fact, whether or not a legal entity." *Kitler v. Church of Jesus Christ of Latter-Day Saints*, 2025 WL 2209870, at *12 n.11 (N.D.N.Y. Aug. 4, 2025) (citations omitted); *see also Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019) (citation omitted). Accordingly, courts in civil cases have interpreted "venture" broadly to include "commercial" enterprises or businesses whose "primary focus" need not be trafficking. *G.G.*, 76 F.4th at 554 (citing and quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 727 (11th Cir. 2021)). Some but not all courts have added the gloss that the venture must "involve[] danger, uncertainty, or risk, and potential gain." *E.g.*, *Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329, 337 (S.D.N.Y. 2025) (citation omitted); *see* MTD 10.

Plaintiffs adequately allege a venture under any of these standards. Here, the World Cup Labor Venture was Qatar's initiative to build the stadiums and other infrastructure needed to host the World Cup. ¶5. This was an enormous undertaking, involving years of planning and execution in Qatar, and spending billions of dollars. The Venture had commercial components, including a public relations element and a lobbying element. *Id.* It was a "commercial venture" that involved a "coordinated ... campaign" designed to exploit trafficked labor and "hide the labor abuse through

'sportswashing' Qatar's image." ¶4. Defendants were tasked with publicly "defend[ing] Qatar's human rights record" and "minimiz[ing] the wrongs and abuses," among other things. ¶53. The Venture was commemorated by Defendants' contracts and their work in furtherance of those agreements to "try to make the entire world look away from ongoing labor abuses," so that Qatar could continue to build the stadiums it needed for the World Cup, unabated by public outcry. ¶52.

The Venture is defined to include Defendants, the Supreme Committee, and Defendants' clients in the Qatari regime and the Qatar Foundation. ¶7. Defendants assert that Plaintiffs allege no relationship "whatsoever" (MTD 11) between Defendants and Plaintiffs' direct Employers. That is wrong. Plaintiffs allege explicitly that Plaintiffs' Employers were participants in the Venture, right alongside Defendants. *See* ¶¶7, 27. "Defendants were … an inextricable part of the broader World Cup Labor Venture, working on behalf of the client[s] they shared with migrant laborers' direct employers." ¶7. Defendants' contractual counterparties and clients also included the Qatari regime and the Qatar Foundation—which was a direct perpetrator of trafficking crimes as owner and operator of one of the stadiums. *See* ¶¶7, 56, 77. Each Venture participant worked at least in part to achieve the Venture's goal to "ensure that Qatar had continued access to trafficked and forced labor." ¶5.

Plaintiffs have thus plausibly alleged a "venture." Defendants, Qatari Regime entities such as the Supreme Committee, and the Qatar Foundation were "associated in fact," *Bistline*, 918 F.3d at 873, easily fulfilling the TVPRA's "broad definition" of venture, *see Kitler*, 2025 WL 2209870, at *12 n.11. Even under a narrower understanding, Plaintiffs' allegations show Defendants were engaged in "an enterprise or undertaking that involve[d] danger, uncertainty, or risk, and potential gain." *Mueller*, 777 F. Supp. 3d at 337. The Venture's central goal—ensuring that stadiums and infrastructure were built in time for the 2022 World Cup—involved substantial uncertainty, risk,

and potential reward. ¶64. The projects may have been incomplete or exceeded budget, among other things. Qatar was rewarded financially and politically through hosting the World Cup. Defendants, for their part, were rewarded generously; although the amount of their gain is not knowable before discovery, it is clear they were paid millions. *See*, *e.g.*, ¶186. And because there was potential reputational risk (among other risks) associated with, for example, minimizing the prevalence of the Qatari practice of confiscating passports, there was uncertainty and danger for Defendants. Defendants' commercial and business relationships with Qatar, the Supreme Committee, and the Qatar Foundation, among others, were intended to and did facilitate an environment conducive to trafficked and forced labor, so that the Employers could continue to exploit Plaintiffs and others. ¶64. That was a venture under any definition.

Defendants protest that the Venture is "far-reaching." MTD 9.[2] This argument gets them nowhere, as nothing in the definition of "venture," the TVPRA, or precedent suggests a "venture" cannot reach far in the TVPRA context. While the Venture here does involve many players, this breadth makes sense: The Venture sought to complete several billion-dollar, state-of-the-art construction projects under a pressing deadline. That is likely why nothing in the TVPRA exempts broad, "far reaching" ventures from its purview. And for good reason: providing a safe harbor to broad ventures would mean that the most egregious, nefarious, and impactful slaving schemes would have no redress. That would make no sense.

Defendants assert the TVPRA "venture" requirement exculpates them absent allegations of a direct relationship or contractual privity with the primary TVPRA offenders, whereby

---

[2] Plaintiffs nowhere claim "any person that said anything favorable about Qatar or the World Cup," would be a Venture participant, contrary to Defendants' assertion. MTD 17. But even if Plaintiffs' Venture definition were understood to encompass that group, any included defendant would have defenses under the TVPRA statutory elements, such as participation and knowing benefit, to ensure that only those Congress meant to include as knowing beneficiaries would be liable.

Defendants shared in those entities' specific risk and profit. MTD 10-12. Not so. The TVPRA imposes no such requirement, and courts have rightly rejected that formulation. *See Doe, (H.E.W.) v. Radisson Hosp., Inc.*, 2025 WL 349556, at *6 (W.D. Tex. Jan. 21, 2025) (discussing how franchisor hotels may be liable under the TVPRA for trafficking by a franchisee's clients, noting that "a continuous business relationship" with the franchisee is sufficient because it could "give[] rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success"), *adopted*, 2025 WL 560708 (W.D. Tex. 2025); *see also Doe (K.R.D.) v. Hilton Worldwide Holdings, Inc.*, 2025 WL 2539010, at *8 (N.D. Cal. Sep. 4, 2025) (collecting cases showing a "continuous business relationship" is sufficient). That is because Defendants' position cannot be squared with the text of §1589(b) which imposes liability for participation "in a venture" that violated §1589(a) rather than "in trafficking" or "with a trafficker." *See G.M. Choice Hotels Int'l, Inc.*, 725 F. Supp. 3d 766, 778-79 (S.D. Ohio 2024) (finding participation in "commercial business ventures" where the plaintiff was trafficked, without requiring that "Defendant participated in [] trafficking"). Indeed, courts have made clear that participation in a venture *cannot* be limited to knowing conduct only, as it is in the criminal context, because in the civil context, §1595 "permits claims against beneficiaries who *should have known* about the TVPRA violation." *Hilton Worldwide Holdings*, 2025 WL 2539010, at *8 (defining participation in a venture to mean only "that the defendant [took] part in an association in fact that assisted, supported, or facilitated a violation of 18 U.S.C. § 1591(a)(1)").

Defendants' position also cannot be squared with the many cases finding beneficiary liability where the trafficking beneficiary and perpetrator had no direct relationship. *See T.B. v. Red Roof Inns, Inc.*, 2025 WL 755165, at *12 (S.D. Ohio Mar. 10, 2025) (franchisor defendants found at pleading stage to have participated in a TVPRA "commercial" venture despite

perpetrator's "routine" direct business relationship being with franchisee); *T.P. v. Wyndham Hotels & Resorts, Inc.*, 2022 WL 17363234, at *11 (S.D. Ohio Dec. 1, 2022) (similar); *A.R. v. Wyndham Hotels & Resorts, Inc.*, 2022 WL 17741054, at *7 (S.D. Ohio Dec. 16, 2022) (similar); *C.T. v. Red Roof Inns, Inc.*, 2023 WL 3510879, at *4 (M.D. Fla. Mar. 11, 2023) ("[T]o find the existence of a venture, the Court need consider only whether operating hotels is an enterprise involving risk and potential profit. Clearly, it is."); *Doe v. Scottsdale Inns LLC*, 2024 WL 3494375, at *4 (D. Ariz. July 22, 2024) (finding that plaintiff had adequately alleged a "venture" between hotel franchisor and franchisee, despite primary TVPRA violations happening at customer level). While Defendants may prefer that the TVPRA imposed the high bar that a knowing beneficiary interacted directly with the trafficker, the law imposes no such requirement.

Plaintiffs' allegations that Defendants participated in the Venture are extensive. Portland admitted it, ¶¶79-81, 104; it signed contracts requiring it to perform Venture work and filed FARA disclosures confirming it did so, ¶67. *See* MTD 5-6; *see also id.* 14 n.3 (Portland admitted it did work at least indirectly for the Qatar Foundation). Portland's employees have publicly disclosed their work was related to the World Cup and for the Supreme Committee. ¶¶71, 80-81. Far from being conclusory, Plaintiffs' allegation that Portland was the "cornerstone" of Qatar's campaign to refute accusations of labor abuses is based on *Portland's own employees' statements* and public news reports. ¶66; *see also* ¶19. Plaintiffs also have well-founded, detailed allegations of the ways that Portland participated, including through media monitoring and crisis communications strategy via a "rapid response team," ¶¶70-72, 98, 147, 175, developing media and U.S. influencer engagement plans to "minimize or manage coverage of labor abuses related to the World Cup in Qatar," ¶68, "attack[ing] critics of Qatar," ¶73, directly interacting with migrant laborers at their housing facilities during a whitewashing propaganda tour, ¶¶74, 177, 184, having a "direct

relationship with perpetrators who were actively lying about the labor abuses as they were occurring, and facilitat[ing] dissemination of those lies," ¶75, drafting knowingly false media articles related to migrant labor abuse, ¶¶76, 178, drafting misleading press releases to respond to negative coverage regarding labor abuses, ¶156, and providing general "reputation laundering" services designed to ensure labor exploitation could continue, ¶78. Portland's Noah Black publicly announced that he worked as part of the "delivery team," naming dozens of other Portland employees who took part in the World Cup public relations campaign, ¶79, which makes clear Portland's FARA filings were pursuant to its Venture participation, *see*, *e.g.*, D.I. 56-7 at 12 (Noah Black disclosed as "Key Personnel" working for Qatar).[3] Plaintiffs' allegations as to Portland more than suffice.

Omnicom supported Portland and another of its Venture-participating subsidiaries Mercury Public Affairs LLC ("Mercury"),[4] *e.g.* ¶¶88, 91, 96-98, 101-104, by controlling Portland's and Mercury's Venture work, ¶¶101, 106-08, and by providing back office and enterprise-level resources to Portland and Mercury for that work, including: "data analysis, social media, and earned media support" via the "omniearnedID" program and "Omni Custom Audiences" toolkit, ¶¶99, 147, "tax and accounting," ¶¶95, 101, "legal and compliance," ¶100, and financial support and cash position management, ¶101. Plaintiffs further allege Omnicom participated in the Venture

---

[3] Portland asserts Plaintiffs do not plausibly allege Portland's work related to World Cup construction, wishing to substitute the FARA documents it filed with Defendants' motion for Plaintiffs' allegations. MTD 14 & n.4. But its employees' pronouncements demonstrate that while the contracts did not list the World Cup specifically, the focus of Portland's work under the contract was in fact on the World Cup. Also, one cannot avoid liability merely by omitting reference to the illegal activity in a contract, particularly where public information makes clear what the contract was actually about. No inference is needed: Defendants' employees said Defendants participated.

