UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                                 :

A.A. et al.,
                                                 :

                    Plaintiffs,          :

                                                 :           25-CV-3389 (JMF)

           -v-                       :

                                               :          <u>OPINION AND ORDER</u>

OMNICOM GROUP, INC. et al.,
                                                 :

                    Defendants.        :

                                               :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In 2022, Qatar hosted the World Cup.  The years before the competition saw a massive

amount of construction in the country, from new stadiums and housing to other infrastructure.

The 106 Plaintiffs in this case were among the thousands of foreign construction workers who

did this construction.  Claiming that they were trafficked to Qatar and forced to work there under

nightmarish conditions, they bring claims here under the Trafficking Victims Protection

Reauthorization Act (the "TVPRA" or "Act"), 18 U.S.C. §§ 1589, 1590, 1593, 1595, and

analogous provisions of New York law.  They do not, however, sue their employers in Qatar or

the people who allegedly trafficked them there.  Instead, they sue five public relations and

lobbying firms based on the firms' work on behalf of the Qatari government and related entities.

They claim that the Defendant firms played an integral role in enabling their abuse by covering

up, minimizing, and otherwise "sportswashing" their terrible working conditions, thereby

shielding Qatar from international criticism of its labor laws and working conditions.  ECF No. 1

("Compl."), ¶ 4.  Defendants now move, pursuant to Rules 12(b) of the Federal Rules of Civil

Procedure, to dismiss.  They argue that Plaintiffs lack standing to bring their claims, that the

Court lacks personal jurisdiction over one of the firms, and that Plaintiffs fail to state any valid claims. *See* ECF No. 54; *see also* ECF No. 55 ("Defs.' Mem."), at 1-3.

For the reasons that follow, the Court concludes that it has jurisdiction to address Plaintiffs' claims and that some, but not all, of their claims fail as a matter of law. Accordingly, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

Unless otherwise noted, the following facts are taken from the Complaint and assumed to be true for purposes of these motions. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

The Qatari labor market has historically operated through the *kafala* (sponsorship) system, in which millions of migrant workers' visas were tied to the employers who brought them to the country. Compl. ¶ 31. The *kafala* system has long been criticized for enabling Qatari employers to engage in abusive labor practices against migrant workers with impunity, secure in the knowledge that the workers had little recourse due to their dependence on their employers for legal status, jobs, housing, and food. *Id.* ¶¶ 3, 32.

In 2010, the Fédération Internationale de Football Association, better known as FIFA, awarded the 2022 World Cup to Qatar, which kicked off "the most ambitious infrastructure-development project in Qatar's history." *Id.* ¶ 1. Over the next decade, Qatar built a new airport, dozens of new hotels, several new state-of-the-art stadiums, and additional infrastructure to accommodate the anticipated crowds. *Id.* But Qatar had a problem: The World Cup was also shining a spotlight on the *kafala* system and labor abuses in the country, leading many in the international community to pressure Qatar to implement substantive labor reforms. *Id.* ¶ 45. Indeed, politicians in the United States and the European Union, as well as various non-

governmental organizations, went so far as to announce their opposition to hosting the World

Cup in Qatar due to its human rights violations against migrant workers.  *See id.* ¶¶ 46-50.

Prompted by this pressure, the Qatari government pledged in 2012 that it would phase out the

*kafala* system and implement reforms to improve working conditions.  *Id.* ¶ 35.

The promised reforms were long delayed and took effect only eight years later, but even

under the new system, "little changed on the ground for many workers."  *Id.* ¶ 41.  Qatari

employers still "frequently delayed, withheld, or arbitrarily deducted migrant workers' wages

and/or overtime, . . . forced migrant workers to work through the night, sometimes as long as 36

hours straight, and forced migrant workers to live . . . in inhumanely crowded, unsafe, and

unsanitary conditions."  *Id.* ¶ 42.  And employers continued their unlawful practice of

confiscating migrant workers' passports and threatening them with prosecution, thereby

preventing them from returning to their home countries until they completed their contracts and

restricting their ability to change employers while in Qatar.  *See id.* ¶¶ 43, 44.

Plaintiffs in this case are 106 Filipino nationals who allege that they are among the

thousands of migrant workers who were brought to Qatar under false pretenses and then forced

to work under "nightmarish" conditions building the stadiums and associated infrastructure for

the World Cup.  *Id.* ¶¶ 2, 8.  Each of them alleges that their employers induced them to come to

Qatar based on false promises of pay and good working conditions, deprived them of their

passports upon arriving in Qatar, forced them to work excessively long hours, and subjected

them to unsafe and unsanitary working and living conditions.  *See, e.g., id.* ¶ 189.

Plaintiffs allege that the Qatari government and entities closely associated with it,

including the Qatar Foundation and the Supreme Committee for Delivery and Legacy of the

FIFA World Cup Qatar 2022 (the "Supreme Committee"), were not only aware of these abusive

practices, but were also actively involved in enabling them by issuing meaningless statements, reports, and recommendations meant to create the false perception that Qatar was taking action against labor abuses. *See, e.g.*, *id.* ¶¶ 54, 57, 58, 60, 63. In fact, Plaintiffs allege that the Qatar Foundation — a nonprofit entity that published reports on the state of labor practices in the country and recommended reforms, *see id.* ¶ 59 — owned and operated one of the newly built stadiums and thus directly benefitted from some Plaintiffs' trafficked and exploited labor. *See id.* ¶¶ 77, 191, 207, 219, 221, 236, 252, 254, 284.

But these Qatari entities could not and did not achieve their goals without help. Instead, they "spent millions of dollars to hire experienced lobbyists, public relations firms, and marketers . . . to try to make the entire world look away from ongoing labor abuses so that Qatar could deliver the [World Cup]" through a sophisticated lobbying and public relations campaign. *Id.* ¶ 52. Defendants in this case — Omnicom Group, Inc. ("Omnicom"); its subsidiary, Portland PR, Inc. ("Portland"); Ogilvy Group, LLC ("Ogilvy"); and its subsidiaries, Ogilvy Public Relations Worldwide LLC ("OPRW") and Memac Ogilvy & Mather LLC ("Memac") — are the lobbying and public relations firms that Qatar, the Qatari Embassy in the United States, the Qatar Foundation, and the Supreme Committee hired to carry out that operation.

The Complaint contains detailed allegations as to each firm's involvement, but, broadly speaking, Plaintiffs allege the firms were paid to monitor reporting regarding trafficked and forced labor in Qatar, respond to such reporting, generate whitewashing content to offset it and distract from the abuses, lobby government entities to ignore labor exploitation, and advise Qatari entities on how to manage their reputations and messaging about human rights abuses. *See id.* ¶ 6. To be clear, Plaintiffs do not allege that any Defendant directly engaged in forced labor or human trafficking. Instead, they allege that Defendants' work enabled Qatari employers

to use trafficked and forced labor in the lead up to the World Cup despite heavy international pressure, which ultimately ensured that they could deliver stadiums and infrastructure to their shared Qatari clients on time and within budget. *See id.* ¶ 7.

More specifically, the Complaint alleges the following with respect to each Defendant:

- *Portland*: Portland is a public relations firm based in Washington, D.C., *see id.* ¶¶ 16, 19, that was hired by Qatar, the Qatar Foundation, and the Supreme Committee to "refute accusations of labor abuses of the migrant workers for the World Cup," *id.* ¶ 66. Portland employees publicly confirmed that they worked on "crisis communication strategy development," "24/7 media monitoring," and "drafting responses to members of the media" on behalf of the Supreme Committee. *Id.* ¶ 71 (cleaned up). And public social media posts from employees state that Portland had a "100+ strong team across 4 offices worldwide" that was tasked with "deliver[ing] FIFA World Cup 2022 Qatar's message to the world." *Id.* ¶ 80. To help accomplish that goal, Portland arranged for international journalists to tour migrant workers' housing facilities, showing them "spacious and comfortable villas . . . meant to distract from the actual, squalid living conditions of the vast majority of the workers." *Id.* ¶ 74. Portland also assisted senior Qatari government officials in efforts to refute a *Washington Post* article asserting that as many as 1,200 migrant workers had died while working on projects related to the World Cup. *Id.* ¶ 76.

- *Omnicom*: Omnicom, which is based in New York, is Portland's corporate parent. *Id.* ¶¶ 15, 21. It provided resources, content, employees, and various corporate services to Portland and Mercury, another subsidiary that was allegedly involved in lobbying work on behalf of Qatar (but which is not named as a Defendant in this case). *Id.* ¶¶ 96-100. Some Portland employees, including the head of Portland's Doha Office and its current Chief Executive Officer, apparently play dual roles as Omnicom employees and worked on Portland's World Cup efforts for its Qatari clients even though they were formally employed by Omnicom. *See id.* ¶¶ 101, 102-04.

- *Memac*: Memac is a public relations firm based in Dubai that was hired by the Qatar Foundation. *See id.* ¶¶ 17, 23. Memac was designated as the "communications partner" of the Qatar Foundation and won multiple awards for "managing the brand and reputation of [the Qatar Foundation] during the FIFA World Cup Qatar 2022." *Id.* ¶ 109. That work included responding to "relentless international scrutiny" leading up to the World Cup and "execut[ing] a program that contributed significantly to the 180-degree perception turnaround" of Qatar. *Id.* ¶ 115. Public filings indicate that Memac handled all of the Qatar Foundation's "interactions with . . . media," "draft[ed] press releases, feature articles, and speeches for leading spokespersons," and "alert[ed] [the Qatar Foundation] of any extremely positive or negative articles that might require action." *Id.* ¶ 111. In essence, it acted as an "embedded" public relations team at the Qatar Foundation. *Id.* ¶ 112.

- *OPRW*: OPRW is a public relations firm based in New York. *Id.* ¶¶ 15, 24. It supported Memac's public relations work by conducting media outreach and providing lobbying

services in the United States. *Id.* ¶ 119. That support included providing social media consulting services, *id.* ¶ 122, countering negative reporting related to labor abuses, *id.* ¶ 125, and lobbying American legislators regarding Qatari labor reforms, *id.* ¶ 126. The Complaint further alleges that several OPRW employees worked with Memac directly on World Cup related issues. *See id.* ¶ 123.

- *Ogilvy*: Ogilvy, based in New York, is the corporate parent of both Memac and OPRW. *Id.* ¶¶ 15, 127. Like OPRW, Ogilvy is alleged to have helped Memac deliver on its contract with the Qatar Foundation by supporting both its public relations and lobbying efforts. *Id.* ¶ 129. That support took the form of providing marketing technology services to support Memac's work. *Id.* ¶ 130. Additionally, in furtherance of the company's "One Ogilvy" strategy — pursuant to which it would service clients using resources across its entire corporate family, without regard to corporate form and formalities — several of Ogilvy's high-level employees were "dual hatted" with Memac and worked directly on World Cup projects Memac was conducting on behalf of the Qatar Foundation and Supreme Committee. *See id.* ¶ 140; *see also id.* ¶¶ 132-36 (listing those employees). For example, the CEO of Memac served simultaneously as Ogilvy's Chief Digital Officer for Europe, the Middle East, and Africa. *See id.* ¶ 136.