[4] Defendants incorrectly assert Mercury was not a Venture participant because Plaintiffs did not allege that its clients were themselves Venture participants. MTD 15 n.5. That is wrong; Plaintiffs did so allege that the Qatar Regime (which includes the Qatari Embassy and the Qatari Government Communications Office) participated. ¶7.

by hosting a 2018 Supreme Committee propaganda tour in New York, ¶88, providing labor from multiple Omnicom divisions (CLS Strategies division, general media group, and Experiential Group) to sportswash Qatar, ¶¶90, 92, 94, allowing its employees (and all its subsidiaries) to participate in Portland's and Mercury's Venture work throughout the project via the "matrix organization structure," ¶¶22, 102, supporting Portland and Mercury's FARA filings through its in-house legal department, ¶¶100-01, and providing labor from its OMD Worldwide group to generate unique beIN Sports content, ¶93. That Omnicom may have participated *less extensively* than Portland does not mean it did not participate—it certainly did.

Memac Ogilvy signed a contract to be the communications partner for the Qatar Foundation, including specifically as to the World Cup, ¶¶109, 111, repeatedly admitted its participation in the Venture, ¶¶110, 116-17, and won industry awards for that work, ¶¶114-15. Plaintiffs plausibly allege Memac Ogilvy participated in the Venture by providing public relations support related to the Venture to the Qatar Tourism Authority, ¶113, embedding employees at the Qatar Foundation, ¶112, running the Qatar Foundation media office, ¶111, drafting and distributing press releases, drafting articles and speeches, and managing social media, *id.*, monitoring and helping to respond to negative media, ¶¶111, 147, 164-66, 175-76, 179, and reaching into the United States (and specifically New York) to work with its U.S. affiliates (including OPRW, ¶¶24-25) to do Venture work, ¶118-23.

OPRW facilitated Memac Ogilvy's work in New York and in Washington, D.C., including but not limited to by communicating with U.S. media outlets and providing lobbying support to "suppress pressure on Qatar to implement labor reforms," ¶¶119-20, 124, and managing Memac Ogilvy's work, ¶121. OPRW also independently provided public relations support directly to the Qatar Foundation, ¶121, social media support for the Venture via its New York "Social@Ogilvy"

team, ¶122, and lobbying support via its Ogilvy Government Relations ("OGR") department, ¶¶24, 125. OPRW's corporate parent's FARA disclosures confirmed that OPRW participated in the Venture by, for example, performing work related to the labor abuses at the World Cup construction sites, and specifically *The Guardian*'s reporting of the same. ¶¶125-26. Multiple OPRW employees admitted to working for the Qatar Foundation, ¶123, and it is reasonable to infer they were working with Memac Ogilvy to help deliver on the broad contract Memac Ogilvy had entered into related to the Venture. Such participation included but was not limited to OPRW's monitoring and (falsely) responding to negative media related to the labor abuses, ¶¶176, 179-80.

Ogilvy, for its part, publicly disclosed it was working directly for the Qatar Foundation, specifically by engaging U.S. media, ¶128, and that it was working with its subsidiaries Memac Ogilvy and OPRW to do so, ¶¶127-30, 139. Plaintiffs allege Ogilvy participated by, for example, providing "MarTech" global marketing technology and New York-based support for OPRW and Memac Ogilvy's Venture work, ¶130—indeed, Ogilvy provided "backbone data analytics tools and personnel to assist" Memac Ogilvy and OPRW in their monitoring of negative press and work to respond thereto, ¶147. Plaintiffs also adequately allege Ogilvy ran the social media functions across all Ogilvy businesses, including Memac Ogilvy. ¶135. It is reasonable to infer therefrom that Ogilvy participated in Venture work related to social media. Further, Plaintiffs adequately allege Ogilvy had "dual-hatted" employees who worked for Ogilvy directly while also serving functions for Memac Ogilvy—many of whom (*e.g.*, Lucie Abrie, JoAnn Kharma, and Jeffrey Chertack) publicly admitted working for the Supreme Committee, ¶¶131-36, 138, after Ogilvy's transition in 2017 to a "One Ogilvy" brand which dismantled distinctions between divisions at the company, ¶¶26, 132, 140. Ogilvy also generally managed and controlled the foreign operations of Memac Ogilvy in its Venture work. ¶¶133-35, 137, 140-41.

13

Defendants wish that all of that was simply "routine" or "run-of-the-mill" public relations work. MTD 16, 17, 18, 19. But even that anodyne characterization of Plaintiffs' allegations, found nowhere in the Complaint, admits Defendants took part in the Venture. There is no safe haven for "routine" participation in a forced labor venture. *See G.G.*, 76 F.4th at 559-60. But even if the Court were to accept Defendants' claim that participation under the TVPRA requires bespoke services, Plaintiffs allege Defendants provided just that. Defendants created a custom strategy designed for the Venture "to hide the labor abuse through 'sportswashing' Qatar's image," so it could deflect public attention from, and thereby enable, the Venture's use of forced labor. ¶¶4, 111. As such, this is not a case where Defendants merely provided some off-the-shelf good or service on equal terms to other clients. *See G.G.*, 76 F.4th at 560 (discussing participation via solutions "tailored" to the client's needs). Instead, Defendants provided the sort of "special tailoring of one's services to [the Venture]" that can establish liability. *See Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 406 (S.D.N.Y. 2023) ("[E]ven if it is true that 'active participation' ... requires some special tailoring of one's services to that venture, plaintiffs plausibly plead that this element of participation liability is satisfied."). In any event, Defendants' quibbles with those allegations cannot be resolved at the pleading stage. *E.g.*, *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) ("Fact-specific questions cannot be resolved on the pleadings." (cleaned up)).

Defendants point to a smattering of FARA materials that may be judicially noticed but cannot be considered, at the pleading stage, for the truth asserted therein. *Khatskevich*, 2025 WL 833872, at *5-8 (considering materials submitted by defendant and noting that if a court considers materials outside the complaint or those incorporated by reference, the court must convert the motion into one for summary judgment). But even the FARA materials Defendants chose to file,

and reasonable inferences drawn therefrom, *support Plaintiffs' allegations* that they participated in the Venture. For example, the first Ogilvy FARA disclosure, D.I. 57-1, discloses how Memac Ogilvy, OPRW, and Ogilvy were contractually obligated to the Qatar Foundation to, among other things, perform "daily media monitoring," *id.* at 11, monitor and help respond to public relations crises including by "delivery of crisis communication responses to the media and external stakeholders," *id.* at 10, conduct social media management, *id.* at 15, and provide staffing directly for Qatar Foundation work, as dictated by the Qatar Foundation, *id.* at 17. The FARA disclosure also lists the email address for an Ogilvy (not Memac Ogilvy) employee as Memac Ogilvy's general manager, *id.* at 35.[5] Further still, Ogilvy's CFO, Jim Woods, signed the document, *id.* at 3, confirming that he was the New York executive who negotiated "all 'client commercial agreements' for the worldwide business," ¶132(a).

One of Portland's disclosed FARAs, D.I. 56-5, reveals Justin Kerr-Stevens—a Portland employee name-checked in Noah Black's announcement that they had been working on the World Cup, ¶79—was the project lead for "Project Q," which included in its broad remit "[m]onitoring media and third party comment[s] through publicly broadcast news related to Qatar including … sports," *id.* at 3. Another Portland FARA lists *Noah Black himself* as "Key Personnel of Portland," who were "personally and substantially involved in the performance" of services, *see* D.I. 56-10 at 10; Mr. Black later admitted publicly that his employer (and dozens of its employees) participated in the Venture, *see* ¶79. Further, Portland's Victoria Dean signed a FARA disclosure which obliquely describes work for Qatar generally, D.I. 56-13 at 5; Defendants may wish the Court to infer that because the disclosure did not contain the words "World Cup" that document

---

[5] The email address listed is "maclean.brodie@ogilvy.com," which presumably belongs to Ogilvy employee MacLean Brodie, ¶134.

did not disclose Venture participation—but that draws the inference in the wrong direction and ignores Plaintiffs' allegation regarding Ms. Dean's explicit public admission that her team had been "handling international media for the 2022 FIFA World Cup," ¶81.

The FARA materials Defendants chose *not to* share with the Court also confirm Defendants participated in the Venture.[6] For example, Omnicom and Portland did not disclose the publicly available FARA materials (and related contracts) about the bespoke "war room" they helped set up at the Qatari embassy, the entire purpose of which was to monitor and respond to media reporting about labor abuses at the World Cup, ¶98. Nor did they disclose Mercury's history of lobbying domestically about labor abuses at the World Cup. ¶¶85, 87. Those FARA disclosures are publicly available.[7] Ogilvy similarly omits publicly available FARA documents,[8] including the

---

[6] Plaintiffs collected FARA Supplemental filings by Defendants and their affiliates that worked on the Venture during the relevant time and found that Defendants included with their motion a very small subset of the filings. To do this, Plaintiffs searched the Department of Justice's supplemental FARA filings database (https://efile.fara.gov/ords/fara/f?p=1235:10) using the FARA numeric identifiers used by Defendants and relevant subsidiaries and affiliates. In the relevant time period, there were *fifty-two* biannual Supplementals in total, which included forty-six supplementals filed directly by Defendants and/or their subsidiaries, three filed by a U.S. company working as a Qatari "war room" agent via contract with Defendant Portland, and three filed by a New York company working as an agent for Defendant Memac Ogilvy on Qatar Foundation-related business. *See* Declaration of Eli J. Kay-Oliphant ¶5 ("Kay-Oliphant Decl."), filed herewith.

[7] *E.g.*, The Gallagher Group LLC, Feb. 12, 2015 FARA Ex. AB, at 23-24, https://efile.fara.gov/docs/6277-Exhibit-AB-20150212-2.pdf (attaching Portland's "war room" contract); The Gallagher Group LLC, Nov. 10, 2015 FARA Ex. AB, at 5, 11, https://efile.fara.gov/docs/6277-Supplemental-Statement-20151110-1.pdf (showing that Portland's work in the "war room" included, but was not limited to, responding to the *Washington Post* article related to migrant labor abuse during the World Cup); Mercury, June 29, 2015 FARA Ex. AB, at 20, https://efile.fara.gov/docs/6170-Supplemental-Statement-20150629-4.pdf (showing that Mercury's work related to responding to the *Washington Post* article).

[8] While Ogilvy disclosed a 2021 contract with the Qatari Embassy that states that "it previously registered ... through contract with Nelson, Mullins" (D.I. 57-3 at 7), Ogilvy did not file that contract. *See* Ogilvy Government Relations ("OGR"), June 21, 2018 FARA Ex. AB, at 1, https://efile.fara.gov/docs/6565-Exhibit-AB-20180621-1.pdf. Nor did Ogilvy submit a FARA Supplemental filing showing it was working on extensive media outreach to New York outlets. *See*

ones that detail the work it performed in 2019 on behalf of the Venture, ¶124. Ogilvy did submit a filing that showed that OPRW disseminated a "labor letter" far and wide, D.I 57-4 at 21-27, but excluded the publicly available basis for Plaintiffs' allegations, ¶¶125-26, 129, that the *content of that letter* had been developed pursuant to a contract with Nelson Mullins, and how the letter falsely denied labor abuses in Qatar in connection with the World Cup preparations, in a specific example of how Defendants' participation manifested.[9]

Defendants baselessly assert that their hand-picked FARA materials are nevertheless dispositive as to their participation because of what the documents do not say. MTD 5 n.1. But it is irrelevant, particularly at this stage, that the FARA documents do not mention the World Cup specifically. *Contra* MTD 18. Plaintiffs have extensively alleged facts outside of the FARA documents showing Defendants' participation. For example, Plaintiffs allege Ogilvy participated by having specific employees who worked on social media campaigns, managed Memac Ogilvy's work, disclosed they were foreign agents for Qatar Foundation, said they worked for the Supreme Committee, and publicly admitted they engaged in conduct constituting participation in the Venture. ¶¶132-33. Those examples of the work Ogilvy employees admitted publicly provide the details lacking in Defendants' FARA disclosures. Defendants cannot use the absence of those details from their intentionally opaque FARA disclosures to disprove Plaintiffs' well-sourced allegations concerning their participation, especially at the pleading stage. Plaintiffs' allegations make clear that each Defendant took part in and desired to promote the Venture's success, including

---

Ogilvy, Mar. 29, 2019 FARA Ex. AB, at 1, 10, 12-14, https://efile.fara.gov/docs/6585-Supplemental-Statement-20190329-1.pdf (supporting Plaintiffs' allegations in Complaint ¶124).