In sum, Plaintiffs allege that Defendants, their Qatari clients, and the employers ("Employers") that actually trafficked and abused migrant workers in building stadiums and infrastructure were participants in what they dub the "World Cup Labor Venture." *Id.* ¶ 5. The World Cup Labor Venture had several different components, but it was ultimately aimed at ensuring that Defendants' and Employers' "mutual client[s] could deliver the stadiums and infrastructure needed at a cheap cost and by the time the games kicked off." *Id.* ¶ 7.

On April 24, 2025, Plaintiffs filed this action, alleging that Defendants' participation in the World Cup Labor Venture violated both federal and state law. *See* Compl. Specifically, in Count I, Plaintiffs allege that their Employers trafficked them to Qatar and forced their labor, thereby violating Sections 1589 and 1590 of the TVPRA, and that Defendants violated Section 1595 of the TVPRA by "knowingly benefit[ting] . . . from participation in a venture" that they "knew or should have known" engaged in those violations. 18 U.S.C. § 1595; *see also* Compl. ¶ 304. Count II demands restitution under Section 1593 of the TVPRA. Compl. ¶ 311. And Count III asserts claims under New York state law against Defendants for "knowingly

. . . profit[ting] from," N.Y. Soc. Serv. Law § 483-bb(c)(i), a "scheme, plan or pattern to compel or induce," N.Y. Penal Law § 135.35(3), Plaintiffs into forced labor. *See* Compl. ¶¶ 312-20.

## DISCUSSION

Defendants move, pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6), to dismiss the Complaint for lack of personal jurisdiction as to defendant Memac, lack of subject-matter jurisdiction as to all Defendants, and for failure to state a claim as to all Defendants. The Court will begin by addressing the motions to dismiss for lack of subject-matter jurisdiction and personal jurisdiction because it must first determine if it has the power to hear the case and power over the parties before it addresses the merits. *See, e.g.*, *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006) ("[T]he Supreme Court has . . . rul[ed] that a district court must . . . establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits."); *Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 11 (2025) ("We have long held that a court must have . . . personal jurisdiction . . . before it can resolve a case." (cleaned up)).

## A. Article III Standing

It is well established that "the irreducible constitutional minimum of standing contains three elements": (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). And for an injury to be "concrete," it must "ha[ve] a close

relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). "Causation" requires that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). And to establish "redressability," it "must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted). Finally, because "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), courts must assume that plaintiffs' view of the statute is correct and that they will succeed on the merits when assessing standing at the pleading stage, *see Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 574 (2d Cir. 2018); *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 239 (S.D.N.Y. 2022) ("A court must . . . assume the merit of a claim when deciding whether a plaintiff has standing.").

Wisely, Defendants do not contest that Plaintiffs satisfy the injury-in-fact and redressability prongs of the standing test here. Each Plaintiff alleges, in essence, that "he was not paid what he was promised, and his overtime was not fully compensated," *e.g.,* Compl. ¶ 281, and such harms "readily qualify as concrete injuries under Article III," *TransUnion*, 594 U.S. at 425. And the damages and restitution Plaintiffs seek would plainly "redress the concrete loss that [each] plaintiff has suffered by reason of [each] defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). Defendants do, however, challenge causation, on the ground that Plaintiffs' alleged injuries are not "fairly traceable to the challenged action of the defendant[s]" because they are "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up); *see* Defs.' Mem. 34-39. A chain of causation may not be "attenuated," *Allen v. Wright*, 468 U.S. 737, 752 (1984), but

"Congress has the power to . . . articulate chains of causation that will give rise to a case or controversy where none existed before" so long as, in doing so, it satisfies the constitutional minimum established by Article III. *Spokeo*, 578 U.S. at 341.

Neither the Supreme Court nor the Second Circuit has defined that constitutional minimum when it comes to causation, but in addressing the injury-in-fact and redressability prongs, the Supreme Court has noted that "it is instructive to consider whether" a claimed injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.*; *see also TransUnion*, 594 U.S. at 425. Adopting that approach, the D.C. Circuit held in *Doe 1 v. Apple Inc.*, 96 F.4th 403, 411 (D.C. Cir. 2024), that Congolese cobalt miners had standing to bring claims against technology companies under Section 1595 of the TVPRA, on the theory that the statute "satisfies the constitutional minimum because it mirrors the aiding and abetting liability long established at common law." The court observed that, "[l]ike aiding and abetting liability," the vicarious liability provision of the TVPRA "requires (1) a wrongful act that causes an injury, specifically forced labor; (2) knowledge, as the defendant must knowingly benefit; and (3) substantial assistance, namely participation in the venture." *Id.* Those parallels mean that the "TVPRA's causal chain for a venture has a close relationship to lawsuits that would be cognizable in the English and American courts" and that "Congress's decision to establish such liability in the TVPRA is therefore consistent with Article III." *Id.* (cleaned up).

The Court agrees with the D.C. Circuit's analysis and conclusion and, thus, concludes that Plaintiffs establish causation by alleging Defendants' participation in a venture — the World Cup Labor Venture — that committed labor violations. Defendants' arguments to the contrary are unpersuasive. They characterize the Complaint as pleading only "an indirect and highly

attenuated connection" between Defendants' conduct and Plaintiffs' injuries because, in their view, it is entirely speculative whether Defendants' work had any effect on the decisions of the Qatari government and that, in any case, such injuries would depend on the actions of an independent third party, namely the international community.  *See* Defs' Mem. 35-39.  This argument is not without force and may ultimately defeat Plaintiffs' claims.  But, to quote the D.C. Circuit, the problem with that argument is that it "blur[s] the line between standing and merits."  *Apple*, 96 F.4th at 411.  For present purposes, the issue before the Court is not "whether the [Defendants] are *responsible* for the forced labor" of Plaintiffs in the sense of ultimate liability.  *Id.* at 412.  Instead, it must assume that they are responsible, *see Dubuisson*, 887 F.3d at 574, and ask if, given that, Plaintiffs' injuries can fairly be traced to their conduct.  And Plaintiffs plausibly allege they were victims of trafficking and forced labor at least in part because Defendants ran a spirited and successful campaign to shield Qatar and the Employers working on its behalf to deliver the World Cup stadiums from growing international pressure and scrutiny.

Perhaps recognizing as much, Defendants shift gears and attempt to minimize *Apple* by pointing to *Coubaly v. Cargill Inc.*, 144 F.4th 343, 350 (D.C. Cir. 2025), a more recent D.C. Circuit decision analyzing causation with respect to the same TVPRA provision.  There, the court held that cocoa plantation workers lacked standing to sue American cocoa importers under the TVPRA because they failed to allege facts sufficient to trace the cocoa importers' supply chains to any of the particular farms on which the plaintiffs worked.  Defendants contend that *Coubaly* requires dismissal in this case because "Plaintiffs fail to connect the Defendants either directly or through intermediaries to the Employers who allegedly injured Plaintiffs."  ECF No. 70 ("Defs.' Reply"), at 13-14 (cleaned up).  But that is incorrect on two levels.  First, it is unclear

— and this Court is not convinced — that *Coubaly*'s analysis is applicable outside of the context of commodity supply chains where a product's movement from producer to supplier can easily be traced. Second, even if that approach were correct for service agreements like the ones alleged here, Plaintiffs plainly allege such a connection. Two of Defendants' primary clients were the Qatar Foundation and the Supreme Committee. The Qatar Foundation, as noted, is alleged to have directly owned and operated one of the newly built stadiums and, thus, would have benefitted directly from the trafficked and exploited labor of several Plaintiffs. *See* Compl. ¶¶ 77, 191, 207, 219, 221, 236, 252, 254, 284. And the Supreme Committee was the "body charged with delivering the [World Cup]" and tasked with "ensur[ing] the basic rights of foreign migrant workers involved in select projects related to the construction of stadiums and associated infrastructure." *Id.* ¶ 63. Thus, Plaintiffs trace a line, first from Defendants' conduct to their Qatari clients, and from there to the Employers that committed labor abuses on the very projects Defendants' clients were responsible for overseeing.

In short, Plaintiffs satisfy the requirements for Article III standing and Defendants' motion to dismiss for lack of subject matter jurisdiction must be and is therefore DENIED.

## B. Personal Jurisdiction

Next, the Court turns to Memac's motion to dismiss for lack of personal jurisdiction. When responding to a Rule 12(b)(2) motion to dismiss, a "plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (per curiam) (internal quotation marks omitted). Where, as here, there has been no discovery, a plaintiff need only make a *prima facie* showing that personal jurisdiction exists. *See, e.g., Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam). "Such a showing entails making legally sufficient allegations,

including an averment of facts that, if credited, would suffice" to establish that jurisdiction exists. *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (cleaned up). More specifically, a plaintiff must demonstrate: (1) procedurally proper service of process, (2) "a statutory basis for personal jurisdiction that renders such service of process effective," and (3) that "the exercise of personal jurisdiction . . . comport[s] with constitutional due process principles." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) (internal quotation marks omitted). In evaluating personal jurisdiction, a court must construe "all allegations . . . in the light most favorable to the plaintiff." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).

Here, Memac does not challenge service of process. Instead, it argues there is no statutory basis for personal jurisdiction and that, even if there were, exercising personal jurisdiction would not comport with due process. *See* Defs.' Mem. 50-54. In response, Plaintiffs proffer two bases for personal jurisdiction over Memac: Rules 4(k)(2) and 4(k)(1)(A) of the Federal Rules of Civil Procedure. *See* ECF No. 66 ("Pls.' Opp'n"), at 47-52. The Court agrees that personal jurisdiction over Memac is proper under Rule 4(k)(2) (and, thus, does not reach Plaintiffs' other arguments). Rule 4(k)(2), "which is commonly known as the federal long-arm statute, permits federal courts to exercise personal jurisdiction over a defendant that lacks contacts with any single state if the complaint alleges federal claims and the defendant maintains sufficient contacts with the United States as a whole." *Havlish v. Royal Dutch Shell PLC*, No. 13-CV-7074 (GBD), 2014 WL 4828654, at *4 (S.D.N.Y. Sept. 24, 2014) (quoting *Getz v. Boeing Co.*, 654 F.3d 852, 858 (9th Cir. 2011)). Rule 4(k)(2) establishes personal jurisdiction "where (1) the claim arises under federal law, (2) the defendant is not subject to jurisdiction in

any state's courts of general jurisdiction, and (3) exercising jurisdiction is consistent with the United States Constitution and laws." *Id.* (internal quotation marks and footnote omitted).