[9] OGR, Jan. 30, 2019 FARA Ex. AB, at 13-14, 19-20, https://efile.fara.gov/docs/6565-Supplemental-Statement-20190130-1.pdf; Informational Materials, May 25, 2021, at 1-3, 5-6, https://efile.fara.gov/docs/5928-Informational-Materials-20210526-21.pdf (offering misleading commentary on Qatar's purported reforms and acknowledging knowledge of adverse media coverage of workers' deaths from *The Guardian*).

by assisting, supporting, or facilitating the Venture's need to minimize and refute (at times with lies) accurate reporting regarding migrant labor abuse in the various World Cup construction projects. That is all that is needed to adequately allege Defendants participated. *See G.G*, 76 F.4th at 559; *Khatskevich*, 2025 WL 833872, at *10.

Defendants repeat that they should be allowed to escape liability because they did not directly participate in any labor violations or have privity with the Employers that trafficked Plaintiffs. MTD 1, 9, 13. But Plaintiffs do not bring a perpetrator liability claim, they bring a knowing *beneficiary* claim. *See* §1595(a). Nothing in the statute requires that Defendants themselves commit labor violations, only that Defendants knowingly benefited from participation in *a venture* that violated the TVPRA. *Id.*

Defendants claim they should be insulated liability because they performed work for Qatar itself (*i.e.*, the Regime's communications office and the embassy), *e.g.*, MTD 13. But Plaintiffs allege that each of Defendants' clients, including those Regime entities, were Venture participants, ¶¶7, 27, because they furthered the goal of Qatar and the Supreme Committee of continuing to access trafficked and forced labor. Defendants similarly assert work for the Qatar Foundation was not participation in the Venture. MTD 5-8, 12, 17. But Plaintiffs plausibly allege the Qatar Foundation was a Venture participant, ¶¶7, 27, not merely by virtue of serving as the propaganda mouthpiece for the Qatari Regime for Venture-related media, ¶¶54-63, 147, 164-66, 171, but also as a direct perpetrator of trafficked and forced labor as owner and operator of a stadium, ¶¶77,

157(i), 164.[10] Where, as here, there was a venture violating the TVPRA, and Defendants worked "for the purpose of enabling it," *Bistline*, 918 F.3d at 876, Plaintiffs have alleged participation.

Defendants next claim (MTD 15) Portland merely "observed" rather than participated when Portland arranged a propaganda tour of workers' housing facilities—a tour which ultimately led to BBC journalists being jailed by the Qatari Regime, ¶¶74-75, 184—and helped draft a false response to a media article about labor abuse, ¶76. The Court should not accept this spin at the pleading stage. First, to characterize writing a knowingly false response to a news article and organizing a sham tour for journalists as passive "observation" stretches to absurdity the meaning of that word. To be clear, Plaintiffs allege active participation through affirmative acts, not merely observation. *See Kitler*, 2025 WL 2209870, at *13. Second, Defendants' argument minimizes and mischaracterizes Plaintiffs' allegations regarding Portland's wide-ranging participation in the Venture. These two specific examples are not meant to show the full extent of Portland's participation; rather, they show that *at least some* of Portland's alleged participation *related to World Cup construction labor abuse*.

Defendants baldly assert there is no basis to allege OPRW employees worked on the Venture. MTD 17-18. That ignores Plaintiffs' allegations regarding the many ways OPRW was involved, ¶¶119-26, and the specifically named employees who admitted they worked for Qatar Foundation, ¶123. *See also supra* nn.8-9 (detailing the work that OGR, a d/b/a of OPRW, did).

---

[10] It is understandable that Defendants wish to distance themselves from Qatar Foundation, MTD 14 n.3, but to assert Plaintiffs do not allege that Qatar Foundation had any direct relationship with Plaintiffs' Employers at Al Rayyan stadium dramatically misstates Plaintiffs well founded allegations. ¶77. Further, Plaintiffs plausibly allege the Qatar Foundation participated in the Venture throughout all the construction projects. *E.g.*, ¶55 Finally, Plaintiffs point out that Defendants' FARA filings obfuscated the relationship between Qatar Foundation and the Qatari regime, stating that it was a "private" or "independent" organization," ¶54 n.1; Defendants have now furthered that falsehood by parroting the language in those false filings in their motion.

From the laundry list of Plaintiffs' allegations regarding the Ogilvy entities' extensive and varied participated, Defendants choose one—Plaintiffs' allegation that Ogilvy's New York-based "Social@Ogilvy" program was used for Venture work—and call it conclusory. MTD 17. Defendants' argument fails. Even if the "Social@Ogilvy" allegation were disregarded as conclusory, Plaintiffs' many other allegations about how OPRW (and Ogilvy) extensively participated in the Venture would remain intact. But in any event, this allegation is far from conclusory. Plaintiffs plausibly allege Memac Ogilvy's contractual remit included to "[m]anage all social media," ¶111(e), Memac Ogilvy worked directly with OPRW employee Jennifer Risi who was "***worldwide*** managing director [for] media influence," ¶120, and many other OPRW and Ogilvy New York employees said they worked on worldwide social media projects, ¶¶121-23, 132. Further, OPRW advertised Social@Ogilvy as "a ***worldwide*** practice," "deliver[ing] solutions across ***all areas*** of business," and "deliver[ing] ***global*** ... solutions," ¶122. And OPRW and Ogilvy social media personnel even disclosed they worked for the Qatar Foundation and the Supreme Committee, ¶¶123, 132. Throughout, Ogilvy delivered its services without distinguishing between Ogilvy, OPRW, and Memac Ogilvy employees, via its "One Ogilvy" business approach. *E.g.*, ¶135 (Ogilvy employee managed Memac Ogilvy's social media operations); ¶136 (Ogilvy chief digital officer dual-hatted as Memac Ogilvy CEO discussing the "single integrated enterprise"). From all this, it is reasonable to infer that the Social@Ogilvy platform was used to help deliver one of Memac Ogilvy's specifically identified contractual requirements in furtherance of its Venture work, and that Ogilvy and OPRW participated via that work.

Finally, Defendants assert Plaintiffs' claims against Ogilvy and Omnicom should be dismissed because Plaintiffs do not sufficiently allege facts to "pierce the corporate veil." MTD 19-22. First, Plaintiffs adequately allege that Ogilvy and Omnicom are each independently liable

as knowing beneficiaries, regardless of whether the veil is pierced. Second, Plaintiffs sufficiently allege an agency relationship between Ogilvy and Omnicom and their respective subsidiaries. Under New York law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (citation omitted). "An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) (citation omitted). Existence of an agency relationship "is a mixed question of law and fact" generally decided at trial. *In re JVJ Pharmacy Inc.*, 630 B.R. 388, 403 (S.D.N.Y. 2021) (citations omitted). Here, Plaintiffs sufficiently allege Omnicom and Ogilvy's subsidiaries Portland and Mercury, and Memac Ogilvy, respectively, worked under the direction, control, and supervision of their corporate parents. ¶¶26, 100-08, 131-32, 134-36, 140, 142-44. Plaintiffs thus allege enough to at least raise a question of fact as to whether Omnicom's and Ogilvy's subsidiaries are their agents, on top of everything alleged specifically as to the corporate parents' participation.

<center>*    *    *    *</center>

At end, Defendants' protests that they did not participate in the Venture fail at the pleading stage. Plaintiffs need only allege that Defendants desired to promote the Venture's success, *see G.G.*, 76 F.4th at 559-60, and have done so. Plaintiffs also sufficiently allege Defendants participated by assisting, supporting, or facilitating the Venture, *see id.*; *Khatskevich*, 2025 WL 833872, at *10, due to Defendants' specialized role to obscure, minimize, and conceal trafficking abuses.

<center>21</center>

**B.      Plaintiffs Plausibly Allege Defendants Knew or Should Have Known the Venture Used Trafficked and Forced Labor.**

Section 1595 imposes "a negligence standard" on defendants, and "all courts agree that a defendant under Section 1595 must have had at least constructive knowledge that the 'venture' in question has engaged in an act in violation of [the TVPRA] in order for participant liability to attach." *G.G.*, 76 F.4th at 555 n.9 (collecting cases). Plausible allegations that the venture used trafficked or forced labor, based on public reporting or the defendants' own dealings with its venture counterparties, satisfy this requirement. *See id.* at 555-56. Defendants need not have constructive knowledge related to the plaintiffs' specific harms, only as to the venture's general use of trafficked or forced labor. *See id.* at 556-57 (collecting cases); *see also Kitler*, 2025 WL 2209870, at *11. Even under the heightened pleading standard for fraud, state of mind such as "knowledge," or "other conditions of a person's mind may be alleged generally" at the pleading stage. FED. R. CIV. P. 9(b); *see also G.G.*, 76 F.4th at 555-56. The Complaint easily clears this low bar.

In addition to Defendants' general understanding of the *kafala* system and that the types of abuses Plaintiffs experienced were commonplace in the Qatar construction industry, writ large, ¶¶42-44, 49-51, 150, Defendants knew, or would have discovered based on public reporting and their own due diligence prior to signing their contracts to participate, that the Venture would use trafficked and forced labor. ¶¶153, 161-63.[11] Omnicom stated explicitly that it assesses labor abuse issues with each of its business partners. ¶162. It is reasonable to infer that Ogilvy does the

---

[11] Defendants wrongly characterize Plaintiffs' due diligence allegations as "vague" and made only on "information and belief." MTD 26. Plaintiffs' allegations are based on *Defendants' own statements* about how they assess whether to work with a client. *E.g.*, ¶162. It is reasonable to infer, based on those statements and Defendants' sophisticated business practices that they would have performed due diligence before engaging in Venture work, so there is at least a factual dispute regarding whether that diligence would have revealed the existence of labor abuses.

same, and that each Defendant therefore knew or should have known the Venture would be rife with trafficked and forced labor before signing contracts to participate in it. Indeed, the point of Defendants' work was to respond (at times by lying) to media coverage related to labor abuses, ¶¶145-46, so Defendants should have known that there was a risk that labor abuse was ongoing and would have learned of those risks when deciding whether to do the work. For example, Defendants could not have missed the 2013 article in *The Guardian* entitled "Qatar's World Cup 'Slaves'" when deciding whether to work for the Qatar Foundation and the Qatari Regime. ¶157(a) (emphasis removed). Similar reports of the Venture's use of trafficked and forced labor were published before Defendants started participating. *See, e.g.*, ¶¶157-58.

Then, after beginning work, Defendants learned time and again the Venture was abusing migrant laborers. They learned from their own on-the-ground personnel, ¶152, from government and NGO reports, ¶¶154-56,[12] cacophonous media reporting, ¶¶157-60, 166,[13] Google notifications, ¶157 n.4, and from their own dealings with FIFA, the Supreme Committee, and the Qatar Foundation, ¶181-84.

Since the *raison d'être* for Defendants' work was to monitor all the negative media, ¶¶157, 175, they would have seen all these reports—including public reporting immediately after they started work and the *Deutsche Welle* report regarding deaths of hundreds of workers, including at Al Rayyan in Education City (which their client Qatar Foundation was responsible for building), where workers were forced to work through heat and complained of passport confiscation,

---

[12] It is clear Portland knew of the 2016 Amnesty International "Qatar World Cup of Shame" report, ¶49, because Portland's client the Qatari Embassy issued a press release in response, ¶156.