Here, the first two prongs of Rule 4(k)(2) are plainly satisfied. First, Plaintiffs allege violations of the TVPRA, so the case "'arises under federal law' for the purposes of Rule 4(k)(2)." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008). The fact that Plaintiffs bring one claim under state law is of no moment; if the Court may exercise personal jurisdiction over Memac with respect to Plaintiffs' claims under federal law, it may exercise jurisdiction over it as to the state-law claim too because that claim and the federal claims "derive from a common nucleus of operative fact." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993). Second, "[b]y arguing that it has no presence in the United States and did not engage in transactions in New York sufficiently related to the instant dispute to constitute 'transacting business' jurisdiction," Memac has "established the [second] necessary predicate for personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2)." *Peterson v. Islamic Republic of Iran*, No. 10-CV-4518 (KBF), 2013 WL 1155576, at *17 (S.D.N.Y. Mar. 13, 2013); *see also* Defs.' Mem. 50-52. The dispositive question, then, is whether the exercise of personal jurisdiction over Memac under Rule 4(k)(2) is consistent with the due process requirements of the Constitution.

In evaluating whether the exercise of jurisdiction under Rule 4(k)(2) is consistent with due process, courts have traditionally applied nearly the same test as they do when personal jurisdiction is based on state long-arm statutes. Specifically, to determine whether "[d]ue process permits a court to exercise personal jurisdiction over a non-resident," a court must "ask whether the defendant has sufficient minimum contacts with the forum" — here, the United States as a whole — "to justify the court's exercise of personal jurisdiction . . . and consider whether the assertion of personal jurisdiction is reasonable under the circumstances of the

particular case." *Porina*, 521 F.3d at 127 (internal quotation marks omitted).  That calls for an inquiry into "the quality and nature of the defendant's contacts with the forum . . . under a totality of the circumstances test," and into whether "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013).  For a defendant's contacts with the United States to support personal jurisdiction, they "must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).  In other words, they "must show that the defendant deliberately reached out beyond its home." *Id.* (cleaned up).  And because due process requires an affiliation between the forum and underlying controversy, the plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum." *Id.* (cleaned up).[1]

---

[1]    Some courts have questioned whether this analytical framework survives the Supreme Court's recent decision in *Fuld*, which held that minimum-contacts analysis does not apply to the "subset of federal cases . . . in which personal jurisdiction is . . . 'authorized by a federal statute,'" 606 U.S. at 11 (quoting FED. R. CIV. P. 4(k)(1)(C)), and suggested that a more "flexible jurisdictional inquiry" may be warranted when, as here, a federal court is asked to exercise personal jurisdiction over a foreign defendant, *id.* at 16; *compare, e.g.*, *Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG) (PK), 2025 WL 2504317, at *16-17 (E.D.N.Y. Aug. 29, 2025) (concluding that, after *Fuld*, Rule 4(k)(2) provides a proper basis for personal jurisdiction in cases concerning "important foreign policy and national security concerns."), *with Cent. Am. Bank for Econ. Integration v. Mossi*, No. 24-CV-2544 (CRC), 2025 WL 2732731, at *8 (D.D.C. Sept. 25, 2025) (noting that, "even though *Fuld* did not squarely involve an application of [Rule 4(k)(2)]," it "theoretically unsettles the D.C. Circuit's minimum contacts-based [Rule 4(k)(2)] standard").  Happily, the Court need not chart the precise boundaries of what a more "flexible jurisdictional inquiry" would entail here because any defendant possessing "sufficient minimum contacts with the forum would also satisfy the . . . standards set forth in *Fuld*." *In re Fairfield Sentry Ltd.*, 671 B.R. 404, 418 (Bankr. S.D.N.Y. 2025).  Thus, if Memac satisfies the more stringent test — as the Court concludes it does — it necessarily satisfies any more "flexible" inquiry.

Here, Plaintiffs argue that Memac meets that test because it reached into the United States to "collaborate directly with Ogilvy's New York office" and its United States-based employees "to provide support for U.S.-based media relations" that furthered Memac's efforts on behalf of the World Cup Labor Venture. Pls.' Mem. 48 n.28. Those contacts are plainly sufficient to demonstrate that Memac availed itself of the privilege of doing business in the United States and could therefore foresee being haled into court here. That is because they demonstrate that Memac "deliberately reached out beyond its home" in an attempt to influence the media of the United States and, by extension, discourse here regarding Qatar's labor practices. *Ford*, 592 U.S. at 359. And as to the question of whether Plaintiffs' claims "arise out of or relate to" these contacts, the answer is also yes because Plaintiffs allege that Memac's efforts were explicitly aimed at supporting the World Cup Labor Venture, which is the basis of their claims under the TVPRA and New York state law.

Memac's counterarguments fall short. Memac does not dispute that its collaboration with Ogilvy generated sufficient contacts with the United States. Instead, it asserts that the Court may not consider those links in its jurisdictional analysis because doing so would require "imputing [Ogilvy's] contacts . . . to Memac," which would, in turn, require disregarding Memac's status as a separate corporate entity. Defs.' Mem. 52-53; *see also Transfield ER Cape Ltd. v. Indus. Carriers, Inc.,* 571 F.3d 221, 224 (2d Cir. 2009). But no such leap is required. As noted, Memac itself has sufficient contacts with the United States to justify personal jurisdiction over it because its collaboration with Ogilvy was aimed at influencing U.S. media and public discourse, not because Ogilvy and it are one entity. And on the relatedness prong, Defendants argue that Plaintiffs' allegations are insufficient because they show only "that Memac provided [the Qatar Foundation] with general work related to the World Cup, not work targeted to defend Qatar's

migrant labor policies." Defs.' Mem. 52. But construing "all allegations . . . in the light most

favorable to" Plaintiffs, as the Court must, *Whitaker*, 261 F.3d at 208, it is reasonable to infer

that Memac's work on the World Cup related to defending Qatar's migrant labor policies

because, among other things, Memac itself boasted of "execut[ing] a program that contributed

significantly to the 180-degree perception turnaround" of Qatar. Compl. ¶ 115.[2]

Given that Memac's contacts with the United States are sufficient to justify the exercise

of personal jurisdiction under Rule 4(k)(2), the only remaining question is "whether the assertion

of personal jurisdiction is reasonable under the circumstances of this case." *Porina*, 521 F.3d at

127 (internal quotation marks omitted). In assessing the reasonableness of a court's exercise of

specific jurisdiction, courts consider "(1) the burden that the exercise of jurisdiction will impose

on the defendant; (2) the interests of the forum state in adjudicating the case; and (3) the

plaintiff's interest in obtaining convenient and effective relief." *BMW of N. Am. LLC v. M/V*

*Courage*, 254 F. Supp. 3d 591, 600 (S.D.N.Y. 2017) (cleaned up). Notably, a defendant must

present "a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *Id.* (internal quotation marks omitted). Here, each factor weighs in

favor of exercising personal jurisdiction over Memac. First, although Memac is a foreign entity,

the "mere fact that a defendant is foreign and would have to travel to [the United States] is

insufficient to defeat a finding of reasonableness," *id.*, especially where, as here, the defendant is

represented by the same counsel as other parties who are indisputably subject to the personal

---

[2]      Memac also briefly argues that Plaintiffs are categorically barred from invoking Rule
4(k)(2) as a basis for jurisdiction because "specific jurisdiction is applicable only when a
Plaintiff alleges jurisdiction under Rule 4(k)(1)." Defs.' Reply 22. But *Fuld*, the case Memac
cites for that proposition, says nothing of the sort. And federal courts frequently assert specific
personal jurisdiction over defendants pursuant to Rule 4(k)(2). *See, e.g.*, *Enhanced US LLC v.
World Aquatics*, No. 25-CV-7096 (JMF), 2025 WL 3206662, at *4-8 (S.D.N.Y. Nov. 17, 2025).

jurisdiction of this Court.  Second, the United States has a strong interest in "combat[ting]

transnational human trafficking on numerous fronts, including by expanding the civil claims and

remedies available to its victims" in the TVPRA.  *Roe v. Howard*, 917 F.3d 229, 242 (4th Cir.

2019).  And finally, "bringing [Memac] before this court will enable efficient resolution of

[Plaintiffs'] claims in a single proceeding."  *BMW*, 254 F. Supp. at 600 (cleaned up).  In

response, Memac asserts that the United States lacks an interest in adjudicating the case because

Section 1595's civil remedy does not apply extraterritorially and all the primary violations of the

Act occurred abroad.  *See* Defs.' Reply 22-23.  But these assertions go to the merits of Plaintiffs'

claim, and as already noted, the Court may not "decide the merits of the claim en route to

determining its justiciability."  *Dubuisson*, 887 F.3d at 574; *see also Coleman v. Miller*, 307 U.S.

433, 446 (1939).

In short, the Court concludes that it may exercise personal jurisdiction over Memac

pursuant to Rule 4(k)(2) and that doing so comports with the requirements of due process.

Accordingly, Memac's motion to dismiss pursuant to Rule 12(b)(2) must be and is DENIED.

## C.  Failure to State a Claim

Having determined it has both subject-matter jurisdiction and personal jurisdiction over

Memac, the Court turns to Defendants' motion to dismiss for failure to state a claim.  "In

reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual

allegations set forth in the complaint as true and draw all reasonable inferences in favor of the

plaintiff."  *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319-20 (S.D.N.Y. 2012) (citing *Holmes

v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)).  A court will not dismiss any claims pursuant to

Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that

is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that

contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Significantly, "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted).  But a complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  If a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

Defendants throw the veritable kitchen sink at the Complaint.  As to Plaintiffs' TVPRA claims under Section 1595, they argue that the conduct alleged in the Complaint fails to state a claim and that, even if it did, Plaintiffs' claims must still fail because: (1) the statute does not apply extraterritorially and this case does not involve a domestic application of the statute; (2) the claims are barred by the "act of state" doctrine that prohibits federal courts from passing judgment on the legality of official acts of foreign states; and (3) the First Amendment provides Defendants with a complete defense.  As to Plaintiffs' TVPRA claim under Section 1593, Defendants argue that the TVPRA does not authorize restitution for civil actions.  Finally, Defendants maintain that Plaintiffs' claim under New York law must fail for the same reasons as its TVPRA claim.  The Court will address each argument in turn.