[13] It is clear Defendants knew of the 2014 *The Guardian* article and the 2015 *Washington Post* article because their clients responded directly to them and Defendants' job would have included helping with those responses. ¶¶59, 76, 86, 125-26.

¶157(i).[14] It was publicly reported that Defendants' clients would call their public relations teams every time a bad article was published, ¶147, so it is reasonable to infer Defendants learned early and often.

In face of that overwhelming evidence that Defendants knew, Defendants' bald assertion that Plaintiffs allege only that Defendants had "some *general* awareness of labor abuses in Qatar," MTD 2, rings hollow. Far from basing allegations of knowledge on sweeping generalities of "unspecified labor abuses" in Qatar, *see* MTD 25, Plaintiffs' detailed allegations demonstrate Defendants' constructive, if not actual knowledge, of the Venture's pervasive use of trafficked labor. At minimum, there is a factual dispute about Defendants' knowledge that is inappropriate for resolution at the pleading stage, *see Int'l Code Council*, 43 F.4th at 53.

Faced with overwhelming allegations of their knowledge, Defendants retreat to arguing that their liability turns on whether they knew the identity of, and harm suffered by, each specific Plaintiff. MTD 1-2, 22-27. But that is not the law. Defendants would revise the TVPRA's reference to knowledge of "***an*** act in violation of this chapter" to instead say "***the*** act in violation of this chapter"—specific to the violation. But, as the Seventh Circuit explained in *G.G.*, "[w]e see no reason to rewrite the statutory text by substituting 'the' for 'an'"—and even if that leap were warranted, it would not follow that knowledge of "the" violation also means knowledge of "the victim's identity." 76 F.4th at 556. Thus, the TVPRA does not require "actual or constructive knowledge of the specific victim," and Defendants point to nothing in the statute "requir[ing] such an odd result." *Id*. at 556-57 (collecting cases); *see also Doe v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *8 (E.D. Cal. Jan. 7, 2025) ("[B]ased on the language of the statute, and in the

---

[14] Portland wishes to limit its participation in the Venture to its work directly for Qatar Foundation in 2017, MTD 26, but that makes no sense due to their far-ranging participation, discussed *supra*.

absence of any authority ... indicating otherwise, the knowledge requirement attaches to the venture, and not a particular victim." (citation omitted)). Were it otherwise, "Section 1595 would be ***severely undermined*** in some of the most egregious cases," such as larger trafficking operations where a defendant "could simply bury its head in the sand with respect to individual victims" to "insulate[]" itself "from civil liability." *G.G.*, 76 F.4th at 557 (emphasis supplied).

Defendants prefer the dissent in *G.G.*, MTD 23-24, and its reliance upon "of a person" language—but the panel majority, following the majority of courts, rebutted that view at length. *G.G.*, 76 F.4th at 556-58 (collecting cases).[15] Further, the Eleventh Circuit in *Red Roof Inns* (cited at MTD 22-23) did not reach or analyze whether plaintiff-specific knowledge is required, making the court's statement that the defendant must have "knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff," 21 F.4th at 726, pure dictum.[16] Cases Defendants cite (at MTD 23) that rely on *Red Roof Inns* simply parrot the "knowledge … as to the plaintiff" sound bite without further analysis (as Defendants wish this Court to do) and so lack any persuasive force. *E.g.*, *Doe (G.N.C.) v. Uniquest Hosp., LLC*, 2024 WL 4149251, at *4 (S.D.N.Y. Sept. 11, 2024); *Doe (P.B.) v. Wyndham Hotels & Resorts, Inc.*, 2023 WL 8890229, at *4-5 (D.N.J. Dec. 26, 2023). That does not justify imposing this extra-statutory requirement. As one court in this Circuit

---

[15] Courts nationwide have consistently rejected arguments that §1595 contains a plaintiff-specific knowledge requirement. *See, e.g.*, *C.J. v. Santosa & Brother Inc.*, 2025 WL 933800, at *5 (D. Colo. Mar. 27, 2025); *Timko v. NSPA Lounge LLC*, 2025 WL 2162470, at *11 (W.D. Pa. July 30, 2025); *F.C. v. Jacobs Sols., Inc.*, 2025 WL 1766069, at *20 (D. Colo. June 26, 2025); *K.O. v. G6 Hosp., LLC*, 728 F. Supp. 3d 624, 644 (E.D. Mich. 2024); *Doe (A.L.G.) v. Wyndham Hotel & Resorts, Inc.*, 2024 WL 5371983, at *4 (W.D. Tex. Nov. 21, 2024).

[16] Notably, the decision on appeal in *Red Roof Inns* did not resolve (or even consider) the question of whether the TVPRA requires the defendant to have knowledge of the trafficking of a particular plaintiff. *See generally Doe #1 v. Red Roof Inns, Inc.*, 2020 WL 1872335, at *3 (N.D. Ga. Apr. 13, 2020), *aff'd* 21 F.4th 714. The question of victim-specific knowledge was thus not presented on appeal.

recently put it, Defendants cannot "cite to any element of either the text or the legislative history ... that supports this [victim-specific] interpretation." *Deutsche Bank*, 671 F. Supp. 3d at 406-07.

Defendants assert that under the majority view liability improperly extends to any company that did business with Qatar after any public allegations of labor trafficking. MTD 24. Not so. To be liable, the defendant must participate in a venture that it knew or should have known perpetrated violations—a much more restricted (and reasonable) universe of liability.

Finally, Defendants urge that they are like the franchisor defendants in *S.J. v. Choice Hotels International, Inc.*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020), where defendants were not liable because they did not know of "a specific sex trafficking venture," even though they were aware of sex trafficking generally. MTD 27. But Plaintiffs have alleged enough, even under the *S.J.* standard. Plaintiffs allege specific labor trafficking in the venture to build the stadiums and related infrastructure for the World Cup, with far reaching examples within the Venture itself, as opposed to citing labor violations only in the Qatar construction industry, generally. Defendants were hired to protect the Venture's access to exploitable migrant labor, which is a much more specific need and goal for trafficked labor than was manifest in *S.J.*, where defendants were merely "generally aware that sex trafficking sometimes occurred on their franchisees' properties." 473 F. Supp. 3d at 154. In *S.J.*, there were no allegations of the franchisors' specific knowledge about the types of trafficking that were occurring, or where. Here, Plaintiffs allege much more than simply that Defendants "might have been able to guess" there was abuse, *id.*, Plaintiffs allege that the specific Venture Defendants participated in was infected by design and so they knew of it.

At end, Plaintiffs' allegations certainly satisfy the TVPRA's negligence standard. *See G.G.*, 76 F.4th at 555 n.9. And Plaintiffs' allegations are easily distinguishable from "[s]weeping generalities" about industry conditions that have been deemed "too attenuated" to support

inferences of Defendants' knowledge. *See Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022) ("*Ratha II*"). Here, Plaintiffs painstakingly point out that it was common knowledge that the Venture specifically, not just the construction industry or Qatar generally, used trafficked or forced labor, based on public reports and Defendants' own dealings. That is enough.

### C.    Plaintiffs Sufficiently Allege Defendants Knowingly Benefitted from Participating in the Venture.

Section 1595(a) requires Plaintiffs to allege Defendants "knowingly benefit[ted]" "financially or by receiving anything of value" from their participation in the Venture. It suffices to allege Defendants were "aware" that that they were "benefitting in some way from [their] participation in the venture. ***That's it.***" *G.G.*, 76 F.4th at 564 (emphasis supplied).

Here, Plaintiffs allege Defendants were paid for their work, ¶¶125, 185-86, 307, and also received benefits based on publicity and notoriety related to participating in such a high-profile project, ¶187. That is enough. Each Defendant obviously knew of these benefits—they signed the contracts, received money, and touted their accomplishments. *See G.G.*, 76 F.4th at 564 ("contracts" can "satisfy the 'knowingly benefits' element").

Defendants would require Plaintiffs to tie the "benefits" to "any conduct furthering the venture." MTD 27. But that is not the law: The alleged "benefit need not take the form of 'profits' that [were] 'the specific result'" of trafficking. *G.G.*, 76 F.4th at 564; *see id.* at 565 (the TVPRA does not require Plaintiffs to allege that Defendants benefitted directly from the "trafficker itself"). *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019), which Defendants cite for their assertion that Plaintiffs must allege that Defendants received a benefit *caused by* facilitating TVPRA violations, MTD 27, is an outlier. Neither *Geiss* nor the handful of decisions

holding similarly identify any statutory basis for this trafficking-specific benefit causation requirement.[17]

That is because, as the Seventh Circuit explained in *G.G.*, the TVPRA's text "clearly dictates [that] where the defendant is simply aware that it is benefiting, that is enough"; no additional causal connection is required. 76 F.4th at 565. Because there exists "no footing in the statutory text" for this additional causation requirement, *id.*, "*Geiss* is an outlier whose gloss on 'knowingly benefits' has been rejected by virtually every other court." *Id.* at 565 n.20 (collecting cases).[18] And it has been called into question (and not followed) even in this District. *See Kitler*, 2025 WL 2209870, at *13-14; *Deutsche Bank*, 671 F. Supp. 3d at 406.

Defendants assert it would excise "knowingly" from the statute if a beneficiary defendant could be liable without knowing the benefit is linked to trafficking. MTD 28. But this cramped reading of "knowingly" ignores that courts routinely find liability where a "defendant 'knew it was receiving some value from participating in the alleged venture.'" *A.D. v. Choice Hotels Int'l, Inc.*, 2023 WL 2991041, at *3 (M.D. Fla. Apr. 18, 2023) (citation and quotation omitted). Defendants' interpretation also improperly grafts a heightened nexus requirement into §1595, since the statute ties the knowing benefit to "participation in a venture," not to the act of trafficking. Courts have squarely rejected Defendants' approach because it would "read[] out the 'should have known' language" in the law. *See B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *4 (N.D. Cal. July 30, 2020) (requiring a link between the benefit and the TVPRA violation would "read[] a requirement for 'actual knowledge' ... into the civil statute").

---

[17] The other case Defendants cite, *Corradino v. Liquidnet Holdings Inc.*, 2021 WL 2853362, at *4 (S.D.N.Y. July 8, 2021), simply follows *Geiss* without independent analysis.

[18] *See also*, *e.g.*, *Timko*, 2025 WL 2162470, at *8-9; *Doe v. Wyndham Hotels & Resorts, Inc.*, 2025 WL 824369, at *7 (S.D. Cal. Mar. 14, 2025) (collecting cases); *Choice Hotels Int'l*, 725 F. Supp. 3d at 777; *Mitchell v. Grand Hotel, Inc.*, 2024 WL 3378035, at *4-5 (W.D. Wis. July 11, 2024).

While it is not necessary to allege a knowing benefit from the trafficking itself, *see*, *e.g.*, *Kitler*, 2025 WL 2209870, at *13 (considering and rejecting *Geiss* in light of "most district courts, and several Circuits" having done the same), Plaintiffs do plausibly allege stadium construction involved the Venture's systematic exploitation of Plaintiffs—and tens of thousands of other migrant laborers who were treated as "modern slaves." *See* ¶2. And it is reasonable to infer Defendants had contractual, or at least implicit, incentives to ensure cheap and consistent labor remained available without restriction, so the stadiums could be delivered in time for the World Cup, at a price point acceptable to Defendants' and Plaintiffs' Employers' mutual clients in Qatar. Plaintiffs thus sufficiently allege Defendants knowingly benefitted under either interpretation of the statute.