1. **The Section 1595 TVPRA Claims**

The TVPRA establishes criminal penalties for, among other things, involuntary servitude, forced labor, human trafficking, and sex trafficking. *See* 18 U.S.C. §§ 1584, 1589-91. Section 1595 of the TVPRA provides a civil remedy in federal court for any "individual who is a victim" of those predicate offenses "against the perpetrator (or whoever knowingly benefits . . . financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)." *Id.* § 1595(a). Accordingly, to be held civilly liable under Section 1595, a defendant must: (1) have "participat[ed] in a venture"; (2) have "knowingly benefitted" from that participation; and (3) have "kn[o]w[n] or should have known" that the venture engaged in one of the predicate criminal acts proscribed by the TVPRA. *Id.* Additionally, because only victims of TVPRA criminal offenses may bring suit, a plaintiff must adequately plead that the venture in question committed predicate TVPRA violations against him or her. *See Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329, 338 (S.D.N.Y. 2025), *appeal docketed*, No. 25-1162 (2d Cir. May 6, 2025). Defendants challenge the sufficiency of the Complaint as to each element. The Court will address them one by one and then turn to Defendants other arguments: that Plaintiffs' claims fail because the statute does not apply extraterritorially; that Plaintiffs' claims violate the act-of-state doctrine; and that Plaintiffs' claims violate the First Amendment.

### a. Participation in a Venture

The TVPRA does not define, and the Second Circuit has not yet interpreted, what constitutes "participation in a venture." 18 U.S.C. § 1595(a).[3] But other Courts of Appeal have reached certain points of consensus based primarily on the phrase's ordinary meaning.

First, nearly all courts agree that the term "venture" in the statute is not limited solely to a venture whose primary purpose is trafficking or forced labor. That is because such a narrow definition would render superfluous the language in the provision that requires the venture to "ha[ve] engaged in an act in violation of this chapter," *id.*, and "[i]t is well-settled that courts should avoid statutory interpretations that render provisions superfluous," *United States v. Rowland*, 826 F.3d 100, 109 (2d Cir. 2016) (internal quotation marks omitted). Instead, as the Seventh and Eleventh Circuits have acknowledged, "the alleged venture can be a 'commercial venture[]' like running or expanding a business . . . whose primary focus is not on . . . trafficking." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) (quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 727 (11th Cir. 2021)). Second, courts have acknowledged, based on the plain meaning of "venture," that the participants must be involved in an "enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain." *Apple*, 96 F.4th at 415; *see also Red Roof Inns*, 21 F.4th at 724. And finally, courts have generally concluded that while "participation" in a venture under the TVPRA "need not involve direct participation in the . . . trafficking itself," *Salesforce*, 76 F.4th at 559, it *does* require "taking part or sharing" in the venture in a meaningful way, *Apple*, 96 F.4th at 415 (quoting *Participation*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000)).

---

[3] The Second Circuit recently heard oral argument on this issue in *Mueller v. Deutsche Bank Aktiengesellschaft,* No. 25-1162 (2d Cir. Dec. 11, 2025), but has not yet issued a decision.

Significantly, taking part or sharing in the venture in a meaningful way requires "something more than engaging in an ordinary buyer-seller transaction" or a "purchasing agreement." *Id.* (internal quotation marks omitted). Precisely how much more is not clear, but courts have found participation when a party provides "culpable assistance" through, for example, a "continuous business relationship" with a "desire to promote the wrongful venture's success." *Salesforce*, 76 F.4th at 559-60. Such culpable assistance can consist of providing "active, ongoing support" that is "tailored" to the needs of the venture with an aim of "facilitat[ing] and support[ing]" its growth. *Id.* at 560; *see also Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017) (Souter, J.) (refusing to dismiss a TVPRA claim against a motel operator who "demand[ed] further payment" from a sex trafficker after the trafficking was apparent). In *Salesforce* for example, the Seventh Circuit held that Salesforce, a customer relationship management software provider, could be held liable for its participation in a venture with Backpage, a classified advertising website operator known for facilitating sex trafficking, when it both "entered . . . several lucrative contracts" with the website operator and provided the website operator with "targeted solutions" based on its assessment of the website's "operational needs" to support its growth on an ongoing basis. 76 F.4th at 560.

Measuring the Complaint against these standards and "draw[ing] all reasonable inferences in favor of the plaintiff[s]," *Cohen*, 874 F. Supp. 2d at 319, the Court concludes that the Complaint plausibly alleges that (1) the World Cup Labor Venture is a "venture" within the meaning of Section 1595 and (2) all Defendants, with the exception of Omnicom, participated in that venture. The World Cup Labor Venture plainly constitutes a commercial "undertaking that involves danger, uncertainty, or risk, and potential gain." *Apple*, 96 F.4th at 415. The venture, which involved Defendants, the Employers, and their shared Qatari clients, was aimed at

ensuring that the stadiums and associated infrastructure were built on time and under budget for the World Cup. *See* Compl. ¶¶ 7, 64. It involved the expenditure of massive amounts of money and considerable manpower, came with real risks to the reputation of the Qatari government and associated entities, and ultimately paid off to the tune of "millions of dollars," *id.* ¶ 52, in revenue for Defendants and "billions of dollars in revenue" for Qatar, *id.* ¶ 1.

Defendants counter that this is insufficient to constitute a venture because, in their view, Plaintiffs must also allege that Defendants shared directly in the profits and risks of the primary violators of the TVPRA — i.e., the Employers. *See* Defs.' Mem. 10-11. But nothing in the TVPRA or the cases cited by Defendants requires such a nexus. Instead, all that is required is that the entities be part of an "undertaking that involves danger, uncertainty, or risk, and potential gain." *Apple*, 96 F.4th at 415. As several courts have recognized, that means that even parties indirectly linked to traffickers may be participants in a venture that engages in trafficking or forced labor. *See, e.g.*, *T.B. v. Red Roof Inns, Inc.*, No. 24-CV-2420, 2025 WL 755165, at *11-12 (S.D. Ohio Mar. 10, 2025) (holding that hotel franchisors may be held liable under Section 1595 despite not directly interacting with traffickers); *Doe v. Scottsdale Inns LLC*, No. 23-CV-759 (PHX) (JJT), 2024 WL 3494375, at *4 (D. Ariz. July 22, 2024) (same). Defendants admittedly did not directly interface with the Employers, but Plaintiffs nevertheless allege that they were an integral part of the venture by ensuring the Employers could continue their abusive labor practices without international pressure. On that basis, Defendants can be held liable.

Moving on to "participation," the Court concludes that Plaintiffs plausibly allege that all Defendants save one (Omnicom) engaged in the type of "active, ongoing support" that was "tailored" to the needs of the venture that courts have held can support liability under Section 1595. *Salesforce*, 76 F.4th at 560. The strongest allegations, by far, are those against Portland.

Plaintiffs allege that the firm was hired by the Qatar Foundation and Supreme Committee to "refute accusations of labor abuses of migrant workers for the World Cup." Compl. ¶ 66. Public social media posts from Portland employees confirm that it had a "100+ strong team across 4 offices worldwide" that was tasked with "deliver[ing] FIFA World Cup 2022 Qatar's message to the world." *Id.* ¶ 80. The firm assisted its clients in attempting to refute news articles that documented the scale of death associated with the World Cup. *Id.* ¶ 76. And most significantly, it took on-the-ground initiatives to further that goal by arranging tours of Potemkin-like villages for international journalists, showing them "spacious and comfortable villas . . . meant to distract from the actual, squalid living conditions of the vast majority of the workers." *Id.* ¶ 74. All of that work was tailor-made to quiet public and media outrage about labor abuses associated with the World Cup and helped to ensure those practices could continue unabated.

The Complaint contains similar allegations as to Memac. The firm was "embedded" in the Qatar Foundation as its in-house public relations team and handled all the Foundation's "interactions with . . . media." *Id.* ¶¶ 111-12. It won multiple awards for managing the Qatar Foundation's brand and reputation during the World Cup and boasted of orchestrating a "180-degree perception turnaround." *Id.* ¶ 115. Given the Qatar Foundation's role in publishing reports on the state of labor practices in the country and recommending labor standards, *see id.* ¶ 59, not to mention its direct ownership and operation of one of the newly built stadiums, *id.* ¶ 77, it is reasonable to infer that Memac was responsible for responding to, and minimizing reporting regarding, abusive labor practices. Indeed, at least one report by the German broadcaster *Deutsche Welle* zeroed in on the treatment of workers at the Foundation's stadium; it included video of workers being forced to work through temperatures as high as 120 degrees and aired testimony from workers whose passports had been confiscated. *See id.* ¶ 157. That is

precisely the sort of "extremely . . . negative" coverage that Memac would have been responsible for bringing to the attention of the Qatar Foundation and addressing. *Id.* ¶ 111.

Plaintiffs' allegations against OPRW and Ogilvy are slightly more attenuated, but they still contain sufficient factual content to make it plausible that the firms participated in the World Cup Labor Venture through the provision of "active, ongoing support." *Salesforce*, 76 F.4th at 560. Several of OPRW's employees publicly registered as foreign agents for the Qatar Foundation for the express purpose of conducting proactive "media outreach" at the same time that Memac was serving as the Foundation's embedded in-house public relations team. *See* Compl. ¶ 123. And OPRW's lobbying arm publicly disclosed its involvement in work that Plaintiffs characterize as "whitewashing Qatar's labor abuses and touting labor reforms." *Id.* ¶ 125; *see also* ECF No. 57-4, at 21-23 (disclosing that lobbyists from OPRW "sent a [l]abor letter on [Qatari] workers' rights" to several congressional offices). Similarly, several high-level Ogilvy employees were "dual hatted" with Memac and worked directly on the projects it was conducting on behalf of the Qatar Foundation and Supreme Committee. *See id.* ¶¶ 132-36 (listing those employees). Indeed, one Ogilvy employee was named as the "General Manager" of Memac on the contract submitted with Ogilvy's public filings regarding its work on the World Cup Labor Venture even though he was not formally a Memac employee. *Id.* ¶ 134. Given the timing of that activity and Ogilvy's stated strategy of "utilizing cross-discipline and cross-entity teams to perform client expectations," *id.* ¶ 131, it is reasonable to infer that both OPRW and Ogilvy collaborated with Memac to sportswash Qatari labor abuses in support of the World Cup Labor Venture and therefore can be said to have participated in it.

Defendants dispute the foregoing allegations, but their efforts to do so are both improper at this stage in the litigation and unavailing. Based largely on public filings they deem

incorporated into the Complaint by reference, they maintain that they provided only "routine public relations services" to their Qatari clients that had nothing to do with the World Cup Labor Venture. *See, e.g.*, Defs.' Mem. 14-15; *see also id.* at 16 (characterizing Ogilvy's efforts as "run-of-the-mill" and Memac's as only "World Cup-related work generally"). But Defendants may not substitute the generic language of those filings for Plaintiffs' well-pleaded allegations. As discussed, Plaintiffs plausibly allege that Portland, Memac, OPRW, and Ogilvy provided tailored services — including orchestrating sham tours of migrant worker living facilities and lobbying members of Congress — that were intended to minimize Qatari labor abuses in the run-up to the World Cup. Those activities are far more similar to the "active, ongoing support" that Salesforce provided to Backpage than they are to "ordinary buyer-seller transaction[s]." *Apple*, 96 F.4th at 415. Defendants fare little better arguing that, under Plaintiffs' theory, "everyone who said anything positive about Qatar would be part of a TVPRA venture." Defs.' Mem. 17. Only those who provided active, targeted, and continuous support intended to ensure the success of the World Cup Labor Venture — a category that included the foregoing Defendants — can be said to have participated in it. And even then, participation alone does not a violation of the TVPRA make — as discussed below, a defendant must also benefit from, and have knowledge of, the venture's predicate TVPRA violations to be liable. *See* 18 U.S.C. § 1595(a).