### D.    Plaintiffs Sufficiently Allege Underlying Violations of the TVPRA.

An individual who is a victim of a violation of §1589 or §1590 "may bring a civil action against ... whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [§1589 or §1590]." 18 U.S.C. §1595(a). §1589 prohibits obtaining labor by means or threats of use of force, serious harm, abuse of law or legal process, or "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. §1589(a)(1)-(4). Confiscation of passports is an indication of "abuse of law or legal process," for purposes of a §1589 claim. *See Sulaiman v. Laram*, 2017 WL 11659746, at *4 (S.D.N.Y. Apr. 4, 2017); *see also Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 525-26 (D. Md. 2016); *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 28 (D.D.C. 2016). §1590 prohibits "knowingly recruit[ing], harbor[ing] transport[ing], provid[ing], or obtain[ing] by any means, any person for labor or services in violation of this chapter." 18 U.S.C. §1590(a). A

29

"false promise[] of fair working conditions and appropriate compensation" can violate §1590. *Lipenga*, 219 F. Supp. at 526).

Defendants wrongly assert Plaintiffs' §1590 trafficking claim fails as a matter of law. MTD 29. Plaintiffs each allege they were lied to about the terms and conditions of their living and working conditions in Qatar, and that they agreed to go to Qatar under false pretenses. ¶¶8-9, 151, 188-294. Plaintiffs also allege they were not paid what they were promised, furthering the lies that brought them there. ¶¶188-294. And each allege they were trapped in Qatar after being tricked into going there. *Id.* Plaintiffs' allegations suffice under Rule 8; no additional allegations about specific trafficking conditions are required.

Despite Defendants' wish to require a "separate act of recruitment," to maintain a §1589 forced labor claim, MTD 30-32, no such requirement exists. Plaintiffs here allege they were lied to by recruiters who tricked them to go to Qatar, where they were forced to labor. Plaintiffs' allegations contain sufficient detail regarding, for instance, their passports being taken, that they were forced by their employers to work interminable hours and to live in inhumane conditions, and that they were not allowed to leave (and thus had to work) because they did not have their passports. ¶¶188-294. That is enough.

Defendants single out A.A. and characterize his allegations as mere "legal conclusion[s]," MTD 31-32. But that ignores his detailed factual allegations and the broader venture-wide allegations that support his claims. *See* ¶¶145-60. A.A. alleges Venture participants confiscated his passport upon arrival, preventing him from leaving Qatar or his job; forced him to work over 16 hours daily through exhaustion; withheld promised wages; and subjected him to inhumane living conditions. ¶189. Further, the fact that each Plaintiff alleges similar violations of the TVPRA

makes even more reasonable the inference that each Plaintiff's specific claims are true: If they were happening elsewhere, to others, it gives credence that it happened to each Plaintiff as well.

Defendants complain Plaintiffs' allegations are passive voice, vague, and repetitive. MTD 30, and quibble that Plaintiffs have not stated with particularity how, who, or what caused them to "work through exhaustion." MTD 30. But no heightened pleading standard applies and under Rule 8 Plaintiffs need only make a "short and plain statement" of their claim sufficient to put Defendants on notice of its basis. *Arista Recs.*, 604 F.3d at 120. In any event Defendants are wrong: Plaintiffs clearly allege their Employers took their passports and forced them to work and live in the conditions in violation of the TVPRA. *See, e.g.*, ¶189.[19] And Plaintiffs are aware of no case that requires a plaintiff to spell out the identities of every wrongdoer in an unlawful venture. *Cf. Gilbert v. United States Olympic Comm.*, 2019 WL 1058194, at *21 (D. Colo. Mar. 6, 2019) (rejecting application of Rule 9(b) specificity), *report and recommendation adopted in part, rejected in part*, 423 F. Supp. 3d 1112 (D. Colo. 2019). Even without stating specifically that the recruiters in the Philippines and Plaintiffs' Employers are the ones who trafficked them and forced them to labor, those inferences are reasonable, and sufficient at the motion to dismiss stage.

All of Plaintiffs' cumulative allegations, taken together, support reasonable inferences that each Plaintiff states baseline claims regarding violations of §1589 and §1590. Another court, in *F.C.*, examined the nearly identical allegations of many of the Plaintiffs in this case and determined:

---

[19] Defendants wish the Court would ignore Plaintiffs' allegations that Venture participants took their passports, MTD 32-33, but Plaintiffs have reason to believe that their Employers took their passports because their Employers were the ones they dealt with upon their arrival in Qatar, and it is logical to assume and infer the Employers took the passports. Plaintiffs' claims should not be dismissed simply because they cannot name, by name, who took their passports, and Defendants point to no case that holds otherwise.

> [E]ach Filipino plaintiff alleges that his stadium-building employer,
> along with other venture participants, confiscated his passport upon
> arrival in Qatar to prevent him from leaving the employer or the
> country until the end of the contract.... Each plaintiff also alleges
> inhumane living conditions ... while being forced routinely to work
> overtime.... The plaintiffs' allegations of TVPRA violations suffice.

2025 WL 1766069, at *19. This Court should do the same.

## II.    Plaintiffs Adequately State a Claim Under New York State Law.

New York's labor trafficking statute makes it a crime to "compel[] or induce[] another to

engage in labor or recruits, entices, harbors, or transports such other person by means of

intentionally ... withholding, destroying, or confiscating any actual or purported passport, ... [or]

using force or engaging in any scheme, plan or pattern to compel or induce such person to engage

in or continue to engage in labor activity." N.Y. PENAL LAW §135.35 (McKinney). A victim of that

provision "may bring a civil action against ... whoever knowingly advances or profits from, or

whoever should have known he or she was advancing or profiting from, an act in violation of" the

provision. N.Y. SOC. SERV. LAW §483-bb (McKinney). As just stated, Plaintiffs have plausibly

alleged they were trafficked and forced to work, including by being lied to and having their

passports taken from them, and have plausibly alleged Defendants knowingly benefited from

participating in the Venture that did so.

## III.   Plaintiffs Have Article III Standing.

Plaintiffs allege a constitutionally sufficient link between their injuries and Defendants'

conduct. Under the TVPRA, the only necessary connection between Defendants' conduct and

Plaintiffs' injuries is Defendants' knowing participation in the trafficking venture that injured

Plaintiffs. This kind of vicarious liability is widespread in both common and statutory law and is

well within Congress's power to impose under Article III—as the D.C. Circuit recently held when

rejecting Defendants' theory, *see Doe 1 v. Apple Inc.*, 96 F.4th 403, 409-12 (D.C. Cir. 2024) ("*Apple*

*II*"), and as a court in another District similarly decided when examining Plaintiffs' related claims, *see F.C.*, 2025 WL 1766069, at \*2-5.

Article III causation is a threshold requirement of "no more than de facto causality, a standard that is, of course, lower than for proximate causation." *Ateres Bais Yaakov Academy of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352-53 (2d Cir. 2023) (citations omitted). It is "not an onerous standard," *id.*; it requires only that the plaintiff's injury be "fairly traceable" to the defendant's conduct—not that such conduct directly cause the injury or be the "very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997); *see also*, *e.g.*, *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55-56 (2d Cir. 2016) ("A defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing.") (citation omitted). It need not be the sole or even the primary cause of the injury. *E.g.*, *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1244-45 (10th Cir. 2021). That said, the injury may not "result [from] the independent action of some third party." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992) (citation omitted). Finally, when assessing standing, the court must accept plaintiffs' allegations as true and assume plaintiffs will prevail on the merits. *See Apple II*, 96 F.4th at 409-11 (citation omitted).

The TVPRA does not require plaintiffs to prove that a particular defendant directly caused their injuries. Instead, trafficking victims may sue both "perpetrators"—traffickers who directly harmed the plaintiffs—*and* "whoever knowingly benefits ... from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPRA. §1595(a). That is, trafficking victims have a "private right of action" to sue both the slavers and "defendants who are involved ***indirectly*** with slavery" via participation in the trafficking venture. *Nestlé USA Inc. v. Doe*, 593 U.S. 628, 638 (2021) (emphasis supplied). The TVPRA's broad

"indirect" liability reflects Congress's "recogni[tion of] a causal link between the injury of forced labor and actors who indirectly facilitate it" by participating in a venture that violates the TVPRA. *Apple II*, 96 F. 4th at 412.

It is that "causal link" between trafficking and those who indirectly facilitate it that Defendants argue violates Article III, because it imposes liability on venture participants for injuries caused by what Defendants characterize as the "independent action of some third party"— *i.e.*, the "perpetrators" directly liable under the statute. MTD 35. Indeed, Defendants try to point to independent links in the causal chain in which third parties intervene. MTD 36. And Defendants argue Plaintiffs plead "an indirect and highly attenuated connection between Defendants' conduct and Plaintiffs' injuries," and thus do not "plausibly establish[] the requisite causal nexus." MTD 35. But Defendants mischaracterize the TVPRA, Plaintiffs' allegations, and Article III.

Neither the TVPRA nor Plaintiffs would impose liability on Defendants for "independent" acts of "third parties." The direct "perpetrators" under §1595(a)—which include Plaintiffs' direct Employers, *e.g.*, ¶¶2, 189-294, 300—are not "third parties" acting "independently" and thus breaking the chain of injury causation. Rather, they are participants in the same "venture" as the Defendants—a venture that has "engaged in a violation of" the TVPRA, and from which Defendants benefited. Under §1595(a), *participants* like Defendants are liable not as direct tortfeasors but as *co-venturers* with "perpetrators" of trafficking injuries. That distinguishes TVPRA venture liability from the "independent third party" cases on which Defendants rely.[20]

The question is whether the statutory causal chain of liability Congress created—imputing

---

[20] MTD 35-39 (citing *Idrobo v. Microsoft*, 2025 WL 662697(S.D.N.Y. Feb. 28, 2025); *Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178 (2d Cir. 2019), *cert. granted, judgment vacated*, 141 S. Ct. 1262 (2021); *Farrakhan v. Anti-Defamation League*, 2025 WL 24066 (2d Cir. Jan. 3, 2025)).

liability from trafficking "perpetrators" to their knowing co-venturers—falls "outside the limits of the Constitution" under Article III. MTD 34. It does not. The Supreme Court held in the context of Article III's "injury" requirement that Congress's power to create previously unrecognized forms of statutory injury is bounded only by the need for a "close historical or common-law analogue" to the statutory injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021); *see also Salazar v. Nat'l Basketball Ass'n,* 118 F.4th 533, 541 (2d Cir. 2023). Defendants fail to acknowledge this standard, and for good reason: Multiple "close historical or common-law analogues" exist for TVPRA venture liability. TVPRA venture liability is a form of *vicarious* liability, in which a party is legally responsible for another's wrongdoing "because of the party's relationship to the wrongdoer."[21] Examples from common law include aiding and abetting (liability for providing "knowing and substantial assistance" to the direct tortfeasor[22]), conspiracy (liability for "reasonably foreseeable acts" of a co-conspirator "taken to further the conspiracy"[23]), joint venture (liability for actions of "all participants" in the venture[24]), and *respondeat superior* (employer liability for employee torts "committed ... in the scope of their employment"[25]).

Under *TransUnion*, the TVPRA's similarity to established causes of action forecloses Defendants' Article III challenge. Just last year, the D.C. Circuit—faced with this exact Article III argument—identified aiding-abetting as a sufficiently "close historical or common-law analogue" to TVPRA liability to satisfy Article III, applied *TransUnion*, and held that because "[t]he TVPRA's causal chain for a 'venture' has a 'close relationship' to lawsuits that would be

---

[21] 1 Am. L. of Torts §4:1 n.3 (citation omitted).

[22] *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491 (2023).

[23] *Id*. at 496.