By contrast, the Court concludes that Plaintiffs' allegations are insufficient to establish Omnicom's participation in the World Cup Labor Venture. As Defendants correctly observe, the Complaint does not allege any direct relationship between Omnicom and the Qatari entities in the Venture. *See* Defs.' Mem. 15. Instead, it alleges Omnicom's participation through its provision of "resources," "employees," and "content" to Portland and Mercury. *See* Compl.

¶¶ 88-105.[4]  But several of those allegations are made on information and belief without a basis

in "factual information that makes the inference of culpability plausible." *Arista Records*, 604

F.3d at 120.  Plaintiffs allege, for example, that Omnicom provided "materials" and "content" to

various media outlets, *see* Compl.  ¶¶ 90-94, but they provide no factual basis to support the

inference that those materials addressed, or even related to, Qatari labor abuses in the lead up to

the World Cup.  And even when there is a factual basis for Plaintiffs' allegations, they establish

only the type of "ordinary buyer-seller transaction[s]" or "purchasing agreements" that are

insufficient to constitute participation in the venture.  *Apple*, 96 F.4th at 415.  Put differently, that

Omnicom provided generic "tax and accounting work," Compl. ¶ 95, "shared offices," *id.* ¶ 97,

and "legal and compliance support services," *id.* ¶ 100, to Portland and Mercury is not, by itself,

enough to establish participation in the World Cup Labor Venture because it is not the type of

tailored, "active, ongoing support" that would allow the Court to infer that Omnicom had a

"desire to promote the wrongful *venture's* success."  *Salesforce*, 76 F.4th at 559-60 (emphasis

added).  At most, it demonstrates that Omnicom had a desire to promote the success of its

subsidiaries as any parent company would.  Plaintiffs also allege that certain Omnicom

employees were "dual hatted" with Portland and Mercury, *see* Compl. ¶ 101, but they provide no

factual support for the inference that any of those employees, unlike the Ogilvy and OPRW

employees previously discussed, worked on projects related to the World Cup Labor Venture.

---

[4]      In their memorandum of law opposing Defendants' motion, Plaintiffs assert that
"Omnicom participated in the Venture by hosting a 2018 Supreme Committee propaganda tour
in New York."  Pls.' Opp'n 11-12 (citing Compl. ¶ 88).  If that were true, it might well be
enough to plausibly allege Omnicom's participation in the alleged venture.  But the assertion is
misleading, if not worse.  The relevant paragraph in the Complaint actually alleges that "*Mercury*
hosted an event" for Qatar in "a New York office *leased by Omnicom*."  Compl. ¶ 88 (emphases
added).  That does not remotely establish Omnicom's participation.

Lacking an independent basis on which to conclude that Omnicom was a participant in the World Cup Labor Venture, the Court declines Plaintiffs' invitation to "pierce the corporate veil" and impose liability based solely on the corporate relationships between Omnicom and its subsidiaries.  *See* Pls.' Opp'n 20-21.  Under New York law — which applies because New York is Omnicom's state of incorporation, *see, e.g.*, *Glob. Gaming Philippines., LLC v. Razon*, No. 21-CV-2655 (LGS), 2022 WL 836716, at *5 (S.D.N.Y. Mar. 21, 2022) — the corporate veil may be pierced only under "extraordinary circumstances."  *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).  Plaintiffs, however, do not even attempt to argue that such extraordinary circumstances are present here and thus have forfeited the argument.  *See Grytsyk v. Morales*, 527 F. Supp. 3d 639, 651 (S.D.N.Y. 2021).  Instead, they argue only that they plead an agency relationship between Omnicom on the one hand and Portland and Mercury on the other.  But courts in this district routinely dismiss allegations that firms have a parent-subsidiary corporate structure as insufficient to demonstrate an agency relationship because "to permit otherwise would risk expos[ing] any corporate parent to potential agency liability."  *Shcherb v. Angi Homeservs. Inc.*, No. 19-CV-367 (MKV), 2020 WL 2571041, at *2 (S.D.N.Y. May 21, 2020) (cleaned up).

In sum, the Court concludes that the Complaint fails to allege that Omnicom participated in the World Cup Labor Venture within the meaning of the TVPRA.  Accordingly, Count I must be and is DISMISSED against Omnicom for failure to state a claim.

### b.  Benefit

The next element — that the defendant "knowingly benefitted" from its participation in the venture — is plainly satisfied as to all remaining Defendants.  As the Seventh Circuit has explained, "a plaintiff can allege that the defendant 'knowingly benefitted' by alleging only that the defendant was aware that it was benefitting in some way from its participation in the venture.

That's it." *Salesforce*, 76 F.4th at 564.  Here, Plaintiffs plausibly allege that each Defendant signed contracts with its Qatari counterparts and was paid for its work on the World Cup Labor Venture.  *See* Compl. ¶ 185.  That is enough.  Relying primarily on *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019), Defendants maintain that Plaintiffs must plead both "(1) knowledge of the benefit *and* (2) a causal relationship between the benefit and the venture that violated the TVPRA."  Defs.' Mem. 27 (emphasis added).  In their view, Plaintiffs fail to satisfy the latter requirement because the Complaint does not allege that Defendants had knowledge that they received a benefit *because of* their facilitation of the underlying TVPRA violation.  *Id.*.  But as several other courts have noted, the additional causation requirement has "no footing in the statutory text."  *Salesforce*, 76 F.4th at 565; *see also Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 408 (S.D.N.Y. 2023) (noting that "the Court is not convinced that the benefit element should be read [to incorporate a causal requirement]").  And in any event, it is reasonable to infer that Defendants knew they were being paid, at least in part, *because* their efforts ensured cheap and consistent labor to build World Cup stadiums and infrastructure.  That is because, as discussed below, Defendants allegedly knew of the venture's extensive TVPRA violations before signing those contracts.  Accordingly, Plaintiffs satisfy this requirement under either standard.

   c.  **Knowledge**

   Next, Plaintiffs must allege that each Defendant "knew or should have known" — i.e., had actual or constructive knowledge — that the venture engaged in one or more of the criminal acts proscribed by the TVPRA.  18 U.S.C. § 1595(a).  Actual knowledge is "an awareness or understanding of a fact or circumstance," while constructive knowledge is knowledge that "one

using reasonable care or diligence should have." *Red Roof Inns*, 21 F.4th at 725 (citation

omitted).  And under Rule 9(b), "knowledge . . . may be alleged generally."  FED. R. CIV. P. 9(b).

Plaintiffs plausibly allege, at a minimum, that each remaining Defendant should have

known that the World Cup Labor Venture engaged in acts of human trafficking and forced labor

in violation of the TVPRA.  That is primarily because these Defendants were hired specifically

to monitor and address widespread reporting by the media and other organizations on precisely

those violations.  *See* Compl. ¶¶ 145-46.  Portland, for example, is alleged to have helped its

Qatari clients refute a *Washington Post* article asserting that as many as 1,200 migrant workers

had died while working on World Cup-related projects.  *See id.* ¶ 76.  In doing so, it is

reasonable to infer that Portland would have become aware through the exercise of reasonable

diligence of the alleged ongoing abuses, including trafficking and forced labor.  Similarly,

Memac was hired to flag "extremely . . . negative article[s]," *id.* ¶ 111, on behalf of the Qatar

Foundation and so reasonable diligence on its part would have plausibly uncovered reporting by

*Deutsche Welle* documenting TVPRA violations at the stadium its client owned and operated.

*See id.* ¶ 157.  And given the shared employees and missions of OPRW, Ogilvy, and Memac, it

is reasonable to infer that OPRW and Ogilvy had (or, at minimum, should have had) knowledge

of the violations as well.  Indeed, as the Complaint illustrates, they would have learned about the

alleged violations from their own on-the-ground personnel, *id.* ¶ 152, from reports issued by

governments and international organizations, *id.* ¶¶ 154-56, from widespread media reporting, *id.*

¶¶ 157-60, 166, and from their own dealings with both the Supreme Committee and the Qatar

Foundation, *id.* ¶¶ 181-84.

Defendants offer two rejoinders, but neither is convincing.  First, they argue that

Plaintiffs' allegations, taken as true, "suggest at most that Defendants should have known of

labor abuses in Qatar *generally*," not specifically with respect to the World Cup.  Defs.' Mem. 25-26 (cleaned up).  But accepting Plaintiffs' allegations as true, and drawing all inferences in their favor, it strains credulity to conclude that Defendants would have somehow had general knowledge about labor abuses in Qatar but lacked specific knowledge about abuses for the very event they were hired to support.  Second, Defendants contend that liability under the TVPRA requires that proof that they knew about violations as to each specific Plaintiffs and not just knowledge of violations by the venture more generally.  *See* Defs.' Mem. 23-24.  That argument relies primarily on the dissent in *Salesforce*, which reasoned that because the TVPRA criminal violations incorporated by reference into Section 1595 use the "victim-specific" terms "a person" and "the person," damage suits are available only "when a plaintiff plausibly alleges that the defendant should have known that the venture engaged in her particular sex trafficking." *Salesforce*, 76 F.4th at 568 (Kirsch, J., dissenting).  But as the majority correctly noted, that interpretation rewrites the plain text of Section 1595(a), which requires only that the defendant "knew or should have known" that the "venture . . . has engaged in *an* act in violation."  18 U.S.C. § 1595(a) (emphasis added); *see also Salesforce*, 76 F.4th at 552-53.  Like the Seventh Circuit (and the vast majority of courts to consider the issue), this Court sees no reason to read "an act in violation" as "the act" of victimization that allows the particular plaintiff to bring suit under Section 1595.  *See, e.g., M.L. v. Craigslist Inc.*, No. 19-CV-6153 (BHS) (TLF), 2020 WL 5494903, at *5 (W.D. Wash. Sept. 11, 2020); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1257 (M.D. Fla. 2020) (listing cases).  Doing so would have the perverse result of making it easier for participants in large, complex ventures to escape liability under the TVPRA.  And contrary to Defendants' claim, *see* Defs.' Mem. 23, there is nothing peculiar about making it easier to establish scienter for a putative civil defendant under Section 1595 than for a criminal

defendant under a predicate TVPRA offense.  Indeed, as the Supreme Court has noted in the context of aiding and abetting, liability "does not require the defendant to have known 'all particulars of the primary actor's plan.'"  *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 496 (2023) (quoting RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 10, Comment c, p. 104 (Tent. Draft No. 3, Apr. 6, 2018)).  Accordingly, the Court concludes that Plaintiffs plausibly allege that the remaining Defendants had constructive knowledge of the venture's violations of the TVPRA.