[24] *E.g.*, *Barton v. Waechter, L.L.C.*, 2008 WL 11439344, at *3 (D. Kan. Jan. 3, 2008) (citation omitted).

[25] Restatement (Second) of Agency §219(1) (Mar. 2024 update).

cognizable" at common law, "Congress's decision to establish such liability in the TVPRA is ... consistent with Article III." *Apple II*, 96 F.4th at 410-11. Defendants cite *Apple II* repeatedly for other propositions but are tellingly silent about this one.

Finally, Defendants mischaracterize Plaintiffs' allegation regarding passport confiscation to mean that such confiscation was inevitable, severing any necessary causality. This argument is irrelevant to venture liability for all the reasons given above. Even if that were not so, it would not support dismissal. Plaintiffs plausibly allege that there was substantial pressure on Qatar to reform, ¶¶4, 6, 45, 88, and there was cacophonous media attention on labor abuse issues, *e.g.*, ¶¶145-46, 157, and so it is not speculative to allege that Defendants maintained the environment that allowed for labor abuses to continue—indeed it was the entire reason they were hired by their Qatari clients. Defendants assert Plaintiffs have not alleged enough about whether labor reform was slowed by Defendants' acts, MTD 35-36, and that Plaintiffs must allege that Defendants' acts to refute accusations of labor abuses actually succeeded, MTD 36-37, but it is not speculative to allege, at the pleading stage, that Defendants' efforts helped sustain an environment in which labor abuses could continue. *See, e.g.*, *F.C.*, 2025 WL 1766069, at *4 (noting that even "indirect" harm does not preclude standing if plaintiffs allege defendants participated in the venture, the venture harmed the plaintiffs by forcing their labor in violation of the TVPRA and, thus, the harm is fairly traceable to the defendants).

For all these reasons, Plaintiffs have amply discharged their "relatively modest" burden to demonstrate Article III standing. *Bennett*, 520 U.S. at 171.

## IV.    Extraterritorial Application of the TVPRA Is Proper, and Plaintiffs in Any Event Seek Domestic Application.

Defendants' extraterritoriality argument is wrong. The only Court of Appeals to consider the issue held that the TVPRA applies extraterritorially. Specifically, the Fourth Circuit directly

considered and rejected the very arguments Defendants make here. *Roe v. Howard*, 917 F.3d 229, 239-44 (4th Cir. 2019); *see also Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 200, 205 (5th Cir. 2017) (noting parties' concession that the 2008 amendment to the TVPRA "enables federal courts to entertain a private party's civil suit that alleges extraterritorial violations of the TVPRA" but holding this expansion of extraterritorial jurisdiction to civil claims applies only to claims arising after the 2008 amendments). Since 2008, when the TVPRA was amended to provide for extraterritorial jurisdiction, no Court of Appeals (and only one district court of which Plaintiffs are aware) has accepted Defendants' argument. Meanwhile, another court directly examined this argument in relation to many of Plaintiffs' claims and allowed them to proceed. *F.C.*, 2025 WL 1766069, at *9-14. This Court should follow the majority approach, including the well-reasoned decision of the Fourth Circuit in *Howard*, and find that the TVPRA civil cause of action applies extraterritorially. Even if this Court were to conclude otherwise, it would not matter: Plaintiffs' allegations establish that domestic application of the statute is appropriate and thus do not implicate extraterritoriality at all. Either way, Defendants' challenge must fail.

## A.    The TVPRA Civil Cause of Action Applies Extraterritorially.

Under the extraterritoriality analysis endorsed by the Supreme Court in *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016), the TVPRA applies extraterritorially. Here, "the most obvious textual clue" is that the statute includes "a number of predicates that plainly apply to at least some foreign conduct." *Id.* at 338. Taken as a whole, the statutory text, structure, and context provide "a clear, affirmative indication that it applies extraterritorially." *Id.* at 337.

By providing a civil remedy for any "victim of a violation of [Chapter 77]," §1595 directly incorporates predicate offenses that govern foreign conduct. Predicate offenses found in Chapter 77 include, for instance, peonage, slavery, and trafficking in persons. This provides "strong textual evidence of its extraterritorial effect." *Howard*, 917 F.3d at 241 (citation omitted). Congress's

decision to include such "extraterritorial predicates" for the private right of action provides a "clear, affirmative indication" that §1595 provides a civil remedy for foreign conduct. *Id.* at 242 (quoting *RJR Nabisco*, 579 U.S. at 339); *see also F.C.*, 2025 WL 1766069, at *10 (finding that Congress's incorporation of extraterritorial predicates into Section 1595 gives a "clear, affirmative indication that § 1595 provides a civil remedy for the foreign conduct that is prohibited by the TVPRA" (citations omitted; cleaned up)).

Confirming this interpretation, §1596 provides for "additional jurisdiction" and expressly extends "extra-territorial jurisdiction" over specified offenses when committed by a U.S. national or a person "present in" the United States. Section 1595, in turn, authorizes victims to bring a civil action for violations of those same offenses. Read together, these two provisions evidence a clear intent to extend extraterritorial jurisdiction over certain offenses committed abroad and to provide a coextensive civil remedy. Defendants complain that §1596 does not expressly cross-reference §1595 in its list of offenses, but that would have been illogical because §1595 does not define the underlying violation. Instead, §1595 provides a civil remedy for offenses defined elsewhere. Moreover, because §1595 *already* provided a civil remedy coextensive with the TVPRA's predicate criminal provisions, it would have been redundant to list §1595 within §1596. Logically, all Congress had to do to extend §1595's civil remedy extraterritorially was change the extraterritorial scope of the criminal offenses to which it referred.

The context of the statute—human trafficking, a violation of international law that often involves cross-border conduct—provides an additional indication that Congress intended the TVPRA civil remedy to apply to extraterritorial conduct. *See Howard*, 917 F.3d at 242 ("Congress was clearly concerned with international rather than purely domestic matters."); *see also id.* (noting that the TVPRA's "stated purpose and accompanying congressional findings demonstrate that

Congress enacted it to address the problem of human trafficking 'throughout the world'" (quoting Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386 §102(b)(1), 114 Stat. 1464, 1466) ("TVPA 2000")). Indeed, when Congress added the civil remedy to the TVPRA, it highlighted the challenge of "responding to the needs of victims of trafficking in the United States **and abroad**." Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193 §2(2), 117 Stat. 2875 (emphasis supplied); *see id.* §4(a)(4)(A), 117 Stat. at 2878  (codifying civil remedy).

Another district court considered the legislative history and noted "Congress added the jurisdictional expansion ... shortly after two courts considering TVPRA civil suits held the provisions were not extraterritorial." *Ratha v. Phatthana Seafood Co.*, 2016 WL 11020222, at *5 (C.D. Cal. Nov. 9, 2016) (*Ratha I*") (citations omitted) (reviewing legislative history). That court concluded,

> [w]ith respect to the TVPRA's extraterritorial jurisdiction, **Congress's intent is clear**.... Congress has clearly indicated that it intends the TVPRA, unlike statutory schemes that are silent on extraterritorial jurisdiction, to be a unified statutory scheme of interlocking provisions that provides extraterritorial jurisdiction over specific predicate offenses **and further expressly provides for restitution and a civil remedy** whenever a court in the United States has that jurisdiction.

*Id.* (emphasis supplied; citations omitted).[26] Members of Congress confirm this conclusion, as they explained in an amicus brief, "the TVPRA, including its private right of action, applies to extraterritorial conduct provided that a defendant is a U.S. national or permanent resident, or is present in the United States." *See* Br. for Members of Congress Sen. Blumental, Rep. Smith, *et al.*,

---

[26] The Ninth Circuit left this conclusion intact. *See Ratha II*, 35 F.4th at 1168 ("[W]e assume without deciding that Plaintiffs are correct and that § 1595 permits a private cause of action for extraterritorial violations of the substantive provisions listed in § 1596."); *see also id.* at 1168 n.5. *See also* 143 S. Ct. 491 (2022) (*cert. denied*).

as Amici Curiae Supporting Respondents, *Nestlé USA, Inc. v. Doe*, 593 U.S. 628 (2021) (Nos. 19-416 & 19-453), at 32. The court in *F.C.* considered all this and Plaintiffs' claims and agreed with the Fourth Circuit that "the purpose, structure, history, and context of the TVPA militate toward the extraterritorial application of § 1595." *F.C.*, 2025 WL 1766069, at *10 (citing and quoting *Howard*, 917 F.3d at 241).

In *Howard*, the court held the presumption against extraterritoriality of the TVPRA's civil remedy is rebutted at *RJR Nabisco* step one, which asks "whether the statute gives a clear, affirmative indication that it applies extraterritorially." 579 U.S. at 337. The *Howard* court held the TVPRA civil remedy contains a clear affirmative indication of extraterritorial application because it incorporates extraterritorial predicates. *See* 917 F.3d at 242; *see also Adhikari*, 845 F.3d at 204 (noting without holding that the TVPRA civil remedy applies extraterritorially).

Defendants' argument that extraterritorial jurisdiction does not extend to civil actions under the TVPRA "has been overwhelmingly rejected by the courts." *Ratha*, 2016 WL 11020222, at *6 (collecting cases); *see also C.T. v. Red Roof Inns, Inc.,* 2021 WL 2942483, at *8 (S.D. Ohio July 1, 2021); *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 132 (D.D.C. 2024) ("the Court finds that section 1595 expressly and by its own terms incorporates offenses that themselves have extraterritorial application ... and that there is a clear indication that the civil remedy was meant to apply extraterritorially"); *C.T. v. Red Roof Inns, Inc.*, 2021 WL 602578, at *4 (S.D. Ohio Feb. 16, 2021) ("Section 1596(a) allows foreign plaintiffs to bring suit for conduct occurring outside of the United States, so long as a court has personal jurisdiction over the defendants"); *Abafita v. Aldukhan*, 2019 WL 6735148, at *5 (S.D.N.Y. Apr. 4, 2019) ("The TVPRA has extraterritorial effect.... By conferring extra-territorial jurisdiction over any offense ... under the TVPRA, § 1596 permits private parties to pursue a civil remedy under the TVPRA for

extraterritorial violations." (cleaned up; citations and quotations omitted)); *Adhikari v. KBR Inc.*, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017) (discussing the civil remedy under the TVPRA, and the 2008 amendment, and noting that "Congress ... extended the remedies for forced labor and trafficking to apply extraterritorially").

Defendants point to two unpublished decisions from one district court. *See Doe I v. Apple Inc.*, 2021 WL 5774224, at *14 (D.D.C. Nov. 2, 2021) ("*Apple I*"), *aff'd on other grounds sub nom. Apple II*, 96 F.4th 403; *Mia et al. v. Kimberly-Clark Corp.*, 2025 WL 752564 (D.D.C. Mar. 10, 2025), *appeal pending*. As just discussed, those decisions (and their focus on the "offenses" language in Section 1596) are anomalies. Indeed, the D.C. Circuit, when it had the opportunity to do so, neither adopted nor endorsed this minority view. *See Apple II*, 96 F.4th at 414 n.4; *see also*, *e.g.*, *ManTech Int'l Corp.*, 752 F. Supp. 3d at 133 (another court in *Apple I*'s District declined to adopt its extraterritoriality holding). This Court should follow the majority and hold that the TVPRA civil remedy applies extraterritorially.

### B. Should the Court Find the TVPRA's Civil Remedy Does Not Apply Extraterritorially, Plaintiffs Seek Domestic Application.

The second step of the *RJR Nabisco* analysis considers the statute's "focus": "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." 579 U.S. at 337. Here, the "focus" of Defendants' culpable conduct—participating in and knowingly benefiting from a venture that engaged in trafficking violations—"occurred in the United States," so this would be a "permissible domestic application even if other conduct occurred abroad." *See id*. Indeed, where the alleged wrongful act "gives rise to a cause of action," a court should consider "the 'gravamen' of ***that*** alleged wrongful conduct rather than any harm that may result elsewhere." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022) (emphasis in original).