### d.  Primary Violation

Finally, Plaintiffs must adequately plead that the venture in question committed predicate TVPRA criminal violations against them.  *See, e.g.*, *Mueller*, 777 F. Supp. 3d at 338.

Plaintiffs do so here.  First, they plausibly allege violations of Section 1589 of the TVPRA, which prohibits forced labor — defined as "obtain[ing] the labor or services of a person by . . . means of force, . . . serious harm, . . . the abuse or threatened abuse of law or legal process; or . . . any scheme" intended to cause a person to believe that if they did not provide their services, they "would suffer serious harm or physical restraint."  18 U.S.C. § 1589(a)(1)-(4).  It also punishes anyone who

> knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

*Id.* § 1589(b).  Confiscating or threatening to confiscate a person's passport is considered an "abuse of law or legal process" for purposes of a Section 1589 claim.  *See Sulaiman v. Laram*, No. 16-CV-8182 (CM), 2017 WL 11659746, at *4 (S.D.N.Y. Apr. 4, 2017); *see also Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 525-26 (D. Md. 2016); *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 28 (D.D.C. 2016).

Here, each Plaintiff alleges that his Employer confiscated his passport upon arrival in Qatar to prevent him from leaving his employer or the country until the end of his contract.  *See, e.g.*, Compl. ¶ 189 ("Venture participants . . . confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.").  That is enough to allege violations of Section 1589.  Defendants acknowledge — as they must — that Plaintiffs' allegations of passport confiscation "could . . . support an underlying § 1589 violation," Defs.' Mem. 32, but they maintain that the allegations are insufficient to sustain a claim because the Complaint does not adequately plead that a participant in the alleged venture confiscated Plaintiffs' passports, *see id.*  But Plaintiffs name their Employers and state that "[v]enture participants, including but not limited to, on information and belief, [their] direct employer[s], confiscated [their] passport[s] when [they] first arrived in Qatar."  Compl. ¶ 190.  It is therefore reasonable to infer that their passports were taken by their Employers.

In any event, Plaintiffs also plausibly allege violations of Section 1590 of the TVPRA, which prohibits human trafficking — defined as "knowingly recruit[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing] by any means, any person for labor or services in violation of this chapter."  18 U.S.C. § 1590(a).  "[F]alse promises of fair working conditions and appropriate compensation" can constitute knowing recruitment within the meaning of Section 1590.  *See, e.g.*, *Lipenga*, 219 F. Supp. 3d at 526.  And here, each Plaintiff alleges that he was "not paid what he was promised and had earned," Compl. ¶ 189, and thus plausibly alleges a violation of Section 1590.

### e.  **Extraterritoriality**

Having addressed Defendants' arguments with respect to the statutory elements of a TVPRA claim, the Court turns to their other arguments, beginning with extraterritoriality.

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). Thus, under "the presumption against extraterritoriality, absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* (cleaned up). Courts analyze the issue of extraterritoriality using a two-step framework. "At the first step, we ask whether the presumption against extraterritoriality has been rebutted — that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *In re Fairfield Sentry Ltd.*, 147 F.4th 136, 155 (2d Cir. 2025) (quoting *RJR Nabisco*, 579 U.S. at 337). "If the statute contains such an 'unmistakable' indication, 'then claims alleging exclusively foreign conduct may proceed.'" *Id.* (quoting *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 418 (2023)). But step one does not require "an express statement of extraterritoriality," *RJR Nabisco*, 579 U.S. at 340, because "context can be consulted as well," *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010), and indeed can even be "dispositive," *RJR Nabisco*, 579 U.S. at 340. Courts must also "separately apply the presumption against extraterritoriality" to a statute's private "cause of action," even when it concludes "that the presumption has been overcome with respect to [the statute's] substantive prohibitions." *Id.* at 346.

"If the statute does not apply extraterritorially, then we proceed to the second step and ask 'whether the case involves a domestic application of the statute.'" *In re Fairfield*, 147 F.4th at 155 (quoting *RJR Nabisco*, 579 U.S. at 337). "A court will answer that question by looking to the statute's focus." *Id.* (internal quotation marks omitted). "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S.

407, 413-14 (2018) (cleaned up).  "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad."  *RJR Nabisco*, 579 U.S. at 337.  But "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  *Id.*

Defendants here argue that the private right of action set forth in Section 1595 of the TVPRA fails both steps of the *RJR Nabisco* framework and that Plaintiffs cannot maintain their claims because the forced labor and human trafficking of which they complain occurred overseas.  *See* Defs.' Mem. 39-42.  Their arguments have some force, but the Court ultimately disagrees — in part.  In doing so, it joins the Fourth Circuit and several other courts in concluding that Section 1595 applies extraterritorially, but only to the extent that its predicate criminal TVPRA violations also have extraterritorial application.  And under Section 1596 of the TVPRA, the predicate criminal violations alleged in this case — Sections 1589 and 1590 — have extraterritorial application, but only when a direct violator with certain connections to the United States commits them.  As applied to this case, that rule has two implications.  First, Plaintiffs may not bring their Section 1595 claims against Memac because it lacks the requisite connection with the United States.  Second, Plaintiffs may not pursue their Section 1595 claims against the other Defendants to the extent their claims are premised on violations of Section 1590.

The Court begins the first step of its analysis by observing that Section 1595 does not contain any express language delineating its geographical scope.  But, as noted, "an express statement of extraterritoriality" is not required for a statute to apply extraterritorially because context can be consulted and indeed may even be "dispositive."  *RJR Nabisco*, 579 U.S. at 340. That is the case here.  Here, as in *RJR Nabisco*, the "most obvious textual clue" rebutting the

presumption against extraterritoriality is that the statute includes "a number of predicates that plainly apply to at least some foreign conduct."  *Id.* at 338.  Indeed, as the Fourth Circuit observed, "[m]any of the predicate offenses proscribed by [the TVPRA] apply extraterritorially, either expressly or by way of other provisions delineating their extraterritorial application." *Howard*, 917 F.3d at 242.  Section 1585, for example, criminalizes the seizure "on any foreign shore" of "any person with intent to make that person a slave."  18 U.S.C. § 1585.  Likewise, Section 1586 prohibits "serv[ice] on board of any vessel" used "in the transportation of slaves from any foreign country or place to another." *Id.* § 1586.  And perhaps most relevant, Section 1596 provides that "the courts of the United States have extraterritorial jurisdiction" over offenses "under" various sections of the Act, including Section 1589 and 1590, so long as "an alleged offender is a national of the United States . . . or . . . is present in the United States, irrespective of the[ir] nationality."  *Id.* § 1596(a).  "'Congress's incorporation' of such 'extraterritorial predicates' into § 1595 'gives a clear, affirmative indication' that § 1595 provides a civil remedy for the foreign conduct that is prohibited by" the TVPRA, at least "to the extent that the particular predicate offense supporting a specific claim applies extraterritorially." *Howard*, 917 F.3d at 242 (quoting *RJR Nabisco*, 579 U.S. at 340).

The structure, history, and purpose of the TVPRA support that conclusion.  First, the statute contains other provisions authorizing funds and programs to support international efforts to address the global problem of human trafficking.  *See, e.g.*, 22 U.S.C. § 7104(c) (creating "border interdiction" programs to combat trafficking at "key border crossings"); *id.* § 7105 (authorizing foreign assistance programs to protect and aid trafficking victims abroad).  Second, Congress has repeatedly expanded the scope of the TVPRA to reach and proscribe additional types of foreign conduct.  In 2003, for example, Congress reauthorized and amended the TVPRA

to address the challenges that remained "in responding to the needs of victims of trafficking in the United States *and abroad*."  Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 2(2), 117 Stat. 2875, 2875 (emphasis added).  And "[t]he 2008 TVPRA further expanded the extraterritorial reach" of the statute by adding Section 1596.  *Howard*, 917 F.3d at 237.  These steps were intended to advance Congress's goal of addressing human trafficking "throughout the world."  Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 102(b)(1), 114 Stat. 1464, 1466.  It demonstrates that "Congress was clearly concerned with international rather than purely domestic matters," *Howard*, 917 F.3d at 242, helping to rebut the presumption of extraterritoriality with respect to Section 1595's private right of action.  The overwhelming majority of courts to consider the issue agree.  *See, e.g., Howard*, 917 F.3d at 239-40; *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 204 (5th Cir. 2017); *Abafita v. Aldukhan*, No. 16-CV-6072 (RMB) (SDA), 2019 WL 6735148, at *5 (S.D.N.Y. Apr. 4, 2019), *report and recommendation adopted*, 2019 WL 4409472 (S.D.N.Y. Sept. 16, 2019); *Plaintiff A. v. Schair*, No. 11-CV-00145 (WCO), 2014 WL 12495639, at *6 (N.D. Ga. Sept. 9, 2014); *F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158, 1179-80 (D. Col. 2025).

Defendants acknowledge that Section 1596 grants federal courts authority to adjudicate extraterritorial criminal violations of Sections 1589 and 1590, but they offer two reasons that it is nevertheless irrelevant to Section 1595's private right of action.  *See* Defs.' Mem. 41-42.  Neither reason is persuasive.  First, they argue that Section 1595's absence from the list of provisions laid out in Section 1596 demonstrates that Congress did not intend for it to have extraterritorial effect.  But adding Section 1595 to that list would have made little sense because Section 1596 refers to "offenses," and Section 1595 is not an "offense" in itself but rather a "free-standing provision that creates a civil remedy for an 'offense,' that is, 'any violation of this

chapter.'"  *United States ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 133

(D.D.C. 2024) (quoting 18 U.S.C. § 1595(a)).  Relatedly, Defendants argue that Section 1596

applies only in criminal cases because it uses words like "offense" and "prosecution[]."  Defs.'

Mem. 41.  But Section 1595 also uses words associated with criminal proceedings.  *See* 18

U.S.C. § 1595(c)(2) (providing for civil statute of limitations "if the victim was a minor at the

time of the alleged offense"); *id.* § 1595(a) (allowing a "civil action against the perpetrator").

And in any case, that argument ignores the key teaching of *RJR Nabisco*, which is that "a statute

may apply to foreign conduct insofar as it clearly and directly incorporates a predicate statutory

provision that applies extraterritoriality."  *Howard*, 917 F.3d at 242 (citing *RJR Nabisco*, 579

U.S. at 339-41).  Under that rule, the TVPRA's incorporation of predicate offenses with express

extraterritorial effect in its private right of action is sufficient to resolve the issue at the first step.