Plaintiffs plausibly allege Defendants did work in furtherance of, and knowingly benefited from, the Venture in the United States. They filed FARA disclosures saying they were working from the United States on the Venture. ¶¶67-68, 84, 111, 124-26, 128, 132, 186. Specific employees disclosed their Venture work done from the United States, ¶67 (Portland's Managing Partner Charles McLean), ¶68 (other Portland employees in New York), ¶69 (Portland employees in Washington, D.C.), ¶120-23 (OPRW employees in New York). And they were responsible for other key Venture acts in the United States. *E.g.*, ¶88 (Omnicom hosted a propaganda meeting for the Supreme Committee); ¶98 (Omnicom worked with Portland and Mercury employees who ran the "war room" at the Qatari Embassy); ¶186 (Ogilvy employees reached out to New York media). On top of that litany of domestic conduct, Defendants also benefitted domestically. ¶186. Defendants took credit for working on the Venture through domestic channels, ¶187, benefitting within the United States for their work on such a high-profile project, and were paid millions, ¶185-86. Each is a domestic violation of the TVPRA.

For all these reasons, the focus of *Defendants'* acts and their benefits were domestic. Plainly the "focus" of what Plaintiffs allege *Defendants* did—participating in and knowingly benefiting from a venture that engaged in trafficking violations—"occurred in the United States." *RJR Nabisco*, 579 U.S. at 337. And the "gravamen" of wrongs that Defendants committed, indeed their inculpating acts, were domestic, regardless of if Defendants' co-Venturers committed wrongs in Qatar. *See Rodriguez*, 29 F.4th at 716. As such, Plaintiffs seek a permissible domestic application of the TVPRA.

## V.    Plaintiffs Do Not Seek Extraterritorial Application of New York Law.

Plaintiffs seek domestic application of the New York law providing civil liability for advancing or profiting from slave labor. A New York state defendant is liable under N.Y. Soc. Serv. Law §483-bb if it "knowingly advances or profits from," or "should have known [it] was

advancing or profiting from, an act in violation of" the New York criminal code provision, N.Y. PENAL LAW §135.35, which prohibits, among other things, compelled labor and confiscating passports. Defendants protest that there is no extraterritorial application to these provisions, but the New York law, on its face, allows a civil litigant to bring an action against New York defendants who advance or profit from the prohibited acts. Defendants point to *Smith v. AECOM Tishman*, a case considering a civil claim for an employment dispute abroad, but that case did not consider (or decide) whether a plaintiff could sue a defendant for its "advance[ment] and profit[] from" violative acts *in New York,* under §483-bb. *See* 2023 WL 2734430, at *5 (S.D.N.Y. Mar. 30, 2023), MTD 43. As just explained *supra* IV.B, Defendants both advanced and profited from acts in violation of N.Y. PENAL LAW §135.35 while *in New York*, so that is culpable conduct under New York law and a plain reading of §483-bb.

## VI.    The Act of State Doctrine Does Not Prohibit Plaintiffs' Claims.

The act of state doctrine bars U.S. courts from declaring invalid, and thus ineffective as a rule of decision, the official act of a foreign sovereign. *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). "It is not a categorical rule of abstention that prohibits courts from deciding cases or controversies whenever issues of foreign relations arise" and "should not ... be casually expanded 'into new and uncharted fields.'" *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019) (quoting and citing *Kirkpatrick*, 493 U.S. at 409). "[W]hen the *validity* of a foreign state's action is not the question being litigated, and the inquiry is simply whether the *conduct in question occurred*, the act of state doctrine is not implicated." *Id.* at 59 (citation omitted; emphasis supplied); *see also Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 145 (2d Cir. 2022) (reasoning that when a claim depends not on "whether the alleged acts are valid, but whether they occurred" in a way that gives rise to liability, a plaintiffs' claims are not foreclosed by the doctrine (citations omitted)). And where there is no official government act in question—

*i.e.*, a "formality" such as a "statute, decree, order, resolution, or comparable evidence of sovereign authorization for any of the actions in question"—the doctrine is not triggered at all. *Kashef*, 925 F.3d at 60-61 (citations omitted).

Defendants assert Plaintiffs' claims necessarily call into question Qatar's conduct and demand this Court opine on it. MTD 44. Not so, there is nothing in the lawsuit that would require this Court to decide on the legality of Qatar's official acts performed within its boundaries. For instance, Defendants are wrong to say that this case requires the Court to find that "the *kafala* system ... violate[s] the TVPRA." *Id.* at 45. Rather, the Complaint alleges that the *kafala* system creates conditions that are ripe for forced labor, and that Defendants' knowledge of that system therefore shows their knowledge that the Venture used forced labor. Nor does the Complaint seek to challenge the legality of any "official act of a foreign sovereign" at all. *Kirkpatrick*, 493 U.S. at 405. Defendants grasp at straws, arguing it would be improper to say that Plaintiffs' Employers committed criminal violations of the TVPRA or New York state law. MTD at 46. But Plaintiffs' Employers' acts are not the same as the acts of the Qatari Regime, so the act of state doctrine is beside the point.

Defendants ask that this Court abstain, invoking the Administration's current diplomatic initiatives with Qatar, MTD 46 n.15, but act of state is not a broad abstention doctrine and the political environment is not relevant. *See Kashef*, 925 F.3d at 58. The doctrine is only invoked if there is a question in the litigation about the "validity" of an official government act of Qatar, a so-called "formality." *See id.* at 60-61. There is none, here, and since Plaintiffs seek to prove only *that Defendants did* what Plaintiffs allege—that is, prove the "conduct in question occurred"—act of state simply does not apply. *Id.* at 59.

**VII.    The First Amendment Does Not Shield Defendants from Liability.**

Although "[i]t is possible to find some kernel of expression in almost every activity a person undertakes ... such kernel is not sufficient to bring the activity within the protection of the First Amendment." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570 (1991) (citation and quotation omitted). As such, "not all categories of speech are protected by the First Amendment." *United States v. Schulte*, 436 F. Supp. 3d 747, 751 (S.D.N.Y. 2020) (citation omitted). This case falls squarely within several such unprotected categories.

For example, "laws not fairly characterized as regulating expression but instead regulating conduct do not trigger First Amendment scrutiny." *Volokh v. James*, 2025 WL 2177513, at *9 (2d Cir. Aug. 1, 2025). Additionally, "speech integral to criminal conduct" is a category that is not protected. *United States v. Hilliard*, 2024 WL 3634201, at *2 (2d Cir. Aug. 2, 2024) (citation and quotation omitted); *see also Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949). Indeed, "laws focused on criminal conduct ... raise no constitutional concerns even though they can be violated by means of speech." *U.S. v. Alvarez*, 617 F.3d 1198, 1212-13 (9th Cir. 2010). And this carve-out can apply in "non-criminal contexts" as well, so long as "the offense in question is defined by a valid statutory scheme promoting an important public interest." *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 223 (S.D.N.Y. 2000) (citations omitted). Finally, the First Amendment does not protect deliberately misleading speech. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009).

Plaintiffs' claims regulate Defendants' conduct. Plaintiffs allege Defendants actively monitored reporting regarding trafficked and forced labor and relayed those findings to their clients so that Defendants could lie, dissemble, minimize, and misrepresent the reality regarding labor abuses endemic to the Venture. ¶6. They did this by, among other things, embedding themselves with Qatar Foundation, ¶112, setting up a "war room" to monitor and respond to media, ¶98,

organizing and managing a misleading propaganda tour, ¶74, and helping their clients draft misleading or false responses about the labor abuse, *e.g.* ¶76. Defendants argue that Plaintiffs seek liability "exclusively" for speech acts. MTD 47-48. That is wrong, Plaintiffs allege significant *conduct* that does not trigger First Amendment protection. *See Volokh*, 2025 WL 2177513, at *9. What Defendants point to as "speech acts" are simply evidence of participation—they show that Defendants participated, by doing non-speech acts, but their speech acts verify (and admit) they did that conduct. *See*, *e.g.*, MTD 47 (citing ¶70, in which Plaintiffs allege that Portland employes "loudly and publicly announced" acts they did such as "manag[ing] daily media monitoring"). There is some speech, to be sure, but most of what Defendants point to is the *evidence* of participation, rather than the inculpatory acts triggering liability. Defendants' participation in the Venture is therefore not protected speech—it is paid-for conduct creating liability because it was meant to further the Venture's goal of continuing to use trafficked and forced labor. ¶65.

Defendants cite no case (and Plaintiffs know of none) where a TVPRA claim was dismissed on First Amendment grounds. This is likely because the speech at issue here is "integral" to a federal civil (and criminal) statutory regime which promotes an important public interest. *See Giboney*, 336 U.S. at 502; *Universal City Studios*, 82 F. Supp. 2d at 223. Plaintiffs seek to impose liability for the harms of Defendants' commercial activities, many of which were done in Qatar and on behalf of foreign entities, and which furthered and promoted human trafficking. ¶65. Because the statutory scheme furthers this public interest, and because the acts Defendants point to as speech are integral to their liability, those speech acts get no First Amendment protection.

And while it is also true that lobbying is entitled to special First Amendment protection, MTD 49 (citations omitted), lobbying with deliberately misleading content is not protected. *See Philip Morris USA*, 566 F.3d at 1123. Further, lobbying is only part of conduct, and even if that

were excluded from the battery of ways in which each Defendant allegedly participated, there is still more than enough to hold each Defendant liable as a knowing beneficiary in the Venture. To be sure, Plaintiffs point to Mercury's lobbying efforts as evidence of Omnicom and Portland's "'broad remit,' ranging from 'government affairs through to nation branding,' including by providing Qatar public relations and media management services." ¶19. The fact that Mercury was involved in lobbying (and the subjects upon which it was lobbying, and the acts it took to do so) further demonstrates the extent to which Defendants were *involved in the Venture*.

Finally, Defendants present the straw man that Plaintiffs would seek liability for anyone that "ever [spoke] in defense of Qatar," which would be "incompatible with the First Amendment." MTD 50. That caricature is nowhere close to Plaintiffs' position. Rather, Plaintiffs allege specifically that Defendants are liable because they knowingly received financial benefits for crafting a misleading and false marketing and public relations campaign to sportswash trafficked and forced labor, as part of a commercial venture that was meant to further labor exploitation. ¶65. These acts are doubly unprotected: (1) they are *conduct* adjacent to the illegal and criminal act of knowingly benefiting from participation in a trafficking venture; and (2) they involved knowingly misleading and false commercial speech. *See Philip Morris USA*, 566 F.3d at 1123. That is a far cry from the hypothetical person unaffiliated with the trafficking venture who speaks their mind in support of Qatar.

## VIII.  Memac Ogilvy Is Subject to Personal Jurisdiction in this Court.

Defendants concede personal jurisdiction as to all Defendants except Memac Ogilvy, an entity incorporated in the United Arab Emirates. Defendants' arguments notwithstanding, personal jurisdiction over Memac Ogilvy is appropriate under §1595(a) and Federal Rule of Civil Procedure 4(k)(1)(A) or, in the alternative, Federal Rule of Civil Procedure 4(k)(2).

## A.    Memac Ogilvy Is Subject to Jurisdiction Under the Laws of New York.

Memac Ogilvy is subject to personal jurisdiction under Rule 4(k)(1)(A), which permits jurisdiction over defendants who have been served and who are subject to long-arm jurisdiction in the courts of (in this case) New York state. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167-68 (2d Cir. 2013). Under the New York long-arm statute, a court may exercise personal jurisdiction over any nonresident "who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state," N.Y. C.P.L.R. §302(a)(1), where "the claim asserted … arise[s] from that business activity." *Licci*, 732 F.3d at 168 (quotation omitted).[27] Both requirements are met here.