But that does not mean — as Plaintiffs appear to suggest, *see* Pls.' Opp'n 41 — that

Section 1595 applies extraterritorially without limitation.  Instead, it only "applies

extraterritorially to the extent that the particular predicate offense supporting a specific claim

applies extraterritorially."  *Howard*, 917 F.3d at 242; *accord Ratha v. Phatthana Seafood Co.*, 35

F.4th 1159, 1168 (9th Cir. 2022) (assuming without deciding that Section 1595 "permits a

private cause of action for extraterritorial violations of the substantive provisions listed in § 1596

so long as § 1596's other requirements are satisfied."); *Jacobs Sols.*, 790 F. Supp. 3d at 1185

(holding that "[S]ection 1596's own limits cabin the scope of the extraterritorial[] application of

[S]ection 1595").  And, as noted, Congress, through Section 1596, made extraterritorial

application of Sections 1589 and 1590 contingent on an "alleged offender" being "a national of

the United States" or otherwise "present in the United States, irrespective of the[ir] nationality."

18 U.S.C. § 1596(a)(1)-(2).  As applied to Section 1595, that limitation is susceptible to two

different interpretations.  The first equates the "offender" in Section 1596 with any civil

defendant sued under Section 1595 so that Section 1595 has extraterritorial application whenever

such a defendant is either a United States citizen or present in the United States.  The second

equates the "offender" in Section 1596 with the "perpetrator" in Section 1595 (*i.e.*, the one who

commits the predicate TVPRA violation that gives rise to a civil cause of action).  Under this

interpretation, a plaintiff would have to "allege that the persons or entities in the venture that

committed direct violations of [S]ections 1589 or 1590 fit in one of the . . . categories tying them

to the United States" to avail themselves of Section 1595's extraterritorial reach.  *Jacobs Sols.*,

780 F. Supp. 3d at 1184.

In the Court's view, the latter interpretation is the better reading of the statute,

substantially for the reasons proffered by the court in *Jacobs Solutions*.  Most significantly,

Section 1593A makes it a crime to engage in the same conduct that Section 1595 subjects to civil

liability — "knowingly benefit[ting] . . . from participation in a venture which has engaged in

any act in violation of this chapter," 18 U.S.C. § 1593A — but Congress did not include that

provision in the list of criminal offenses for which "the courts of the United States have extra-

territorial jurisdiction."  *Id.* § 1596(a).  As the *Jacobs Solutions* court observed, adopting the first

interpretation would therefore lead to an odd result: A private plaintiff could sue a defendant for

participation in a venture based on extraterritorial conduct so long as the defendant had the

requisite connection to the United States, while a federal prosecutor could not indict that

defendant for the *exact same* conduct.  *See* 780 F. Supp. at 1184.  That anomaly would create a

risk of "international friction" by subjecting foreign defendants to enforcement "without the

check imposed by prosecutorial discretion."  *RJR Nabisco*, 579 U.S. at 346-47.  And where there

is such risk, "the need to enforce the presumption [against extraterritoriality] is at its apex."  *Id.*

at 348.  By contrast, the latter interpretation — which requires that the "persons or entities in the venture that committed direct violations . . . fit in one of the . . . categories tying them to the United States," *Jacobs Sols.*, 780 F. Supp. 3d at 1184 — avoids these problems.

In the first instance, then, extraterritorial application of Section 1595 turns on whether Defendants are "national[s] of the United States" or otherwise "present in the United States, irrespective of the[ir] nationality."  18 U.S.C. § 1596(a)(1)-(2).  The TVPRA does not define, and the Second Circuit has not interpreted, what it means for an alleged offender to be "present in the United States," so the Court assumes that the "ordinary meaning of that language accurately expresses the legislative purpose."  *Hardt v. Reliance Standard Life Ins.*, 560 U.S. 242, 251 (2010).  The ordinary meaning of the adjective "present" is "in a particular place," NEW OXFORD AMERICAN DICTIONARY 1381 (3d ed. 2010), which suggests more than the "minimum contacts" that can support personal jurisdiction; instead, an actual "physical presence" in the United States is required, *Ratha*, 35 F.4th at 1170.[5]  That dooms Plaintiffs' Section 1595 claims against Memac.  First and most obvious, it is "incorporated and headquartered in Dubai, United Arab Emirates," Compl. ¶ 17, so it is plainly not a "national of the United States."  And second, Plaintiffs do not allege that Memac had an "address, employees, or physical presence" in the United States during the period at issue in the case.  *Ratha*, 35 F.4th at 1169.[6]

---

[5]    Admittedly, the *Ratha* court assumed without deciding that the plaintiffs in that case were correct in arguing that presence "requires foreign companies to possess nothing more than minimum contacts with the United States."  35 F.4th at 1170.  But the court expressed deep skepticism of that assumption and noted that the case upon which the plaintiffs relied to support their argument supported a physical presence requirement instead.  *See id.*

[6]    Plaintiffs allege that several Memac employees were "dual hatted" with Ogilvy, *see* Compl. ¶¶ 132-36, but they do not allege that any of those employees lived or worked in the United States.

The remaining Defendants — Portland, OPRW, and Ogilvy — are all headquartered and incorporated in the United States, *see* Compl. ¶¶ 16, 24, 25, and are therefore "national[s] of the United States."  18 U.S.C. § 1596(a)(1).  The question remains, however, whether they could be considered to have "committed direct violations of sections 1589 or 1590."  *Jacobs Sols.*, 780 F. Supp. 3d at 1184.  With respect to Plaintiffs' allegations regarding Section 1589, the answer to that question is yes.  As noted, Section 1589(b) punishes any individual who "knowingly benefits . . . from participation in a venture which has engaged in the providing or obtaining of labor or services" by any of the means forbidden in subsection (a), so long as they did so in "knowing or in reckless disregard of the fact that the venture has engaged" in such activities.  18 U.S.C. § 1589(b).  That language is, in all relevant aspects, parallel to the language of Section 1595 and, therefore, provides a basis for prosecuting Portland, OPRW, and Ogilvy under the criminal predicate.[7]  In other words, the statute gives a clear, affirmative indication that Section 1595 applies extraterritorially to predicate violations of Section 1589 committed by U.S. entities — like these Defendants — via Section 1596's express grant of extraterritoriality.  But the same cannot be said for Plaintiffs' allegations regarding Section 1590.  Unlike Section 1589, Section 1590 lacks language criminalizing participation in a venture that engages in human trafficking.  And Plaintiffs do not argue that any nationals of the United States or persons present in the United States directly engaged in conduct constituting human trafficking.  *See* Compl. ¶ 301 (alleging that "Plaintiffs' direct employers," which were Qatari companies, "lied to Plaintiffs about the conditions [they] would live in and the terms of [their] working conditions and

---

[7]    To be clear, it is immaterial that Plaintiffs allege that the Employers, not Defendants, were the ones who actually violated Section 1589.  Construing the scope of extraterritoriality at the first step of the *RJR Nabisco* framework is a matter of "statutory construction."  *RJR Nabisco*, 579 U.S. at 335.  Thus, all that matters is whether the Complaint plausibly alleges that Defendants *could* have committed the direct violation of the predicate offense, as it does.

compensation"). Accordingly, they cannot invoke Section 1596's extraterritorial scope to support their Section 1595 claims based on Section 1590 violations.

The Court turns, then, to step two of the *RJR Nabisco* framework with respect to Plaintiffs' claims against Memac and claims based on Section 1590. As discussed, step two asks "whether the case involves a domestic application of the statute." *In re Fairfield*, 147 F.4th at 155 (internal quotation marks omitted). A court answers that question "by looking to the statute's 'focus.'" *Id.* (internal quotation marks omitted). In the context of the TVPRA, courts have almost uniformly held "that the focus of the TVPRA's private right of action is ultimately on the underlying criminal violations and not on any benefits that accrue from them." *Mia v. Kimberly-Clark Corp.*, No. 22-CV-2353 (CJN), 2025 WL 752564, at *8 (D.D.C. Mar. 10, 2025); *see also Plaintiff A v. Schair*, No. 11-CV-145 (WCO), 2014 WL 12495639, at *5 (N.D. Ga. Sept. 9, 2014); *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. 10-CV-1172 (JAK), 2012 WL 5378742, at *6 (C.D. Cal. Aug. 27, 2012). That is because Section 1595 provides a civil remedy only to a "victim of a violation," 18 U.S.C. § 1595(a), and does not "create a new violation merely for benefitting from other violations," *Mia*, 2025 WL 752564, at *8 (internal quotation marks omitted). That principle is sufficient to resolve the second step of the inquiry because the alleged criminal trafficking and forced labor alleged here occurred entirely in Qatar. Accordingly, Plaintiffs seek an impermissibly extraterritorial application notwithstanding the fact that some Defendants allegedly benefited from TVPRA violations in the United States.[8]

Plaintiffs dispute that conclusion, relying primarily on the D.C. Circuit's decision in *Rodriguez v. Pan American Health Organization*, 29 F.4th 706 (D.C. Cir. 2022). *See* Pls.'

---

[8]     Even if that were not the case, Memac, as an Emirati entity, is not alleged to have benefited in the United States from its participation in the venture.

Opp'n 41-42.  In that case, the court held, in the context of deciding an immunity issue, that the "gravamen" — *i.e.*, "focus" — of Cuban doctors' TVPRA claims against an international organization was in the financial benefits that accrued to that organization in the United States, rather than the trafficking and forced labor the doctors suffered in Brazil.  *See* 29 F.4th at 715-16.  But that case is inapposite because the plaintiffs there alleged that the international organization directly violated Section 1589(b) by "knowingly benefit[ting] . . . from participation in a venture" that engaged in forced labor.  *See id.* at 710.  That meant that the "alleged financial activity *itself* g[ave] rise to a cause of action" and was "*itself* wrong . . . as opposed to wrongful based only on other conduct."  *Id.* at 716 (emphases added).  Plaintiffs here do not press that kind of theory of wrongdoing under Section 1589(b), which means that Defendants' allegedly unlawful activity is unlawful only by virtue of the TVPRA violations committed by the Employers.  Accordingly, the "focus" of the statute is the wrongdoing committed in Qatar, so this case does not involve a domestic application of the statute.

In sum, the Court concludes that all claims against Memac and the Section 1595 claims that rely on predicate violations of Section 1590 against all Defendants involve impermissible extraterritorial applications of the TVPRA.  Thus, they must be and are DISMISSED.

### f.  The Act-of-State Doctrine

The Court can swiftly dispose of Defendants' argument that the Complaint runs afoul of the "act-of-state" doctrine.  That doctrine "bars federal and state courts from 'declar[ing] invalid, and thus ineffective as a rule of decision for the courts of this country, the official act of a foreign sovereign.'"  *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 137 (2d Cir. 2022) (quoting *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990)).  But "when the validity of a foreign state's action is not the question being litigated, and the inquiry is simply

whether the conduct in question occurred, the act of state doctrine is not implicated." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 59 (2d Cir. 2019) (rejecting the application of the doctrine to bar claims that the defendant aided and abetted genocide). That is so even if the case "may embarrass foreign governments." *Kirkpatrick*, 493 U.S. at 409.