The first step of the jurisdictional inquiry is not in dispute: Defendants do not deny that Memac Ogilvy "transact[ed] … business within" New York both by itself and through agents by reaching into New York to satisfy its contractual obligations.[28] *See* MTD 51-52 (arguing only that Memac Ogilvy's alleged New York contacts fail the claim-relatedness requirement).

---

[27] New York contacts that satisfy the requirements of §302(a)(1) may theoretically be insufficient to satisfy constitutional minimum contact requirements, but such a case would be "rare" and "perhaps unprecedented." *Bartlett v. Société Générale De Banque Au Liban Sal*, 2020 WL 7089448, at *6 (E.D.N.Y. Nov. 25, 2020). Memac Ogilvy has not asserted any due process argument, and so has forfeited it.

[28] Nor could it do so. Plaintiffs allege, for example, that Memac Ogilvy reached into New York to collaborate directly with "Ogilvy's New York office," and specifically with Jennifer Risi, an OPRW employee who was "worldwide managing director-media influence" and "head[ed] Ogilvy's New York team." ¶120. Similarly, Ogilvy's FARA filings, in which Ogilvy, while headquartered in New York, disclosed its work for the Qatar Foundation, to perform work related to the Memac Ogilvy contract, including "engag[ing] U.S. media" and "engag[ing] interested reporters and editors to help shape resulting coverage." ¶128. And other New York employees and Ogilvy individuals did work for Memac Ogilvy in furtherance of the Venture. *See* ¶132. It is more than enough that Defendants admit Memac Ogilvy reached into New York—in their words, quoting the FARA Ogilvy filed, it "engaged The Ogilvy Group in NY to provide support for U.S.-based media relations." MTD 8 (citing D.I. 57-1). The work conducted by Ogilvy personnel in New York in furtherance of Memac Ogilvy's contractual obligations to the Qatar Foundation constitutes the transaction of business here "through an agent" that "relates to" Plaintiffs' claims. Nothing more is necessary to support jurisdiction under §302(a)(1).

As to the second step—claim relatedness—Defendants argue that no part of Plaintiffs' claims arise from Memac Ogilvy's contacts with New York. MTD 51-52. But "arising from" is not an onerous requirement: it requires only that the claim is not "completely unmoored" from the jurisdictional contacts. *Peterson v. Bank Markazi*, 121 F.4th 983, 1004 (2d Cir. 2024) (citation omitted). That low bar is easily cleared here. Plaintiffs allege that Defendants, including Memac Ogilvy, orchestrated a media and public relations campaign to help sportswash the Venture's use of human trafficking, and Memac Ogilvy engaged in aspects of that orchestrated campaign in New York. *See* MTD 8 (admitting Memac Ogilvy reached into New York to do Venture work); *see also, e.g.*, ¶¶128-30. Memac Ogilvy's New York contacts can hardly be said to be "completely unmoored" from the broader sportswashing campaign of which they were a part.

Defendants do not even really argue otherwise, asserting that all they did in New York was provide "run-of-the-mill public relations and lobbying services." MTD 51. Plaintiffs dispute whether Memac Ogilvy's work was routine rather than specialized and tailored—a fact question that cannot be resolved on a motion to dismiss—but no matter: The New York acts in furtherance of the Venture are sufficient for personal jurisdiction, regardless. The law does not require that the New York contacts be the primary basis for Plaintiffs' claims, or even that they be independently wrongful. Mere "relation" to the claims is enough. Plaintiffs' allegations are sufficient under *Licci*, because the TVPRA makes it unlawful to participate in a venture and Plaintiffs allege Memac Ogilvy did that in New York.

Finally, Defendants devote much of their jurisdictional argument to rebutting a jurisdictional theory based on veil-piercing. MTD 52-54. This argument misses the mark. Plaintiffs do hinge personal jurisdiction on the argument that the Ogilvy and Memac Ogilvy entities are one and the same. Rather, Plaintiffs reasonably allege the "coordinated activities" of the two companies

49

"indicate an affiliation closer than that of unrelated corporations," and this "affiliation" "lends its weight to a determination that personal jurisdiction may be imposed over [Memac Ogilvy] based on its activities" in New York conducted with and through other Ogilvy entities. *First Am. Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353, 363 (S.D.N.Y. 1997); *see also Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*, 2005 WL 3658006, at *5-6, *8 (D.N.J. June 7, 2005) (exercising specific jurisdiction over U.K. affiliate of "unified global accounting firm" based on its "close relationship" and work performed with affiliated U.S. office). This is conduct in New York via an agent, which is an express basis for exercising personal jurisdiction over the principal under C.P.L.R. §302(a). *E.g.*, *First Am. Corp.*, 988 F. Supp. )at 362-63. Plaintiffs need not pierce the corporate veil to adequately allege this Court has personal jurisdiction over Memac Ogilvy, and they have done so.

### B. If Jurisdiction Is Not Appropriate Under New York Law, Memac Ogilvy Is Subject to Jurisdiction Under the Federal Long-Arm Statute.

Plaintiffs believe that their allegations amply support personal jurisdiction under Rule 4(k)(1) and New York's long-arm statute. Even if the Court were to hold otherwise, however, jurisdiction would still be appropriate under the federal long-arm statute, Rule 4(k)(2). That Rule provides for federal-court jurisdiction over a defendant who is "not subject to jurisdiction in any state's courts of general jurisdiction" so long as "exercising [such] jurisdiction is consistent with the United States Constitution and laws." FED. R. CIV. P. 4(k)(2)(A). Jurisdiction is "consistent with the United States Constitution and laws" "so long as [it] comports with the Due Process Clause of the Fifth Amendment." *See Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 127 (2d Cir. 2008) (citations and quotation omitted). Both elements of Rule 4(k)(2) are satisfied here.

*First*, Memac Ogilvy does not assert that it is "subject to jurisdiction in any state's courts of general jurisdiction," and Plaintiffs plausibly allege Memac Ogilvy is incorporated and

headquartered abroad, and thus not subject to general jurisdiction in any state.[29] That is dispositive under Rule 4(k)(2).

*Second*, exercising jurisdiction over Memac Ogilvy is consistent with the Fifth Amendment's Due Process Clause. Until recently, the Second Circuit maintained that due process under both the Fifth and Fourteenth Amendments utilized the same "minimum contacts" test, except that Fourteenth Amendment due process looked to contacts with a specific state while the Fifth Amendment's looked to contacts with the United States as a whole.  *E.g.*, *Lensky v. Turk Have Lovari, A.O.*, 2023 WL 6173334, at *2-3 (2d Cir. Sept. 22, 2023). Recently, however, the Supreme Court conclusively "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment," holding that Fifth Amendment due process "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld v. Palestinian Liberation Org.*, 606 U.S. 1, 16 (2025).

Having conclusively interred the minimum contacts test in Fifth Amendment cases, the Court then asked what test applies. The *Fuld* plaintiffs argued that the Fifth Amendment imposes no limits on Congress's ability to hale foreign defendants into U.S. courts—and two concurring Justices agreed. *Id.* at 44-45 (Thomas, J., and Gorsuch, J., concurring in the judgment). However, the *Fuld* majority—without rejecting that "maximalist" argument—determined that the statute could be upheld on narrower grounds and so did "not purport to delineate the outer bounds" of the Fifth Amendment. 606 U.S. at 18. Specifically, the Court found it sufficient—although perhaps not necessary—that the statute "ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns." *Id.*; *see also id.* at 23 (finding due

---

[29] Plaintiffs submit herewith a certification confirming their understanding that, based upon the information available to them, Memac Ogilvy is not presently subject to personal jurisdiction in the courts of general jurisdiction of any state. *See* Kay-Oliphant Decl. ¶¶2-4.

process satisfied because "the statute ties the assertion of jurisdiction to predicate conduct that in and of itself bears a meaningful relationship to the United States").

Under that standard, this Court's assertion of jurisdiction over Memac Ogilvy poses no constitutional difficulty. As the Fourth Circuit has explained, the TVPRA "represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims"—one that "was clearly concerned with international rather than purely domestic matters." *Howard*, 917 F.3d at 242. Indeed, the precursor to the TVPRA expressly implicates U.S. foreign policy. For example, it provides for "actions against governments failing to meet minimum [anti-trafficking] standards," including barring such governments from receiving non-humanitarian U.S. aid, authorizing grants to foreign governments who fight trafficking, and "establish[ing] within the Department of State an Office to Monitor and Combat Trafficking." TVPA 2000 §110. Consistent with that, government agencies have characterized the TVPA and TVPRA as "key elements of the U.S. foreign policy response to human trafficking." *E.g.*, Michael Weber, Cong. Rsch. Serv., IF10587, Human Trafficking and U.S. Foreign Policy: An Introduction (Nov. 16, 2023).

Because §1595's civil remedy is available only against defendants who participate in and benefit from trafficking ventures that implicate important U.S. foreign objectives, exercising jurisdiction over such defendants does not violate the Fifth Amendment under *Fuld*. In any event, given that Defendants have not raised a Fourteenth Amendment due process objection, they have no conceivable argument that jurisdiction contravenes the "more flexible jurisdictional inquiry" appropriate to the Fifth Amendment. *Fuld*, 606 U.S. at 16.

## IX.    Plaintiffs' §1593 Restitution Claim Should Not Be Dismissed.

Section 1593(a) authorizes mandatory "restitution" "in addition to any other civil or criminal penalties" for "any offense" under the TVPRA. Defendants assert restitution "applies only

in criminal proceedings." MTD 54. Courts nationwide have rejected that interpretation. "***Nothing in the text*** of the statute suggests that restitution applies solely to criminal cases." *U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 201 (D. Md. 2019) (emphasis supplied); *see also F.C.*, 2025 WL 1766069, at *21 (similar); *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1171 (D. Kan. 2018) (Section 1593 "authorizes mandatory restitution for human trafficking victims"); *Dinsay v. RN Staff Inc.*, 2021 WL 2643639, at *2-3 (S.D. Ind. June 28, 2021) (rejecting argument that restitution is unavailable in the civil context); *Lipenga*, 219 F. Supp. 3d at 530-31 (ordering restitution in civil case); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457 (E.D. Va. 2015) (same). Thus, Plaintiffs' restitution claim should not be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

\*    \*    \*    \*

53

September 9, 2025

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ _____

Eli J. Kay-Oliphant
  eli.kay-oliphant@sparacinopllc.com
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530

Sean Grimsley (*pro hac vice*)
  sgrimsley@olsongrimsley.com
Jason Murray (*pro hac vice*)
  jmurray@olsongrimsley.com
Eric Olson (*pro hac vice*)
  eolson@olsongrimsley.com
Abigail Hinchcliff (*pro hac vice*)
  ahinchcliff@olsongrimsley.com
Olson Grimsley Kawanabe Hinchcliff & Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Tel: 303-535-9151

*Counsel for Plaintiffs*

</div>

## <u>CERTIFICATION OF WORD COUNT</u>

I, Eli J. Kay-Oliphant, an attorney duly admitted to practice law in this Court, hereby certify that Plaintiffs' Opposition to Defendants' Motion to Dismiss complies with the word count limit set forth in the Court's Order dated July 22, 2025 (D.I. 53) because it contains 17,213 words, excluding the parts exempted by Section 4(C) of the Court's Individual Rules and Practices in Civil Cases and Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this document.

Dated: September 9, 2025

_/s/_ _____

Eli J. Kay-Oliphant