These principles foreclose application of the doctrine here. Nothing in this case requires the Court to opine on the legality of Qatar's official acts, including its establishment of the *kafala* system or subsequent reforms. Plaintiffs allege that it was the Employers, not Qatar, who violated the TVPRA by confiscating their passports and making false promises regarding compensation and living conditions to induce them to come to Qatar. And Defendants do not argue that that conduct was permitted under the Qatari laws establishing the *kafala* system, let alone that it was an official act of the Qatari government. *See* Defs.' Mem. 45 (noting only that the *kafala* system tied migrant workers' visas to their employers). Accordingly, all the Court must do here is determine "whether the conduct in question occurred." *Kashef*, 925 F.3d at 59. It therefore concludes that the act-of-state doctrine has no applicability to this case.

### g. The First Amendment

Finally, Defendants contend that the First Amendment shields them from civil liability under Section 1595 because they are alleged to have engaged in political speech and lobbying. *See* Defs.' Mem. 46-50. It is true, as a general matter, that the Free Speech Clause "can serve as a defense in . . . tort suits." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). But "laws not fairly characterized as regulating expression but instead regulating conduct do not trigger First Amendment scrutiny." *Volokh v. James*, 148 F.4th 71, 88 (2d Cir. 2025). And even when speech is at issue, "not all categories of speech are protected by the First Amendment." *United States v. Schulte*, 436 F. Supp. 3d 747, 751 (S.D.N.Y. 2020). Courts have long recognized, for

example, that "speech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Gagliardi*, 506 F.3d 140, 148 (2d Cir. 2007) (cleaned up). Indeed, "speech integral to criminal conduct" is one of the "historic and traditional categories" of unprotected speech. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (cleaned up); *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). Accordingly, courts have held that "aiding and abetting" criminal activity, even when done solely through speech, is unprotected by the First Amendment. *United States v. Sattar*, 395 F. Supp. 2d 79, 102 (S.D.N.Y. 2005); *see also United States v. Bell*, 414 F.3d 474, 482 n.8 (3d Cir. 2005). And that category extends to "both criminal and non-criminal contexts as long as the offense in question is defined by a valid statutory scheme promoting an important public interest." *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 223 (S.D.N.Y. 2000).

In light of these principles, the Court has little difficulty concluding that the First Amendment does not shield Defendants' activity. To begin with, much of the unlawful behavior alleged by Plaintiffs concerns Defendants' conduct, not speech. Plaintiffs allege that Defendants participated in the World Cup Labor Venture by, among other things: organizing and managing a propaganda tour for journalists, Compl. ¶ 74; bringing negative publicity to their clients' attention, *id.* ¶ 111; and helping their clients draft responses to media inquiries, *id.* ¶ 76. But even assuming *arguendo* that Defendants engaged in speech or expressive conduct, it is nevertheless unprotected because it was the "very vehicle," *Gagliardi,* 506 F.3d at 148, by which Defendants "knowing[ly] benefitted . . . from participation in a venture," 18 U.S.C. § 1595(a), that they knew or should have known engaged in TVPRA violations. And Defendants do not dispute — nor could they — that the TVPRA constitutes a valid statutory scheme that promotes an incredibly important public interest "in responding to the needs of victims of trafficking in the

United States and abroad."  Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 2(2), 117 Stat. 2875, 2875.  Accordingly, the First Amendment does not shield Defendants from liability under the TVPRA.

In response, Defendants argue that their speech, on its own, did not violate any criminal provision and therefore is not subject to the exception.  *See* Defs.' Reply 15.  But that argument fails on two levels.  First, it is incorrect on its own terms.  As already noted, Defendants' conduct violates Section 1589(b) of the TVPRA, which criminalizes "knowingly benefit[ting] . . . from participation in a venture which has engaged in the providing or obtaining" of forced labor with "knowing or in reckless disregard of the fact that the venture has engaged" in such activities.  18 U.S.C. § 1589(b); *see also* 18 U.S.C. § 1593A (criminalizing similar conduct).  And second, Defendants provide — and the Court has found — no authority limiting the exception in the way Defendants suggest.  Indeed, doing so would generate the anomalous result of immunizing Defendants from civil liability while still allowing them to be subject to the harsher medicine of criminal liability for the exact same conduct.  In rejecting this view, the Court follows the many courts that have held that defendants who commit the common law analogue to the TVPRA's civil cause of action — aiding and abetting, *see supra* Section A — are not shielded by the First Amendment from prosecution simply because their assistance took the form of speech.  *See Sattar*, 395 F. Supp. 2d at 102; *Bell*, 414 F.3d at 482 n.8; *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 36-39 (2010) (upholding a statute that criminalizes certain speech as material support to terrorists against a First Amendment challenge).

Thus, Defendants' First Amendment defense to liability must be and is rejected.[9]

---

[9]    Defendants argue in passing that holding them liable would mean that "no one can ever speak in defense of Qatar without being legally complicit in a TVPRA violation."  Defs.' Mem. 50.  That strawman is hardly worth addressing, but to make the point clear: The TVPRA only

### 2. Section 1593 TVPRA Claims

Next, Defendants challenge Count II of the Complaint, in which Plaintiffs seek restitution under Section 1593 of the TVPRA, which provides that "in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any offense under this chapter." 18 U.S.C. § 1593(a). Defendants argue that this provision "applies only in criminal proceedings" and is therefore unavailable to Plaintiffs because it orders restitution for any "offense" and provides that it shall be paid to "victim[s]" who are defined as "the individual harmed as a result of a crime under this chapter." Defs.' Mem. 54. But Plaintiffs here are plainly "victim[s]" who were harmed as a result of criminal TVPRA violations. And the mere fact that the statute uses the word "offense" is far too slender a reed to render it an exclusively criminal remedy. *Cf. Ellingburg v. United States*, 607 U.S. —, No. 24-482, 2026 WL 135982, at *2-3 (U.S. Jan. 20, 2026) (holding that a restitution provision in a different statute is "plainly criminal punishment" based on a litany of statutory features not present here). This Court therefore joins every other court that has considered the issue in concluding that restitution is available in civil actions under the TVPRA. *See, e.g.*, *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 201 (D. Md. 2019); *Lipenga*, 219 F. Supp. 3d at 530; *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457 (E.D. Va. 2015); *Jacobs Sols.*, 790 F. Supp. 3d at 1194.

### 3. State-Law Claims

Finally, the Court turns to Count III, which raises New York state law claims. New York's labor trafficking statute makes it a crime to "compel[] or induce[] another to engage in labor or recruit[], . . . such other person by means of intentionally . . . withholding, destroying, or

---

holds liable one who knowingly receives financial benefits for participating in ventures that commit human trafficking and forced labor with the knowledge that violations are ongoing. It does not cover everyone who speaks favorably about Qatar.

confiscating any actual or purported passport, . . . [or] using force or engaging in any scheme, plan or pattern to compel or induce such person to engage in or continue to engage in labor activity."  N.Y. PENAL LAW § 135.35.  And a victim of that provision "may bring a civil action against . . . whoever knowingly advances or profits from, or whoever should have known he . . . was advancing or profiting from, an act in violation of" the provision.  N.Y. SOC. SERV. LAW § 483-bb(c)(i).  The language of these statutes largely mirrors that of the TVPRA.  Nevertheless, Plaintiffs' claim fails because neither the Penal Law provision prohibiting labor trafficking nor the private right of action on which Plaintiffs' suit is premised apply extraterritorially.

As a general rule, "[t]he laws of one state can have no force and effect in the territorial limits of another jurisdiction, in the absence of the consent of the latter."  N.Y. STAT. LAW § 149.  Accordingly, New York courts apply a "settled rule of statutory interpretation, that unless expressly stated otherwise, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state enacting it."  *Goshen v. Mut. Life Ins. Co. of N.Y.*, 730 N.Y.S.2d 46, 47 (N.Y. App. Div. 1st Dep't 2001) (cleaned up), *aff'd*, 774 N.E.2d 1190 (2002).  Neither the Penal Law provision prohibiting labor trafficking nor the private right of action on which Plaintiffs' suit is premised provides any express statement of extraterritoriality.  And, unlike the relevant provisions of the TVPRA, they do not piggyback on predicate offenses that refer to extraterritorial conduct or contain express grants of extraterritorial application.  *See, e.g.*, *Smith v. AECOM Tishman*, No. 21-CV-2915 (PGG) (SDA), 2023 WL 2734430, at *5 (S.D.N.Y. Mar. 30, 2023) ("[T]here is no evidence in the Penal Law provisions cited by [Plaintiff] that they were intended to apply outside of New York.").  Plaintiffs respond that they seek only "domestic application" of the New York laws.  *See* Pls.' Opp'n 42-43.  But that argument fails for the same reason their identical argument under the TVPRA failed: "[T]he focus of . . . [a] private right of

action is ultimately on the underlying criminal violations and not on any benefits that accrue

from them." *Mia v. Kimberly-Clark Corp.*, No. 22-CV-2353 (CJN), 2025 WL 752564, at *8

(D.D.C. Mar. 10, 2025).  Accordingly, Count III must be and is DISMISSED.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss for lack of subject-matter

jurisdiction and lack of personal jurisdiction are DENIED.  Defendants' motion to dismiss

pursuant for failure to state a claim is GRANTED with respect to Counts I and II against

Omnicom and Memac, and against all Defendants to the extent Plaintiffs raise a claim that relies

upon predicate violations of 18 U.S.C. § 1590.  The motion is also GRANTED with respect to

Count III against all Defendants.  The motion is otherwise DENIED.

Unless and until the Court orders otherwise, the remaining Defendants shall answer the

remaining claims within **three weeks of the date of this Opinion and Order**.  *See* FED. R. CIV.

P. 12(a)(4)(A).  Additionally, all parties shall appear for an initial pretrial conference with the

Court on **March 31, 2026**, at **4:00 p.m**.  The conference will be held remotely by telephone in

accordance with Rule 2(B) of the Court's Individual Rules and Practices in Civil Cases, available

at https://nysd.uscourts.gov/hon-jesse-m-furman.  The parties should join the conference by

calling the Court's dedicated conference line at (855) 244-8681 and using access code 2303 019

3884, followed by the pound (#) key.  When prompted for an attendee ID number, press the

pound (#) key again.  Counsel should review and comply with the rules regarding

teleconferences in the Court's Individual Rules and Practices in Civil Cases, including Rule

2(B)(i), which requires the parties, **no later than 24 hours before the conference**, to send a

joint email to the Court with a list of counsel who may speak during the teleconference and the

telephone numbers from which counsel expect to join the call.

The Clerk of Court is directed to terminate as Defendants Omnicom Group, Inc. and

Memac Ogilvy & Mather LLC and to terminate ECF No. 54.

SO ORDERED.

Dated: February 24, 2026
       New York, New York

_____
JESSE M. FURMAN
United States District Judge